## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- x

In re:                                                             :     Chapter 11
                                                                   :
EMERGE ENERGY SERVICES LP, *et al.*,[1]                            :     Case No. 19-_____ (_____)
                                                                   :
                              Debtors.                             :     (Joint Administration Requested)
                                                                   :

--------------------------------------------------------- x

## DECLARATION OF BRYAN M. GASTON,
## RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Under 28 U.S.C. § 1764, Bryan M. Gaston declares as follows under the penalty of perjury:

1. I am the Restructuring Officer ("**RO**") of each of the debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**" or "**Emerge Energy**"). I served as Chief Restructuring Officer ("**CRO**") from January 23, 2019 through June 28, 2019. I have served as RO from that date forward. I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**").

2. As RO, I share responsibility for overseeing the operations and financial activities of the Debtors, including but not limited to, monitoring cash flow, business relationships, and financial planning. As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors'

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Emerge Energy Services LP (2937), Emerge Energy Services GP LLC (4683), Emerge Energy Services Operating LLC (2511), Superior Silica Sands LLC (9889), and Emerge Energy Services Finance Corporation (9875). The Debtors' address is 5600 Clearfork Main Street, Suite 400, Fort Worth, Texas 76109.

management team, I am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' management or retained advisers in the ordinary course of my responsibilities.  I am authorized by each of the Debtors to submit this First Day Declaration.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.  If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On July 15, 2019 (the "**Petition Date**"), Emerge Energy Services LP (the "**Partnership**"), its general partner Emerge Energy Services GP LLC (the "**General Partner**"), and the wholly owned direct and indirect subsidiaries of the Partnership (the "**Partnership Subsidiaries**") each filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**").   The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

4.      I submit this First Day Declaration on behalf of the Debtors in support of their (i) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and (ii) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2]  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses.  I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

5.    Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Pleadings.

## PART I

## I.    COMPANY AND BUSINESS OVERVIEW

6.    The Partnership is a publicly-traded Delaware limited partnership that is engaged in the business of mining, processing, and distributing silica sand proppant, a key component in the hydraulic fracturing ("fracking") of oil and gas wells.  Proppant is sand or similar particulate material suspended in water or other fluid injected into wells at high pressure to keep fissures open to stimulate the extraction of hydrocarbons.  The Partnership is the direct or indirect parent company of each of the Partnership Subsidiaries.  The General Partner is the sole general partner in the Partnership, and the ownership units in the General Partner are held by a non-debtor entity.  Emerge Energy conducts its operations primarily through its subsidiary Superior Silica Sands LLC, a Debtor in the Chapter 11 Cases.  A copy of a simplified organizational chart is attached hereto as Exhibit A.

7.    The Debtors conduct their mining and processing operations from facilities located in Wisconsin and Texas.  In addition to mining and processing silica sand primarily for use in the oil and gas industry, the Debtors also, to a lesser degree, sell their sand for use in building products and foundry operations.

3

A.      **Company History and Ownership Structure**

8.      Emerge Energy was formed in 2012 by management and affiliates of Insight Equity Management Company LLC and its affiliated investment funds (collectively, "**Insight Equity**").  On May 14, 2013, Emerge Energy completed its initial public offering to become a publicly listed limited partnership.  On May 17, 2019, Emerge Energy received an expected notice from the New York Stock Exchange ("**NYSE**") indicating non-compliance with the NYSE's continued listing requirements that required maintaining an average closing security price of at least $1.00 over a period of 30 consecutive trading days. On May 31, 2019, Emerge Energy received further notice from the NYSE that it had determined to commence proceedings to delist Emerge Energy's common units due to a failure to maintain a market capitalization of at least $15 million over 30 consecutive trading days.  From May 14, 2013 until May 31, 2019, the Partnership's common units had been listed on the NYSE under the symbol "EMES".  Currently, the Partnership's common units are quoted on the OTC exchange under the symbol "EMESZ."  The Partnership remains registered with the Securities and Exchange Commission ("**SEC**") and, accordingly, files various reports with the SEC including annual and quarterly financial reports.

9.      As of the date hereof, there were approximately 31,139,306 common units issued and outstanding, with approximately 25,333 record holders of common units.  This number does not include unitholders whose units are held in trust by other entities.  Accordingly, the actual number of unitholders is greater than the number of holders of record.

10.     Insight Equity and certain current and former members of senior management own or otherwise control approximately 27% of such common units in the aggregate, with the remainder held by the public at large and widely disbursed.  Unlike the holders of common stock in a corporation, the common unitholders have only limited voting

4

rights with respect to Emerge Energy.  Instead, as discussed more fully below, the power and authority related to the management and control of the Partnership and its subsidiaries is vested solely in the General Partner (which is wholly owned by Insight Equity as shown on <u>Exhibit A</u> attached hereto).  The General Partner, in turn, delegated such power and authority pursuant to its organizational documents to the Board of Directors of the General Partner (the "**Board**"). The Board, in turn, through a voting and standstill agreement and voting proxy delegated certain powers to a special restructuring committee of the Board (the "**Special Restructuring Committee**") created pursuant to the RSA (as defined in paragraph 33 below).

### B.   Overview of Operations

11.   <u>General Background</u>.  As noted above, the Debtors mine, process, and distribute silica sand.  The Debtors' production of sand consists of three basic processes: mining, wet plant operations,[3] and dry plant operations.[4]  Most mining activities of the Debtors take place in an open pit environment whereby the Debtors remove the topsoil, which is set aside, and then remove other non-economic minerals, or "overburden," to expose the sand deposits; this process is called surface mining.  At certain sites, the Debtors then "bump" the sand using explosives on the mine face, which causes the sand to fall into the pit.  Immediately after being mined, sand is then transported to the wet plants.

12.   The Debtors also utilize a process called hydraulic mining whereby they use high pressure water cannons to dislodge the sandstone, and transport the sand and water

---

[3]   "<u>Wet plant</u>" means an industrial site where sand is fed through a stone breaking machine, crusher system and then slurried into the plant.  The sand is then scrubbed and hydrosized by log washers or rotary scrubbers to remove the deleterious materials from the ore, and then separated using a vibrating screen and waterway system to generate separate sand products.

[4]   "<u>Dry plant</u>" means an industrial site where sand is fed through a dryer and screening system to be dried and screened in varying size gradations.  The finished product that emerges from the dry plant is then stored in silos or stockpiles before being transported to customers or is immediately loaded onto a conveyance for transportation.

RLF1 21623878v.1

mixture via pipeline to the wet plant. Where the geology is suitable, this technique minimizes the use of heavy excavation machinery, thereby lowering operating costs.  In certain locations, the Debtors use dredging mining techniques, whereby sand deposits are extracted from the ground with water.  The resulting slurry is then transported via pipeline to the wet plant.  Once the Debtors have mined out a portion of the economic reserves, they then either return the land to its previous contours or to a more usable contour.

13.    At the Debtors' wet plants, the mined sand goes through a series of processes designed to separate the sand from unusable materials.  The resulting wet sand is then conveyed to a wet sand stockpile to decant (*i.e.* drain water) into an on-site recycling facility, while the remaining fine grains and other materials, if any, are separated through a series of settlement ponds.  Wet sand from the Debtors' stockpile is then conveyed by feed system or trucked to their dry plants where the sand is dried, screened into specific mesh categories, and stored in silos.  From the silos, the Debtors load sand directly into railcars or trucks, which they then ship to transload facilities or directly to customers.  Due to weather conditions in Wisconsin, the Debtors have historically operated their wet plants in that region on a seasonal basis.  These plants are operated during spring and summer months to build inventory and shut down during fall and winter months.  The following table provides information regarding the Debtors' frac sand production facilities as of the date hereof:

6

| Plant | Lease Expiration | State | Capacity [a] | Notes |
|---|---|---|---|---|
| **Wet** | | | | |
| 1 Auburn | March 2036 | Wisconsin | 2,000 | Idle |
| 2 Thompson Hills | December 2037 | Wisconsin | 1,600 | Operating |
| 3 FLS | July 2037 | Wisconsin | 1,400 | Operating |
| 4 Church Road | N/A-Owned | Wisconsin | 1,200 | Idle |
| 5 LP | March 2038 | Wisconsin | 1,200 | Idle |
| 6 San Antonio | N/A-Owned | Texas | 5,000 | Operating, wet/dry on same site |
| 7 Kosse | N/A-Owned | Texas | 1,600 | Operating, wet/dry on same site |
| Total | | | 14,000 | |
| **Dry** | | | | |
| 1 New Auburn | N/A-Owned | Wisconsin | 2,500 | Idle, Transload Only |
| 2 Barron | December 2037 | Wisconsin | 2,400 | Operating |
| 3 Arland | N/A-Owned | Wisconsin | 2,500 | Idle |
| 4 San Antonio | N/A-Owned | Texas | 4,000 | Operating, wet/dry on same site |
| 5 Kosse | N/A-Owned | Texas | 600 | Operating, wet/dry on same site |
| Total | | | 12,000 | |

[a] Estimated annual capacity in 000's of tons

14.    <u>Transportation Logistics and Infrastructure</u>.  The Debtors sell their sand both free-on-board ("**FOB**") at their plants, as well as at transload facilities that are closer to the wellhead.  At the Debtors' Texas plants (generally known as "in-basin sand"), orders are picked up by truck because most orders are transported 200 miles or less from plant sites.  With respect to the Debtors' Wisconsin plants, however, nearly all product is transported in excess of 200 miles with transportation costs typically representing more than 50% of customers' overall cost for delivered sand.  Accordingly, Wisconsin sand (generally known as northern white sand or "**NWS**") is primarily transported by rail to a transload and storage location in close proximity to the customer's intended end use destination, which is then picked up by truck.

7

15.     The Debtors offer their customers a total supply chain solution pursuant to which they manage every aspect of the supply chain from mining and manufacturing to delivery within close proximity to the wellhead.  To that end, the Debtors have, over time, built a significant fleet of company-leased and customer-committed railcars, assembled a network of leased transload and terminal storage sites located near major shale plays, and designed a supply chain management system.

16.     In 2017 the entire proppant industry began a shift away from NWS to in-basin sand (i.e. sand directly mined, processed and delivered in the basin where customer consumption occurs).  Although the Debtors adjusted to the market by pursuing in-basin facilities in Texas and Oklahoma, the Debtors maintained a substantial portion of their operations in Wisconsin.  The reduction in demand for NWS in turn led to a material over-supply of leased railcars and transload facilities under long term contract all tied to the Debtors' NWS business.  There is currently insufficient volume for the Debtors to operate their NWS business profitably absent a restructuring of these burdensome contracts.  Therefore, the Debtors require significant, immediate relief from the financial burden created by these circumstances.  Specifically, as of the date hereof, the Debtors leased a total of approximately 4,910 railcars, a majority of which have lease terms expiring during 2020-2022, but some of which have lease terms expiring as late as 2028.  The following table summarizes the Debtors' railcar fleet status as of July 9, 2019:

8

| Expiration | Storage | Plant | Terminal | Moving | Other | Total |
|---|---|---|---|---|---|---|
| Expired | 72 | 23 | 28 | 15 | 23 | 161 |
| 2019 | 57 | 28 | 20 | 7 | 13 | 125 |
| 2020 | 226 | 84 | 51 | 25 | 58 | 444 |
| 2021 | 236 | 175 | 153 | 88 | 98 | 750 |
| 2022 | 589 | 127 | 116 | 57 | 104 | 993 |
| 2023 | 1,015 | 87 | 92 | 34 | 149 | 1,377 |
| 2024 | 311 | 97 | 68 | 32 | 67 | 575 |
| 2025 | 109 | 67 | 68 | 38 | 50 | 332 |
| 2028 | 114 | 11 | 17 | 11 | 0 | 153 |
| Total | 2,729 | 699 | 613 | 307 | 562 | 4,910[5] |

17.    In addition to the delivered rail cars under leases described above, the Debtors have contractual obligations with one particular lessor to lease an additional 3,047 rail cars yet to be delivered.  During the 2016 market decline the Debtors negotiated temporary relief from the obligation with the lessor to accept these cars.  The relief resulted in creation of an unsecured promissory note from the Debtors to the lessor, the current balance of which is $6,547,889 as of the Petition Date.  After the 2016 amendment, the first 47 cars were scheduled to be delivered in July 2018, with the remainder scheduled for delivery almost evenly during 2019-2021.  To date, in spite of the deferral, the Debtors still do not need and have not accepted delivery of these cars.  Now in addition to (i) being contractually bound by above-market rates for accepted railcars that the Debtors do not need and (ii) facing contractual obligations for a significant number of excess railcars the Debtors also do not need, the Debtors are further

---

[5]    This number excludes 75 railcars that the Debtors have sub-leased to third parties and another 25 railcars that have been repossessed on terminated leases.

RLF1 21623878v.1

incurring significant monthly costs due to underutilization of these excess railcars previously delivered but not in use. In the aggregate, the obligations for extraneous delivered rail car leases including storage costs exceeds $3,000,000 per month (this is in addition to the promissory note described in paragraph 17, herein).

18.     After months of engaging with all material railcar lessors in attempted negotiations, the Debtors were successful in re-negotiating amended leases with three lessors including resolution of the promissory note and undelivered railcar obligations. Leases with all other lessors are being rejected as part of first day pleadings in the Chapter 11 Cases.

19.     Customers. The Debtors sell substantially all (greater than 94% of total revenue in 2018) of their sand to customers in the oil and gas proppants market. These customers include major oilfield services companies as well as exploration and production companies that are engaged in hydraulic fracturing. For the year ended December 31, 2018, the Debtors' top two customers collectively accounted for 38% of total revenue. Non-frac sand sales accounted for 6% of total revenue in 2018, and consists of customers in the sports sands, construction, and foundry industries. In 2018, total revenue from customers under long-term contracts (including take-or-pay, fixed-volume, and efforts-based contracts) accounted for 60% of total revenue.

20.     Competition. The frac sand market is a highly competitive market that is comprised of (i) a small number of large, national producers, which are referred to as "Tier 1" producers, and (ii) a larger number of small, regional, or local producers. Competition in the frac sand industry has increased recently, and the Debtors expect competition to increase in the future as significant new entrants began operations in 2018 with local, in-basin sand mines. Suppliers compete based on price, consistency, quality of product, site location, distribution capability,

customer service, reliability of supply, breadth of product offering and technical support.  Based on management's internal estimates, the Debtors believe they are one of the top producers of frac sand in 2018 by production capacity and sales volumes.

21.    <u>Employees</u>.    The Partnership and its subsidiaries have no employees. Rather, all of the Debtors' management, administrative and operating functions are performed by employees of the General Partner, who are reimbursed by the Partnership pursuant to its limited partnership agreement.  The following is a graph of employee headcount by month for the period January 1, 2018 through July 10, 2019.



22.    Due to a continued depression in the NWS market, the Debtors had already been operating their New Auburn, Wisconsin, dry plant on limited shifts reduced from historical levels.  On May 15, 2019, the Debtors took the further step of announcing the closure of their New Auburn dry plant facility effective May 31, 2019.  Although all 22 impacted employees were offered positions within the company (most seasonal positions in the nearby Thompson Hills wet plant) several elected not to accept this offer.  Additionally, on June 6,

11

2019, as part of a reduction in force associated with the restructuring, the Debtors terminated an additional 9 employees across multiple plants and at their corporate offices.  As of the date hereof, after accounting for these reductions, the General Partner employed approximately 236 employees.  None of these employees is subject to a collective bargaining agreement.

  **E.**  **Summary of Prepetition Debt**

  23. <u>Revolving Loan Agreement (First Lien)</u>.  The Debtors (other than the General Partner and Emerge Energy Services Finance Corporation) are parties to that certain Second Amended and Restated Revolving Credit and Security Agreement, dated as of January 5, 2018 (as the same may be amended, modified or supplemented, the "**<u>Revolving Loan Agreement</u>**"), with HPS Investment Partners, LLC ("**<u>HPS</u>**"), as administrative and collateral agent (in such capacity, together with any successor agent, the "**<u>Revolving Loan Agent</u>**"), and the lenders party thereto from time to time (the "**<u>Revolving Loan Lenders</u>**").[6]  As of the date hereof, the Revolving Loan Agreement had an aggregate outstanding principal amount of approximately $66,710,000, comprised of $3,518,010 in the form of letters of credit and approximately $63,191,990 in an aggregate outstanding principal amount in the form of outstanding loans, plus accrued but unpaid interest, fees, costs, and expenses.  These obligations are secured by senior, first priority security interests in, and liens upon, substantially all of the Debtors' assets.

  24. <u>Notes Purchase Agreement (Second Lien)</u>.  The Debtors (other than the General Partner and Emerge Energy Services Finance Corporation) are parties to that certain

---

[6]  The original agent and lender under the Revolving Loan Agreement was PNC Bank.  On or about March 15, 2019, HPS and certain other Noteholders (as defined below) purchased 100% of the obligations outstanding under the Revolving Loan Agreement pursuant to and in accordance with the Intercreditor Agreement (as defined below).  Because of this buyout, the Revolving Loan Lenders and Noteholders are affiliates or controlled fund of each other.

Notes Purchase Agreement, dated as of January 5, 2018 (as the same may be amended, modified or supplemented, the "**Notes Purchase Agreement**"), with HPS, as administrative and collateral agent (in such capacity, together with any successor agent, the "**Notes Purchase Agent**"), and the noteholders party thereto from time to time (the "**Noteholders**").  As of the date hereof, the Notes Purchase Agreement had an aggregate outstanding principal amount of approximately $215,755,307, plus accrued but unpaid interest, fees, costs, and expenses.  These obligations are secured by second priority security interests in, and liens upon, substantially all of the Debtors' assets, which liens are junior in priority to the security interests and liens arising in connection with the Revolving Loan Agreement pursuant to that certain Intercreditor Agreement dated as of January 5, 2018 (as the same may be amended, modified or supplemented, the "**Intercreditor Agreement**") between the Revolving Loan Agent and Notes Purchase Agent.

   25. <u>Unpaid Trade Debt & Related Obligations</u>.  In the ordinary course, the Debtors incur trade debt with certain vendors in connection with the operation of their business. The Debtors believe that, as of the Petition Date, their unsecured trade debt and other obligations are in excess of approximately $56,000,000.  This is inclusive of accrued but unpaid obligations under railcar leases, abandoned transloading facilities, as well as railcar storage obligations which in some cases have gone unpaid over a six-month period.

## II. EVENTS LEADING TO THE CHAPTER 11 FILINGS

### a. General Background

   26. The Debtors' business experienced rapid growth from 2011 to 2014 due to technological advances in horizontal drilling and the hydraulic fracturing process that have made the extraction of large volumes of oil and natural gas from domestic unconventional hydrocarbon

formations economically feasible.  Demand for frac sand decreased during 2015 and 2016 as a result of an industry downturn due to low commodity prices.

27.     Commodity prices stabilized in the middle of 2016, however, leading to an improvement in drilling activity during the third quarter of 2016, and into 2017 and early 2018. The market for frac sand began to soften again in early August 2018, due to a decline in well completion activities resulting from the exhaustion of capital budgets for oil and gas exploration and production companies.  These factors, along with the new production from in-basin frac sand competitors discussed above, led the frac sand market to quickly turn from a state of short-supply in the first half of 2018 to over-supply in the second half of 2018.  As a result of the imbalance between supply and demand, select in-basin markets for frac sand experienced price erosion as did NWS as a whole.

28.     While experiencing these negative macro-economic factors and a decline in demand for NWS, in April 2017 the Debtors acquired a site in San Antonio, Texas which had operated a small sand mine for decades.  The Debtors then undertook a large capital expenditure project to develop this San Antonio site into a large, premier in-basin frac sand facility.  The project, however, experienced certain complications and continues to produce below the facility's nameplate capacity in its sixth full month of operation, in spite of reasonably strong customer demand and pricing.  Exasperating the issue further, the facility has temporarily ceased mining operations at the facility's A and B mines as discussed below in paragraph 29.  A summary of the San Antonio facility loadout and utilization is detailed in the following chart:



29.     The above graph illustrates reduced performance in June and in the first eight days of July.  This is the result of a levee breach incident that occurred on Friday June 21, 2019.  Specifically, a 15-foot section of the west wall in the facility's mud retention pond failed causing an inundation of water and sediment to the southwest corner of the mine, also known as the "C-side".  No injuries occurred as a result of the breach.  The Debtors took immediate actions in order to block any personnel or equipment from entering the area.  The Debtors also simultaneously contacted representatives from the U.S. Mining Safety and Health Administration ("**MSHA**") at the time to give notice of the incident.  MSHA issued a Section 103(k) order on the entire mine area, meaning the Debtors could not access any part of the impacted mine.[7]  The full extent of damage to the C-line cannot be fully assessed until the water

---

[7]     Section 103(k) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (the "**Mine Act**") provides that "in the event of any accident occurring in a coal or other mine, an authorized representative of the Secretary [of Health and Human Services], when present, may issue such orders as he deems appropriate to insure the safety of any person in the coal or other mine, and the operator of such

15

and sediment from the incident has abated or been cleared, but given the extent and nature of the incident all equipment and operations related to the C-line are expected to require replacement and this part of the facility's operation is expected to be idle for an extended period of time.   Although lines A and B were not directly impacted by the levee breach, there are shared water and related retaining structures that, pursuant to the Section 103(k) order, cannot be operated and, as a result, prevents the Debtors from operating lines A and B pending completion of remedial steps to ensure that these areas are safe to operate.   In spite of the mining and wet plant operations in San Antonio having been shut down since June 21, 2019 as a result of the incident described above, the Debtors are able to continue operating its drying facilities and delivering product to customers.[8]

b.    **Retention of Chief Restructuring Officer; Signing of Restructuring Support Agreement**

30.    Due to these multitude of factors, the Debtors began to experience revenue, cash flow, and liquidity challenges.   The increasing strain on the Debtors' operations prevented them from meeting certain financial covenants and complying with certain other terms under the Revolving Loan Agreement and the Notes Purchase Agreement.   As a result of these defaults and events of default, the Debtors entered into a series of monthly forbearance agreements with the Revolving Loan Lenders and the Noteholders beginning on December 31,

---

mine shall obtain the approval of such representative, in consultation with appropriate State representatives, when feasible, of any plan to recover any person in such mine or to recover the coal or other mine or return affected areas of such mine to normal."

[8]    In May 2018, as a further move toward an in-basin model, the Debtors obtained a mine site in Kingfisher, Oklahoma, and began construction of a 1.5 million-ton sand facility.   After experiencing the decline in NWS, along with delays and continued complications in the commissioning and ramp-up of San Antonio described in detail above, work on the Oklahoma project was discontinued in January 2019. Through such date the Debtors had incurred $15.2 million of expenses, of which $7.3 million remains unpaid.

2018, in order to, among other things, allow time for the Debtors to explore various strategic alternatives.

31.     Pursuant to these forbearance agreements, the Debtors retained, among others, (i) Ankura Consulting Group, LLC ("**Ankura**") to provide interim management services to the Debtors and (ii) the declarant to serve as the Debtors' CRO.  Since being retained by the Debtors as CRO in January, 2019 and continuing now as RO, I have, among other things: (i) assisted senior management in monitoring accounts payable and interfacing with material vendors; (ii) negotiated on behalf of the Debtors with lender constituents related to any modification to or relief from terms contained in their secured credit facilities; (iii) evaluated and assisted in the renegotiating of material contracts (including railcar and storage leases); (iv) worked with senior management to develop and evaluate business plans and/or strategic restructuring alternatives, including development of any financial models in support of the same and monitoring and adapting such plans as internal or external conditions may dictate; and (v) worked with senior management in connection with liquidity and cash flow forecasting.

32.     At the same time as I was performing the services described above—with particular emphasis on renegotiating the Debtors' railcar and terminal storage leases to increase the chances of a successful out-of-court restructuring—the Debtors and their restructuring advisors (Ankura, Houlihan Lokey, and Latham & Watkins LLP) engaged in extensive discussions and negotiations with Insight Equity, the Revolving Loan Lenders, and the Noteholders regarding a potential in-court restructuring of the Debtors' balance sheet and business operations.

33.     As a result of such extensive negotiations, the parties entered into that certain Restructuring Support Agreement, dated as of April 18, 2019 (as amended from time to

time, the "**RSA**"), by and among the Debtors, Insight Equity, the Revolving Loan Lenders, and the Noteholders, pursuant to which the parties agreed on a restructuring path for the Debtors.   A copy of the RSA is attached hereto as <u>Exhibit B</u>, and its key terms are as follows:[9]

- <u>Special Restructuring Committee</u>.  The creation of a Special Restructuring Committee to approve and implement the terms of the restructuring, on the terms set forth below and in the RSA or such other terms and treatment that the Special Restructuring Committee determines, in good faith, to be necessary in order to confirm a chapter 11 plan.  The Special Restructuring Committee has two members that were appointed by the Debtors  from a slate acceptable to the Noteholders.

- <u>Voting Proxy</u>.  The granting by Insight Equity of a voting proxy to the Special Restructuring Committee, which voting proxy controls the general and limited partnership units owned by Insight Equity and continues in effect for so long as the RSA is not terminated by the Debtors or the Noteholders.

- <u>Global Settlement Fund</u>.  Only if the class of holders of general unsecured claims vote to accept the Plan, the Noteholders have agreed to carve-out from their collateral a global settlement fund representing 5% of the new equity interests in the Reorganized Partnership, plus new warrants to acquire an additional 15% of such new equity interests (the "**Global Settlement Fund**").

- <u>Revolving Loan Lenders</u>.  The Revolving Loan Lenders will be refinanced in full in cash by a new exit facility upon the effective date of the Debtors' chapter 11 plan of reorganization (the "**Chapter 11 Plan**").

- <u>Noteholders</u>.  If the class of general unsecured creditors <u>votes to accept</u> the Chapter 11 Plan, then the Noteholders will convert a material portion of their secured claims in exchange for 95% of the new equity interests in the Reorganized Partnership, subject to dilution by the new warrants.  If the class of general unsecured creditors <u>votes to reject</u> the Chapter 11 Plan, then the Noteholders will convert a material portion of their secured claims in exchange for 100% of the new equity interests in the Reorganized Partnership and the Global Settlement Fund will be eliminated.

- <u>General Unsecured Creditors</u>.  If the class of general unsecured creditors <u>votes to accept</u> the Chapter 11 Plan, then such class will receive its portion of the Global Settlement Fund as set forth in the Chapter 11 Plan.  If the class of general unsecured creditors <u>votes to reject</u> the Chapter 11 Plan, then such

---

[9]     The following is a summary of certain key terms of the RSA and is qualified in its entirety be reference to the RSA.  If there are any inconsistencies between this summary and the terms of the RSA, the RSA shall govern in all respects.

class shall not receive any recovery or property under the Chapter 11 Plan and the Global Settlement Fund will be eliminated.

- <u>Existing Equity Holders</u>.  If the class of general unsecured creditors <u>votes to accept</u> the Chapter 11 Plan, then this class of equity holders will receive its portion of the Global Settlement Fund as set forth in the Chapter 11 Plan that was not allocated to the class of general unsecured creditors.  If the class of general unsecured creditors <u>votes to reject</u> the Chapter 11 Plan, then this class of equity holders shall not receive any recovery or property under the Chapter 11 Plan and the Global Settlement Fund will be eliminated.

- <u>Chapter 11 Plan Milestones</u>.  Pursuant to the Debtors' proposed debtor-in-possession loan facility described more fully below, the Debtors have agreed to comply with the following milestones with respect to the Chapter 11 Plan:

  (i)     filing of the Chapter 11 Plan, Disclosure Statement, and Disclosure Statement Motion on or before July 25, 2019;

  (ii)    entry of the Disclosure Statement Order on or before September 3, 2019;

  (iii)   commencement of Plan solicitation on or before September 3, 2019;

  (iv)    entry of the Confirmation Order on or before October 8, 2019; and

  (v)     the occurrence of the Plan Effective Date on or before October 23 2019.

34.     Even with the signing of the RSA, however, the Debtors (with the support of their secured lenders) continued to negotiate with their material railcar and terminal lessors for months in the hopes of consummating an out-of-court restructuring.  While the Debtors reached agreement with three counterparties, it became clear that there were no viable out-of-court restructuring option for the Debtors to pursue as compared to the benefits that chapter 11 would provide—most importantly the ability to reject burdensome contracts and leases under Section 365 of the Bankruptcy Code.  Accordingly, when faced with a lack of viable restructuring options and dwindling liquidity, and after extensive discussions with their advisors, the Debtors

determined that filing for chapter 11 was in their best interest and in the best interest of their creditors and other stakeholders.

## PART II

35.    In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Orders granting the First Day Pleadings.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

36.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (i) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal interruptions and disruptions to their businesses or loss of productivity or value and (ii) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

## I.    ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.    Joint Administration Motion[10]

37.    By the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of their five Chapter 11 Cases for procedural purposes only. Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect the Debtors.  Thus, I believe that the joint administration of the Chapter 11 Cases will avoid the

---

[10]    "**Joint Administration Motion**" means the *Debtors' Motion for Entry of an Order Under Fed. R. Bankr. P. 1015 and Del. Bankr. L.R. 1015-1 Authorizing Joint Administration of the Chapter 11 Cases.*

unnecessary time and expense of duplicative motions, applications, orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

        **B.**    **Retention Applications**

        38.    I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases.  Accordingly, during the Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (i) Latham & Watkins LLP, as co-counsel; (ii) Richards, Layton & Finger, P.A., as co-counsel; (iii) Kurtzman Carson Consultants LLC, as claims and noticing agent and administrative advisor; (iv) Houlihan Lokey Capital, Inc., as financial advisor and investment banker; and (v) Ankura Consulting Group, LLC, to provide interim management services, a chief restructuring officer, and restructuring officer.  I believe that the above professionals are well-qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of the Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

RLF1 21623878v.1

## II.     BUSINESS OPERATION MOTIONS

### A.     Cash Management Motion[11]

39.     By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of their existing bank accounts, checks, and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described therein; (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices notwithstanding the provisions of section 345(b) of the Bankruptcy Code; (iv) approving the continuation of the Intercompany Transactions; (v) authorizing the Debtors to open and close bank accounts; and (vi) according administrative expense status to postpetition intercompany claims arising from transactions among the Debtors.

#### i.     The Debtors' Cash Management System and the Bank Accounts

40.     The Debtors oversee the collection, disbursement, and movement of cash generated from their operations through a cash management system (the "**Cash Management System**") that manages the Debtors' cash inflows and outflows through a number of bank accounts.  I believe that the Cash Management System is critical to the Debtors' operations as it enables the Debtors to, among other things, (i) monitor cash receipts and ensure payment of

---

[11]     "**Cash Management Motion**" means the *Debtors' Motion for Entry of Orders Under 11 U.S.C. §§ 105(a), 345, 363, 503(b), and 507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Grating Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims*.  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Cash Management Motion.

necessary disbursements, (ii) track various intercompany transfers and transactions between Debtors, and (iii) ensure accurate cash forecasting and reporting.

> ii.    **Continued Ordinary-Course Intercompany Transactions and Postpetition Intercompany Claims and Granting of Administrative Expense Status**

41.    In the ordinary course of business, the Debtors engage in various business relationships with one another.  I believe that these intercompany relationships, as further described in the Cash Management Motion, are necessary and beneficial to the Debtors' business operations and generally provide the Debtors with material savings in respect of general administrative and corporate overhead costs (collectively, the "**Intercompany Transactions**"). As a result of the Intercompany Transactions, cash and services flow between the Debtors on a regular basis.

42.    I believe the Intercompany Transactions are critical to the Debtors' operations.  The Debtors rely upon the Intercompany Transactions for basic functions, like treasury and cash management, that are necessary to keep the Debtors' businesses operational and to ensure that the Debtors are able to pay their vendors and supply their products to their customers in a timely manner.

43.    In addition, to ensure that each individual Debtor will not fund the operations of another entity at the expense of such Debtor's creditors, in the Cash Management Motion, the Debtors request that all postpetition claims, including those arising from any transfer of cash between the Debtors, against a Debtor by another Debtor arising from transactions among them (the "**Intercompany Claims**"), be accorded administrative expense status.  It is my understanding that if postpetition Intercompany Claims are accorded administrative expense status, then each individual Debtor on whose behalf another Debtor has utilized funds or incurred

expenses will continue to bear ultimate repayment responsibility, thereby protecting the interests of each individual Debtor's creditors.

### iii.    Continued Use of the Debtors' Existing Cash Management System and the Debtor Bank Accounts

44.    I believe that the Cash Management System is an ordinary course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and the Debtors' goal of maximizing value for the benefit of all parties in interest.  I believe that to require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  Any disruption in the collection and disbursement of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value and repay their creditors.  Moreover, I believe that such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the Debtor Bank Accounts are held at financially stable institutions insured by the FDIC.  For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and their stakeholders.

45.    If the relief requested in the Cash Management Motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims against the Debtors, except those otherwise authorized by the Court, the Debtors will work closely with the Banks to ensure appropriate procedures are in place to prevent checks issued by the Debtors prepetition

24

from being honored absent this Court's approval and to ensure that no third party with automatic debit capabilities is able to debit amounts attributable to the Debtors' prepetition obligations.  In light of the scope and complexity of the Cash Management System, I believe it would be onerous for the Debtors to meet the U.S. Trustee Guidelines requiring them to close all existing bank accounts and open new debtor in possession accounts.  I also believe that doing so would risk material operational problems, as the Debtors' business partners and own personnel transition to a wholly-new system

### iv.    Continued Use of the Debtors' Existing Checks and Business Forms

46.    To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without the designation "Debtor-in-Possession" or a bankruptcy case number imprinted upon them.  Notwithstanding the foregoing, once the Debtors' existing checks have been used, the Debtors will, when reordering checks, require the designation "Debtor-in-Possession" and the main bankruptcy case number on all checks; provided that, with respect to checks that the Debtors or their agents print themselves, the Debtors shall begin printing the "Debtor-in-Possession" legend and the main case number on such items within ten days of the date of entry of the Interim Order  Except as set forth above, I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates.  Further, such changes would disrupt the Debtors' business operations and would not confer any benefit upon parties that deal with the Debtors.

### v.    Waiver of Certain Requirements of the U.S. Trustee

47.    I have been generally informed of the applicable requirements of the U.S. Trustee Guidelines.  I believe that (i) the Debtors are able to work with their current Banks to ensure that this goal of separation between the prepetition and postpetition periods is observed

and (ii) enforcing certain of the U.S. Trustee Guidelines would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

48.     In light of the complexity of the Cash Management System, it would be onerous, unnecessarily inconvenient, and would fail to produce any realizable benefits to the Debtors' estates to require the Debtors to close all of the Debtor Bank Accounts and open new debtor-in-possession accounts.

49.     Further, it would be unnecessary and inefficient to require the Debtors to abide by the UST requirement to establish specific debtor-in-possession accounts for tax payments (including payroll taxes) and to deposit in such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations.  I believe that the Debtors can pay their tax obligations most efficiently in accordance with their existing practices, and any diversion from the Debtors' existing practices will complicate payment of the Debtors' tax obligations.  Further, I believe that the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of such accounts.  I also believe that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessarily burdensome.

### vi.    Continued Deposit Practices

50.     As part of the Cash Management System, the Debtors routinely deposit funds into the Debtor Bank Accounts (the "**Deposit Practices**").  The Debtors request (i) authorization to continue to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of section 345(b) of the Bankruptcy Code, on an interim basis for a period of thirty days (or such additional time as the U.S. Trustee may agree to) from the Petition Date, to the extent that such requirements are

26

inconsistent with the Deposit Practices.  For the avoidance of doubt, to the extent the Debtor

Bank Accounts may be classified as an investment account, or to the extent any of the Debtors'

routine deposits into the Debtor Bank Accounts may be regarded as investment activity, the

Debtors seek authorization to continue to deposit funds into such Debtor Bank Accounts in

accordance with existing practices, notwithstanding the requirements of section 345(b) of the

Bankruptcy Code.

### B.    Employee Wages Motion[12]

51.    By the Employee Wages Motion, the Debtors seek entry of interim and

final orders (i) authorizing the Debtors, in their discretion, to (a) pay or otherwise honor various

prepetition workforce-related obligations (the "**Workforce Obligations**") to or for the benefit of

their employees (the "**Employees**") and temporary workers (the "**Temporary Staff**" and,

together with the Employees, the "**Workforce**") for compensation, expense reimbursements, and

benefits under all plans, programs, policies, and agreements maintained by, or for the benefit of,

or contributed to or entered into by, the Debtors prior to the Petition Date, including

(collectively, the "**Workforce Programs**"), and (b) continue the Workforce Programs in the

ordinary course of business during the pendency of the Chapter 11 Cases in the manner and to

the extent that such Workforce Programs were in effect immediately prior to the filing of the

Chapter 11 Cases; (ii) confirming that the Debtors are permitted, but not required, to pay any and

all local, state, federal, and foreign withholding and payroll-related or similar taxes relating to

---

[12]    "**Employee Wages Motion**" means the *Debtors' Motion for Entry of Orders Under 11 U.S.C. §§ 105(a), 362(d), 363(b), 507(a), 541, 553, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing (A) Payment of Prepetition Workforce Obligations and (B) Continuation of Workforce Programs on Postpetition Basis, (II) Authorizing Payment of Payroll-Related Taxes, (III) Confirming the Debtors' Authority to Transmit Payroll Deductions, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators, and (V) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments.*  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Employee Wages Motion.

the prepetition Workforce Obligations; (iii) confirming that the Debtors are permitted, but not required, to continue to deduct and to transmit deductions from payroll checks as authorized by Employees, as required by any Workforce-related plan, program or policy, or as required by law; (iv) confirming that the Debtors are permitted, but not required, to pay any prepetition claims owing to vendors and third party Administrators; and (v) authorizing and directing all banks to receive, process, honor, and pay all of the Debtors' prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant to the Employee Wages Motion.

### i.    The Debtors' Workforce

52.    As of the Petition Date, the Debtors' Workforce consists of approximately 236 Employees (63 salaried and 173 hourly).  None of the Debtors' Employees are subject to a collective bargaining agreement or similar labor agreement.  Because the Debtors' business is cyclical in nature, the Debtors number of Employees fluctuates based on whether the Debtors are in a peak business season and the Debtors' specific needs at any given time.

53.    The Debtors' Workforce also consists of Temporary Staff.  The number of Temporary Staff similarly fluctuates based on whether the Debtors are in a peak business season and the Debtors' specific needs at any given time.  The Debtors do not currently employ any Temporary Staff, however, the Debtors may employ Temporary Staff postpetition on an as-needed basis during peak seasons.

54.    I believe that the Debtors' ability to preserve their businesses and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the morale and, thus, the performance of the Workforce may be adversely affected.  I also believe that if the Debtors fail to pay the Workforce Obligations in the ordinary course, their Workforce will suffer extreme personal hardship and, in some cases, may be unable

to pay their basic living expenses.   Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates.   I believe that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of the Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

### ii.   Workforce Compensation Programs

55.   ***Employee Payroll and Payroll Deductions***.  The Employees are paid wages and salaries on a bi-weekly basis.   The average payroll each two-week pay period is approximately $760,000 in the aggregate.   The Debtors utilize The Ultimate Software Group, Inc. ("**UltiPro**") for payroll processing services related to payment of the Employees' wages and salaries.   The Debtors pay their Employees in arrears for work performed one week prior to the Debtors' normal bi-weekly payroll.   As a result, such Employees often have a significant amount of unpaid wages and other compensation that has accrued, but is unpaid.   The Debtors estimate that, as of the Petition Date, they owe approximately $900,000 in wages and salaries to Employees.

56.   The Debtors believe that, as of the Petition Date, no Employee is owed wages or salary compensation in excess of the $13,650 statutory cap pursuant to section 507(a)(4) of the Bankruptcy Code.

57.   In the ordinary course of their businesses, the Debtors make deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, local, and foreign, income, FICA, employment insurance and other taxes, as well as for court ordered garnishments, savings programs, repayments for loans taken against the savings programs, benefit plans, insurance and other similar programs (collectively, the

"**Deductions**").    The Debtors' average bi-weekly Deductions for Employees aggregate approximately $290,000.

58.    As of the Petition Date, certain Employees are owed certain prepetition amounts related to their compensation.  Where employees are owed such amounts, the applicable Deductions have not yet been taken.  Additionally, the Debtors may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions that have been withheld from Employees' paychecks.

59.    The Debtors estimate that, as of the Petition Date, accrued but unpaid Deductions total approximately $350,000.

### iii.    PTO

60.    As part of their overall compensation, Employees are eligible, in certain circumstances, to receive paid time off ("**PTO**") for, among other things, vacation, personal days, and holidays.  The specifics of the Debtors' PTO policies vary based upon the Employee's position and length of employment.  I believe these programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the reorganization process.

61.    The Debtors estimate that, as of the Petition Date, total accrued but unpaid PTO liability for all Employees is approximately $425,000.  This accrued amount, however, does not represent a true "cash" liability for the Debtors, as the Debtors anticipate that Employees will use most of their PTO in the ordinary course of business, and eligible Employees receive cash payments on account of unused Earned Time Off upon termination or resignation.[13]  Although

---

[13]    Eligible Employees have the option to request payout of their accrued PTO balance of up to 40 hours.  The maximum potential associated liability that would be due to such Employees, should they all request this payout would be $235,000, which amount is included in the $425,000 PTO liability.  As of the Petition Date no Employee has requested such a payout of their accrued PTO.

RLF1 21623878v.1

the Debtors request authority to pay such accrued but unpaid PTO liability in the ordinary course

of business as necessary, no amounts will be due or owing to any Employee unless and until such

Employee is no longer employed by the Debtors (assuming the Employee does not use his or her

PTO) or to the extent required by applicable non-bankruptcy law.

### iv.   Employee Incentive Programs

62.    In the ordinary course of business, to encourage and reward outstanding

performance, the Debtors offer certain Employees the opportunity to earn bonuses under certain

bonus programs, including, most recently, the Annual Bonus Program,  and the SIP (collectively,

the "**Employee Incentive Programs**"). Pursuant to the Employee Incentive Programs, eligible

Employees may earn awards based on individual and business targets.  Payments with respect to

the Employee Incentive Programs are made by the Debtors directly to the applicable Employees.

63.    *The Annual Bonus Program.*  Under the Debtors' annual bonus program

(the "**Annual Bonus Program**"), eligible Employees are entitled to a single bonus payment,

usually paid at the end of the year.   The payments under the Annual Bonus Program are

determined by the Debtors' management, entirely discretionary, and based on Company

performance.  Generally, hourly Employees receive a flat rate bonus in a specified amount, and

salaried Employees, including executives and vice presidents, receive a certain percentage

(between 5% and 80%) of their annual salary based on the title of such Employee.  In December

2018, the Debtors paid approximately $76,600 in the aggregate to hourly Employees in

connection with the Annual Bonus Program.[14]   Currently, there are no amounts owed in

connection with the Annual Bonus Program.

---

[14]    In June 2019 the Debtors paid $362,500 in the aggregate to 54 salaried Employees in connection
with the 2018 Annual Bonus Program.

64.     ***The SIP.***  The Debtors also maintain a stock incentive plan (the "**SIP**") by which the Debtors award eligible Employees shares of phantom stock.  The SIP is available to Employees with the title of "plant manager" and above (totaling approximately six Employees who are not "insiders" as defined in the Bankruptcy Code as of the Petition Date).  The Debtors do not believe that they will owe any amounts on account of the SIP nor that phantom stock that will vest during the Chapter 11 Cases.

### v.     The Recruiting Agency and Temporary Staffing Agency

65.     The Debtors utilize the services of The Personnel Consulting Group (the "**Recruiting Agency**") to assist in the hiring of certain corporate and sales Employees.  The Recruiting Agency is paid a contingent fee upon the employment by the Debtors of a candidate provided by the Recruiting Agency.  As of the Petition Date, the Debtors believe that there are no amounts due to the Recruiting Agency.

66.     In addition, in the ordinary course of business, the Debtors also hire temporary workers (the "**Temporary Staff**").  The number of Temporary Staff fluctuates based on whether the Debtors are in a peak business season and the Debtors' specific needs at any given time.  The Debtors do not currently employee any Temporary Staff, however, the Debtors may employ Temporary Staff postpetition on an as-needed basis during peak seasons.  The Debtors currently hire all Temporary Staff directly, however, the Debtors are considering retaining the services of a temporary staffing agency to assist the Debtors in hiring Temporary Staff in the future.  As of the Petition Date, the Debtors believe that there are no amounts owed in connection with the retention of Temporary Staff.

### vi.     Employee Reimbursement Policies

67.     ***Business Expenses***.  The Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related

expenses that Employees incur within the scope of their job duties.  These include expenses for business travel (including airfare, lodging, taxi costs, automobile rentals, meals, and internet charges), and other general business-related expenses.  Employees are expected to use sound judgment and good business sense when incurring the expenses.

68.    In addition, approximately thirty-one Employees are furnished with corporate credit cards maintained through American Express (the "**AmEx Credit Cards**") which they use to make authorized business purchases on behalf of the Debtors.  The Debtors pay the balances that accrue under the AmEx Credit Cards directly to American Express on a monthly basis.  The Debtors are primarily liable for the amounts charged on the AmEx Credit Cards.  The continued use of the AmEx Credit Cards is critical to the Debtors' business operations insofar as it is one of the mechanisms by which Employee expenses that are incurred in the ordinary-course of their employment duties are efficiently paid.  In the aggregate, for the twelve months prior to the Petition Date, the Debtors' Employees incurred approximately $145,000 per month in business expenses charged to the AmEx Credit Cards.  The Debtors estimate approximately $55,000 remains outstanding on account of prepetition business expenses charged to the AmEx Credit Cards as of the Petition Date.

69.    All Employees whether they have been issued a credit card or not are required to submit expense reports.  Expense reports include supporting receipts and are approved by Employee's supervisors in order to be reimbursed.  Employees are reimbursed for their work-related expenses via direct deposit or check by the Debtors promptly after the expense report is approved by the applicable manager and accounting staff.  Employees are to submit their expense data within a reasonable time after incurring business expenses, however, because Employees do not always promptly furnish their receipts, it is difficult for the Debtors to

33

determine the exact amount outstanding at any particular time.  Taking into account a potential lag period, the Debtors estimate that, as of the Petition Date, their obligations to Employees for accrued, reimbursable business-related expenses (submitted and un-submitted) aggregate approximately $65,000, inclusive of amounts owed in connection with the AmEx Credit Cards.

70.    ***Vehicle Program and the Vehicle Fleet Program***.  The Debtors offer certain Employees the ability to participate in a vehicle program (the "**Vehicle Program**") through which eligible Employees who use vehicles in the ordinary course of their employment with the Debtors and maintain a vehicle meeting certain standards and conditions, are provided a monthly vehicle allowance.  Employees that participate in the Vehicle Program receive an allowance of either (i) $900 on average each month or (ii) the IRS established standard mileage rates for the use of a car (vans, pickups or panel trucks), currently $0.58 per mile for business-related travel.  As of the Petition Date, approximately four Employees participate in the Vehicle Program.  For the twelve months prior to the Petition Date, the average amount of reimbursements paid by the Debtors under the Vehicle Program was approximately $3,000 per month.  The Debtors estimate that there are accrued but unpaid amounts under the Vehicle Program of approximately $5,000 as of the Petition Date.

71.    The Debtors also own thirty-one and lease two vehicles located across the Debtors' plants and headquarters that are available for use by the Debtors' sales team and plant managers under the Debtors' vehicle fleet program (the "**Vehicle Fleet Program**").  For the twelve months prior to the Petition Date, the Debtors' average aggregate, monthly costs related to the Vehicle Fleet Program, including, but not limited to, lease payments, maintenance and upkeep costs and gas, is approximately $20,000.  The Debtors estimate that accrued but unpaid amounts under the Vehicle Fleet Program total approximately $5,000 as of the Petition Date.

34

72.     ***Relocation Expenses.***  In the ordinary course of business, the Debtors cover relocation expenses if an Employee relocates at the request of the Debtors (the "**Relocation Expenses**").  The Debtors estimate there are no accrued but unpaid amounts under the Relocation Expenses as of the Petition Date.

73.     ***Per Diem.***  The Debtors provide certain non-corporate, field Employees that have not been issued an AmEx Credit Card with a $50 per-diem stipend (the "**Per-Diem**") when such employees are required to travel in connection with their employment with the Debtors.  The Debtors issue the Per-Diem in connection with the Debtors' bi-weekly payroll.  For the twelve months prior to the Petition Date, the Debtors' aggregate average monthly Per-Diem totaled approximately $2,000.  As of the Petition Date, the Debtors believe that there are no amounts owed in connection with the Per-Diem Obligations.

74.     ***Company-Owned Homes.***  The Debtors own six homes (the "**Company-Owned Homes**").  One of the Company-Owned Homes is located near the Debtors' operations Texas and five are located near the Debtors' operations in Wisconsin.  The Debtors rent the Company-Owned Homes to certain of their Employees.  None of the Company-Owned Homes are subject to mortgage payments, however, the Debtors are responsible for *de minimis* maintenance and upkeep costs associated with the Company-Owned Homes per month.  As of the Petition Date, the Debtors believe that there are no accrued and unpaid amounts owing on account of the Company-Owned Homes.

75.     ***Miscellaneous Reimbursement Programs***.  The Debtors also reimburse their Employees for certain other miscellaneous programs and benefits (the "**Miscellaneous Reimbursement Programs**").  For example, the Debtors may reimburse (or pay directly) certain professional expenses incurred by Employees, such as required continuing education expenses,

professional license fees or dues, and subscriptions.  In addition, Employees are reimbursed, up to certain annual limits, for the purchase of safety equipment, work boots, safety prescription glasses, and work uniforms.  The Debtors also provide certain Employees with a cell phone allowance.  The total amount of reimbursements paid by the Debtors under these Miscellaneous Reimbursement Programs average approximately $15,000 per month for the twelve months prior to the Petition Date.  As of the Petition Date, the Debtors estimate that accrued and unpaid amounts under the Miscellaneous Reimbursement Programs total approximately $12,500.

### vii.    Independent Director Fees and Expenses

76.    In the ordinary course of business, the Debtors pay fees for and reimburse expenses of five non-Employee independent members of Debtor, Emerge Energy Services GP (the "**Independent Directors**").  Three Independent Directors, Kevin Clark, Mark Gottfredson, and Francis J. Kelly III, are paid, in the aggregate, approximately $46,000 on a quarterly basis for services conducted during the prior quarter.  Two Independent Directors, Eugene Davis and William Transier, are paid, in the aggregate, approximately $60,000 on a monthly basis for services to be conducted during that same month.  The Independent Directors' service is necessary for the continued management of the Debtors and, accordingly, it is essential that the Debtors be authorized to pay all Independent Director fees and any business related expenses incurred by the Independent Directors that have accrued as of the Petition Date.  As of the Petition Date, the Debtors estimate that the aggregate accrued but unpaid fees and expenses owed to the Independent Directors total approximately $5,000.

### viii.    Employee Benefits Programs

77.    In the ordinary course of business, the Debtors offer eligible Employees, their eligible spouses and dependents, and certain former Employees various standard Employee Benefits, including, without limitation: (i) medical, prescription drug, dental, and vision

coverage, (ii) participation in the HSAs, (iii) participation in the Income Protection Plans, (iv) the ability to participate in the 401(k) Program, (v) workers' compensation, (vi) severance benefits, and (vii) the ability to participate in Supplemental Benefits Programs (collectively, the "**Employee Benefits Programs**" and, any obligations thereunder, the "**Employee Benefits Obligations**").

78.     As further provided in the Employee Wages Motion, certain of the Employee Benefits Obligations remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of the Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date.   The Debtors request authority to pay or provide as they become due all prepetition Employee Benefits Obligations that have already accrued.   The Debtors estimate that the aggregate accrued amount of such prepetition Employee Benefits Obligations described in the Employee Wages Motion is approximately $67,500.

### ix.     Honoring Prepetition Workforce Obligations

79.     The Debtors request authority to pay or provide, as they become due, all prepetition Workforce Obligations that are described in Sections B, C, and D of the Employee Wages Motion.   The Debtors estimate that the aggregate amount of the prepetition Workforce Obligations is approximately $1,060,000.   Estimated outstanding amounts as of the Petition Date are summarized in further detail in the Employee Wages Motion.

80.     I believe that the continuity and competence of the Debtors' Workforce would be jeopardized if the relief requested in the Employee Wages Motion is not granted. Specifically, if the Debtors fail to honor and pay prepetition Employee Compensation Obligations, Employee Reimbursement Obligations and Employee Benefits Obligations, in the

ordinary course of business, the Debtors' Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  This hardship would have a highly negative impact on Workforce morale and productivity, thereby resulting in immediate and irreparable harm to the Debtors' continuing operations and their estates.  Accordingly, the Debtors have determined that payment of these amounts is vital to preventing the loss of key members of the Workforce during the pendency of the Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

### x.   Postpetition Continuation of Workforce Programs

81.     The Debtors also request confirmation of their right to continue honor and perform their obligations with respect to all Workforce Programs, except as otherwise indicated. The Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale, reward performance through certain incentives, minimize attrition, and preserve continuity and stability of the Debtors' operations.  The Debtors believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, loss of productivity, and disruption of business operations that would occur if the Workforce Programs were discontinued.

82.     Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of the Chapter 11 Cases.

### xi.   Payments to Administrators

83.     With respect to the Employee compensation and benefits described in the Workforce Obligations Motion, the Debtors contract with several vendors to administer and deliver payments or other benefits to their Employees (the "**Administrators**").  The Debtors pay

these Administrators' fees and expenses incurred in connection with providing such services. For example, in the ordinary course of business the Debtors pay fees to Administrators, including, but not limited to, (i) $20,000 quarterly to UltiPro in connection with payroll administration and tracking, (ii) $300 monthly to HSA Bank in connection with the administration of the HSAs (through October 1, 2019), (iii) $300 monthly to Benefit Strategies in connection with the administration of the HSAs (beginning on July 1, 2019), and (iv) $4,600 monthly to the BB&T in connection with the administration of the 401(k) Plan.  As of the Petition Date, the Debtors believe that there is $5,000 owed to the Administrators.

84.    I believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred.  If the Debtors were required to replace the Administrators postpetition, it likely would cause significant disruption to the payment of benefits and other obligations to the Workforce. Accordingly, I believe that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

### xii.    Honoring of Prepetition Checks

85.    Prior to the Petition date, the Debtors paid certain of their Workforce Obligations with checks that had not been presented for payment as of the Petition Date.  In order to ensure the orderly payment of the Workforce Obligations, the Debtors request that the Court enter an order authorizing the Debtors' banks to honor any such checks that are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to this Motion.  To the extent that any such checks are nevertheless refused payment, the Debtors additionally request authority to replace any checks or electronic

39

fund transfers that may be dishonored and to reimburse any related expenses that may be incurred as a result of any bank's failure to honor a prepetition check or electronic fund transfer.

### C.      Tax Motion[15]

86.      By the Tax Motion, the Debtors seek entry of interim and final orders authorizing the Debtors, in their sole discretion, to pay any prepetition tax and fee obligations consisting of international taxes, income taxes, franchise taxes, property taxes, sales and use taxes, LLC taxes, road maintenance fees, rail car import taxes and any other taxes and fees for which the Debtors' directors and officers may be liable or which may not constitute property of the Debtors' estates and any other types of taxes, fees, assessments or similar charges and any penalty, interest or similar charges in respect of such taxes and fees (collectively, the "**Taxes and Fees**") owing to (i) those international, federal, state and local governmental and quasi-governmental entities listed on Exhibit C attached to the Tax Motion (the "**Taxing Authorities**"), and (ii) Debtor Emerge Energy Services Operating LLC ("**OLLC**") and CN Customs Brokerage Services Inc. ("**CN**") as reimbursement for amounts paid by OLLC and CN on behalf of Debtor Superior Silica Sands LLC ("**SSS**") on account of certain Taxes and Fees. Unless further authorization is obtained from the Court, the Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under the Tax Motion to (i) $600,000 on an interim basis and (ii) $935,000 on a final basis.

87.      The manner in which the Debtors pay the Taxes and Fees varies.  With respect to certain of the Taxes and Fees, the Debtors pay the applicable Taxing Authority directly.  With respect to franchise taxes in the State of Texas (the "**Texas Franchise Tax**"),

---

[15]      "**Tax Motion**" means the *Debtors' Motion for Entry of Orders Under 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541 and Fed. R. Bankr. P. 6003 and 6004 Authoring Payment of Prepetition Taxes and Fees.*  Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Tax Motion.

Debtor OLLC makes payments to the Texas Department of Revenue on behalf of Debtor SSS. In such instances, OLLC then allocates the appropriate portion of the Texas Franchise Tax to SSS, who then simultaneously reimburses OLLC in cash as an intercompany transfer. Following the Petition Date, OLLC and SSS each intend to continue such method of payment of the Texas Franchise Taxes. With respect to railcar import taxes (the "**Rail Car Import Tax**"), the Debtors' vendor CN makes payments to the Canada Revenue Agency on behalf of Debtor SSS. In such instances, CN then allocates the appropriate portion of the Rail Car Import Tax to SSS, who then reimburses CN in cash. Following the Petition Date, CN and SSS each intend to continue such method of payment of the Rail Car Import Tax. With respect to the Canadian Goods and Services Taxes, such taxes are included in the invoices billed to the Debtors by the transloading facilities.

88.     Although as of the Petition Date the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may not yet have become due. Certain prepetition Taxes and Fees will not be due until the applicable monthly, quarterly, or annual payment dates – in some cases immediately and in others not until next year. In 2018, the Debtors incurred approximately $2,600,000 on account of Taxes and Fees. As of the Petition Date, the Debtors estimate that they have accrued liabilities, which are not yet due, in the approximate amount of $935,000 on account of Taxes and Fees.

89.     If the Taxes and Fees are not timely paid, I believe that the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws. I also understand that certain of the Taxes and Fees may be considered to be

41

obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment. In such events, I believe that collection efforts by the Taxing Authorities would create obvious distractions for the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion. Accordingly, I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process.

### D.    Insurance and Bonding Motion[16]

90.    By the Insurance and Bonding Motion, the Debtors request entry of interim and final orders authorizing them to (i) continue to (a) administer the Insurance Policies and pay their Prepetition Insurance Obligations and (b) pay their Prepetition Bonding Obligations, to the extent the Debtors determine in their discretion that such payments are necessary or appropriate; (ii) pay their Postpetition Insurance Obligations and their Postpetition Bonding Obligations in the ordinary course, as such payments become due; (iii) revise, extend, supplement, change, terminate and/or replace the Debtors' insurance coverage or the Bonding Program as needed in the ordinary course of business; and (iv) maintain or renew current, or enter into new, postpetition financing arrangements with respect to insurance premiums. The Debtors seek authority under the Insurance and Bonding Motion to make payments on account of Prepetition Insurance Obligations and Prepetition Bonding Obligations in an amount not to

---

[16]    "**Insurance and Bonding Motion**" means the *Debtors' Motion for Entry of Orders Under 11 U.S.C. §§105(a), 362(d), 363(b), and 503(b) Authorizing Debtors' to (I) Pay Their Prepetition Insurance Obligations, (II) Pay Their Prepetition Bonding Obligations, (III) Maintain Their Postpetition Insurance Coverage, (IV) Maintain Their Bonding Program, and (V) Maintain Postpetition Financing of Insurance Premiums.* Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Insurance and Bonding Motion.

exceed $150,000 in the aggregate upon entry of the Interim Order, and in an amount not to exceed $300,000 in the aggregate upon entry of the Final Order.

### i.    The Debtors' Insurance Obligations

91.    In the ordinary course business, the Debtors maintain certain insurance policies that are administered by multiple third-party insurance carriers (the "**Insurance Carriers**"), which provide coverage for, among other things, general and environmental liability, commercial automobile liability, employment practices liability, umbrella liability, excess liability, rolling stock and mobile equipment liability, directors' and officers' liability, excess liability, fiduciary liability, crime, property, and cyber (collectively, the "**Insurance Policies**"). A detailed list of the Insurance Policies that are currently held by the Debtors is attached to the Insurance and Bonding Motion as <u>Exhibit C</u>.  I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in some cases, such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts.  It is my understanding that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

92.    I understand the total amount paid on account of annual premiums and payments associated with the Insurance Policies is approximately $2 million.  I have been informed that the Debtors' primary general and environmental liability, commercial automobile liability, umbrella liability, excess liability, and rolling stock and mobile equipment liability policies are annual policies, each of which expires on May 30, 2020.  The Debtors' general liability (farm homes) is an annual policy that expires on August 22, 2019.  The Debtors' directors' and officers' liability policies are three year policies that expire on February 20, 2020. The Debtors' fiduciary liability, crime, and employment practices liability policies are annual

policies that expire on September 30, 2019.  The Debtors' property and cyber policies are annual policies that expire on October 30, 2019.  I have been further informed that under the general liability (farm homes), the directors' and officers' liability, fiduciary liability, crime, and employment practices liability policies were due and were paid in full by the Debtors at the beginning of the relevant policy period or extension period, as applicable.

93.    I understand that, because it is often not economically advantageous for the Debtors to pay their insurance premiums on a lump-sum basis, and in an effort to manage cash flows most efficiently, the Debtors have financed the premiums for their primary general and environmental liability, commercial automobile liability, umbrella liability, excess liability, and rolling stock and mobile equipment liability policies (the "**Financed Policies**") pursuant to a premium financing agreement (the "**PFA**") between the Debtors and AFCO Credit Corporation ("**AFCO**").

94.    I understand that, under the PFA, the Debtors make eleven monthly payments of $81,029.87, each of which included interest at a rate of 4.49%.  The Debtors believe that, as of the Petition Date, no amounts are due and owing to AFCO in connection with the PFA.

95.    Willis Towers Watson and AON Risk Services Northeast serve as the Debtors' insurance brokers (the "**Insurance Brokers**") and manage the Debtors' relationships with the Insurance Carries.  Among other things, the Insurance Brokers assist the Debtors in selecting the appropriate carriers (subject to the Debtors' approval) and represent the Debtors in negotiations with the Insurance Carriers.  The Insurance Brokers have allowed the Debtors to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner, and to realize savings in the procurement of such policies.  The Insurance Brokers'

Fees are included in the premium payments the Debtors make under the Insurance Policies. In 2018, the Debtors paid approximately $200,000 in the aggregate to the Insurance Brokers in connection with the Insurance Policies.

96.     I believe that the maintenance of insurance coverage under the various Insurance Policies on an uninterrupted basis is essential to the continued operation of the Debtors' businesses. In addition, I have been informed that, in many cases, it is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases (the "**Operating Guidelines**"), the federal laws and regulations applicable to the Debtors' businesses, the laws of the various states in which the Debtors operate, and the Debtors' various contractual commitments. Thus, I believe that the Debtors should be authorized to continue to pay premiums, taxes, charges, fees, and other obligations owed under or with respect to the Insurance Policies or the financing of the same under the PFA as such obligations come due in the ordinary course of their businesses.

97.     In the Insurance and Bonding Motion, the Debtors request authorization to pay any Prepetition Insurance Obligations to the Insurance Carriers or the Insurance Brokers, or AFCO, as applicable, to the extent that the Debtors determine, in their sole discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Insurance Policies, and to maintain good relationships with the various Insurance Carriers and the Broker. I believe the Debtors' maintenance of their relationships with the Insurance Carriers, the Insurance Brokers, and AFCO is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods. The Debtors

45

additionally request, out of an abundance of caution, authority to renew or replace the Insurance Policies as they may expire or lapse in the ordinary course.

98.     The Debtors will need to continue their insurance coverage throughout the duration of the Chapter 11 Cases.  I believe that the maintenance of their existing Insurance Policies falls squarely within their ordinary course of business and have only sought relief within the Insurance and Bonding Motion out of an abundance of caution.  To reduce both the administrative burden on the Chapter 11 Cases and the expense of operating as debtors in possession, through the Insurance and Bonding Motion, the Debtors request authorization to maintain, amend, extend or renew the Insurance Policies, as necessary, in the ordinary course of business.

### ii.     The Debtors' Bonding Program

99.     In the ordinary course of business, the Debtors are required by certain applicable statutes, rules, and regulations to purchase new, supplemental, or replacement surety bonds (such bonds, together with the surety bonds outstanding as of the Petition Date, the "**Bonding Program**").  Under the Bonding Program, the Debtors provide surety bonds to certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies.  The Bonding Program generally covers reclamation, permits and taxes, conservation and environmental obligations, and other miscellaneous items (collectively, the "**Covered Obligations**").  A detailed list of the surety bonds that are currently maintained for the benefit of the Debtors is attached to the Insurance and Bonding Motion as Exhibit D.  I believe that the Bonding Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.

46

100.     As of the Petition Date, the Debtors outstanding surety bonds were issued by three separate sureties:   (a) One Beacon (two surety bonds totaling approximately $7,670,000), (b) Everest Reinsurance Company (one surety bond totaling approximately $900,000), and (c) Merchants Bonding Company Mutual (two surety bonds totaling approximately $1,000) (collectively, the "**Sureties**").

101.     The premiums for the surety bonds are generally determined on an annual basis and are paid when the bonds are issued and annually upon renewal.  The total amount paid in annual premiums and payments associated with all of the surety bonds is approximately $280,000.   I understand that as of the Petition Date, the Debtors estimate that all premium payments due and owing under the Bonding Program have been paid in full and the Debtors are not aware of any pending requests for payment by the Sureties.

102.     Willis Towers Watson serves as the Debtors' surety bond broker (the "**Surety Broker**") and manages the Debtors' relationships with the Sureties.   Among other things, the Surety Broker assists the Debtors in selecting the appropriate Sureties (subject to the Debtors' approval) and represents the Debtors in negotiations with the Sureties.   The Surety Broker has allowed the Debtors to obtain the bonding coverage necessary to operate their businesses in a reasonable and prudent manner, and to realize savings in the procurement of such policies.   The Surety Broker's Fees are included in the premium payments the Debtors make under the Bonding Program.  In 2018, the Debtors paid approximately $70,000 in the aggregate to the Surety Broker in connection with the Bonding Program.

103.     I believe that the success of the Debtors' efforts to operate effectively and efficiently will depend on the maintenance of the Bonding Program on an uninterrupted basis. To continue their business operations, the Debtors must be able to provide financial assurances

47

to federal and state governments, regulatory agencies, and other third parties.  This, in turn,

requires the Debtors to maintain access to the existing Bonding Program, including by paying the

Bonding Obligations as they come due, maintaining required letters of credit, and paying any

indemnity obligations that may arise in connection with the Bonding Program in the ordinary

course of business, as well as renewing or potentially acquiring additional bonding capacity as

needed in the ordinary course of their businesses, requesting releases from obsolete bonding

obligations, and executing other agreements in connection with the Bonding Program.

Accordingly, I believe it is important that the Debtors be authorized to participate in the Bonding

Program in the same manner as they did prepetition and to pay or set off any prepetition or

postpetition Bonding Obligations, and revise, extend, supplement, or change the Bonding

Program as needed, including through the issuance of new surety bonds.

### E.    Utilities Motion[17]

104.    In the Utilities Motion, the Debtors request entry of interim and final

orders, approving procedures that would provide adequate assurance of payment to their utility

service providers (the "**Utility Companies**") under section 366 of the Bankruptcy Code, while

allowing the Debtors to avoid the threat of imminent termination of electricity, water, fuel, waste

services, telecommunications, and similar utility products and services (collectively, the "**Utility**

**Services**") from the Utility Companies.

105.    As of the Petition Date, approximately thirty-five Utility Companies

provide Utility Services to the Debtors at various locations.  A non-exclusive list of the Utility

---

[17]    "**Utilities Motion**" means the *Debtors' Motion for Entry of Orders Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment.* Capitalized terms used, but not otherwise defined, in this section shall have the respective meanings ascribed to them in the Utilities Motion.

Companies and the Utility Services they provide is attached as Exhibit 1 to the proposed Interim and Final Orders granting the Utilities Motion. The Utility Companies service the Debtors' operations and facilities related to the Debtors' mining, processing, and distribution of high-quality silica sand. Debtor Superior Silica Sands LLC pays all Utility Services on behalf of the Debtors. The success and smooth operation of the Debtors' businesses depend on the reliable delivery of electricity, fuel, and the other Utility Services. The Debtors require the Utility Services to operate their businesses, manage their mines and plants, and maintain and service the equipment the Debtors use to service their customers. I am not currently aware of any past due amounts owed to any of the Utility Companies. Based on the timing of the filings in relation to the Utility Companies' billing cycles, however, there may be outstanding invoices reflecting prepetition utility costs that have been incurred by the Debtors but for which payment is not yet due, as well as prepetition utility costs for services provided since the end of the last billing cycle that have not yet been invoiced.

106.    I understand that the Debtors intend to pay any postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors will deposit $454,750, which is an amount equal to approximately fifty percent of the estimated monthly cost of the Utility Services, into a segregated, non-interest-bearing account, within twenty days of the Petition Date (the "**Adequate Assurance Deposit**"). The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases, which may be adjusted and/or reduced by the Debtors to account for any of the following: (i) to the extent that the Adequate Assurance Deposit includes any amount on account of a company that the Debtors subsequently determine is not a "utility" within the meaning of section 366 of the Bankruptcy Code, (ii) an adjustment or

49

payment made in accordance with the Delinquency Notice Procedures described in the Utilities

Motion, (iii) the termination of a Utility Service by a Debtor regardless of any Additional

Adequate Assurance Request, (iv) the closure of a utility account with a Utility Company for

which funds have been contributed for the Adequate Assurance Deposit, or (v) any other

arrangements with respect to adequate assurance of payment reached by a Debtor with individual

Utility Companies; *provided*, that, (a) with respect to a company that the Debtors subsequently

determine is not a "utility" within the meaning of section 366 of the Bankruptcy Code, the

Debtors may adjust and/or amend the balance of the Adequate Assurance Deposit upon fourteen

days' advance notice to such company; or, (b) with respect to the Debtors' termination of a

Utility Service or closure of a utility account with a Utility Company, the Debtors may adjust

and/or amend the balance of the Adequate Assurance Deposit upon reconciliation and payment

by the Debtors of such Utility Company's final invoice in accordance with applicable

nonbankruptcy law, to the extent that there are no outstanding disputes related to postpetition

payments due.

      **F.**    **Customer Programs Motion**[18]

      107.    By the Customer Programs Motion, the Debtors seek entry of interim and

final orders authorizing the Debtors to satisfy, in their discretion, to continue, renew, replace,

implement new and/or terminate their various programs with certain customers (the "**Customer**

**Programs**") and any other customer practices as they deem appropriate, without further

application to the Court.  Historically, the Debtors have incurred no costs in the administration of

their Customer Programs, and there are no such obligations outstanding as of the Petition Date.

---

[18]    "**Customer Programs Motion**" means the *Debtors' Motion for Entry of Orders Under 11 U.S.C. §§ 105(a), 363(b) and 363(c) and Fed. R. Bankr. P. 6003 and 6004 Authorizing the Debtors to Continue Their Customer Programs.*

108.    I believe that the Debtors' goodwill and ongoing business relationships may erode if their customers or distributors perceive that the Debtors are unable or unwilling to fulfill the prepetition commitments they have made through the Customer Programs.  I also believe that if the Debtors are unable to preserve the loyalty of their customers and distributors, the Debtors' businesses would likely suffer material harm.  Accordingly, I believe that granting the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their estates, and their creditors.

109.    The following are general descriptions and examples of the Customer Programs.

### i.    Prepayments

110.    The Debtors allow certain customers to prepay for silica sand at a discounted price (the "**Prepayment Program**").   Pursuant to the Prepayment Program, participating customers are given the opportunity, at the start of each calendar quarter, to prepay for a specified tonnage of silica sand at a discounted rate.  Charges for the prepaid amounts are then deducted from the invoices sent to the customer.  This program reduces counterparty payment risk and helps the Debtors build strong business relationships with customers, which in turn increases the volume of the Debtors' sales.  Without the Prepayment Program, the Debtors risk losing business and customers to competitors.  While the Debtors do not believe that Court approval is required to continue the Prepayment Program, by the Customer Programs Motion the Debtors request authority to continue, renew, replace, modify, implement new and/or terminate such program, in their business judgment.

###### ii.    Guaranties

111.    Under certain customer contracts, Debtor Superior Silica Sands, LLC ("**SSS**"), guarantees its supply of silica sand.  SSS provides two types of Supply Guaranties, one pursuant to Take or Pay Agreements (the "**Take or Pay Guaranty**") and a second based on monthly obligations with customers (the "**Monthly Guaranty**" and, together with the Take or Pay Guaranty, the "**Supply Guaranties**"). Pursuant to the Supply Guaranties, in the event that SSS is unable to supply a customer with the amount of silica sand SSS is obligated to provide, SSS must issue credits to the customer.

112.    Under the Take or Pay Guaranty, a customer agrees to purchase a minimum tonnage of sand from particular SSS basins and, in turn, SSS must be able to supply the minimum amount of sand required to be purchased from the specific basins.  Pursuant to the Take or Pay Guaranty, if SSS does not produce or is unable to provide the minimum amount of sand required to purchased, SSS must issue credits against the customer's outstanding accounts receivable.  In order to receive any credits, the customer must provide SSS with evidence showing that the customer purchased the sand from a different supplier at a higher price than the same sand sold by SSS.  Upon satisfactory proof, SSS must issue the customer credits for the difference in price paid, up to a maximum dollar amount per ton of sand.  Thus, for example, if a customer claimed it bought 20,000 tons of sand from another supplier due to a shortfall in production by SSS, at a price per ton that was $5 above the price SSS charged for the same sand, SSS must issue a credit of $100,000.  As of the Petition Date, SSS has incurred no cost as a result of the Take or Pay Guaranty.

113.    Pursuant to the Monthly Guaranty, SSS is obligated to provide a specified tonnage of sand each month to its customers.  In the event that SSS is unable to meet its monthly

obligation, SSS must issue credits against the customer's outstanding accounts receivable. The amount of credits issued depends on, (i) the extra cost the customer expended to purchase sand from another supplier, (ii) the additional transportation cost, if any, that resulted from the customer having to purchase sand from a different supplier, and (iii) any other cost incurred by the customer as a result of the failure of SSS to fulfill the monthly obligation and/or delay in fulfilling the order. Thus, for example, under the Monthly Guaranty, if a customer claims a 20,000 ton shortfall and the customer purchases the 20,000 tons from a different supplier for an extra $1 per ton, with an additional transportation cost of $2 per ton and has other costs of $20,000 due to the shortfall, SSS must credit the customer $80,000. As of the Petition Date, SSS has incurred no cost as a result of the Monthly Guaranty.

## III.   CONTINUING VENDOR MOTIONS

### A.   Lienholders Motion[19]

114.   By the Lienholders Motion, the Debtors request entry of interim and final orders (i) authorizing, but not directing, the Debtors to pay certain prepetition claims held by shippers, lien claimants, and royalty interest owners; (ii) confirming the administrative expense priority status of outstanding orders and authorizing, but not directing, the Debtors to pay prepetition amounts related to the outstanding orders; (iii) authorizing financial institutions to honor and process related checks and transfers; and (iv) granting certain related relief.

115.   A summary of the specific relief requested in the Lienholders Motion is set forth below:

---

[19]   "**Lienholders Motion**" means the *Debtors' Motion for Entry of Orders Under 11 U.S.C. §§ 105(a), 363(b), 506(b), 541, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing Debtors to Pay Certain Prepetition Claims of Shippers, Lien Claimants, and Royalty Interest Owners, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief.*

|                     | Interim Relief | Final Relief |
|---------------------|---------------:|-------------:|
| **Shipping Claims** | $473,000       | $1,504,000   |
| **Lien Claims**     | $57,000        | $147,000     |
| **Royalty Payments**| $186,000       | $211,000     |

116.    I believe that the Debtors' ability to operate their business without interruptions is dependent upon the Debtors' vendors, suppliers, shippers and warehousemen, each of which either provides the Debtors with the materials and supplies necessary to ensure safe mining conditions, extract and process silica sand, transport silica sand among the Debtors' mines and plants, or deliver silica sand to the Debtors' customers.  The Debtors utilize the services of a number of service providers who, by the nature of their business and the work that they perform for the Debtors, may seek to assert that prepetition amounts owed to them are secured by statutory liens on property of the Debtors that is either in the possession of the service provider or that has been improved upon by the provider.  The Debtors are also obligated to make royalty payments to certain royalty interest owners who may assert that prepetition royalty payments owed to them are secured by liens on the Debtors' property.  Moreover, amounts held by the Debtors on account of the royalty interests may not be property of the Debtors' bankruptcy estates.   In order to continue the operation of their business uninterrupted postpetition, the Debtors seek to pay the prepetition claims of these claimants, each of which may be entitled to priority over general unsecured creditors.

## II.        CONCLUSION

117.    The Debtors' ultimate goal in the Chapter 11 Cases is the maximization of estate value through a plan process contemplating a conversion of the Prepetition Credit Facility to equity in the reorganized Debtors.  In the near term, however, to minimize any loss of value of their businesses during the Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of the Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation of a Chapter 11 plan will be substantially enhanced.

118.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of July 2019.

Emerge Energy Services LP
Emerge Energy Services GP LLC
Emerge Energy Services Operating LLC
Superior Silica Sands LLC
Emerge Energy Services Finance Corporation
*Debtors and Debtors in Possession*


*/s/ Bryan Gaston*
Bryan Gaston
Restructuring Officer of Emerge Energy
Services LP

## **Exhibit A**

Organizational Chart



 = Chapter 11 filer

= Chapter 11 filer that is secured obligor
on Revolver Loan and Secured Notes

All Chapter 11 filers are Delaware entities, except
for Superior Silica Sands which is a Texas entity.

## Exhibit B

Restructuring Support Agreement

Execution Version

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (including the exhibits attached hereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof, this "**Agreement**"), dated as of April 18, 2019, is entered into by and among (i) Emerge Energy Services LP ("**Emerge LP**"), (ii) each direct and indirect subsidiary of Emerge LP party hereto (each an "**Emerge LP Subsidiary**", and together with Emerge LP, the "**Company**"), (iii) Emerge Energy Services GP LLC ("**Emerge GP**"), (iv) the direct and indirect owners of Emerge GP party hereto (the "**Consenting Equity Holders**"), (v) the Revolving Loan Agent (as defined below), (vi) the Revolving Loan Lenders (as defined below) party hereto (the "**Consenting Revolving Loan Lenders**"), (vii) the Notes Agent (as defined below), and (viii) the Noteholders (as defined below) party hereto (the "**Consenting Noteholders**"). Each of the foregoing are referred to herein individually as a "**Party**", and collectively as the "**Parties**."

RECITALS

WHEREAS, reference is made to that certain Second Amended and Restated Revolving Credit and Security Agreement, dated as of January 5, 2018 (as the same may be amended, modified or supplemented), by and among Emerge Energy Services Operating LLC ("**EESO**") and Superior Silica Sands LLC ("**SSS**"), as borrowers, Emerge LP, as parent guarantor, HPS Investment Partners, LLC ("**HPS**"), as administrative and collateral agent (in such capacity, together with any successor agent, the "**Revolving Loan Agent**"), and the lenders party thereto from time to time (the "**Revolving Loan Lenders**," such agreement, the "**Revolving Loan Agreement**," and such facility, the "**Revolving Loan Facility**"). Any and all claims and obligations arising under or in connection with the Revolving Loan Agreement and related loan documents are defined herein as the "**Revolving Loan Obligations**." As of the date hereof, the Revolving Credit Facility had an aggregate outstanding principal amount of approximately $66,710,000 (the "**Aggregate Outstanding Revolving Loan Amount**"), comprised of $10,181,544 in the form of letters of credit and approximately $56,528,456 in an aggregate outstanding principal amount in the form of outstanding loans, plus accrued but unpaid interest, fees, costs, and expenses;

WHEREAS, reference is made to that certain Second Lien Note Purchase Agreement, dated as of January 5, 2018 (as the same may be amended, modified or supplemented), by and among EESO and SSS, as issuers, Emerge LP, as parent guarantor, HPS, as notes and collateral agent (in such capacity, together with any successor agent, the "**Notes Agent**"), and the noteholders party thereto from time to time (the "**Noteholders**," such agreement, the "**Notes Purchase Agreement**," and such facility, the "**Notes Purchase Facility**"). Any and all claims and obligations arising under or in connection with the Notes Purchase Agreement and related loan documents are defined herein as the "**Notes Purchase Obligations**." As of the date hereof, the Note Purchase Facility had an aggregate outstanding principal amount of approximately $208,512,307 (the "**Aggregate Outstanding Notes Purchase Amount**"), plus accrued but unpaid interest, fees, costs, and expenses;

WHEREAS, Emerge GP is the general partner of Emerge LP and, in such capacity and pursuant to, and subject to the terms and conditions of, its applicable organization documents, has the authority to conduct, direct, and manage all activities of Emerge LP;

WHEREAS, the Company is seeking to restructure its debt obligations and capital structure and to recapitalize the Company in accordance with the terms and conditions set forth in the restructuring term sheet attached hereto as <u>Exhibit A</u> (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof, the "**Term Sheet**")[1] pursuant to an out-of-court restructuring (the "**Out-of-Court Restructuring**");

WHEREAS, if the Company does not consummate the Out-of-Court Restructuring as described in the Term Sheet and this Agreement, then the Company will, at the direction of the Committee (as defined below), commence proceedings under chapter 11 of the Bankruptcy Code (as defined below) in accordance with the terms and conditions set forth in the Term Sheet and herein in order to restructure its debt obligations and capital structure and to recapitalize the Company in accordance with the terms and conditions set forth in the Term Sheet (the "**In-Court Reorganization**" and, together with the Out-of-Court Restructuring, the "**Transaction**");

WHEREAS, concurrently with the execution and delivery of this Agreement, (i) the Board of Directors of Emerge GP (the "**Board**"), at the request of the Consenting Creditors (as defined below), is designating a restructuring committee (the "**Committee**") to exercise the powers of the Board (and the Board will relinquish all such powers delegated to the Committee) pursuant and subject to a charter in the form attached hereto as <u>Exhibit B</u> (the "**Charter**"), and (ii) the Committee and Emerge Energy Services Holdings LLC ("**Emerge Holdings**"), as the sole member of Emerge GP, are entering into a voting and standstill agreement in the form attached hereto as <u>Exhibit C</u> (the "**Voting and Standstill Agreement**"), pursuant to which Emerge Holdings is delivering to the Committee an irrevocable voting proxy in the form attached to the Voting and Standstill Agreement as <u>Exhibit A</u> (the "**Voting Proxy**");

WHEREAS, the Charter, the Voting and Standstill Agreement, and the Voting Proxy shall, subject to their respective terms and conditions, each remain in full force and effect from the Agreement Effective Date (as defined below) until the earlier of (i) the termination of this Agreement solely in accordance with <u>Section 6(a)</u> below, and (ii) the date on which the Transaction is substantially consummated in accordance with the terms and conditions of the Definitive Documents (such earlier date, the "**Reversion Date**"); and

WHEREAS, from the Agreement Effective Date until the Reversion Date, the Committee shall at all times comprise two independent directors appointed by the Company from a slate acceptable to the Majority Noteholders (as defined below) and, to the extent approved by and in the sole discretion of Emerge GP, one independent director nominated by the Company.

---

[1] Capitalized terms used but not otherwise defined herein are defined in accordance with the Term Sheet, which is expressly made part of this Agreement and incorporated herein by reference.

NOW, THEREFORE, in consideration of the promises, covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.   <u>The Transaction</u>

Subject to the terms and conditions of this Agreement and the exhibits attached hereto, the Parties agree as follows until this Agreement has been terminated in accordance with <u>Section 6</u> below:

a.   <u>Generally</u>.   Each of the Parties will use commercially reasonable efforts to cause to occur and cooperate in the prompt consummation of the Transaction on terms and conditions consistent in all respects with the Term Sheet and this Agreement.   Each of the Parties shall also cooperate with each other in good faith and shall use commercially reasonable efforts to coordinate their activities in connection with all matters concerning the pursuit, implementation, and consummation of the Transaction.   The agreements, representations, warranties, covenants, and obligations of the Consenting Creditors,[2] Emerge GP, and the Consenting Equity Holders under or in connection with this Agreement are several and not joint in all respects.   Any breach or violation of this Agreement by a Party shall not result in liability for any other Party.

b.   <u>Form of Transaction</u>.   The Transaction shall be effectuated as an Out-of-Court Restructuring unless the Committee determines (in good faith) that execution of the Out-of-Court Restructuring as contemplated in the Term Sheet is no longer reasonably possible or in the best interests of the Company and its stakeholders.   In that event, the Company shall, as soon as practicable, effectuate the In-Court Reorganization on terms and conditions consistent in all respects with the Term Sheet, in one or more cases (the "**Chapter 11 Cases**") filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to be commenced in the Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") that shall (i) contemplate a Plan (as defined below) that is consistent in all respects with the terms and conditions of Appendix 1 of the Term Sheet, or (ii) to the extent the Chapter 11 Cases involve any sale of assets pursuant to section 363 or 1123 of the Bankruptcy Code, provide that the Noteholders may serve as a stalking horse, with standard stalking horse protections, and can credit bid in connection with the purchase of such assets.

2.   <u>Agreement Effective Date</u>

This Agreement shall be effective at 12:01 a.m. prevailing Eastern Time on the date hereof; <u>provided</u> that, as of such date, (i) the Company, Emerge GP, the Consenting Equity Holders, the Revolving Loan Agent, Revolving Loan Lenders holding 100% of the outstanding aggregate principal amount of the Revolving Loan Obligations, the Notes Agent, and Noteholders holding 100% of the outstanding aggregate principal amount of the Notes Purchase Obligations shall have executed and delivered to each other counterpart signature pages to this Agreement; (ii) the Board of Emerge GP shall have approved and adopted the Charter annexed hereto as <u>Exhibit B</u>, and (iii) Emerge Holdings shall have executed and delivered the Voting Proxy to the Committee

---

[2]   As used herein, the term "**Consenting Creditors**" means, collectively, the Revolving Loan Agent, the Consenting Revolving Loan Lenders, the Notes Purchase Agent, and the Consenting Noteholders.

(such date, the "**Agreement Effective Date**").  The terms and provisions of this Agreement, and the rights, agreements, covenants, and the obligations of the Parties hereunder, shall not become effective or binding until the occurrence of the Agreement Effective Date.

3.    All Parties:  Implementation of the Transaction

Subject to the terms and conditions of this Agreement and the exhibits attached hereto, each Party hereby covenants and agrees, from the Agreement Effective Date until this Agreement has been terminated as to it in accordance with Section 6 below:

(i)    to negotiate in good faith the definitive documents implementing, achieving or relating to the Transaction or described in or contemplated by this Agreement or the Term Sheet (collectively, such definitive documents, the "**Definitive Documents**"), including, but not limited to, any stock purchase agreement, asset purchase agreement, equity transfer agreement, stockholder agreement, equity commitment agreement, and partnership agreement; and any chapter 11 motions, orders and related documents, including, but not limited to, debtor-in-possession and exit financing documents, cash collateral orders and related budgets, and all related agreements, documents, exhibits, annexes and schedules and, if applicable, the chapter 11 plan of reorganization (the "**Plan**"), the disclosure statement used to solicit votes on the Plan (the "**Disclosure Statement**"), the order of the Bankruptcy Court confirming such Plan (the "**Confirmation Order**") and any "first day" pleadings to be filed by the Company in connection with the Chapter 11 Cases, in each case the terms and conditions of which will be consistent in all respects with the Term Sheet, as such definitive documents are approved in writing by, or amended, modified or supplemented from time to time with the written consent of, the Committee and Noteholders holding more than 50% of the outstanding aggregate principal amount of the Notes Purchase Obligations (the "**Majority Noteholders**");

(ii)    to promptly execute and deliver (to the extent they are a party thereto) and otherwise support the prompt consummation of the transactions contemplated by the Definitive Documents; and

(iii)    not object to, delay, impede, commence any proceeding, or take any other action to interfere, directly or indirectly, in any material respect with the prompt consummation of the Transaction (or instruct, direct, encourage or support any person or entity to do any of the foregoing).

4.    Support of the Transaction

a.    Consenting Creditors Support.  Subject to the terms and conditions of this Agreement and the exhibits attached hereto, each Consenting Creditor agrees that, until this Agreement has been terminated as to it in accordance with Section 6, it will:

(i)    not accelerate the Revolving Loan Obligations or Notes Purchase Obligations, not commence an involuntary bankruptcy case against the Company, and not foreclose, take any enforcement action, or otherwise exercise any remedy against or realize upon any portion of the Collateral (as defined under the Revolving Loan Agreement); provided that the Consenting Creditors further agree that this Section 4(a)(i) shall survive and continue to

4

apply for the benefit of the Company for two (2) business days after this Agreement has been terminated in accordance with Section 6 below;

(ii)    not object to, or otherwise commence any proceeding to oppose, the Transaction, the confirmation or consummation of the Plan, or approval of the Disclosure Statement;

(iii)    not take any action to prevent, delay or impede the consummation of the Transaction or the Definitive Documents;

(iv)    provided that such Consenting Creditors, as applicable, have been solicited in accordance with applicable law, tender for exchange all notes beneficially owned by such Consenting Noteholder or for which it is the nominee, investment manager, or advisor for beneficial holders thereof for New Equity Interests;

(iv)    provided that such Consenting Creditors, as applicable, have been solicited in accordance with sections 1125 and 1126 of the Bankruptcy Code, if applicable, and other applicable law, vote all claims (as defined in Section 101(5) of the Bankruptcy Code) beneficially owned by such Consenting Creditor or for which it is the nominee, investment manager, or advisor for beneficial holders thereof in favor of the Transaction (and to accept the Plan, if applicable) and in favor of the releases, indemnity and exculpation provided under the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying voting materials, and return a duly-executed ballot in connection therewith no later than the applicable deadline set forth in the Disclosure Statement;

(v)    not change, withdraw or revoke (or seek to change, withdraw or revoke) its participation in the Transaction or any vote to accept the Plan;

(vi)    not "opt out" of or object to any releases, indemnity or exculpation provided under the Plan (and to the extent required by such ballot, affirmatively "opt in" to such releases, indemnity and exculpation); and

(vii)    not support or vote in favor of any other plan of reorganization or liquidation proposed or filed, or to be proposed or filed, in the Chapter 11 Cases if commenced.

Notwithstanding the foregoing, in the event that (i) the Bankruptcy Court does not approve the releases and exculpation as described in the Term Sheet pursuant to the Confirmation Order and (ii) this Agreement has not been terminated as of the date of entry of the Confirmation Order, then each Consenting Creditor covenants and agrees to support and not object to the Reorganized Company providing such releases and exculpation (and, to the extent applicable, take reasonable steps to cause the Reorganized Company to provide such releases and exculpation) as promptly as reasonably possible after the occurrence of the date on which the Transaction is substantially consummated in accordance with the terms and conditions of the Definitive Documents (the "**_Effective Date_**") (and each Consenting Creditor covenants and agrees not to object to, delay, impede, or take any other action (including to instruct or direct any other person or entity) to interfere with the prompt consummation thereof), which covenants and agreements shall survive the occurrence of the Termination Date.

b.      <u>Emerge GP and Consenting Equity Holders Support</u>.  Subject to the terms and conditions of this Agreement and the exhibits attached hereto, Emerge GP and each Consenting Equity Holder agrees that, until this Agreement has been terminated as to it in accordance with <u>Section 6</u>, it will:

(i)      not object to, or otherwise commence any proceeding to oppose, the Transaction, the confirmation or consummation of the Plan, or approval of the Disclosure Statement;

(ii)     not take any action to prevent, delay or impede the consummation of the Transaction or the Definitive Documents;

(iii)    provided that it has been solicited in accordance with sections 1125 and 1126 of the Bankruptcy Code, if applicable, and other applicable law and solely to the extent that it is a member of a voting class under the Plan, to vote all Existing Equity Interests beneficially owned by it or for which it is the nominee, investment manager, or advisor for beneficial holders thereof in favor of the Transaction (and to accept the Plan, if applicable) and in favor of the releases, indemnity and exculpation provided under the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying voting materials, and return a duly-executed ballot in connection therewith no later than the applicable deadline set forth in the Disclosure Statement;

(iv)     not change, withdraw or revoke (or seek to change, withdraw or revoke) its participation in the Transaction or its vote to accept the Plan;

(v)      not "opt out" of or object to any releases, indemnity or exculpation provided under the Plan (and to the extent required by such ballot, affirmatively "opt in" to such releases, indemnity and exculpation); and

(vi)     not support or vote in favor of any other plan of reorganization or liquidation proposed or filed, or to be proposed or filed, in the Chapter 11 Cases if commenced.

c.      <u>Service on Committee</u>.    Notwithstanding anything in this Agreement to the contrary, if any Consenting Creditor is appointed to, and serves on a committee in the Chapter 11 Cases, the terms of this Agreement shall not be construed to limit its exercise of fiduciary duties in its role as a member of such committee, and any exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; <u>provided</u>, <u>however</u>, that service as a member of a committee shall not relieve such Consenting Creditor of its obligations to affirmatively support, and vote to accept, the Plan, on the terms and conditions set forth herein; <u>provided</u>, <u>further</u>, that nothing in this Agreement shall be construed as requiring any Consenting Creditor to serve on any committee in the Chapter 11 Cases.

d.      <u>Definitive Documents; Other Rights Reserved</u>.  The agreements, covenants, and obligations of each Party under <u>Section 1</u>, <u>Section 3</u> and this <u>Section 4</u> are conditioned upon and subject to the terms and conditions of the Transaction and the Definitive Documents being consistent in all respects with this Agreement and the Term Sheet.  Unless expressly limited herein, nothing contained herein shall limit the ability of Emerge GP, a

6

Consenting Creditor, or a Consenting Equity Holder to (i) consult with the Company or any other Party (or any of their respective professionals or advisors) or (ii) appear and be heard concerning any matter arising in the Chapter 11 Cases; provided, that such consultation or appearance is not inconsistent with such Party's covenants and obligations under this Agreement.

5.    Company's Obligations to Support the Transaction

a.    Subject to the terms and conditions of this Agreement and the exhibits attached hereto, and until this Agreement has been terminated as to it in accordance with Section 6, the Company shall, subject to its applicable fiduciary duties, use its commercially reasonable best efforts to:

(i)    support and promptly consummate the Transaction as expeditiously as practicable under applicable law on terms and conditions consistent in all respects with the Term Sheet;

(ii)    obtain any and all required regulatory and/or third-party approvals for the Transaction as expeditiously as practicable (if any and to the extent such approvals are not overridden by the Bankruptcy Code);

(iii)    not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay consummation of, the Transaction; and

(iv)    not file or otherwise pursue a chapter 11 plan or any other Definitive Document that is inconsistent with the terms of this Agreement and the Term Sheet;

b.    Notwithstanding the foregoing, in the event that (i) the Bankruptcy Court does not approve the releases and exculpation as described in the Term Sheet pursuant to the Confirmation Order and (ii) this Agreement has not been terminated as of the date of entry of the Confirmation Order, then the Reorganized Company covenants and agrees to provide such releases and exculpation as promptly as reasonably possible after the occurrence of the Effective Date, which covenants and agreements shall survive the occurrence of the Termination Date.

c.    Notwithstanding anything to the contrary herein, the Company (solely at the direction of, and with the consent of, the Committee from the Agreement Effective Date until the Reversion Date) shall be entitled, at any time prior to consummation of the Transaction, to solicit, encourage and initiate any offer or proposal from, enter into any agreement with, or engage in any discussions or negotiations with any person or entity concerning any actual or proposed transaction involving any or all of (i) a competing plan of reorganization or other financial and/or corporate restructuring of the Company, (ii) the issuance, sale or other disposition of any equity or debt interests, or any material assets, of the Company, or (iii) a merger, consolidation, business combination, liquidation, recapitalization, refinancing or similar transaction involving the Company (each, an "**Alternative Transaction**"), in each case to the extent the Committee determines in good faith that such Alternative Transaction best maximizes value for the applicable Company entity and its stakeholders.  At all times prior to the date on which the Transaction is consummated, the Company shall promptly deliver to the other Parties all written communications delivered to or received by the Company or any of its advisors making

7

or materially modifying any alternative offers, including, without limitation, copies of all expressions of interest, term sheets, letters of interest, offers, and proposed agreements related to the foregoing.

6.  Termination

a.  All Parties.  This Agreement shall terminate as to all Parties upon the earliest to occur of any of the following:

(i)  the Transaction is consummated;

(ii)  the Transaction is not consummated in accordance with this Agreement and the Term Sheet by December 31, 2019 (the "**Outside Date**"), as such date may be further extended in writing from time to time by Emerge GP, the Company (with the consent of the Committee from the Agreement Effective Date until the Reversion Date), and the Majority Noteholders;

(iii)  Emerge GP, the Company (with the consent of the Committee from the Agreement Effective Date until the Reversion Date), and the Majority Noteholders mutually agree to such termination in writing; or

(iv)  this Agreement is terminated pursuant to and in accordance with paragraph (b) or (c) of this Section 6.

b.  The Company.  The Company (with the consent of the Committee from the Agreement Effective Date until the Reversion Date) may terminate this Agreement by written notice to the other Parties upon the occurrence of any of the following events:

(1)  upon a material breach by any Consenting Creditor of its obligations hereunder (a "**Defaulting Creditor**"), which breach is not cured within five (5) business days after the giving of written notice of such breach; provided, however, the Company may not terminate this Agreement if the Consenting Revolving Loan Lenders and the Consenting Noteholders that remain after excluding such Defaulting Creditor still constitute the Majority Revolving Loan Lenders (as defined below) and the Majority Noteholders;

(2)  if the Committee from the Agreement Effective Date until the Reversion Date (and thereafter, if any of the board of directors, boards of managers, or other governing body of Emerge LP or any Emerge LP Subsidiary, as applicable) determines, in good faith and based upon advice of legal counsel, that proceeding with the Transaction would be inconsistent with the exercise of its applicable fiduciary duties under applicable law (if any), rule or regulation; or

(3)  if the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Transaction or declares this Agreement or any material provision contained herein to be unenforceable.

c.    <u>Consenting Creditors</u>.  Revolving Loan Lenders holding more than 50% of the outstanding aggregate principal amount of the Revolving Loan Obligations (the "**Majority Revolving Loan Lenders**") and the Majority Noteholders may terminate this Agreement by written notice to the other Parties upon the occurrence of any of the following events:

(1)    upon a material breach by the Company, Emerge GP, or any Consenting Equity Holder of its respective obligations hereunder, which breach is not cured within five (5) business days after the giving of written notice of such breach;

(2)    in the event the Chapter 11 Cases are commenced, either (a) the Company (i) withdraws the Plan, (ii) moves to voluntarily dismiss any of the Chapter 11 Cases, (iii) moves for conversion of any of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code, or (iv) moves for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or trustee in any of the Chapter 11 Cases, or (b) a final order is entered by the Bankruptcy Court granting any of the relief described in clauses (ii), (iii) or (iv) above;

(3)    if the Company enters into an Alternative Transaction or shall have publicly announced its intention to support or pursue, or entered into any agreement to support or pursue, an Alternative Transaction;

(4)    in the event the Chapter 11 Cases are commenced, the Company files any motion or other pleading with the Bankruptcy Court indicating its intention to support or pursue, or files with the Bankruptcy Court, any chapter 11 plan of reorganization (or related disclosure statement) that is inconsistent in any material respect with this Agreement and the Term Sheet;

(5)    in the event the Company determines not to pursue the Transaction in accordance with <u>Section 6(b)(2)</u> of this Agreement; or

(6)    if the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Transaction or declares this Agreement or any material provision contained herein to be unenforceable.

Notwithstanding anything to the contrary herein, any right to terminate this Agreement as to the Consenting Creditors may be exercised only by the Majority Revolving Loan Lenders and the Majority Noteholders on behalf of all Consenting Creditors, and may not be exercised by one or more individual Consenting Creditors not constituting the Majority Revolving Loan Lenders and the Majority Noteholders.

d.    <u>Emerge GP and the Consenting Equity Holders</u>.  Emerge GP and the Consenting Equity Holders may terminate this Agreement, solely as to themselves, by written notice to the other Parties upon the occurrence of any of the following events:

(1)     upon a material breach by the Company of its respective obligations hereunder, which breach is not cured within five (5) business days after the giving of written notice of such breach;

(2)     upon a material breach by any Consenting Creditor of its respective obligations hereunder, which breach is not cured within five (5) business days after the giving of written notice of such breach; provided, however, neither Emerge GP nor any Consenting Equity Holder may terminate this Agreement if the Consenting Revolving Loan Lenders and the Consenting Noteholders that remain after excluding such Defaulting Creditor still constitute the Majority Revolving Loan Lenders (as defined below) and the Majority Noteholders;

(3)     upon the execution or delivery of, or the amendment, modification, or waiver of any term or condition of, any Definitive Document (including with respect to any sale of assets pursuant to Section 363 or 1123 of the Bankruptcy Code) without the prior written consent of Emerge GP and the Consenting Equity Holders to the extent such Definitive Document or proposed amendment, modification or waiver either (i) adversely changes the economic treatment of the holders of Existing Equity Interests, Emerge GP or any Consenting Equity Holder in a material and disproportionate manner relative to the Consenting Noteholders or (ii) adversely changes the releases, exculpation, indemnities or other benefits to be provided to Emerge GP or any Consenting Equity Holder or any of their respective affiliates, subsidiaries, members, managers, professionals, directors, or officers, in each case as contemplated by the Term Sheet as in existence as of the date hereof;

(4)     if the Bankruptcy Court or other governmental authority with jurisdiction shall have issued any order, injunction or other decree or taken any other action, in each case, which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the implementation of the Transaction or declares this Agreement or any material provision contained herein to be unenforceable; or

(5)     in the event the Company determines not to pursue the Transaction in accordance with Section 6(b)(2) of this Agreement.

Notwithstanding anything in this Agreement to the contrary, any termination of this Agreement pursuant to this sub-paragraph (d) by Emerge GP or the Consenting Equity Holders shall not limit, alter, or impair any term or condition of this Agreement between or among the Company, on the one hand, and the Consenting Creditors, on the other hand, and this Agreement shall remain binding and enforceable as between or among such Parties and otherwise in full force and effect as to such Parties unless and until this Agreement is terminated in accordance with sub-paragraph (a), (b) or (c) of this Section 6.

e.     Effect of Termination.  If this Agreement is terminated pursuant to this Section 6, any and all further agreements, obligations, and covenants of the applicable Parties hereunder shall be terminated without further liability (except for such agreements, obligations, and covenants that expressly survive such termination).  If this Agreement may be terminated at a time when permission of the Bankruptcy Court is required for a Party to terminate, or cause the termination of, this Agreement (or for such Party to change, revoke or withdraw, or cause to change, revoke or withdraw, its vote to accept the Plan), no other Party shall oppose any attempt

10

by such moving Party to obtain Bankruptcy Court approval for such act or action; provided that the moving Party has otherwise fully complied with the terms and conditions of this Section 6. Notwithstanding anything to the contrary in this Agreement, (i) no termination of this Agreement shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination; and (ii) the right to terminate this Agreement under this Section 6 shall not be available to any Party whose failure to fulfill any of its material obligations under this Agreement has been the cause of, or resulted in, the occurrence of the proposed termination event.

7.    Representations of the Company

The Company hereby jointly and severally represents and warrants to the other Parties that the following statements are true and correct in all material respects as of the date hereof:

a.    Power and Authority.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

b.    Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

c.    No Conflicts.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its organizational documents or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party or under its organizational documents.

d.    Governmental Consents.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than (i) such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission; (ii) the filing of a pre-merger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, including the rules and regulations promulgated thereunder (the "**HSR Act**"), which, to the extent required, have been or will be made, and (iii) such filings as may be necessary or required in connection with the Chapter 11 Cases.

e.    Binding Obligation. This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization moratorium, or other similar laws relating to or relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

f.    No Litigation.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

11

g.  <u>Representation</u>.  It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement and the Term Sheet, and has had the contents hereof fully explained by such counsel and is fully aware of such contents and legal effect.

h.  <u>No Claims</u>.  To the best of its knowledge, there are no actions, suits, orders, directives or other legal or regulatory proceedings instituted, pending or threatened against any current or former officer, director or employee of Emerge GP or the Company (in their respective capacities as such) before any court or arbitrator or any governmental authority or instituted by any governmental authority, which action, suit, order, directive or other legal or regulatory proceeding would require, or be subject to, indemnity or reimbursement by Emerge GP or the Company.

i.  <u>Specified Leases</u>.  The Company is not party to any material railcar or terminal lease other than the railcar and terminal leases listed on Exhibit 3 attached to the Term Sheet.

j.  <u>Emerge GP</u>.  Emerge GP is the sole and exclusive general partner of Emerge LP.

8.  <u>Representations of the Consenting Creditors</u>

Each of the Consenting Creditors severally, but not jointly, represents and warrants to the other Parties that the following statements are true and correct in all material respects as of the date hereof with respect to itself only:

a.  <u>Holdings by Consenting Creditors</u>.  It either (i) is the sole legal and beneficial owner of the principal amount of Revolving Loan Obligations and Notes Purchase Obligations set forth opposite its name on <u>Schedule A</u> attached hereto and all related claims, rights and causes of action arising out of or in connection with or otherwise relating thereto (for each such Consenting Creditor, the "**Consenting Creditor Claims**"), in each case free and clear of all claims, liens and encumbrances, or (ii) has sole investment or voting discretion with respect to such Consenting Creditor Claims and has the power and authority to bind the beneficial owner(s) of such Consenting Creditor Claims to the terms of this Agreement.  It has full and sole power and authority to vote on and consent to matters concerning such Consenting Creditor Claims with respect to the Transaction.

b.  <u>Prior Transfers</u>.  It has made no prior assignment, sale, grant, pledge, conveyance, or other transfer of, and has not entered into any agreement to assign, sell, grant, pledge, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in its Consenting Creditor Claims or its voting rights with respect thereto.

c.  <u>Power and Authority</u>.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

US-DOCS\106874274.7

d.      Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

e.      No Conflicts.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its certificate of incorporation or by-laws (or other organizational documents) or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents).

f.      Governmental Consents.   The execution and delivery of this Agreement and the performance of its obligations hereunder do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than (i) such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission, (ii) any necessary filings under the HSR Act, which, to the extent required, have been or will be made, and (iii) such filings as may be necessary or required in connection with the Chapter 11 Cases.

g.      Binding Obligation. This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization moratorium, or other similar laws relating to or relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

h.      No Litigation.   No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

i.      Representation.  It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement and the Term Sheet, and has had the contents hereof fully explained by such counsel and is fully aware of such contents and legal effect.

j.      Accredited Investor.  It is (i) a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities of the Company (including any securities that may be issued in connection with the Transaction), making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, (ii) an "accredited investor" within the meaning of Rule 501 of the Securities Act of 1933 (as amended) or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933 (as amended) and (iii) acquiring any securities that may be issued in connection with the Transaction for its own account and not with a view to the distribution thereof. Each Consenting Creditor hereby further confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient.

9.      Representations of Emerge GP and Consenting Equity Holders

Emerge GP and each of the Consenting Equity Holders severally, but not jointly, represents and warrants to the other Parties that the following statements are true and correct in all material respects as of the date hereof with respect to itself only:

a.      Ownership of Existing Equity Interests.  It is the sole legal and beneficial owner of the Existing Equity Interests set forth opposite its name on Schedule B attached hereto, free and clear of all claims, liens and encumbrances (other than claims, liens, and encumbrances arising under or in connection with the Revolving Loan Facility and the Notes Purchase Facility) and has full and sole power and authority to consent to matters concerning such Existing Equity Interests with respect to the Transaction.  No other affiliate or subsidiary of it owns or controls any Existing Equity Interests other than as set forth opposite its name on Schedule B attached hereto.

b.      Prior Transfers.  It has made no prior assignment, sale, grant, pledge, conveyance, or other transfer of, and has not entered into any agreement to assign, sell, grant, pledge, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in its Existing Equity Interests (other than claims, liens, and encumbrances arising under or in connection with the Revolving Loan Facility and the Notes Purchase Facility) or its voting rights with respect thereto (other than the Voting Proxy).

c.      Power and Authority.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

d.      Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

e.      No Conflicts.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its organizational documents or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party or under its organizational documents.

f.      Governmental Consents.  The execution and delivery of this Agreement and the performance of its obligations hereunder do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, other than (i) such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission, (ii) any necessary filings under the HSR Act, which, to the extent required, have been or will be made, and (iii) such filings as may be necessary or required in connection with the Chapter 11 Cases.

g.      Binding Obligation.  This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization moratorium, or other similar laws relating to or

14

relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

h.    <u>No Litigation</u>.    No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

i.    <u>Representation</u>.    It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement and the Term Sheet, and has had the contents hereof fully explained by such counsel and is fully aware of such contents and legal effect.

j.    <u>No Claims</u>.    To the best of its knowledge, there are no actions, suits, orders, directives or other legal or regulatory proceedings instituted, pending or threatened against any current or former officer, director or employee of Emerge GP or the Company (in their respective capacities as such) before any court or arbitrator or any governmental authority or instituted by any governmental authority, which action, suit, order, directive or other legal or regulatory proceeding would require, or be subject to, indemnity or reimbursement by Emerge GP or the Company.

k.    <u>Accredited Investor</u>.    It is (i) a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities of the Company (including any securities that may be issued in connection with the Transaction), making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, and (ii) an "accredited investor" within the meaning of Rule 501 of the Securities Act of 1933 (as amended) or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933 (as amended).  It hereby further confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient.

10.    <u>Additional Claims and Interests</u>

This Agreement shall in no way be construed to preclude a Consenting Creditor from acquiring additional claims against or interests in the Company (collectively, the "**Additional Claims/Interests**").  However, in the event a Consenting Creditor (or any of their respective controlled funds) shall acquire any such Additional Claims/Interests after the date hereof (or holds such Additional Claims/Interests as of the date hereof), such Additional Claims/Interests shall automatically be deemed, without further notice to or action of any Party, to be subject to the terms and conditions of this Agreement.

11.    <u>Transfer of Claims and Existing Equity Interests</u>

Each Consenting Creditor agrees that, until this Agreement has been terminated as to it in accordance with <u>Section 6</u>, it will not, directly or indirectly, (i) sell, transfer, pledge, assign, hypothecate, grant an option on, or otherwise convey or dispose of any of its Consenting Noteholder Claims (except in connection with consummation of the Transaction), unless such

15

transferee or other recipient is either a Party hereto or has executed and delivered to the Company a joinder, substantially in the form attached hereto as <u>Exhibit D</u> and otherwise in form and substance reasonably satisfactory to the Company and the Majority Noteholders, or (ii) grant any proxies, deposit any of the Consenting Noteholder Claims into a voting trust or enter into a voting agreement with respect to any of the Consenting Noteholder Claims (collectively, a "**Claim Transfer**"). Any attempted or proposed Claim Transfer that does not comply with the foregoing shall be deemed void *ab initio* and of no force or effect. No Consenting Creditor shall have any liability under this Agreement arising from or related to the failure of its transferee to comply with the terms of this Agreement.

Emerge GP and each Consenting Equity Holder agrees that, until this Agreement has been terminated as to it in accordance with <u>Section 6</u>, it will not, directly or indirectly, (i) sell, transfer, pledge, assign, hypothecate, grant an option on, or otherwise convey or dispose of any of its Existing Equity Interests unless such transferee or other recipient is either a Party hereto or has executed and delivered to the Company a joinder, substantially in the form attached hereto as <u>Exhibit D</u> and otherwise in form and substance reasonably satisfactory to the Company and the Majority Noteholders, or (ii) grant any proxies, deposit any of its Existing Equity Interests into a voting trust or enter into a voting agreement with respect to any of its Existing Equity Interests, in each case except pursuant to the Voting Proxy (collectively, an "**Equity Transfer**"). Any attempted or proposed Equity Transfer that does not comply with the foregoing shall be deemed void *ab initio* and of no force or effect. Emerge GP and the Consenting Equity Holders shall not have any liability under this Agreement arising from or related to the failure of its transferee to comply with the terms of this Agreement.

12.     Prior Negotiations

This Agreement and the exhibits attached hereto set forth in full the terms of agreement between the Parties and is intended as the full, complete and exclusive contract governing the relationship between the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect thereto; <u>provided</u>, that any confidentiality agreement between or among the Parties shall remain in full force and effect in accordance with its terms; <u>provided</u>, further, that the Parties intend to enter into the Definitive Documents after the date hereof to consummate the Transaction.

13.     Amendment or Waiver

No waiver, modification or amendment of the terms of this Agreement or the exhibits attached hereto shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Company (with the consent of the Committee from the Agreement Effective Date until the Reversion Date), the Majority Revolving Loan Lenders, and the Majority Noteholders; <u>provided</u>, that any term or provision of this Agreement or the exhibits attached hereto that expressly requires the consent or approval of a particular Party shall require, as applicable, the written consent or approval of such Party to waive, amend or modify such term or provision. No waiver of any of the provisions of this Agreement or the exhibits attached hereto shall be deemed or constitute a waiver of any other provision of this Agreement or the exhibits attached hereto, whether or not similar, nor shall any waiver be deemed a continuing waiver. Any amendment,

waiver, or modification of this <u>Section 13</u> shall require the written consent of all Parties.  In determining whether any consent or approval has been given or obtained by the Majority Revolving Loan Lenders, the Majority Noteholders, and/or all Consenting Creditors, as applicable, each then existing Defaulting Creditor and its respective Consenting Creditor Claims shall be excluded from such determination.

14.    **<u>WAIVER OF JURY TRIAL</u>**

**EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EXHIBITS ATTACHED HERETO.**

15.    <u>Governing Law and Consent to Jurisdiction and Venue</u>

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or the exhibits attached hereto or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States District Court for the Southern District of New York and only to the extent such court lacks jurisdiction, in the New York State Supreme Court sitting in the Borough of Manhattan, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the jurisdiction of such courts, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to jurisdiction and venue, upon any commencement of the Chapter 11 Cases and until the effective date of the Plan, each of the Parties agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement or the exhibits attached hereto.

16.    <u>Specific Performance</u>

It is understood and agreed by the Parties that, without limiting any rights or remedies available under applicable law or in equity, money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

17.    <u>Reservation of Rights; Settlement Discussions</u>

Except as expressly provided in this Agreement or the exhibits attached hereto, nothing herein is intended to, or does, in any manner, waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests.  Notwithstanding anything to the contrary contained in this Agreement or the exhibits attached hereto, nothing in this Agreement or the exhibits attached hereto shall be, or shall be deemed to be or constitute: (i) a release, waiver, novation, cancellation, termination or discharge of the Consenting Creditor Claims (or any security

17

interest or lien securing such claims) or the Existing Equity Interests; or (ii) an amendment, modification or waiver of any term or provision of the Revolving Loan Facility or Notes Purchase Facility or any related loan document, which are hereby reserved and reaffirmed in full. If the Transaction is not consummated, or if this Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their respective rights and remedies thereunder and applicable law.

This Agreement and the Transaction are part of a proposed settlement of a dispute among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and the exhibits attached hereto and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement or the exhibits attached hereto (as applicable).

18.    Headings; Recitals

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement. The recitals to this Agreement are true and correct and incorporated by reference into this Section 18.

19.    Notice

Any notices or other communications required or permitted under, or otherwise in connection with, this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person or upon confirmation of receipt when transmitted by facsimile transmission (but only if followed by transmittal by national overnight courier or hand for delivery on the next business day) or on receipt after dispatch by registered or certified mail, postage prepaid, or on the next business day if transmitted by national overnight courier, addressed in each case as follows:

If to the Company, Emerge GP, or any Consenting Equity Holder:

Superior Silica Sands LLC
5600 Clearfork Main Street, Suite 400
Ft. Worth, TX 76109
Attn: Rick Shearer
rick@sssand.com

-and-

Insight Equity
1400 Civic Place, Suite 250
Southlake, TX 76092
Attn: Warren Bonham
wbonham@insightequity.com

*with a copy to*:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834
Attn:  Keith A. Simon
Direct Dial:  212.906.1372
Fax:  212.751.4864
Email: keith.simon@lw.com

-and-

Hunton Andrews Kurth LLP
600 Travis Street, Suite 4200
Houston, TX 77002
Attn:  Tad Davidson
Direct Dial:  713.220.3810
Fax:  713.220.4285
Email:  TadDavidson@HuntonAK.com

If to any Consenting Creditor:

To the address (if any) specified on the signature page of this Agreement
for the applicable Consenting Creditor

*with a copy to*:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Matt Barr
       David Griffiths

Telephone:  212.310.8000
Fax:  212.310.8007
Email: matt.barr@weil.com
        david.griffiths@weil.com

20.    Successors and Assigns

Subject to Section 11, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto, without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement.  This Agreement is intended to and shall bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives.

19

21.   No Third-Party Beneficiaries

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or shall otherwise be entitled to enforce any provision hereof.

22.   Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Any Party hereto may execute and deliver a counterpart of this Agreement by delivery by facsimile transmission or electronic mail of a signature page of this Agreement signed by such Party, and any such facsimile or electronic mail signature shall be treated in all respects as having the same effect as having an original signature.

23.   No Consideration

It is hereby acknowledged by the Parties that no pecuniary consideration shall be due or paid to the Parties in exchange for their support of the Transaction or vote to accept the Plan, other than the obligations imposed upon such Party pursuant to the terms of this Agreement.

24.   Acknowledgement; Not a Solicitation

This Agreement does not constitute, and shall not be deemed to constitute (i) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934 (or any other federal or state law or regulation), (ii) a solicitation for consents to the Out-of-Court Restructuring or (iii) a solicitation of votes on the Plan for purposes of the Bankruptcy Code.  The consent of each Consenting Creditor and Consenting Equity Holder to the Out-of-Court Restructuring and vote to accept or reject the Plan shall not be solicited except in accordance with applicable law.

25.   Public Announcement and Filings

Except as required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body, or in filings to be made with the Bankruptcy Court, no Party shall, nor shall it permit any of its respective affiliates to, make any public announcement in respect of this Agreement or the transactions contemplated hereby or by the Term Sheet without the prior written consent of the Company and the Majority Noteholders (in each case such consent not to be unreasonably withheld).  Notwithstanding the foregoing, the Company shall not be required to keep confidential the aggregate holdings of all Consenting Creditors, and each Consenting Creditor hereby consents to the disclosure of the execution of this Agreement by the Company, and the terms and contents hereof, in the Plan, the Disclosure Statement filed therewith, and any filings by the Company with the Bankruptcy Court or the Securities and Exchange Commission, or as otherwise required by applicable law or regulation, or the rules of any applicable stock exchange or regulatory body.

26.     Relationship Among Parties

It is understood and agreed that no Party has any duty of trust or confidence in any form with any other Party, and there are no commitments among or between them, in each case arising solely from or in connection with this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.

27.     No Strict Construction

Each Party acknowledges that it has received adequate information to enter into this Agreement, and that this Agreement and the exhibits attached hereto have been prepared through the joint efforts of all of the Parties.  Neither the provisions of this Agreement or the exhibits attached hereto nor any alleged ambiguity herein or therein shall be interpreted or resolved against any Party on the ground that such Party's counsel drafted this Agreement or the exhibits attached hereto, or based on any other rule of strict construction.

28.     Remedies Cumulative; No Waiver

All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

29.     Severability

If any portion of this Agreement or the exhibits attached hereto shall be held to be invalid, unenforceable, void or voidable, or violative of applicable law, the remaining portions of this Agreement and the exhibits attached hereto (as applicable) so far as they may practicably be performed shall remain in full force and effect and binding on the Parties hereto, provided that, this provision shall not operate to waive any condition precedent to any event set forth herein.

30.     Time of Essence

Time is of the essence in the performance of each of the obligations of the Parties and with respect to all covenants and conditions to be satisfied by the Parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.  If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

US-DOCS\106874274.7

31.     <u>Additional Parties</u>

Without in any way limiting the provisions hereof, additional Revolving Loan Lenders and Noteholders may elect to become Parties by executing and delivering to the Company a counterpart hereof.  Such additional Revolving Loan Lenders and Noteholders shall become a Party to this Agreement as a Consenting Revolving Loan Lender or Consenting Noteholder, as applicable, in accordance with the terms of this Agreement.

32.     <u>Rules of Interpretation</u>

For purposes of this Agreement, unless otherwise specified:  (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits of this Agreement; and (c) the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Agreement in its entirety rather than to a particular portion of this Agreement.

33.     <u>Term Sheet</u>

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  The Term Sheet sets forth the material terms and conditions of the Transaction; <u>provided</u>, <u>however</u>, the Term Sheet is supplemented by the other terms and conditions of this Agreement.  In the event of any conflict or inconsistency between the Term Sheet and any other provision of this Agreement, the Term Sheet will govern and control to the extent of such conflict or inconsistency.

*[Remainder of page intentionally left blank; signature page follows.]*

US-DOCS\106874274.7

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized signatories, solely in their respective capacity as such and not in any other capacity, as of the date first set forth above.

**EMERGE LP**

EMERGE ENERGY SERVICES LP

By:   Emerge Energy Services GP LLC, its general partner

By:   _____
Name: Richard J. Shearer
Title:   Chief Executive Officer

**EMERGE LP SUBSIDIARIES**

EMERGE ENERGY SERVICES OPERATING LLC

By:   _____
Name: Warren B. Bonham
Title:   Vice President

SUPERIOR SILICA SANDS LLC

By:   _____
Name: Warren B. Bonham
Title:   Vice President

EMERGE ENERGY SERVICES FINANCE CORPORATION

By:   _____
Name: Warren B. Bonham
Title:   Vice President

**EMERGE GP**

EMERGE ENERGY SERVICES GP LLC

By: _____
Name: Richard J. Shearer
Title: Chief Executive Officer

## **Exhibit A**

**Term Sheet**

April 18, 2019

THIS SUMMARY IS NOT AN OFFER FOR THE PURCHASE, SALE, EXCHANGE, HYPOTHECATION, OR OTHER TRANSFER OF SECURITIES FOR PURPOSES OF THE SECURITIES ACT OF 1933, THE SECURITIES EXCHANGE ACT OF 1934 AND/OR OTHER FEDERAL OR STATE LAW OR REGULATION OR A SOLICITATION OF ACCEPTANCES OR REJECTION OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.  THIS SUMMARY IS BEING PROVIDED IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR FEDERAL OR STATE RULE OF EVIDENCE.  THE TRANSACTIONS DESCRIBED IN THIS SUMMARY ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN.

NOTHING IN THIS TERM SHEET (INCLUDING APPENDIX 1 HERETO) SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, AND DEFENSES OF EACH PARTY HERETO.  THIS TERM SHEET (INCLUDING APPENDIX 1 HERETO) DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE DEFINITIVE DOCUMENTATION, WHICH REMAIN SUBJECT TO DISCUSSION, NEGOTIATION, AND EXECUTION (INCLUDING WITH RESPECT TO TAX ANALYSIS AND DILIGENCE MATTERS).  EXCEPT AS PROVIDED IN THE SUPPORT AGREEMENT, THIS TERM SHEET (INCLUDING APPENDIX 1 HERETO) AND THE TERMS CONTAINED HEREIN ARE CONFIDENTIAL.

SUMMARY OF PRINCIPAL TERMS OF PROPOSED RESTRUCTURING TRANSACTION

This term sheet (the "**Term Sheet**") outlines certain key terms of a proposed Out-of-Court Restructuring (as defined in the Support Agreement (as defined below)) for Emerge Energy Services GP LLC ("**Emerge GP**"), Emerge Energy Services LP ("**Emerge LP**") and each direct and indirect subsidiary of Emerge LP (each an "**Emerge LP Subsidiary**," and together with Emerge LP, the "**Company**"), and Appendix 1 hereto outlines certain key terms of a proposed In-Court Reorganization (as defined in the Support Agreement) to be executed if the Out-of-Court Restructuring cannot be consummated on the terms provided for in this Term Sheet and the Support Agreement.

Reference is made to the following documents and obligations:

(i)        that certain Second Amended and Restated Revolving Credit and Security Agreement, dated as of January 5, 2018 (as the same may be amended, modified or supplemented), by and among Emerge Energy Services Operating LLC ("**EESO**") and Superior Silica Sands LLC ("**SSS**"), as borrowers, Emerge LP, as parent guarantor, HPS Investment Partners, LLC ("**HPS**"), as administrative and collateral agent (in such capacity, together with any successor agent, the "**Revolving Loan Agent**"), and the lenders party thereto from time to time (the "**Revolving Loan Lenders**", such agreement, the "**Revolving Loan Agreement**," and such facility, the "**Revolving Loan Facility**").  Any and all claims and obligations arising under or in connection with the Revolving Loan Agreement and related loan documents are defined herein

Execution Version

as the "**Revolving Loan Obligations**".  As of the date hereof, the Revolving Credit Facility had an aggregate outstanding principal amount of approximately $66,710,000 (the "**Aggregate Outstanding Revolving Loan Amount**"), comprised of $10,181,544 in the form of letters of credit and approximately $56,528,456 in an aggregate outstanding principal amount in the form of outstanding loans, plus accrued but unpaid interest, fees, costs, and expenses; and

(ii)    that certain Second Lien Note Purchase Agreement, dated as of January 5, 2018 (as the same may be amended, modified or supplemented), by and among EESO and SSS, as issuers, Emerge LP, as parent guarantor, HPS, as notes and collateral agent (in such capacity, together with any successor agent, the "**Notes Agent**"), and the noteholders party thereto from time to time (the "**Noteholders**", such agreement, the "**Notes Purchase Agreement**," and such facility, the "**Notes Purchase Facility**").  Any and all claims and obligations arising under or in connection with the Notes Purchase Agreement and related loan documents are defined herein as the "**Notes Purchase Obligations**".  As of the date hereof, the Note Purchase Facility had an aggregate outstanding principal amount of $208,512,307 (the "**Aggregate Outstanding Notes Purchase Amount**"), plus accrued but unpaid interest, fees, costs, and expenses.

This Term Sheet is the "Term Sheet" referenced as Exhibit A in that certain Restructuring Support Agreement, dated as of April 18, 2019 (as the same may be amended, modified or supplemented, the "**Support Agreement**"), by and among the Company, Emerge GP, the direct and indirect owners of Emerge GP party thereto (the "**Consenting Equity Holders**"), the Revolving Loan Agent, the Revolving Loan Lenders party thereto (the "**Consenting Revolving Loan Lenders**"), the Notes Agent, and the Noteholders party thereto (the "**Consenting Noteholders**").  Capitalized terms used but not otherwise defined in this Term Sheet have the meanings given to such terms in the Support Agreement.  This Term Sheet supersedes any proposed summary of terms or conditions regarding the subject matter hereof, whether written or oral.

### GOVERNANCE FOR THE TRANSACTION

### Delivery of Voting Proxy

In connection with its entry into the Voting and Standstill Agreement, Emerge Energy Services Holdings LLC ("**Emerge Holdings**"), as the sole member of Emerge GP, shall deliver an irrevocable proxy (the "**Voting Proxy**") to the Committee (as defined below) on the date of execution of the Support Agreement (the "**Implementation Date**") with respect to voting for directors of Emerge GP, which Voting Proxy shall remain in full force and effect until the earlier of (i) termination of the Support Agreement solely pursuant to section 6(a) thereof, and (ii) the Effective Date (such earlier date, the "**Reversion Date**").  The Voting Proxy shall be attached as an exhibit to the Voting and Standstill Agreement, which shall be attached as an exhibit to the Support Agreement.  The sole and exclusive purpose of the Voting Proxy is to maintain the members, rights, and benefits of the Board of Directors of Emerge GP (the "**Board**") and Committee as in existence as of the Implementation Date until the Reversion Date, and the Committee shall not exercise the Voting Proxy to alter the composition of the Board as constituted on the Implementation Date or to vote the membership interests of Emerge Holdings for any matter or reason whatsoever.

### Role of the Restructuring Committee

From the Implementation Date to the Reversion Date, the Board will designate a restructuring committee (the "**Committee**") to exercise all of the powers of the Board (and the Board will relinquish all such powers delegated to the Committee) pursuant to a charter to be adopted by the Board (the "**Charter**") with respect to the following actions:

- Implement the terms of the Transaction as set forth in this Term Sheet and the Support Agreement;

- Review, evaluate, and, if appropriate, approve and authorize any actions contemplated to be taken by the Company in connection with the Transaction as set forth in or contemplated by this Term Sheet and the Support Agreement;

- Oversee discussions with the Company's key stakeholders with respect to the Transaction as set forth in or contemplated by this Term Sheet and the Support Agreement;

- Oversee the implementation and execution of the Transaction as set forth in or contemplated by this Term Sheet and the Support Agreement;

- Manage the Company's day-to-day cash management in furtherance of the Transaction as set forth in or contemplated by this Term Sheet and the Support Agreement;

- Manage and direct the Chief Restructuring Officer ("**CRO**") in furtherance of the Transaction as set forth in or contemplated by this Term Sheet and the Support Agreement.  Subject to the above and the other terms and conditions of this Term Sheet, the CRO shall be authorized and empowered by the Committee with the following responsibilities (to include and not be limited to):

  - Implement the terms of the Transaction;
  - Direct the Company's day-to-day book keeping, collections, disbursement, treasury, liquidity and reporting obligations;
  - Manage the financial and operational reporting processes to all internal and external constituents;
  - Oversight and approval of expenditures and cash payments;
  - Cash management, including vendors, A/R, taxes; financial controls and processes;
  - Coordinate and manage any asset divestitures;
  - Development of any business plan and development of any related financial models;
  - Define and constrain issues including legal, environmental, tax, and regulatory;
  - Approve any amendments or modifications to the engagement letters of the Company's professionals, and the entry into any new engagement letters for Company professionals;
  - Direct and manage the Company's professionals;
  - Evaluate and renegotiate material contracts, including railcar leases; and
  - Other services and activities as directed by the Committee.

In addition, from the Implementation Date to the Reversion Date, the Committee shall also be authorized to take such other actions as the Committee determines, in good faith, is necessary or desirable in order to carry out its mandate in accordance with the terms hereof so long as such action is in furtherance of any of the foregoing.

The Committee shall have the right, from the Implementation Date to the Reversion Date, to direct the commencement of voluntary cases (the "**Chapter 11 Cases**") of Emerge LP and the Emerge LP Subsidiaries (collectively, the "**Debtors**"), under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in the event that the Committee determines (in good faith) that execution of the Out-of-Court Restructuring as contemplated in this Term Sheet is no longer reasonably possible or in the best interests of the Company and its stakeholders.  Any such filing shall contemplate a chapter 11 plan of reorganization (as amended, supplemented or otherwise modified from time to time in accordance with this Term Sheet, the "**Plan**") that is consistent in all respects with the terms and conditions of Appendix 1

Execution Version

attached hereto or, to the extent the Chapter 11 Cases involve any sale of assets pursuant to section 363 of the Bankruptcy Code, the Noteholders may serve as a stalking horse, with standard stalking horse protections, and can credit bid in connection with the purchase of such assets. A determination by the Committee to file the Chapter 11 Cases in accordance with this Term Sheet shall not cause the occurrence of the Reversion Date.

Any directions, decisions, approvals, or other actions taken by the Committee, including any resolutions at meetings, must be decided by a majority of the Committee.

For the avoidance of doubt, the Charter shall be attached as an exhibit to the Support Agreement and it shall be effective from the Implementation Date until the Reversion Date.

### Composition of the Restructuring Committee

From the Implementation Date until the Reversion Date, the Committee shall at all times comprise two (2) independent directors appointed by the Board from a slate acceptable to the Majority Noteholders and, to the extent approved by and in the sole discretion of Emerge GP, one (1) independent director nominated by the Board.

### SUMMARY OF THE OUT-OF-COURT RESTRUCTURING

The table below summarizes the proposed treatment to be received on the Effective Date (as defined below) by holders of claims against, and interests in, the Company pursuant to the Out-of-Court Restructuring.

### CLAIMS/INTEREST

Revolving Loan Obligations

At the option of the Majority Noteholders, either (i) the Revolving Loan Obligations shall be paid in full in cash from the proceeds of the post-effective date financing facility or (ii) the Revolving Loan Agreement and related loan documents shall be amended and restated on terms and conditions acceptable to the Company, Majority Noteholders, and the Revolving Loan Lenders (or Majority Revolving Loan Lenders, as applicable) in their respective sole discretion.

Notes Purchase Obligations

Each holder of a Notes Purchase Obligation shall receive, upon and subject to the Effective Date and in full satisfaction, settlement, discharge and release of, and in exchange for, such claim and the Notes, its pro rata share of (i) new second lien secured notes with terms and conditions substantially consistent with Exhibit 1 attached hereto (the "**New Notes**") and (ii) ninety-five percent (95%) of the new ownership interests in Emerge LP (the "**New Equity Interests**"), subject to dilution by any securities that are exercisable or exchangeable for or convertible into New Equity Interests issued pursuant to the Management Incentive Plan (the "**Management Incentive Units**") and the Contingent Warrants (as defined below).

Existing Equity Interests in Emerge LP

All outstanding partnership and other ownership interests in Emerge LP (and any related options and warrants to acquire the same) (collectively, the "**Existing Equity Interests**") shall be diluted through the issuance of the New Equity Interests such that, on and as of the Effective Date, each holder of an Existing Equity Interest shall own its pro rata share of (i) five percent (5%) of the total issued and outstanding

## CLAIMS/INTEREST

equity interests of Reorganized Emerge LP (subject to dilution by the Management Incentive Units and the Contingent Warrants), with the remaining ninety-five percent (95%) of the New Equity Interests being owned by the Consenting Noteholders, and (ii) new contingent warrants issued by Reorganized Emerge LP representing fifteen percent (15%) of the New Equity Interests (subject to dilution by the Management Incentive Units), with terms and conditions materially consistent with Exhibit 2 attached hereto (the "**Contingent Warrants**").[1]  When the term New Equity Interest is used in this Term Sheet it means the 5% retained interest in the equity owned collectively by the holders of the Existing Equity Interests, as well as the 95% New Equity Interests owned collectively by the Consenting Noteholders, in each case as of the Effective Date (which 95% New Equity Interests are subject to dilution by the Contingent Warrants).

Existing Equity Interests in Emerge LP Subsidiaries

All outstanding partnership and other ownership interests in each Emerge LP Subsidiary shall remain effective and outstanding and continue to be owned by Emerge LP or the applicable Emerge LP Subsidiary on the Effective Date pursuant to the Definitive Documents.  Emerge Energy Services Operating LLC's LLC Agreement shall be amended and restated on terms and conditions reasonably acceptable to the Committee and the Majority Noteholders; provided that if the terms and conditions of such amended and restated LLC Agreement (i) adversely change the economic treatment of the holders of Existing Equity Interests, Emerge GP or any Consenting Equity Holder in a material and disproportionate manner relative to the Consenting Noteholders or (ii) adversely change the releases, exculpation, indemnities or other benefits to be provided to Emerge GP or any Consenting Equity Holder or any of their respective affiliates, subsidiaries, members, managers, professionals, directors, or officers, in each case as contemplated by this Term Sheet as in existence as of the date hereof, then such amended and restated LLC Agreement shall also be reasonably acceptable to Emerge GP or such Consenting Equity Holder, as applicable.

---

[1]  Holders of outstanding but unexercised options, warrants, calls,  puts, or any other similar agreements of any character, kind, or nature as of the Effective Date will not receive any distribution or property on account of such unexercised equity interests.

Execution Version

### OTHER TERMS OF THE TRANSACTION

**Company Professionals .....................**     Until the Effective Date (and thereafter, at the sole discretion of the Majority Noteholders), and notwithstanding the Charter, Voting and Standstill Agreement or Voting Proxy, unless and until otherwise determined in writing by Emerge GP in its sole discretion, the Company shall continue to retain, in consultation with the Committee, and shall promptly pay the reasonable fees and expenses of, the following:  (i) Houlihan Lokey, as financial advisor to the Company; (ii) Latham & Watkins LLP, as counsel to the Company; (iii) Richards Layton & Finger P.A., as Delaware counsel to the Company; and (iv) Kurtzman Carson Consultants LLC, as claims and noticing agent of the Company, in each case in accordance with the terms and conditions of the engagement letter of such applicable entity.

**Post-Effective Date Financing .....................**     Any post-Effective Date financing facility shall be on terms and conditions acceptable to the Committee and the Majority Noteholders.

**Railcar and Terminal Leases .....................**     The Railcar and Terminal Leases listed on <u>Exhibit 3</u> attached hereto shall be amended and restated on terms and conditions reasonably acceptable to the Committee and the Majority Noteholders.

**Alternate Form of Transaction.....................**     To the extent reasonably acceptable to the Committee and the Majority Noteholders, the Out-of-Court Restructuring and Definitive Documents may be altered or amended to provide that the New Equity Interests will, instead of being issued by Reorganized Emerge LP, be issued by one or more newly formed entities (each, a "**Newco**") owned and controlled, directly or indirectly, by the Consenting Noteholders or their respective designees (which Newco shall, directly or indirectly, own and control Reorganized Emerge LP); <u>provided</u> that if such alteration or amendment (i) adversely changes the economic treatment of the holders of Existing Equity Interests, Emerge GP or any Consenting Equity Holder in a material and disproportionate manner relative to the Consenting Noteholders or (ii) adversely changes the releases, exculpation, indemnities or other benefits to be provided to Emerge GP or any Consenting Equity Holder or any of their respective affiliates, subsidiaries, members, managers, professionals, directors, or officers, in each case as contemplated by this Term Sheet as in existence as of the date hereof, then such alteration or amendment shall also require the consent of Emerge GP or such Consenting Equity Holder, as applicable, which consent shall not be unreasonably withheld.

| | |
|---|---|
| **Tax Structure**………………………………… | The Out-of-Court Restructuring shall be structured as a debt-for-equity exchange consistent with the "*Summary of the Out-of-Court Restructuring*" section above; provided, however, that such structure may be modified with the mutual consent of the Committee and the Majority Noteholders which modified structure may involve, among other things, a debt-for-equity or debt-for assets exchange, an incorporation of Emerge LP and/or other corporate governance changes involving the Company prior to the Effective Date, and/or a contribution of the Notes Purchase Obligations to one or more Newco entities in connection with the Out-of-Court Restructuring. |
| **New Board & New General Partner**……………. | The initial board of directors of the New General Partner (as defined below) (the "**New Board**") to be put in place from and after the Effective Date shall be selected by the Majority Noteholders.  As majority holders of the New Equity Interests, the Majority Noteholders will appoint a new general partner of Reorganized Emerge LP (the "**New General Partner**") and Emerge GP will cease to be general partner of Emerge LP on and as of the Effective Date.  The New General Partner will be owned by the Consenting Noteholders pro rata in proportion to their ownership of New Equity Interests. |
| **Management Incentive Plan**…………………… | On the Effective Date, the New Board shall adopt a customary management incentive plan for the New General Partner and Company, as applicable (the "**Management Incentive Plan**") that provides compensation in the form of Management Incentive Units to those individuals involved in day-to-day management of the Company.  Any shares of New Equity Interests ultimately acquired pursuant to the Management Incentive Plan shall dilute the shares of New Equity Interests otherwise distributed through the Out-of-Court Restructuring.  The New Board shall determine allocation and other terms of the Management Incentive Plan. |

| | |
|---|---|
| **Releases ..............................** | The Definitive Documents will contain mutual customary releases and other exculpatory provisions in favor of the Company, Emerge GP, the Consenting Equity Holders, the Revolving Loan Agent, the Consenting Revolving Loan Lenders, the Notes Agent, and the Majority Noteholders, and each their respective current and former affiliates, subsidiaries, members, managers, equity owners, employees, professionals, directors and officers (in each case in their respective capacities as such) and other persons and entities acceptable to the Committee and Majority Noteholders. Such release shall include, without limitation, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, of the Company, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company would have been legally entitled to assert in its own right (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Effective Date arising from or related in any way in whole or in part to the Company, the Revolving Loan Agreement, the Notes Purchase Agreement, the purchase, sale, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim against or equity interest in the Company that is treated hereunder, or the negotiation, formulation, or preparation of the Definitive Documentation or related agreements, instruments, or other documents. |
| **Noteholder and Revolving Loan Lender Fees and Expenses........................** | The Company shall, upon the Implementation Date and to the extent invoiced, and thereafter upon receipt of an invoice, promptly pay, in full in cash, all reasonable fees and out-of-pocket costs and expenses of Weil, Gotshal & Manges LLP, as counsel to HPS, incurred in connection with the Transaction, drafting and/or negotiating any Definitive Document (whether or not the Transaction contemplated hereby is consummated), and in connection with the analysis, preservation or exercise of any of the respective rights or remedies of HPS, the Noteholders, the Revolving Loan Agent, or the Revolving Loan Lenders under the Revolving Loan Agreement or Notes Purchase Agreement (as applicable), or under any related loan document. |

**Execution Version**

| | |
|---|---|
| **Effective Date**……………………………….. | The date on which the Out-of-Court Restructuring is substantially consummated in accordance with the terms and conditions of the Definitive Documents. |
| **D&O Liability Insurance Policies and Indemnification**……………….…………………. | The Company and Emerge GP (as applicable) shall maintain and continue in full force and effect all insurance policies for directors', managers', and officers' liability (the "**D&O Liability Insurance Policies**"). All indemnification provisions in existence as of the date of the Support Agreement for directors, managers, and officers of the Company and Emerge GP (as applicable) (whether in by-laws, certificate of formation or incorporation, board resolutions, employment contracts, or otherwise, such indemnification provisions, "**Indemnification Provisions**") shall continue in full force and effect and shall continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date. All claims arising from the D&O Liability Insurance Policies and such Indemnification Provisions shall survive the Effective Date and be unimpaired. |
| **Wind-Down of Emerge GP and Certain Consenting Equity Holders** ………………………. | To the extent applicable, the Definitive Documents shall provide for the creation of cash reserves on the Effective Date in such amounts as are reasonably acceptable to Emerge GP, the Committee and the Majority Noteholders to fund the wind-down and dissolution of Emerge GP and certain of the Consenting Equity Holders in accordance with applicable law; provided that such aggregate amount shall not exceed $125,000 without the consent of the Majority Noteholders. |
| **Other Terms and Conditions** …………………….. | The Definitive Documents will contain such other terms and conditions (including conditions precedent) as are reasonable or customary for transactions of this type that are in furtherance of the Out-of-Court Restructuring as set forth in this Term Sheet and the Support Agreement and otherwise acceptable to the Committee and the Majority Noteholders; provided that if such other terms and conditions (i) adversely change the economic treatment of the holders of Existing Equity Interests, Emerge GP or any Consenting Equity Holder in a material and disproportionate manner relative to the Consenting Noteholders or (ii) adversely change the releases, exculpation, indemnities or other benefits to be provided to Emerge GP or any Consenting Equity Holder or any of their respective affiliates, subsidiaries, members, managers, professionals, directors, or officers, in each case as contemplated by this Term Sheet as in existence as of the date hereof, then such term or condition shall also require the consent of Emerge GP or such Consenting |

|  |  |
|---|---|
|  | Equity Holder, as applicable, which consent shall not be unreasonably withheld. |
| **Reorganized Emerge LP**……………………..…….. | Means Emerge LP, as reorganized pursuant to the Transaction. |
| **Reorganized Company**……………………..…….. | Means the Company, as reorganized pursuant to the Transaction. |

**Exhibit 1**

**New Notes**

| | |
|---|---|
| **New Notes Principal Amount**……………………..…….. | $150 million less the Aggregate Outstanding Revolving Loan Amount, or such other amount that is acceptable to the Committee and Majority Noteholders |
| **Issuers**……………………..…..… | Same as under the existing Notes Purchase Agreement |
| **Guarantors**…………………..…… | Same as under the existing Notes Purchase Agreement |
| **Collateral**…………………..…….. | Same as under the existing Notes Purchase Agreement |
| **Priority of Liens**………………… | Crossing liens structure. New Notes to have a first priority lien on fixed asset collateral, including the equity of the Issuers and Guarantors. Revolving ABL Loan Facility to have a first priority lien on borrowing base assets. |
| **Other Terms**………………..…… | The notes purchase agreement governing the New Notes shall contain terms and conditions that are customary for transactions of this type and otherwise acceptable to the Committee and the Majority Noteholders in their respective sole discretion. |

US-DOCS\106456729.14

**Exhibit 2**

**Contingent Warrants**

| | |
|---|---|
| **Shares Represented……** | Fifteen percent (15%) of the New Equity Interests, subject to dilution by the Management Incentive Units. |
| **Expiration Date…………** | 10 years from the Effective Date (the "**Expiration Date**"). |
| **Contingent Exercise……** | Only exercisable when, and if, the holders of the New Equity Interests have received cash or cash equivalent consideration, on or before the Expiration Date, of $190 million. |
| **Anti-Dilution Adjustments……………** | Customary adjustments to be agreed upon. |
| **Other Terms…………………..** | The agreement governing the Contingent Warrants shall contain terms and conditions customary for transactions of this type and otherwise acceptable to Emerge GP, the Consenting Equity Holders, the Committee and the Majority Noteholders. |

US-DOCS\106456729.14

**Exhibit 3**
**Railcar and Terminal Leases**

| | Lease Title | Lease Counterparty |
|---|---|---|
| Railcar Lessor | Master Car Master Lease Agreement | CAI Rail, Inc. |
| Railcar Lessor | Greenbrier Master Lease Agreement | Greenbrier Master Leasing Company, LLC |
| Railcar Lessor | Trinity Industries Leasing Company Railroad Car Lease Agreement | Trinity Industries Leasing Company |
| Railcar Lessor | Master Railcar Lease | CIT Rail LLC |
| Railcar Lessor | Notice and Acknowledgement of Lease Assignment | MUL Railcar Leasing, LLC |
| Railcar Lessor | Notice and Acknowledgement | The Andersons, Inc. |
| Railcar Lessor | Master Lease of Railcars | Chicago Freight Car Leasing Co. |
| Railcar Lessor | Rider Six (6) to Railroad Car Lease Agreement | Wells Fargo Rail Corporation |
| Railcar Lessor | Master Railcar Lease Agreement | SMBC Rail Services LLC |
| Terminals | Transload and Storage Services Agreements | OmniTrax Logistics Services, LLC (Bainville) |
| Terminals | Transloading Service Agreement | TORQ Transloading Inc. (Buick) |
| Terminals | Transloading and Storage Services Agreement | Tidewater Logistics Corp (Big Lake) |
| Terminals | Transloading Agreement | Evergreen Transloading Terminal Ltd (Sexsmith) |
| Terminals | Third Amendment to Sand Transload and Storage Agreement | Di-Corp Sand Transloading LP (Rocky Mountain) |
| Terminals | Transload Facility Management, Warehousing and Transportation Agreement | Arrow Material Services (Elmendorf) |
| Terminals | Rail Yard Services Agreement | Rail Logix Alamo Junction, LLC. |
| Terminals | Material Handle and Storage Agreement | Price River Terminal, LLC (Wellington) |
| Terminals | Transloading Service Agreement | TORQ Transloading Inc. (Unity) |

US-DOCS\106456729.14

# APPENDIX 1

### SUMMARY OF CONTINGENT IN-COURT REORGANIZATION

The table below summarizes the proposed treatment to be received on the effective date of the Plan (the "**Plan Effective Date**") by holders of claims against, and interests in, the Debtors pursuant to the Plan. The Plan, which shall, subject to the Committee Discretion (as defined below), contain means of implementation consistent with this Term Sheet, shall constitute a global settlement and compromise pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedures between the Parties to the Support Agreement (the "**Global Settlement and Compromise**"). The Committee shall, in good faith, use its discretion to propose and seek confirmation of the Plan in accordance with the terms set forth herein or such other terms and treatment that the Committee determines, in good faith, are necessary in order to obtain confirmation of the Plan (the "**Committee Discretion**").

**Global Settlement**

| | |
|---|---|
| **Consideration** | In connection with the Global Settlement and Compromise, and only if the class of holders of General Unsecured Claims vote to accept the Plan, the Consenting Noteholders have agreed to carve-out from their collateral a settlement fund (the "**Global Settlement Fund**") consisting of: |
| | (i) 5% of the New Common Units (as defined below), subject to dilution by the Reorg Management Incentive Units (as defined below) and the Reorg Warrants (as defined below); and |
| | (ii) Out-of-the-money warrants for 15% of the equity of the Reorganized Company and otherwise with terms and conditions consistent with the Contingent Warrants (the "**Reorg Warrants**"), subject to dilution by the Reorg Management Incentive Units. |
| **Allocation** | In the event that the Consenting Noteholders establish the Global Settlement Fund because the class of holders of General Unsecured Claims vote to accept the Plan, the Committee shall have sole discretion to determine the allocation of the Global Settlement Fund among the class of holders of General Unsecured Claims and the class of holders of Existing Emerge LP Common Units, in a manner that ensures confirmation of the Plan (the "**Committee Determination Right**"). |
| **Treatment of Claims and Interests** | |
| **Administrative Expense Claims (including 503(b)(9) Claims) …………………** | Payable in full in cash (i) on the date such amounts become due and owing in the ordinary course of business; or (ii) on or as soon as reasonably practicable after the Plan Effective Date. |
| | Unclassified—Non-Voting |
| **Priority Tax Claims…………………** | Payable in deferred cash payments over a period not longer than five (5) years after the filing of the Chapter 11 Cases in accordance with Section 1129 of the Bankruptcy Code. |
| | Unclassified—Non-Voting |

US-DOCS\106456729.14

| | |
|---|---|
| **Other Priority Claims………………** | Payable in full in cash on or as soon as reasonably practicable after the Plan Effective Date. |
| | Unimpaired—Deemed to Accept |
| **Other Secured Claims………………** | Satisfied in full through (i) payment in full in cash on or as soon as reasonably practicable after the Plan Effective Date, (ii) delivery of collateral securing any such claim and payment of any interest requested under section 506(b) of the Bankruptcy Code, (iii) reinstatement pursuant to section 1124 of the Bankruptcy Code, (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code, or (v) such other treatment as agreed to by such holder, the Debtors, and the Majority Noteholders. |
| | Unimpaired—Deemed to Accept |
| **Revolving Loan Facility………………** | The Revolving Loan Facility will be satisfied in full in cash. |
| | Unimpaired—Deemed to Accept |
| **Notes Purchase Obligations………………** | The Second Lien Notes will be partially reinstated in a principal amount and on terms satisfactory to the Committee and the Majority Noteholders. In satisfaction of the remainder of the Notes Purchase Facility, the Noteholders shall receive: |
| | (i) if the class of holders of General Unsecured Claims vote to accept the Plan, 95% of the reorganized common units of Emerge LP (such units, the "**New Common Units**"), subject to dilution by any Reorg Management Incentive Units (as defined herein) issued pursuant to the Reorg Management Incentive Plan (as defined herein) and the Reorg Warrants, or |
| | (ii) if the class of holders of General Unsecured Claims vote to reject the Plan, 100% of the New Common Units, subject to dilution by any Reorg Management Incentive Units. |
| | In addition, as owners of the New Common Units, the Noteholders will appoint a new general partner of Emerge LP and the old general partner will be removed as of the Plan Effective Date. |
| | Impaired—Entitled to Vote |
| **General Unsecured Claims………………** | If the class of holders of allowed prepetition Claims (as defined in section 101(5) of the Bankruptcy Code) against the Debtors that are not Intercompany Claims or a Claim that is secured or entitled to priority under the Bankruptcy Code (the "**General Unsecured Claims**") votes to accept the Plan, holders of allowed General Unsecured Claims shall receive their *pro rata* share of the Global Settlement Fund, as determined pursuant to the Committee Determination Right. |
| | If the class of holders of General Unsecured Claims vote to reject the Plan, the holders of allowed General Unsecured Claims shall receive no distribution under the Plan. |
| | Impaired—Entitled to Vote |

| | |
|---|---|
| **Intercompany Claims and Other Intercompany Interests……………….** | Intercompany Claims and Other Intercompany Interests shall be compromised, reinstated, or cancelled as acceptable to the Committee and the Majority Noteholders. |
| | Unimpaired—Deemed to Accept |
| **Existing Emerge LP Common Units………………** | As part of the Global Settlement and Compromise and as of the Plan Effective Date, common units of Emerge LP (the "**Existing Emerge LP Common Units**") will be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and if the class of holders of General Unsecured Claims vote to accept the Plan, holders of Existing Emerge LP Common Units shall receive their *pro rata* share of the Global Settlement Fund, as determined pursuant to the Committee Determination Right. |
| | If holders of General Unsecured Claims vote to reject the Plan, there shall be no distribution to holders of Existing Emerge LP Common Units on account of such units. |
| | Impaired—Deemed to Reject |

**<u>Other Implementation Provisions</u>**

| | |
|---|---|
| **Debtor-in-Possession Financing………………….** | To the extent acceptable to the Committee, the Revolving Loan Lenders (or a subset thereof) shall provide debtor-in-possession financing (the "**DIP Facility**") to the Debtors to fund the Chapter 11 Cases pursuant to a DIP Facility term sheet to be separately provided. |
| **Critical Vendors……………** | The Debtors shall consult with the Majority Noteholders regarding vendors that may be deemed critical vendors in the Chapter 11 Cases and estimated critical vendor payments that may be due to such vendors. Thereafter, and prior to the Petition Date (as defined below), the Debtors and the Majority Noteholders shall determine which vendors might be designated as critical vendors in the Chapter 11 Cases. |
| **Reorg Management Incentive Plan………………** | Pursuant to the Plan, following the Plan Effective Date, the new board of directors of the Company or New General Partner appointed by the Majority Noteholders (the "**Reorganized Board**") shall adopt a customary management incentive plan for the Company or New General Partner (the "**Reorg Management Incentive Plan**") that provides compensation in the form of management incentive units consisting of warrants (the "**Reorg Management Incentive Units**") to those individuals involved in day-to-day management of the Company, which Reorg Management Incentive Units shall dilute the other units issued pursuant to the Plan. Any similar existing equity-based management incentive plan will be terminated. The Reorganized Board shall determine allocation and other terms of the Reorg Management Incentive Plan. |
| **Corporate Structure; Governance………………….** | To be determined by the Reorganized Board unless otherwise required, and to be acceptable to the Majority Noteholders in their sole discretion. |

US-DOCS\106456729.14

| | |
|---|---|
| **Executory Contracts and Unexpired Leases............** | The Debtors shall only assume executory contracts and unexpired leases with the consent of the Majority Noteholders. |
| | All executory contracts and unexpired leases not expressly assumed shall be deemed rejected pursuant to the Plan. |
| | In consultation with the Majority Noteholders, the Debtors may reject executory contracts and unexpired leases during the Chapter 11 Cases. |
| | For the avoidance of doubt, any awards granted under the Reorg Management Incentive Plan will be governed by such program and will not be subject to any provisions of any rejected agreements. |
| **Vesting...................** | Upon consummation of the Plan, all of the assets of the Debtors shall vest in the Reorganized Company. |
| **Exculpations, Releases, Injunction, Waiver and Discharge...................** | The Plan shall include a release, exculpation and indemnity provision consistent with the Out-of-Court Restructuring that is otherwise customary for chapter 11 cases and, in addition, (a) standard and customary third party releases and injunction provisions, (b) a waiver of any and all potential causes of action against the Noteholders under chapter 5 of the Bankruptcy Code or otherwise, and (c) a full and complete discharge. |
| **Other Provisions..............** | The Plan shall contain such other terms and conditions as agreed to by the Debtors and the Majority Noteholders. |
| **Conditions to Confirmation and Effectiveness..............** | The Plan shall be subject to usual and customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are satisfactory to the Committee and the Majority Noteholders, including the following: |

(i)     The Bankruptcy Court shall have entered an order in form and substance acceptable to the Committee and the Majority Noteholders approving the disclosure statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code;

(ii)    The Plan and all documents contained in any supplement thereto, including any exhibits, schedules, amendments, modifications or supplements thereto, and all other definitive documentation shall have been negotiated, executed, delivered and filed with the Bankruptcy Court in substantially final form and in form and substance acceptable to the Committee and the Majority Noteholders and otherwise consistent with the terms and conditions described in this Term Sheet and the Support Agreement, as applicable;

(iii)   The Support Agreement shall have been approved pursuant to an order of the Bankruptcy Court and shall not have been terminated, and shall be in full force and effect; and

|  | (iv) | The Bankruptcy Court shall have entered a confirmation order in form and substance acceptable to the Committee and the Majority Noteholders and the confirmation order shall be a final order. |

**Issuance of New Common Units; Execution of the Plan Documents…………………**   On the Plan Effective Date, the Reorganized Company shall issue and execute all securities, notes, instruments, certificates, and other documents required to be issued and executed in accordance with the Plan.

**No Registration Under the Securities Act………………**   The offer, issuance and distribution of the New Common Units and Warrants pursuant to the Plan will be exempt from registration under the Securities Act of 1933 pursuant to section 1145 of the Bankruptcy Code.

**Reorganized Public Company…………………**   The Debtors shall use commercially reasonable efforts to maintain the listing of the Existing Emerge LP Common Units on the New York Stock Exchange.   If necessary, the Reorganized Company shall use commercially reasonable efforts to have the New Common Units and the Reorg Warrants registered with the SEC and listed on a nationally recognized exchange, as soon as practicable subject to meeting applicable listing requirements following the Plan Effective Date.

**Restructuring Timeline……**   Filing of the Chapter 11 Cases (the "**Petition Date**").

On or within one day of the Petition Date, the Debtors shall file a motion seeking entry of interim and final orders approving the terms of the DIP Facility (if such DIP Facility is required as determined by the Committee).

**Petition Date +2 (business days)**: If applicable, the Bankruptcy Court shall have entered an interim order approving the terms of the DIP Facility.

**Petition Date +35**: If applicable, the Bankruptcy Court shall have entered a final order approving the terms of the DIP Facility.

**Petition Date +50:** The Bankruptcy Court shall have entered an order approving the disclosure statement.

**Petition Date +85**: The Bankruptcy Court shall have entered an order confirming the Plan.

**Petition Date +100**: The Debtors shall have filed a notice of effectiveness of the Plan.

US-DOCS\106456729.14

| | |
|---|---|
| **Fees and Expenses**............ | The Debtors shall pay all reasonable costs, fees and expenses of Weil, Gotshal & Manges LLP, as counsel to HPS, and of other advisors retained by the Revolving Loan Agent, HPS, or the Noteholders in connection with the negotiation, prosecution or implementation of the Chapter 11 Cases, under their respective engagement letters or other contractual arrangements. |
| **No Admission**............... | Nothing in this Term Sheet is or shall be deemed to be an admission of any kind as to the extent, validity, or priority of any claims held by any parties hereto. |

US-DOCS\106456729.14

**Exhibit B**

**Charter**

*Execution Version*

# AMENDED AND RESTATED CHARTER
## FOR THE SPECIAL RESTRUCTURING COMMITTEE

## I.     Purpose

The Special Restructuring Committee (the "**Committee**") is appointed by, and acts on behalf of, the board of directors (the "**Board**") of Emerge Energy Services GP LLC (the "**General Partner**"), the general partner of Emerge Energy Services LP (the "**Partnership**"), in connection with, among other things and as set forth herein, the Transaction contemplated by that certain Restructuring Support Agreement (including the exhibits attached thereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "**Support Agreement**"), dated as of April 18, 2019, by and among (i) the Partnership, (ii) each direct and indirect subsidiary of the Partnership party thereto, (iii) the General Partner, (iv) the direct and indirect owners of the General Partner party thereto, (v) the Revolving Loan Agent (as defined therein), (vi) the Revolving Loan Lenders (as defined therein) party thereto (the "**Consenting Revolving Loan Lenders**"), (vii) the Notes Agent (as defined therein), and (viii) the Noteholders (as defined therein) party thereto (the "**Consenting Noteholders**"). Capitalized terms used, but not otherwise defined herein are defined in accordance with the Support Agreement.

This Charter amends and restates in its entirety the special restructuring committee charter dated January 31, 2019. Notwithstanding anything herein to the contrary, this Charter and its respective terms and conditions shall be effective only from the Agreement Effective Date until the earlier of (i) the termination of the Support Agreement solely pursuant to section 6(a) thereof, and (ii) the date on which the Transaction is substantially consummated in accordance with the terms and conditions of the Support Agreement (such earlier date, the "**Reversion Date**", and such time period, the "**Amended Charter Time Period**").

## II.    Composition

During the Amended Charter Time Period, the Committee shall at all times be comprised of two (2) independent directors appointed by the General Partner from a slate acceptable to the Noteholders holding more than 50% of the outstanding aggregate principal amount of the Notes Purchase Obligations (the "**Majority Noteholders**") and, to the extent approved by and in the sole discretion of the General Partner, one (1) independent director nominated by the General Partner.

The initial members of the Committee will be Eugene I. Davis and William L. Transier, both of whom were appointed by the General Partner from a slate acceptable to the Majority Noteholders. The Committee may have a chairperson if approved by the Committee.

## III.   Meetings, Procedures and Authority

The Committee has the authority to establish its own rules and procedures for notice and conduct of its meetings so long as they are not inconsistent with any provisions of the Amended and Restated Limited Liability Company Agreement of the General Partner in effect as of the date hereof (the "**GP LLC Agreement**") that are applicable to the Committee.

In addition to the duties and responsibilities expressly delegated to the Committee in this Charter, the Committee may exercise any other powers and carry out any other responsibilities that are consistent with this Charter and the purposes of the Committee.  The Committee will endeavor to operate by consensus in carrying out its duties and responsibilities. Any directions, decisions, approvals, or other actions taken by the Committee, including any resolutions at meetings, must be decided by a majority of the Committee.

## IV.   Duties and Responsibilities

1.   *Implement and Oversee the Transaction.*   During the Amended Charter Time Period, the Committee shall exercise all of the powers of the Board (and the Board relinquishes all such powers delegated to the Committee) as set forth in the Term Sheet and the Support Agreement with respect to the following actions:

- To implement the terms of the Transaction as set forth in the Term Sheet and the Support Agreement;

- To review, evaluate, and, if appropriate, approve and authorize any actions contemplated to be taken by the Partnership in connection with the Transaction as set forth in or contemplated by the Term Sheet and the Support Agreement;

- To oversee discussions with the Partnership's key stakeholders with respect to the Transaction as set forth in or contemplated by the Term Sheet and the Support Agreement;

- To oversee the implementation and execution of the Transaction as set forth in or contemplated by the Term Sheet and the Support Agreement;

- To manage the Partnership's day-to-day cash management in furtherance of the Transaction as set forth in or contemplated by the Term Sheet and the Support Agreement; and

- To take such other actions as the Committee determines, in good faith, is necessary or desirable in order to carry out its mandate so long as such action is in furtherance of any of the foregoing.

2.   *Manage and Direct the CRO.*   During the Amended Charter Time Period, the Committee shall manage and direct the Chief Restructuring Officer of the General Partner ("**CRO**") in furtherance of the Transaction as set forth in or contemplated by the Term Sheet and the Support Agreement.  Subject to the above and the other terms and conditions of the Term Sheet and Support Agreement, the CRO shall be authorized and empowered by the Committee with responsibilities to include (and not be limited to) the following:

- Implementing the terms of the Transaction;

- directing the Partnership's day-to-day book keeping, collections, disbursement, treasury, liquidity and reporting obligations;

- managing the financial and operational reporting processes with respect to all internal and external constituents;

- overseeing and approving expenditures and cash payments;

- cash management, including vendors, accounts receivable, taxes, financial controls and processes;

- coordinating and managing any asset divestitures;

- development of any business plan and development of any related financial models;

- defining and constraining issues with respect to the Partnership's business, including legal, environmental, tax, and regulatory;

- approving any amendments or modifications to the engagement letters of the Partnership's professionals, and entering into any new engagement letters for Partnership professionals;

- directing and managing the Partnership's professionals;

- evaluating and renegotiating the Partnership's material contracts, including railcar leases; and

- other services and activities as directed by the Committee.

3. _Commencement of Chapter 11 Cases_. During the Amended Charter Time Period, the Committee shall have the right to direct the commencement of voluntary cases (the "**Chapter 11 Cases**") of the Partnership and the Partnership's subsidiaries under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in the event that the Committee determines (in good faith) that execution of the Out-of-Court Restructuring as contemplated by the Term Sheet and the Support Agreement is no longer reasonably possible or in the best interests of the Partnership and its stakeholders. Any such filing shall contemplate a chapter 11 plan of reorganization that is consistent in all respects with the terms and conditions set forth in Appendix 1 to the Term Sheet or, to the extent the Chapter 11 Cases involve any sale of assets pursuant to section 363 of the Bankruptcy Code, the Noteholders may serve as a stalking horse, with standard stalking horse protections, and can credit bid in connection with the purchase of such assets. The Committee shall, in good faith, use its discretion to propose and seek confirmation of a chapter 11 plan in accordance with the terms set forth in the Term Sheet or such other terms and treatment that the Committee determines, in good faith, are necessary in order to obtain confirmation of a chapter 11 plan. A determination by the Committee to file the Chapter 11 Cases in accordance with the Support Agreement and the Term Sheet shall not cause the occurrence of the Reversion Date.

4. _Other Matters_. The Committee (or any member thereof) may make recommendations to the Board regarding any other matters not contemplated by this Charter.

5.       _Minutes_. To the extent practical, the Committee will keep minutes of its meetings.

6.       _Reports to the Board of Directors_. The Committee will report regularly to the Board regarding the activities of the Committee.

7.       _Review of this Charter_. The Committee should periodically review and reassess this Charter and submit any recommended changes to the Board for its consideration.

8.       _Revocation_.  During the Amended Charter Time Period, no waiver, modification, amendment or revocation of the terms of this Amended and Restated Charter shall be valid unless such waiver, modification, amendment or revocation is in writing and has been expressly consented to by the Consenting Noteholders.

US-DOCS\106807717.9

**Exhibit C**

**Voting and Standstill Agreement**

*__Execution Version__*

## VOTING AND STANDSTILL AGREEMENT

This Voting and Standstill Agreement (this "**Agreement**"), dated as of April 18, 2019, is by and between Emerge Energy Services Holdings LLC ("**Emerge Holdings**") and the Committee (as defined below).  Each of the foregoing are referred to herein individually as a "**Party**," and collectively as the "**Parties**."

WHEREAS, reference is hereby made to that certain Restructuring Support Agreement (including the exhibits attached thereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "**Support Agreement**"), dated as of April 18, 2019, by and among (i) Emerge Energy Services LP (the "**Partnership**"), (ii) each direct and indirect subsidiary of the Partnership party thereto, (iii) Emerge Energy Services GP LLC (the "**General Partner**"), (iv) the direct and indirect owners of the General Partner party thereto, (v) the Revolving Loan Agent, (vi) the Revolving Loan Lenders party thereto, (vii) the Notes Agent and (viii) the Noteholders party thereto;

WHEREAS, the Support Agreement contemplates, among other things, a proposed out-of-court restructuring transaction involving the Partnership and its subsidiaries, as well as a proposed in-court reorganization transaction if the out-of-court restructuring transaction cannot be consummated on the terms provided for therein; and

WHEREAS, execution and delivery of this Agreement is a condition precedent to the effectiveness of the Support Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1.
## DEFINITIONS

1.1     As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" of any Person means any Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of securities or partnership, member or other ownership interests, by contract or otherwise).

"Agreement" shall have the meaning set forth in the Preamble to this Agreement, including all exhibits attached hereto.

"Agreement Effective Date" shall have the meaning set forth in the Support Agreement.

"Board" means the board of directors of the General Partner.

"Business Day" means a day on which commercial banking institutions in New York, New York are open for business.

"Charter" means the Amended and Restated Charter for the Special Restructuring Committee authorized by the Board in the form attached to the Support Agreement as Exhibit B and effective as of the date hereof.

"Committee" means the Special Restructuring Committee of the Board created pursuant to the Charter.

"Governmental Authority" shall mean any court, agency, authority, department, regulatory body or other instrumentality of any government or country or of any national, federal, state, provincial, regional, county, city or other political subdivision of any such government or country or any supranational organization of which any such country is a member.

"GP LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of the General Partner, dated as of May 14, 2013.

"Law" or "Laws" means all laws, statutes, rules, regulations, orders, judgments, injunctions and/or ordinances of any Governmental Authority.

"Member" has the meaning set forth in the GP LLC Agreement.

"Person" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, government or any department or agency thereof or other entity, as well as any syndicate or group that would be deemed to be a Person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Reversion Date" means the earlier of (i) the termination of the Support Agreement solely pursuant to section 6(a) thereof, and (ii) the date on which the Transaction is substantially consummated in accordance with the terms and conditions of the Support Agreement.

"Support Agreement" shall have the meaning set forth in the first recital to this Agreement, and shall include all exhibits attached thereto.

"Transaction" shall have the meaning set forth in the Support Agreement.

"Voting Proxy Start Time" shall have the meaning set forth in Section 4.1 of this Agreement.

"Voting Proxy Time Period" means the time period commencing on the Voting Proxy Start Time and ending on the Reversion Date.

1.2    For purposes of this Agreement, unless otherwise specified: (a) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits of this Agreement; and (c) the words "herein," "hereof," "hereunder" and "hereto" refer to this Agreement in its entirety rather than to a particular portion

2

of this Agreement. Capitalized terms used, but not otherwise defined, herein are defined in accordance with the Support Agreement.

## ARTICLE 2.
## RESTRICTIONS

2.1    During the Voting Proxy Time Period and except as expressly contemplated by the Support Agreement, Emerge Holdings shall not take any of the following actions:

a.    delegate any rights or powers of the Member to any other Person pursuant to Section 7.1(b) or 7.1(c) of the GP LLC Agreement;

b.    exercise any rights or powers of the Member under section 7.1(e) of the GP LLC Agreement solely as it relates to sections 7.1(d)(v) and 7.1(d)(vi) of the GP LLC Agreement; it being acknowledged and agreed that all such rights and powers of the Majority Interest (as defined in the GP LLC Agreement) have been irrevocably waived during the Voting Proxy Time Period in favor of the Committee pursuant and subject to Section 2.3 below;

c.    dissolve or remove any member of the Board or Committee as in existence as of the Agreement Effective Date; or

d.    alter or modify the rights or benefits of the Board or Committee as in existence as of the Agreement Effective Date.

2.2    In furtherance of the above, Emerge Holdings shall execute and deliver to the Committee on the Agreement Effective Date an irrevocable proxy, substantially in the form of <u>Exhibit A</u> attached hereto (the "**Voting Proxy**").  Notwithstanding anything herein to the contrary, the Committee shall not exercise the Voting Proxy to alter the composition of the Board as constituted on the Agreement Effective Date or to vote or execute a written consent with respect to any of the voting interests of Emerge Holdings for any matter or reason whatsoever, in each case except as contemplated by the Support Agreement.  Such Voting Proxy shall terminate automatically, without any further action by or notice to any Person, upon the Reversion Date.

2.3    Furthermore, during the Voting Proxy Time Period, Emerge Holdings hereby grants in favor of the Committee its consent to take any and all such actions as necessary to fulfill the purpose of the Charter, including, but not limited to, taking any and all such actions requiring approval of the Majority Interest pursuant to Section 7.1(e) of the GP LLC Agreement solely as it relates to sections 7.1(d)(v) and 7.1(d)(vi) of the GP LLC Agreement.  During the Voting Proxy Time Period, such consent constitutes a full and irrevocable waiver of any and all required votes, consents, rights and other requirements of the Majority Interest pursuant to Section 7.1(e) of the GP LLC Agreement solely as it relates to sections 7.1(d)(v) and 7.1(d)(vi) of the GP LLC Agreement.

## ARTICLE 3.

## [Intentionally omitted]

3

## ARTICLE 4.
## VOTING PROXY START TIME; TERMINATION

4.1     <u>Voting Proxy Start Time</u>.  This Agreement shall be effective at 12:01 a.m. prevailing Eastern Time on the date hereof; <u>provided</u> that, as of such date, (i) the Parties shall have executed and delivered to each other counterpart signature pages to this Agreement and (ii) the Agreement Effective Date shall have occurred under the Support Agreement (or will occur concurrently with the execution and delivery of this Agreement) (such date, the "**<u>Voting Proxy Start Time</u>**").  The terms and provisions of this Agreement, and the rights, agreements, covenants, and the obligations of the Parties hereunder, shall not become effective or binding until the occurrence of the Voting Proxy Start Time.

4.2     <u>Termination</u>.  This Agreement, and the agreements, obligations, and covenants of the Parties hereunder, shall terminate automatically, without any further action by or notice to any Person, upon the Reversion Date; <u>provided</u> that termination of this Agreement shall not relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

## ARTICLE 5.
## MISCELLANEOUS

5.1     <u>Governing Law; Submission to Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, without regard to the conflict of laws principles thereof that would require the application of the Law of any other jurisdiction. The Parties irrevocably and unconditionally submit to the exclusive jurisdiction of the state and federal courts of Delaware solely and specifically for the purposes of any action or proceeding arising out of or in connection with this Agreement.

5.2     <u>Amendment or Waiver</u>.  No waiver, modification or amendment of the terms of this Agreement or the exhibits attached hereto shall be valid unless such waiver, modification or amendment is in writing and has been signed by all of the Parties.  No waiver of any of the provisions of this Agreement or the exhibits attached hereto shall be deemed or constitute a waiver of any other provision of this Agreement or the exhibits attached hereto, whether or not similar, nor shall any waiver be deemed a continuing waiver.

5.3     <u>Notices</u>.  Any notices or other communications required or permitted under, or otherwise in connection with, this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person or upon confirmation of receipt when transmitted by facsimile transmission (but only if followed by transmittal by national overnight courier or hand for delivery on the next Business Day) or on receipt after dispatch by registered or certified mail, postage prepaid, or on the next Business Day if transmitted by national overnight courier, addressed in each case as follows:

<u>If to Emerge Holdings</u>:

Insight Equity
1400 Civic Place, Suite 250
Southlake, TX  76092
Attn:  Warren Bonham
wbonham@insightequity.com

*with a copy to*:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834
Attn:  Keith A. Simon
Direct Dial:  212.906.1372
Fax:  212.751.4864
Email: keith.simon@lw.com

-and-

Hunton Andrews Kurth LLP
600 Travis Street, Suite 4200
Houston, TX 77002
Attn:  Tad Davidson
Direct Dial:  713.220.3810
Fax:  713.220.4285
Email:  TadDavidson@HuntonAK.com

<u>If to the Committee</u>:

Eugene I. Davis
5 Canoe Brook Drive
Livingston, New Jersey 07039
genedavis@pirinateconsulting.com

*with a copy to*:

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834
Attn:  Keith A. Simon
Direct Dial:  212.906.1372
Fax:  212.751.4864
Email: keith.simon@lw.com

5.4     <u>Entire Agreement</u>.  This Agreement and the exhibits attached hereto set forth in full the terms of agreement between the Parties and is intended as the full, complete and exclusive

contract governing the relationship between the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect thereto; <u>provided</u>, that any confidentiality agreement between or among the Parties shall remain in full force and effect in accordance with its terms.

5.5     <u>Severability</u>.  If any portion of this Agreement or the exhibits attached hereto shall be held to be invalid, unenforceable, void or voidable, or violative of applicable Law, the remaining portions of this Agreement and the exhibits attached hereto (as applicable) so far as they may practicably be performed shall remain in full force and effect and binding on the Parties hereto; <u>provided</u> that this provision shall not operate to waive any condition precedent to any event set forth herein.

5.6     <u>Assignment</u>.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto, without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement.  This Agreement is intended to and shall bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives.

5.7     <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Any Party hereto may execute and deliver a counterpart of this Agreement by delivery by facsimile transmission or electronic mail of a signature page of this Agreement signed by such Party, and any such facsimile or electronic mail signature shall be treated in all respects as having the same effect as having an original signature.

5.8     <u>Third Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or shall otherwise be entitled to enforce any provision hereof.

5.9     <u>**WAIVER OF JURY TRIAL**</u>**.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EXHIBITS ATTACHED HERETO.**

*(Signature Page Follows)*

US-DOCS\106938062.9

IN WITNESS WHEREOF, the Parties have executed and delivered this Voting and Standstill Agreement as of the date first above written.

EMERGE ENERGY SERVICES HOLDINGS LLC

By: _____

Name:  Ted W. Beneski
Title:    Chairman of the Board

IN WITNESS WHEREOF, the Parties have executed and delivered this Voting and Standstill Agreement as of the date first above written.

Special Restructuring Committee:

By:_____
Name: Eugene I. Davis


By:_____
Name: William L. Transier

IN WITNESS WHEREOF, the Parties have executed and delivered this Voting and Standstill Agreement as of the date first above written.

Special Restructuring Committee:

By:_____
Name: Eugene I. Davis

By: _____
Name: William L. Transier

## EXHIBIT A

## FORM OF IRREVOCABLE PROXY

In order to secure the performance of the agreements of Emerge Energy Services Holdings LLC ("Emerge Holdings"), who is the sole member of Emerge Energy Services GP LLC (the "General Partner"), pursuant to the Voting and Standstill Agreement, dated as of April 18, 2019 (the "Agreement"), by and between Emerge Holdings and the Committee (as defined therein), Emerge Holdings hereby irrevocably appoints the Committee as attorneys, agents and proxies, with full power of substitution for Emerge Holdings, and in the name, place and stead of Emerge Holdings, to vote (or cause to be voted) or, if applicable, to give consent, in such manners as each such attorneys, agents and proxies shall, in accordance with any written instruction from the Committee given in accordance with the Support Agreement, record such vote (or consent) in the manner and for the limited purposes set forth in Section 2.1 of the Agreement with respect to all voting securities that Emerge Holdings is or may be entitled to vote at any meeting of the General Partner held after the date hereof, whether annual or special and whether or not an adjourned meeting or, if applicable, to approve any action of the General Partner with respect thereto or to give written consent with respect thereto.  Capitalized terms used, but not otherwise defined, herein are defined in accordance with the Agreement.

During the Voting Proxy Time Period, this proxy (the "Voting Proxy") shall be irrevocable and binding on any successor-in-interest of Emerge Holdings.  This Voting Proxy shall operate to revoke and render void any prior proxy as to voting securities heretofore granted by Emerge Holdings which is inconsistent herewith.

Notwithstanding anything herein to the contrary, the Committee shall not exercise this Voting Proxy to alter the composition of the Board of the General Partner, as constituted on the Agreement Effective Date, or to vote or execute a written consent with respect to any of the voting interests of Emerge Holdings for any matter or reason whatsoever, in each case except as contemplated by the Support Agreement.

The terms and provisions of this Voting Proxy, and the rights, agreements, covenants, and the obligations of the Parties hereunder, shall not become effective or binding until the occurrence of the Voting Proxy Start Time. This Voting Proxy, and the agreements, obligations, and covenants of the Parties hereunder, shall terminate automatically, without any further action by or notice to any Person, upon the Reversion Date; provided that termination of this Voting Proxy shall not relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

The provisions of Section 1.2 and Article 5 of the Agreement are incorporated herein by reference and shall apply as if fully set forth herein, *mutatis mutandis*.


Emerge Energy Services Holdings LLC

By:_____
Name:
Title:

## IRREVOCABLE PROXY

In order to secure the performance of the agreements of Emerge Energy Services Holdings LLC ("Emerge Holdings"), who is the sole member of Emerge Energy Services GP LLC (the "General Partner"), pursuant to the Voting and Standstill Agreement, dated as of April 18, 2019 (the "Agreement"), by and between Emerge Holdings and the Committee (as defined therein), Emerge Holdings hereby irrevocably appoints the Committee as attorneys, agents and proxies, with full power of substitution for Emerge Holdings, and in the name, place and stead of Emerge Holdings, to vote (or cause to be voted) or, if applicable, to give consent, in such manners as each such attorneys, agents and proxies shall, in accordance with any written instruction from the Committee given in accordance with the Support Agreement, record such vote (or consent) in the manner and for the limited purposes set forth in Section 2.1 of the Agreement with respect to all voting securities that Emerge Holdings is or may be entitled to vote at any meeting of the General Partner held after the date hereof, whether annual or special and whether or not an adjourned meeting or, if applicable, to approve any action of the General Partner with respect thereto or to give written consent with respect thereto.  Capitalized terms used, but not otherwise defined, herein are defined in accordance with the Agreement.

During the Voting Proxy Time Period, this proxy (the "Voting Proxy") shall be irrevocable and binding on any successor-in-interest of Emerge Holdings.  This Voting Proxy shall operate to revoke and render void any prior proxy as to voting securities heretofore granted by Emerge Holdings which is inconsistent herewith.

Notwithstanding anything herein to the contrary, the Committee shall not exercise this Voting Proxy to alter the composition of the Board of the General Partner, as constituted on the Agreement Effective Date, or to vote or execute a written consent with respect to any of the voting interests of Emerge Holdings for any matter or reason whatsoever, in each case except as contemplated by the Support Agreement.

The terms and provisions of this Voting Proxy, and the rights, agreements, covenants, and the obligations of the Parties hereunder, shall not become effective or binding until the occurrence of the Voting Proxy Start Time. This Voting Proxy, and the agreements, obligations, and covenants of the Parties hereunder, shall terminate automatically, without any further action by or notice to any Person, upon the Reversion Date; provided that termination of this Voting Proxy shall not relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

The provisions of Section 1.2 and Article 5 of the Agreement are incorporated herein by reference and shall apply as if fully set forth herein, *mutatis mutandis*.

Emerge Energy Services Holdings LLC

By: _____

Name:  Ted W. Beneski

Title:    Chairman of the Board

***Irrevocable Proxy***

**Exhibit D**

**Form of Joinder**

US-DOCS\106874274.7

## JOINDER TO RESTRUCTURING SUPPORT AGREEMENT

The undersigned hereby acknowledges that it has received and fully reviewed the Restructuring Support Agreement (including the exhibits attached thereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "**Agreement**"), dated as of April 18, 2019, by and among (i) Emerge Energy Services LP ("**Emerge LP**"), (ii) each direct and indirect subsidiary of Emerge LP party thereto (each an "**Emerge LP Subsidiary**", and together with Emerge LP, the "**Company**"), (iii) Emerge Energy Services GP LLC ("**Emerge GP**"), (iv) the direct and indirect owners of Emerge GP party thereto (the "**Consenting Equity Holders**"), (v) the Revolving Loan Agent (as defined therein), (vi) the Revolving Loan Lenders (as defined therein) party thereto (the "**Consenting Revolving Loan Lenders**"), (vii) the Notes Agent (as defined therein), and (viii) the Noteholders (as defined therein) party thereto (the "**Consenting Noteholders**"). The undersigned acknowledges and agrees, by its signature below, that it is bound by the terms and conditions of the Agreement and shall be deemed a ["Consenting Revolving Loan Lender"/"Consenting Noteholder"] for all purposes under the terms of and pursuant to the Agreement as of the date hereof.

Date:  [_____], 2019

[Name of Holder/Proposed Transferee]

By:_____

Name:

Title:

Principal Amount of Revolving Loan Obligations as of the date hereof:

$_____

Principal Amount of Notes Purchase Obligations as of the date hereof:

$_____

Address for Notice:

[_____]

[_____]

Attention: [_____]

Facsimile: [_____]