## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------   x
In re:                                                          :     Chapter 11
                                                               :
EMERGE ENERGY SERVICES LP, et al.,                             :     Case No. 19-11563 (KBO)
                                                               :
                    Debtors.¹                                  :     Jointly Administered
------------------------------------------------------------   x
```

---

### DISCLOSURE STATEMENT FOR
### THE JOINT PLAN OF REORGANIZATION FOR
### EMERGE ENERGY SERVICES LP AND ITS AFFILIATE DEBTORS
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

> **THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS MAY AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR TO THE DISCLOSURE STATEMENT HEARING.**

**RICHARDS, LAYTON & FINGER, P.A.**
John H. Knight (Bar No. 3848)
Paul N. Heath (Bar No. 3704)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

**LATHAM & WATKINS LLP**
George A. Davis
Keith A. Simon
Hugh K. Murtagh
Liza L. Burton
885 Third Avenue
New York, New York 10022
Telephone:  (212) 906-1200
Facsimile:  (212) 751–4864

Proposed Counsel for the Debtors and Debtors-in-Possession

Dated: July 25, 2019

---

¹     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Emerge Energy Services LP (2937), Emerge Energy Services GP LLC (4683), Emerge Energy Services Operating LLC (2511), Superior Silica Sands LLC (9889), and Emerge Energy Services Finance Corporation (9875).  The Debtors' address is 5600 Clearfork Main Street, Suite 400, Fort Worth, Texas 76109.

**THE VOTING DEADLINE IS [5:00 P.M.] PREVAILING EASTERN TIME ON [●], 2019**
**(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).**

**TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AND CLAIMS AGENT MUST _ACTUALLY_ _RECEIVE_ YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE AS SET FORTH IN THE DISCLOSURE STATEMENT ORDER.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTORS OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.**

**PRESERVATION OF AVOIDANCE ACTIONS UNDER THE PLAN:**

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST, OR TO OBJECT TO CONFIRMATION OF, THE PLAN, CREDITORS, INTEREST HOLDERS AND STAKEHOLDERS SHOULD BE AWARE THAT THE PLAN PRESERVES ALL CAUSES OF ACTION (INCLUDING AVOIDANCE ACTIONS) AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTORS TO PROSECUTE THE SAME.**

**IMPORTANT INFORMATION FOR YOU TO READ**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE OR OTHER APPLICABLE EXEMPTIONS.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.   FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED.  THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION VI HEREIN, "PLAN-RELATED RISK FACTORS."**

## TABLE OF CONTENTS

**Page**

I.      EXECUTIVE SUMMARY .................................................................................................i

    A.      Purpose and Effect of the Plan ...........................................................................ii

    B.      Administrative and Priority Tax Claims ............................................................. iii

    C.      Classification and Treatment of Claims and Interests Under the Plan ...............iv

    D.      Solicitation Procedures .....................................................................................viii

    E.      Voting Procedures..............................................................................................xii

    F.      Confirmation of the Plan .................................................................................xiv

    G.      Consummation of the Plan ................................................................................xv

    H.      Risk Factors ......................................................................................................xv

II.     BACKGROUND TO THE CHAPTER 11 CASE ........................................................1

    A.      The Debtors' Corporate History and Structure ...................................................1

    B.      the Debtors' Opertions .......................................................................................1

    C.      Prepetition Indebtedness ....................................................................................3

    D.      Events Leading to the Chapter 11 Filing ............................................................4

III.    EVENTS DURING THE CHAPTER 11 CASE ..........................................................6

    A.      First Day Motions and Certain Related Relief ...................................................6

IV.     SUMMARY OF THE PLAN ........................................................................................8

    A.      Administrative and Priority Tax Claims .............................................................8

    B.      Classification and Treatment of Classified Claims and Equity Interests.................................. 10

    C.      Acceptance or Rejection of the Plan ................................................................ 16

    D.      Means for Implementation of the Plan ............................................................. 17

    E.      Treatment of Executory Contracts and Unexpired Leases ............................... 24

    F.      Provisions Governing Distributions ................................................................. 27

    G.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims............................ 31

    H.      Conditions Precedent to Confirmation and Consummation of the Plan................................ 33

    I.      Release, Discharge, Injunction And Related Provisions .................................. 34

    J.      Binding Nature of the Plan ............................................................................... 39

    K.      Protection Against Discriminatory Treatment.................................................. 39

    L.      Integral Part of Plan ........................................................................................ 39

V.      CONFIRMATION AND CONSUMMATION PROCEDURES ...............................41

    A.      Solicitation of Votes......................................................................................... 41

|      | B. | Confirmation Procedures ................................................................................................ | 41 |
|------|----|----|----|
|      | C. | Statutory Requirements for Confirmation of the Plan ..................................................... | 41 |
|      | D. | Consummation of the Plan .............................................................................................. | 46 |

**VI.**  **PLAN-RELATED RISK FACTORS** ................................................................................. **47**

|      | A. | Certain Bankruptcy Law Considerations ........................................................................ | 47 |
|------|----|----|----|
|      | B. | Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries Under the Plan .................................................................................. | 49 |
|      | C. | Risk Factors that Could Negatively Impact the Debtors' And Reorganized Debtors' Business ........... | 51 |
|      | D. | Risks Associated with Forward-Looking Statements ...................................................... | 62 |
|      | E. | Disclosure Statement Disclaimer .................................................................................. | 62 |

**VII.**  **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ......................... **65**

|      | A. | Liquidation Under Chapter 7 of the Bankruptcy Code .................................................. | 65 |
|------|----|----|----|
|      | B. | Filing of an Alternative Plan of Reorganization ........................................................... | 65 |
|      | C. | Distributions by the Reorganized Debtors or Other Applicable Distribution Agent ........... | 65 |
|      | D. | Delivery and Distributions; Undeliverable or Unclaimed Distributions ......................... | 66 |
|      | B. | Compliance with Tax Requirements .............................................................................. | 68 |
|      | C. | Allocation of Plan Distributions Between Principal and Interest ..................................... | 68 |
|      | D. | Means of Cash Payment ................................................................................................ | 68 |
|      | E. | Timing and Calculation of Amounts to Be Distributed .................................................. | 68 |
|      | F. | Setoffs .......................................................................................................................... | 68 |

**VIII.**  **EXEMPTIONS FROM SECURITIES ACT REGISTRATION** .................................................. **70**

**IX.**  **CERTAIN U.S. FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN** .............................. **71**

|      | A. | In General ..................................................................................................................... | 71 |
|------|----|----|----|
|      | B. | Partnership Status ......................................................................................................... | 72 |
|      | C. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Holders of the Old Emerge LP Equity Interests .................................................................................. | 73 |
|      | D. | Certain U.S. Federal Income Tax Consequences to Holders of Certain Claims ................. | 74 |
|      | E. | Certain U.S. Federal Income Tax Consequences of Ownership of New Limited Partnership Interests ........................................................................................................ | 82 |
|      | F. | Certain U.S. Federal Income Tax Consequences of Ownership of Warrants ...................... | 98 |

**RECOMMENDATION** ................................................................................................................ **100**

**<u>EXHIBITS</u>**

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Disclosure Statement Order

EXHIBIT C      Financial Projections

EXHIBIT D      Liquidation Analysis

EXHIBIT E      Historical Financial Statements

EXHIBIT F      Valuation Analysis

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

# I.
# <u>EXECUTIVE SUMMARY</u>

Emerge Energy Services LP (the "**Partnership**"), a Delaware limited partnership with its primary headquarters in Fort Worth, Texas, and the other debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended from time to time, the "**Bankruptcy Code**"), in connection with the solicitation of votes on the Joint Plan of Reorganization for Emerge Energy Services LP and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code dated July 25, 2019 (the "**Plan**"),[2] which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  The Confirmation Hearing on the Plan is scheduled to commence at [●] [a.m.] prevailing Eastern Time on [●], 2019 before the Bankruptcy Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u>.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**");

- the significant events that have occurred during the Chapter 11 Cases;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

A.   **PURPOSE AND EFFECT OF THE PLAN**

1.   **Plan of Reorganization Under Chapter 11 of the Bankruptcy Code**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.  Additionally, as discussed in greater detail in Section IV.J herein, titled "Binding Nature of the Plan," a bankruptcy court's confirmation of a plan binds debtors, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

2.   **Financial Restructurings Under the Plan**

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Section IV herein):

- On the Effective Date, the Reorganized Debtors will enter into the $[____] Exit Facility Credit Agreement; proceeds of the Exit Facility Loans will be used to, *inter alia*, repay in full in Cash all DIP Credit Agreement Claims and all Allowed Prepetition Credit Agreement Claims; and Prepetition Credit Agreement Liens will continue as valid, perfected, non-avoidable Liens securing the Exit Facility obligations;

- On the Effective Date, the Reorganized Debtors will issue $[____] aggregate principal amount of New Second Lien Notes to Holders of Allowed Prepetition Notes Claims;

- On the Effective Date, the New General Partner will issue the New Emerge GP Equity Interests to Holders of Allowed Prepetition Notes Claims;

- On the Effective Date; Reorganized Emerge LP will issue the New Limited Partnership Interests as follows: (a), if Class 6 (General Unsecured Claims) votes to reject the Plan, then 100% to Holders of Allowed Prepetition Notes Claims, prior to dilution by the Management Incentive Plan Equity; (b) if Class 6 votes to accept the Plan, then 95% to Holders of Allowed Prepetition Notes Claims and 5% to Holders of  Allowed General Unsecured Claims, in each case prior to dilution by the Management Incentive Plan Equity and any issuances pursuant to the New Warrants;

- On the Effective Date, and only if Class 6 (General Unsecured Claims) votes to accept the Plan, Reorganized Emerge LP will issue the New Warrants as follows: 10% to Holders of Allowed General Unsecured Claims and 5% to Holders of Allowed Old Emerge LP Equity Interests;

- Old Emerge GP Equity Interests will be canceled and each Holder of an Old Emerge GP Equity Interest will receive no recovery on account of such interest, and Emerge GP will cease to be general partner of the Reorganized Emerge LP and will be replaced by the New General Partner;

- Intercompany Claims will be reinstated, compromised, or cancelled, at the option of the relevant Holder of such Intercompany Claims with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement;

- All Old Affiliate Equity Interests in any Emerge LP Subsidiary will remain effective and outstanding and Holders of the same will be Unimpaired under the Plan;

- The legal, equitable and contractual rights of Holders of Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Secured Tax Claims will be unaltered by the Plan.

## B.    ADMINISTRATIVE AND PRIORITY TAX CLAIMS

The following is a summary of the treatment of Administrative and Priority Tax Claims under the Plan. For a more detailed description of the treatment of such Claims under the Plan, please see Article II of the Plan.

### 1.    Administrative Claims

Subject to sub-paragraph (a) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)    Bar Date for Administrative Claims

Except as otherwise provided in Article II.A of the Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; provided that the foregoing shall not apply to either the Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code or the Bankruptcy Court or United States Trustee as the Holders of Administrative Claims.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date will be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims will be deemed discharged as of the Effective Date.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  Nothing in Article II.A of the Plan will limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code.

Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) [120] days after the Effective Date and (b) [60] days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court..

(b)    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors and Reorganized Debtors for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash by the Reorganized Debtors, including from the Carve Out Reserve, within [five (5)] Business Days after entry of the order approving such Allowed Professional Fee Claim.  The Reorganized Debtors will not commingle any funds contained in the Carve Out Reserve and will use such funds to pay only the Professional Fee Claims, as and when allowed by order of the Bankruptcy Court.  Notwithstanding anything to the contrary contained herein or in the Plan, the failure of the Carve Out Reserve to satisfy in full the Professional Fee Claims will not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors.

**2.       Priority Tax Claims**

Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code; or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

**C.       CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN**

**ARTICLE VI BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW**.

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Priority Claims<br><br>Expected Amount: $[●] | Each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement):<br><br>• cash equal to the amount of such Allowed Class 1 Claim;<br><br>• such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or<br><br>• such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 2 | Other Secured Claims<br><br>Expected Amount: $[●] | Each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement):<br><br>• cash equal to the amount of such Allowed Class 2 Claim;<br><br>• such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing;<br><br>• the Collateral securing such Allowed Class 2 Claim; or<br><br>• such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 3 | Secured Tax Claims<br><br>Expected Amount: $[●] | Each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement):<br><br>• cash equal to the amount of such Allowed Class 3 Claim;<br><br>• such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim shall have agreed upon in writing;<br><br>• the Collateral securing such Allowed Class 3 Claim;<br><br>• such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or<br><br>• pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. | 100% |
| 4 | Prepetition Credit Agreement Claims<br><br>Expected Amount: | The Prepetition Credit Agreement Claims are deemed Allowed Secured Claims in the aggregate principal amount of $[_____], plus contingent reimbursement obligations in respect of outstanding letters of credit in an aggregate face amount equal to $[___], and any accrued and unpaid interest payable on such amounts through the Effective Date.[3] On | 100% |

---

[3]    The Allowed amount excludes any accrued fees, costs, and expenses (including all Prepetition Credit Agreement Agent and Lenders Fees and Expenses) that will be paid in cash on the Effective Date pursuant to the Plan or otherwise after the Effective Date in accordance with Article V.T of the Plan.

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| | $[●] | the Effective Date, the Allowed Prepetition Credit Agreement Claims shall, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claims, be indefeasibly paid in full in Cash from the proceeds of the Exit Facility Loans.  Without affecting any additional Liens required by the Exit Facility Loan Documents, each Prepetition Credit Agreement Lien is stipulated to as valid, perfected, and not avoidable, and shall secure the Exit Facility Loans and all other indebtedness and obligations of the Reorganized Debtors under or secured by the Exit Facility Loan Documents. | |
| 5 | Prepetition Notes Claims<br><br>Expected Amount: $[●] | The Prepetition Notes Claims are deemed Allowed in the aggregate principal amount of $[_____], plus accrued and unpaid interest thereon as of the Petition Date.[4]<br><br>**IF AND ONLY IF CLASS 6 VOTES TO ACCEPT THE PLAN, THE FOLLOWING TREATMENT:**<br><br>• On the Effective Date, each Holder of an Allowed Prepetition Notes Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, its Pro Rata share of (1) the New Second Lien Notes; (2) the New Emerge GP Equity Interests; and (3) ninety-five percent (95%) of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity and any issuances pursuant to the New Warrants.<br><br>• Without affecting any additional Liens required by the Exit Facility Loan Documents, each Prepetition Note Lien is stipulated to as valid, perfected, and not avoidable, and shall secure the Exit Facility Loans and all other indebtedness and obligations of the Reorganized Debtors under or secured by the Exit Facility Loan Documents and each such Prepetition Note Lien shall, as of the Effective Date, (i) be ratified, reaffirmed and deemed granted by the Reorganized Debtors, (ii) remain attached to the Reorganized Debtors' assets and property, and (iii) not be, and shall not be deemed to be, impaired, discharged or released by the Plan, the Confirmation Order or on account of the Confirmation or Consummation of the Plan.<br><br>**IF AND ONLY IF CLASS 6 VOTES TO REJECT THE PLAN, THE FOLLOWING TREATMENT:**<br><br>• On the Effective Date, each Holder of an Allowed Prepetition Notes Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, its Pro Rata share of (1) the New Second Lien Notes; (2) the New Emerge GP Equity Interests; and (3) one hundred percent (100%) of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity. | [●]% |

---

[4]    The Allowed amount excludes any unpaid Prepetition Noteholders Fees and Expenses that will be paid in Cash on the Effective Date pursuant to the Plan or otherwise after the Effective Date in accordance with Article V.T of the Plan.

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 6 | General Unsecured Claims<br><br>Expected Amount: $[●] | **IF AND ONLY IF CLASS 6 VOTES TO ACCEPT THE PLAN, THE FOLLOWING TREATMENT**:<br><br>• On, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 6 Claim is an Allowed Class 6 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 6 Claim, its Pro Rata share of (1) 5% of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity and any issuances pursuant to the New Warrants and (2) New Warrants representing 10.0% of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity.[5]<br><br>**IF AND ONLY IF CLASS 6 VOTES TO REJECT THE PLAN, THE FOLLOWING TREATMENT**:<br><br>• On the Effective Date, the Class 6 Claims will be discharged without further notice to, approval of or action by any Person or Entity, and each Holder of a Class 6 Claim shall not receive any distribution or retain any property on account of such Class 6 Claim. | [●]% |
| 7 | Intercompany Claims<br><br>Expected Amount: $[●] | Subject to the Restructuring Transactions, the Intercompany Claims shall be reinstated, compromised, or cancelled, at the option of the relevant Holder of such Intercompany Claims with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement. | 100% |
| 8 | Old Emerge GP Equity Interests | On the Effective Date, the Old Emerge GP Equity Interests will be cancelled without further notice to, approval of or action by any Person or Entity, and each Holder of an Old Emerge GP Equity Interest shall not receive any distribution or retain any property on account of such Old Emerge GP Equity Interests and Emerge GP will cease to be general partner of the Reorganized Emerge LP and will be replaced by the New General Partner. | 0% |

---

[5]     The foregoing is offered solely for settlement purposes as set forth in Article V of the Plan, and such settlement is conditioned on (i) Class 6 voting to accept the Plan, (ii) the Bankruptcy Court confirming the Plan, and (iii) the occurrence of the Effective Date.

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 9 | Old Emerge LP Equity Interests | **IF AND ONLY IF CLASS 6 VOTES TO ACCEPT THE PLAN, THE FOLLOWING TREATMENT**: <br><br> • On, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 9 Equity Interest is an Allowed Class 9 Equity Interest as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 9 Equity Interest becomes an Allowed Class 9 Equity Interest, each Holder of an Allowed Class 9 Equity Interest shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 9 Equity Interest, its Pro Rata share of New Warrants representing 5.0% of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity[6]. <br><br> **IF AND ONLY IF CLASS 6 VOTES TO REJECT THE PLAN, THE FOLLOWING TREATMENT**: <br><br> • On the Effective Date, the Old Emerge LP Equity Interests will be cancelled without further notice to, approval of or action by any Person or Entity, and each Holder of an Old Emerge LP Equity Interest shall not receive any distribution or retain any property on account of such Old Emerge LP Equity Interests. | 0% |
| 10 | Old Affiliate Equity Interests in any Emerge LP Subsidiary | Subject to the Restructuring Transactions, the Old Affiliate Equity Interests shall remain effective and outstanding on the Effective Date and shall be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Equity Interests immediately prior to the Effective Date. | 100% |

## D.    SOLICITATION PROCEDURES

### 1.    The Solicitation and Voting Procedures

On [●], 2019 the Bankruptcy Court entered the Disclosure Statement Order which, among other things, (a) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures and (b) established the deadline for filing objections to the Plan and scheduling the hearing to consider confirmation of the Plan.

**The discussion of the procedures below is a summary of the solicitation and voting process.**  Detailed voting instructions will be provided with each ballot and are also set forth in greater detail in Disclosure Statement Order.

PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS AND THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

### 2.    The Voting and Claims Agent

The Debtors have sought authority to retain Kurtzman Carson Consultants LLC to, among other things, act as Voting and Claims Agent.

---

[6] The foregoing is offered solely for settlement purposes as set forth in Article V of the Plan, and such settlement is conditioned on (i) Class 6 voting to accept the Plan, (ii) the Bankruptcy Court confirming the Plan, and (iii) the occurrence of the Effective Date.

Specifically, the Voting and Claims Agent will assist the Debtors with:  (a) mailing Confirmation Hearing Notices (as defined in the Disclosure Statement Order); (b) mailing Solicitation Packages (as defined in the Disclosure Statement Order and as described below); (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on ballots cast for or against the Plan by Holders of Claims against the Debtors; (e) responding to inquiries from creditors and stakeholders relating to the Plan, the Disclosure Statement, the Ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors regarding the Plan and their Ballots.

**3.      Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim within such Class) under the Plan:

| | SUMMARY OF STATUS AND VOTING RIGHTS | | |
|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Status** | **Voting Rights** |
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4 | Prepetition Credit Agreement Claims | Unimpaired | Deemed to Accept |
| 5 | Prepetition Notes Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 8 | Old Emerge GP Equity Interests | Impaired | Deemed to Reject |
| 9 | Old Emerge LP Equity Interests | Impaired | Deemed to Reject |
| 10 | Old Affiliate Equity Interests | Unimpaired | Deemed to Accept |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan only from Holders of Claims in Classes 5, and 6 (the "**Voting Classes**") because Holders of Claims in the Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.  The Debtors are **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1,2,3,4,7, or 10, because such parties are conclusively presumed to have accepted the Plan and (b) Holders of Old Emerge GP Equity Interests in Class 8 or Holders of Old Emerge LP Equity Interests in Class 9 because such parties are conclusively presumed to have rejected the Plan (collectively, the "**Non-Voting Classes**").  In lieu of a Solicitation Package, Holders of Old Emerge GP Equity Interests in Class 8 and Holders of Old Emerge LP Equity Interests in Class 9 will receive a ballot solely for purposes of allowing such Holders to affirmatively opt out of the Third Party Release contained in Article X of the Plan.  Any Holder of Equity Interests that opts out of the Third Party Release will not receive a Debtor Release or Third Party Release from the Releasing Parties.

**4.      The Voting Record Date**

The Bankruptcy Court has approved [●], 2019 as the voting record date (the "**Voting Record Date**") with respect to all Claims and Equity Interests.  The Voting Record Date is the date on which it will be determined: (a) which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Disclosure Statement Order and (b) which Holders of Claims and

Equity Interests in the Non-Voting Classes are entitled to receive the Confirmation Hearing Notice, including notice of such Holder's non-voting status, in accordance with the Disclosure Statement Order.

5.     **Contents of the Solicitation Package**

The following documents and materials will collectively constitute the Solicitation Package:

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Classes to vote to accept the Plan;

- the Confirmation Hearing Notice, attached to the Disclosure Statement Order;

- this Disclosure Statement (and exhibits annexed thereto, including the Plan);

- the Disclosure Statement Order (without exhibits);

- to the extent applicable, a ballot and/or notice, appropriate for the specific creditor, in substantially the forms attached as Exhibits [ ] and [ ] to the Disclosure Statement Order (as may be modified for particular classes and with instruction attached thereto); and

- such other materials as the Bankruptcy Court may direct.

6.     **Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan**

With the assistance of the Voting and Claims Agent, the Debtors intend to distribute Solicitation Packages on or before [●], 2019 (the "**Solicitation Mailing Date**").  The Debtors submit that the timing of such distribution will provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b).  The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in the Voting Classes receive no more than one Solicitation Package.  If a Holder holds Claims in more than one Class and is entitled to vote in more than one Class, such Holder will receive separate ballots which must be used for each separate Class of Claims.

7.     **Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims**

As set forth above, certain Holders of Claims and Equity Interests are not entitled to vote on the Plan.  As a result, such parties will not receive Solicitation Packages and, instead, will receive the appropriate form of notice as follows:

- Unimpaired Claims – Deemed to Accept. Administrative Claims and Priority Tax Claims are unclassified, non-voting Claims and Claims in Classes 1, 2, 3, 4, 7 and 10 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan.  As such, Holders of such Claims will receive, in lieu of a Solicitation Package, an "Unimpaired Claims Notice" substantially in the form attached as Exhibit [ ] to the Disclosure Statement Order.

- Impaired Claims and Equity Interests – Deemed to Reject.  Holders of Equity Interests in Class 8 are receiving no distribution under the Plan on account of such Equity Interests, and Holders of Equity Interests in Class 9 will receive no distribution under the Plan if Class 6 votes to reject the Plan. Therefore, such Classes are conclusively presumed to reject the Plan.  However, the Holders of Equity Interests in Class 8 and 9 will receive a Ballot solely for purposes of affirmatively opting out of the Third Party Release, substantially in the form attached as Exhibit [ ] to the Disclosure Statement Order.

- Disputed Claims.

    (a) Any Holder of a Claim for which the Debtors have filed an objection on or before [●], 2019, whether such objection related to the entire Claim or a portion thereof, will not be entitled to vote on the Plan and will not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan. Such Holders will receive a "Notice of Non-Voting Status: Disputed Claims," substantially in the form attached as Exhibit [ ] to the Disclosure Statement Order.

    (b) Any Holder of a Claim in any of the Voting Classes against the Debtors for which such Holder has timely filed a Proof of Claim (or an untimely Proof of Claim which has been allowed as timely by the Bankruptcy Court under applicable law on or before the Voting Record Date), which is marked, in whole or in part, as contingent, unliquidated, or disputed, and that is not subject to an objection filed by the Debtors, will have such Claim temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00. Such Holders will receive (a) a Solicitation Package that contains the applicable Ballot, (b) a "Confirmation Hearing Notice," which notice informs such person or entity that its entire Claim has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00 and (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims for Which No Objection Has Been Filed by the Debtors," substantially in the form attached as Exhibit [ ] to the Disclosure Statement Order.

    If any Holder described in the preceding two subparagraphs disagrees with the Debtors' classification or status of its Claim, then such Holder MUST file and serve a motion requesting temporary allowance of its Claim solely for voting purposes in accordance with the procedures set forth in the Disclosure Statement Order.

- Contract and Lease Counterparties. Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have scheduled Claims or Claims based upon Proofs of Claim pending the disposition of their contracts or leases by assumption or rejection. Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, to ensure that such parties nevertheless receive notice of the Plan, counterparties to the Debtors' Executory Contracts and Unexpired Leases will receive, in lieu of a Solicitation Package, a "Contract/Lease Party Notice" substantially in the form attached as Exhibit [ ] to the Disclosure Statement Order.

8.    **Additional Distribution of Solicitation Documents**

In addition to the distribution of Solicitation Packages to Holders of Claims in the Voting Classes, the Debtors will also provide parties who have filed requests for notices under Bankruptcy Rule 2002 as of the Voting Record Date with the Disclosure Statement, Disclosure Statement Order and Plan. Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Disclosure Statement (and any exhibits thereto, including the Plan) by: (a) calling the Voting and Claims Agent at 877-634-7165 (toll-free in US and Canada) or 424-236-7221 (for international callers); (b) writing to Emerge Energy Services, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (c) visiting the Debtors' restructuring website at: http://www.kccllc.net/emergeenergy. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

9.    **Filing of the Plan Supplement**

The Debtors will file the Plan Supplement by [●], 2019. The Debtors will transmit a copy of the Plan Supplement to the Distribution List, as defined in this Section I.D.9. Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (a) calling the Voting and Claims Agent at 877-634-7165 (toll-free in US and Canada) or 424-236-7221 (for international callers); (b) writing to Emerge Energy

Services, c/o Kurtzman Carson Consultants LLC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (c) visiting the Debtors' restructuring website at: http://www.kccllc.net/EmergeEnergy.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

The Plan Supplement will include all Exhibits and Plan Schedules that were not already filed as exhibits to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

As used herein, the term "**Distribution List**" means (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the creditors listed on the Debtors' consolidated list of thirty creditors holding the largest unsecured claims; (v) counsel to the DIP Credit Agreement Agent and the Prepetition Agents; and (vi) all parties entitled to notice pursuant to Local Rule 9013-1(m).

## E.     VOTING PROCEDURES

Holders of Claims entitled to vote on the Plan are advised to read the Disclosure Statement Order, which sets forth in greater detail the voting instructions summarized herein.

### 1.     The Voting Deadline

The Bankruptcy Court has approved [5:00 p.m.] prevailing Eastern Time on [●], 2019 as the Voting Deadline.  The Voting Deadline is the date by which all Ballots must be properly executed, completed and delivered to the Voting and Claims Agent in order to be counted as votes to accept or reject the Plan.

### 2.     Types of Ballots

The Debtors will provide Ballots to Holders of Claims in the Voting Classes (i.e., Classes 5 and 6), the forms of which are attached to the Disclosure Statement Order as Exhibits [ ] and [ ].

The Debtors will also provide Ballots to Holders of Equity Interests in non-voting Classes 8 and 9, in the form attached to the Disclosure Statement Order as Exhibit [ ], solely for purposes of providing an opportunity to affirmatively opt-out of the Third Party Releases.

For avoidance of doubt, and subject to the terms of the Restructuring Support Agreement, each Ballot will include an option for the applicable Holder to affirmatively opt out of the Third Party Release contained in Article X of the Plan.  Subject to the Restructuring Support Agreement, any party that opts out of the Third Party Release will not receive a Debtor Release or Third Party Release from the Releasing Parties.

### 3.     Voting Instructions

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. Those Holders may so vote by completing a Ballot and returning it to the Voting and Claims Agent prior to the Voting Deadline.  Each Ballot will also allow Holders of Claims in the Voting Classes to opt out of the Third Party Release set forth in Article X of the Plan.  Any Holder of Claims or Equity Interests that opts out of the Third Party Release will not receive a Debtor Release or a Third Party Release from the Releasing Parties, subject to the terms of the Restructuring Support Agreement.

> **PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BALLOT(S) THAT YOU HAVE RECEIVED FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

To be counted as votes to accept or reject the Plan, all hard copy Ballots (all of which will clearly indicate the appropriate return address) must be properly executed, completed, dated and delivered by using the return

envelope provided by (a) first class mail, (b) overnight courier or (c) personal delivery, so that they are **actually received** on or before the Voting Deadline by the Voting and Claims Agent at the following address:

> Emerge Energy Services Balloting Center
> c/o Kurtzman Carson Consultants LLC
> 222 N. Pacific Coast Highway, Suite 300,
> El Segundo, CA 90245
>
> If you have any questions on the procedures for voting on the Plan, please call the Voting and Claims Agent at: 877-634-7165 (toll-free in US and Canada) or 424-236-7221 (for international callers)

As an alternative to return of hard copy Ballots, Holders of Claims in the Voting Classes may vote using the Claims Agent's online balloting portal by properly following the instructions on the Debtors' restructuring website at www.kccllc.net/emergeenergy and completing the online balloting process on or before the Voting Deadline.

4.    **Tabulation of Votes**

> **THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AND CLAIMS AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD.  BY SIGNING AND RETURNING A BALLOT EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAS BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

- **ANY BALLOT THAT IS RECEIVED <u>AFTER</u> THE VOTING DEADLINE WILL <u>NOT</u> BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT.**

- **ADDITIONALLY, THE FOLLOWING BALLOTS WILL <u>NOT</u> BE COUNTED:**

  o    any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  o    any Ballot cast by or on behalf of an entity that does not hold a Claim in one of the Voting Classes;

  o    any Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed;

  o    any Ballot that (a) is properly completed, executed and timely filed, but does not indicate an acceptance or rejection of the Plan, or (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

      o    any Ballot cast for a Claim that is subject to an objection pending as of the Voting Record Date (except as otherwise provided in the Disclosure Statement Order);

      o    any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), any indenture trustee or the Debtors' financial or legal advisors;

      o    any Ballot transmitted by facsimile, telecopy or electronic mail;

      o    any unsigned Ballot; or

      o    any Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

## F.    CONFIRMATION OF THE PLAN

### 1.    The Confirmation Hearing

The Confirmation Hearing will commence at [[●] a.m.] prevailing Eastern Time on [●], 2019 before the Honorable Karen B. Owens, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom [●], Wilmington, Delaware 19801-3024.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

### 2.    The Deadline for Objecting to Confirmation of the Plan

The Plan Objection Deadline is [●] p.m. prevailing Eastern Time on [●], 2019.  Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest of such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Plan Objection Deadline by the parties set forth below (the "**Notice Parties**").

(a) Counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: Keith Simon, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: John Knight, Esq.);

(b) Counsel to the Prepetition Agents and DIP Credit Agreement Agent, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153-0119 (Attn: Matt S. Barr, Esq., David Griffiths, Esq., and Candace M. Arthur, Esq. (emails: matt.barr@weil.com, david.griffiths@weil.com, and candace.arthur@weil.com)) and Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, Wilmington, Delaware 19801 (Attn: Laura Davis Jones, Esq. (email: ljones@pszjlaw.com));;

(c) Counsel to [Statutory Committee], [●], [●] (Attn: [●], Esq.); and

(d) The Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware  19801 (Attn: Juliet M. Sarkessian, Esq. (email: Juliet.M.Sarkessian@usdoj.gov)).

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

### 3.    Effect of Confirmation of the Plan

Article X of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtors and certain Holders of Claims, and each of their respective Related Persons, and (c) exculpation of certain parties. **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly.**

> THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## G.    CONSUMMATION OF THE PLAN

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.

## H.    RISK FACTORS

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION VI HEREIN TITLED, "PLAN-RELATED RISK FACTORS."**

## II.
## BACKGROUND TO THE CHAPTER 11 CASE

**A.      THE DEBTORS' CORPORATE HISTORY AND STRUCTURE**

Emerge Energy was formed in 2012 by management and affiliates of Insight Equity Management Company LLC and its affiliated investment funds (collectively, "**Insight Equity**").  On or about May 14, 2013, Emerge Energy completed its initial public offering to become a publicly listed limited partnership.  From May 14, 2013 until May 31, 2019, the Partnership's common units were listed on the NYSE under the symbol "EMES."

The Partnership is engaged in the business of mining, processing, and distributing silica sand proppant, a key component in the hydraulic fracturing ("**fracking**") of oil and gas wells.  Proppant is sand or similar particulate material suspended in water or other fluid injected into wells at high pressure to keep fissures open to stimulate the extraction of hydrocarbons.  The Partnership is the direct or indirect parent company of each of the Partnership Subsidiaries.  The General Partner is the sole general partner in the Partnership, and the ownership units in the General Partner are held by a non-debtor entity.  Emerge Energy conducts its operations primarily through its subsidiary Debtor Superior Silica Sands LLC.

**B.      THE DEBTORS' OPERATIONS**

**1.      General Overview**

As noted above, the Debtors mine, process, and distribute silica sand.  The Debtors' production of sand consists of three basic processes: mining, wet plant operations,[7] and dry plant operations.[8]  Most mining activities of the Debtors take place in an open pit environment whereby the Debtors remove the topsoil, which is set aside, and then remove other non-economic minerals, or "overburden," to expose the sand deposits.  At certain sites, the Debtors then "bump" the sand using explosives on the mine face, which causes the sand to fall into the pit. Immediately after being mined, sand is then transported to wet plant operations.

The Debtors also utilize a process called hydraulic mining whereby they use high pressure water cannons to dislodge the sandstone, and transport the sand and water mixture via pipeline to the wet plant. Where the geology is suitable, this technique minimizes the use of heavy excavation machinery, thereby lowering operating costs.  In certain locations, the Debtors use dredging mining techniques, whereby sand deposits are extracted from the ground with water.  The resulting slurry is then transported via pipeline to the wet processing facility.  Once the Debtors have mined out a portion of the reserves, they then either return the land to its previous contours or to a more usable contour.

At the Debtors' wet plants, the mined sand goes through a series of processes designed to separate the sand from unusable materials.  The resulting wet sand is then conveyed to a wet sand stockpile to decant (i.e. drain water) into an on-site recycling facility, while the remaining fine grains and other materials, if any, are separated through a series of settlement ponds. Wet sand from the Debtors' stockpile is then conveyed or trucked to their dry plants where the sand is dried, screened into specific mesh categories, and stored in silos.  From the silos, the Debtors load sand directly into railcars or trucks, which they then ship to transload facilities or directly to customers.  Due to weather conditions in Wisconsin, the Debtors have historically operated their wet plants in that region on a seasonal basis.  Plants are operated during spring and summer months to build inventory and shut down during fall and winter months.

---

[7]      "Wet plant" means an industrial site where sand is fed through a stone breaking machine, crusher system and then slurried into the plant. The sand is then scrubbed and hydrosized by log washers or rotary scrubbers to remove the deleterious materials from the ore, and then separated using a vibrating screen and waterway system to generate separate sand products.

[8]      "Dry plant" means an industrial site where sand is fed through a dryer and screening system to be dried and screened in varying size gradations. The finished product that emerges from the dry plant is then stored in silos or stockpiles before being transported to customers or is immediately loaded onto a conveyance for transportation.

### 2. Transportation Logistics and Infrastructure

The Debtors sell their sand both free-on-board ("**FOB**") at their plants, as well as at transload facilities that are closer to the wellhead. At the Debtors' Texas plants (generally known as "in-basin sand"), orders are picked up by truck because most orders are transported 200 miles or less from plant sites. With respect to the Debtors' Wisconsin plants, however, nearly all product is transported in excess of 200 miles with transportation costs typically representing more than 50% of customers' overall cost for delivered sand. Accordingly, Wisconsin sand (generally known as northern white sand or "**NWS**") is primarily transported by rail to a transload and storage location in close proximity to the customer's intended end use destination, which is then picked up by truck.

The Debtors offer their customers a total supply chain solution pursuant to which they manage every aspect of the supply chain from mining and manufacturing to delivery within close proximity to the wellhead. To that end, the Debtors have, over time, built a significant fleet of company-leased and customer-committed railcars, assembled a network of leased transload and terminal storage sites located near major shale plays, and designed a supply chain management system.

In 2017 the entire proppant industry began a shift away from NWS to in-basin sand (i.e. sand directly mined, processed and obtained in the basin where customer consumption occurs). Although the Debtors adjusted to the market by pursuing in-basin facilities in Texas and Oklahoma, the Debtors maintained a substantial portion of their operations in Wisconsin. The reduction in demand for NWS in turn led to a material over-supply of leased railcars and transload facilities under long term contract all tied to the Debtors' NWS business. There is currently insufficient volume for the Debtors to operate their NWS business profitably absent a restructuring of these burdensome contracts. As of the Petition Date, the Debtors leased a total of approximately 4,918 railcars, a majority of which have lease terms expiring during 2020-2022, but some of which have lease terms expiring as late as 2028.

In addition to the delivered rail cars under lease described above, the Debtors hold additional leases with one particular lessor for an additional 3,047 rail cars yet to be delivered. During the 2016 market decline the Debtors negotiated temporary relief from the obligation to accept these cars. The relief resulted in creation of an unsecured promissory note from the Debtors to the lessor, the balance of which is $6,547,889 as of the Petition Date. After the 2016 amendment, the first 47 cars were scheduled to be delivered in July 2018, with the remainder scheduled for delivery almost evenly during 2019 – 2021. To date, in spite of the deferral, the Debtors still do not need and have not accepted delivery of these cars. Now in addition to (a) being contractually bound by above-market rates for accepted railcars that the Debtors do not need and (b) facing contractual obligations for a significant number of excess railcars the Debtors also do not need, the Debtors are further incurring significant monthly storage costs for these excess railcars previously delivered but not in use. In the aggregate, the obligations for extraneous rail car leases and storage costs exceeds $3,000,000 per month.

### 3. Customers

The Debtors sell substantially all (greater than 94% of total revenue in 2018) of their sand to customers in the oil and gas proppants market. These customers include major oilfield services companies as well as exploration and production companies that are engaged in hydraulic fracturing. For the year ended December 31, 2018, the Debtors' top two customers collectively accounted for 38% of total revenue. Non-frac sand sales accounted for 6% of total revenue in 2018, and consists of customers in the sports sands, construction, and foundry industries. In 2018, total revenue from customers under long-term contracts (including take-or-pay, fixed-volume, and efforts-based contracts) accounted for 60% of total revenue.

### 4. Competition

The frac sand market is a highly competitive market that comprises (i) a small number of large, national producers, which are referred to as "Tier 1" producers, and (ii) a larger number of small, regional, or local producers. Competition in the frac sand industry has increased recently, and the Debtors expect competition to increase in the future as new entrants began operations in 2018 with local, in-basin sand mines. Suppliers compete based on price, consistency, quality of product, site location, distribution capability, customer service, reliability of supply, breadth of product offering and technical support. Based on management's internal estimates, the Debtors believe they are one of the top producers of frac sand in 2018 by production capacity and sales volumes.

**5.**        **Employees**

The Partnership and its subsidiaries have no employees.  Rather, all of the Debtors' management, administrative and operating functions are performed by employees of the General Partner, who are reimbursed by the Partnership pursuant to its limited partnership agreement.

Due to a continued depression in the NWS market, the Debtors had already been operating their New Auburn, Wisconsin, dry plant on limited shifts reduced from historical levels.  On May 15, 2019, the Debtors took the further step of announcing the closure of their New Auburn dry plant facility effective May 31, 2019.  Although all 22 impacted employees were offered positions within the company (most seasonal positions in the nearby Thompson Hills wet plant) several elected not to accept this offer.  Additionally, on June 6, 2019, as part of a reduction in force associated with the restructuring, the Debtors terminated an additional [9] employees across multiple plants and at their corporate offices.  As of the Petition Date, after accounting for these reductions, the General Partner employed approximately 238 employees.  None of these employees are subject to collective bargaining agreements.

**C.**       **PREPETITION INDEBTEDNESS**

**1.**        **Prepetition Credit Agreement (First Lien)**

The Debtors (other than the General Partner) are parties to that certain Second Amended and Restated Revolving Credit and Security Agreement, dated as of January 5, 2018 (as the same may be amended, modified or supplemented, the "**Prepetition Credit Agreement**"), with HPS Investment Partners, LLC ("**HPS**"), as administrative and collateral agent (in such capacity, together with any successor agent, the "**Prepetition Credit Agreement Agent**"), and the lenders party thereto from time to time (the "**Prepetition Credit Agreement Lenders**").[9]  As of the Petition Date, the Prepetition Credit Agreement had an aggregate outstanding principal amount of approximately $66,710,000, comprising $3,518,000 in the form of letters of credit and approximately $63,191,990 in an aggregate outstanding principal amount in the form of outstanding loans, plus accrued but unpaid interest, fees, costs, and expenses.  These obligations are secured by senior, first priority security interests in, and liens upon, substantially all of the Debtors' assets.

**2.**        **Prepetition Notes Agreement (Second Lien)**

The Debtors (other than the General Partner) are parties to that certain Notes Purchase Agreement, dated as of January 5, 2018 (as the same may be amended, modified or supplemented, the "**Prepetition Notes Agreement**"), with HPS, as administrative and collateral agent (in such capacity, together with any successor agent, the "**Prepetition Notes Agent**"), and the noteholders party thereto from time to time (the "**Prepetition Noteholders**").  As of the Petition Date, the Prepetition Notes Agreement had an aggregate outstanding principal amount of approximately $215,755,307, plus accrued but unpaid interest, fees, costs, and expenses.  These obligations are secured by second priority security interests in, and liens upon, substantially all of the Debtors' assets, which liens are junior in priority to the security interests and liens arising in connection with the Prepetition Credit Agreement pursuant to that certain Intercreditor Agreement dated as of January 5, 2018 (as the same may be amended, modified or supplemented, the "**Intercreditor Agreement**") between the Prepetition Credit Agreement Agent and Prepetition Notes Agent.

**3.**        **Unpaid Trade Debt & Related Obligations**

In the ordinary course, the Debtors incur trade debt with certain vendors in connection with the operation of their business.  The Debtors believe that, as of the Petition Date, their unsecured trade debt is at least approximately

---

[9]        The original agent and lender under the Revolving Loan Agreement was PNC Bank.  On or about March 15, 2019, HPS and certain other Noteholders (as defined below) purchased 100% of the obligations outstanding under the Revolving Loan Agreement pursuant to and in accordance with the Intercreditor Agreement (as defined below).  Because of this buyout, the Revolving Loan Lenders and Noteholders are affiliates or controlled fund of each other.

$56,000,000. This is inclusive of accrued but unpaid obligations under railcar leases, abandoned transloading facilities, as well as railcar storage obligations which in some cases have gone unpaid over a six-month period.

## D.    EVENTS LEADING TO THE CHAPTER 11 FILING

### 1.    General Background

The Debtors' business experienced rapid growth from 2011 to 2014 due to technological advances in horizontal drilling and the hydraulic fracturing process that have made the extraction of large volumes of oil and natural gas from domestic unconventional hydrocarbon formations economically feasible. Demand for frac sand decreased during 2015 and 2016 as a result of an industry downturn.

Commodity prices stabilized in the middle of 2016, however, leading to an improvement in drilling activity during the third quarter of 2016, and into 2017 and early 2018. The market for frac sand began to soften again in early August 2018, due to a decline in well completion activities resulting from the exhaustion of capital budgets for oil and gas exploration and production companies. These factors, along with the new production from in-basin frac sand competitors discussed above, led the sand market to quickly turn from a state of short-supply in the first half of 2018 to over-supply in the second half of 2018. As a result of the imbalance between supply and demand, select in-basin markets for frac sand experienced price erosion as did NWS as a whole.

While experiencing these negative macro-economic factors and a decline in NWS, in April 2017 the Debtors acquired a site in San Antonio, Texas. The Debtors then undertook a large capital expenditure project to develop this San Antonio site into a large, premier sand facility. The project, however, experienced certain complications and continues to produce below the facility's nameplate capacity in its sixth full month of operation, in spite of reasonably strong customer demand and pricing.

In addition, on June 21, 2019, the San Antonio facility experienced a levee breach incident that has temporarily halted active mining at the facility. Specifically, a 15-foot section of the west wall in the facility's mud retention pond failed causing an inundation of water and sediment to the southwest corner of the mine, also known as the "C-side." No injuries occurred as a result of the breach. The Debtors took immediate actions in order to block any personnel or equipment from entering the area. The Debtors also simultaneously contacted representatives from the U.S. Mining Safety and Health Administration ("**MSHA**") at the time to give notice of the incident. MSHA issued a Section 103(k) order on the entire mine area, meaning the Debtors could not access any part of the impacted mine.[10] The full extent of damage to the C-line cannot be fully assessed until the water and sediment from the incident has abated or been cleared, but given the extent and nature of the incident all equipment and operations related to the C-line are expected to require replacement and this part of the facility's operation is expected to be idle for an extended period of time. Although lines A and B were not directly impacted by the levee breach, there are shared water and related retaining structures that, pursuant to the Section 103(k) order, cannot be operated and, as a result, prevents the Debtors from operating lines A and B pending completion of remedial steps to ensure that these areas are safe to operate. In spite of the mining and wet plant operations in San Antonio having been shut down since June 21, 2019 as a result of the incident described above, the Debtors are able to continue operating its drying facilities and delivering product to customers.

### 2.    Prepetition Restructuring Efforts

Due to the aforementioned factors, the Debtors began to experience revenue, cash flow, and liquidity challenges. The increasing strain on the Debtors' operations prevented them from meeting certain financial covenants and complying with certain other terms under the Prepetition Credit Agreement and the Prepetition Notes Agreement. As a result of these defaults and events of default, the Debtors entered into a series of monthly

---

[10] Section 103(k) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq., provides that "in the event of any accident occurring in a coal or other mine, an authorized representative of the Secretary [of Health and Human Services], when present, may issue such orders as he deems appropriate to insure the safety of any person in the coal or other mine, and the operator of such mine shall obtain the approval of such representative, in consultation with appropriate State representatives, when feasible, of any plan to recover any person in such mine or to recover the coal or other mine or return affected areas of such mine to normal."

forbearance agreements with the Prepetition Credit Agreement Lenders and the Noteholders beginning on December 31, 2018, in order to, among other things, allow time for the Debtors to explore various strategic alternatives.

Pursuant to these forbearance agreements, the Debtors retained, among others, (i) Ankura Consulting Group, LLC ("**Ankura**") to provide interim management services to the Debtors and (ii) Mr. Bryan M. Gaston, a Senior Managing Director at Ankura, to serve as the Debtors' Chief Restructuring Officer.  Since being retained by the Debtors in January, 2019, Mr. Gaston has, among other things: (i) assisted senior management in monitoring accounts payable and interfacing with material vendors; (ii) negotiated on behalf of the Debtors with lender constituents related to any modification to or relief from terms contained in their secured credit facilities; (iii) evaluated and assisted in the renegotiating of material contracts (including railcar and storage leases); (iv) worked with senior management to develop and evaluate business plans and/or strategic restructuring alternatives, including development of any financial models in support of the same and monitoring and adapting such plan as internal or external conditions may dictate; and (v) worked with senior management in connection with liquidity and cash flow forecasting.

At the same time as Mr. Gaston was performing these services described above—with particular emphasis on renegotiating the Debtors' railcar and terminal storage leases to increase the chances of a successful out-of-court restructuring—the Debtors and their restructuring advisors (Ankura, Houlihan Lokey, and Latham & Watkins LLP) engaged in extensive discussions and negotiations with Insight Equity, the Prepetition Credit Agreement Lenders, and the Prepetition Noteholders regarding a potential in-court restructuring of the Debtors' balance sheet and business operations.

As a result of such extensive negotiations, the parties entered into that certain Restructuring Support Agreement, dated as of April 18, 2019 (as amended from time to time, the "**RSA**"), by and among the Debtors, Insight Equity, the Prepetition Credit Agreement Lenders, and the Noteholders, pursuant to which the parties agreed on a restructuring path for the Debtors.  The RSA set forth the terms and conditions pursuant to which the signatories thereto support the Plan described in this Disclosure Statement.

Even with the signing of the RSA, however, the Debtors (with the support of their secured lenders) continued to negotiate with their material railcar and terminal lessors for nearly two months in the hopes of consummating an out-of-court restructuring.  While the Debtors made some progress with a handful of counterparties, it became clear that there were no viable out-of-court restructuring options for the Debtors to pursue as compared to the benefits that chapter 11 would provide—most importantly the ability to reject burdensome contracts and leases under Section 365 of the Bankruptcy Code.  Accordingly, when faced with a lack of viable restructuring options and dwindling liquidity, and after extensive discussions with their advisors, the Debtors determined that filing for chapter 11 was in their best interest and in the best interest of their creditors and other stakeholders.

**III.**
**EVENTS DURING THE CHAPTER 11 CASE**

**A.    FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF**

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with, among others, vendors, customers, employees and utility providers that the Debtors believed could be impacted by the commencement of the Chapter 11 Cases.  As a result of these initial efforts, the Debtors were able to minimize, as much as practicable, the negative impacts of the commencement of the Chapter 11 Cases.

On July 15, 2019, the Debtors filed a number of motions (collectively referred to herein as "**First Day Motions**") with the Bankruptcy Court.  At a hearing conducted on July 17, 2019, the Bankruptcy Court entered several orders in connection with the First Day Motions to, among other things:  (i) prevent interruptions to the Debtors' businesses; (ii) ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers; and (iii) provide access to critical financing and capital (each, a "**First Day Order**").

**1.    Procedural Motions**

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" First Day Orders, by which the Bankruptcy Court, *inter alia*, (a) approved the joint administration of the Debtors' Chapter 11 Cases, (b) authorized retention and appointment of Kurtzman Carson Consultants LLC ("**KCC**") as Claims and Noticing Agent.

**2.    Stabilizing Operations**

Recognizing that any interruption of the Debtors' businesses, even for a brief period of time, would negatively impact their operations, relationships with the vendors, revenue and profits, the Debtors filed a number of First Day Motions to help facilitate the stabilization of its operations and effectuate, as much as possible, a smooth transition into operations as debtors in possession.  Specifically, the Debtors sought and obtained First Day Orders granting the Debtors interim authority (subject to final approval at a hearing scheduled for August 14, 2019 (the "**Second Day Hearing**")) to, *inter alia*:

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- pay prepetition amounts owing to Shippers, Lien Claimants, and Royalty Interest Owners;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- continue insurance coverage and a bonding program, and enter into new insurance policies and purchase new surety bonds, if necessary;

- maintain the existing cash management system; and

- remit and pay certain taxes and fees.

### 3. DIP Facility

In order to obtain funding for operations and for the expenses of these Chapter 11 Cases, the Debtors sought and obtained interim authority to enter into and perform under their $35,000,000 Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement (the "**DIP Facility**"), including authority to obtain an initial draw of $7,500,000 thereunder. The DIP Facility lenders are the Prepetition Lenders and Prepetition Noteholders, and the DIP Facility includes an incremental roll-up of the Prepetition Credit Agreement loans in the amount of the proceeds of Prepetition Lenders' collateral received by the Debtors during the Chapter 11 Cases. The DIP Facility closed, and the Debtors made their initial draw thereunder, on July 19, 2019.  The Debtors will request final approval of the DIP Facility at the Second Day Hearing.

### B. SECOND DAY MOTIONS AND RELATED RELIEF

In addition to hearing requests for final relief in respect of the interim orders summarized above, the Debtors filed additional motions seeking additional relief at the Second Day Hearing, including the following:

### 1. Railcar Rejections

The Debtors filed a pair of motions to reject their existing railcar leases and simultaneously to enter into new leases on substantially improved terms for substantially fewer railcars with a reduced number of lessors. If the motions are granted, the Debtors anticipate reducing their current inventory of roughly [5000] railcars to roughly [1500] railcars, all at substantially reduced lease rates going forward.

### 2. Critical Vendors

To prevent the imposition of the automatic stay from disrupting their businesses and to ensure continued deliveries and services on favorable credit terms, the Debtors filed a motion for authority to pay the prepetition claims of certain vendors and third-party service providers whom the Debtors believe are essential to the ongoing operation of their businesses.  The Debtors' ability to pay the claims of these vendors and service providers was and remains critical to maintaining ongoing business operations due to the Debtors' inability to acquire essential replacement goods and services of the same quality, reliability, cost or availability from other sources.  The Debtors' ability to pay the claims of these vendors and service providers, ultimately, was and remains critical to the success of the Debtors' Chapter 11 Cases.

### 3. Professional Retentions

To assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors filed motions for authority to retain and employ the following advisors: (a) Latham & Watkins LLP and Richards, Layton & Finger, P.A., as restructuring counsel; (b) Houlihan Lokey, Inc., as financial advisor; (c) Ankura Consulting Group, LLC, as restructuring advisor, and (d) KCC as administrative advisor.  The Debtors also filed a motion for authority to retain, and to establish procedures for the retention of further, professionals utilized in the ordinary course of the Debtors' businesses.

# IV.
# SUMMARY OF THE PLAN

> THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE <u>MATERIAL</u> <u>TERMS</u>
> OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT
> AND THE PLAN AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF
> THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN
> THIS SECTION IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN
> SHALL CONTROL AND GOVERN.

## A.    ADMINISTRATIVE AND PRIORITY TAX CLAIMS

### 1.    Administrative Claims

Subject to <u>sub-paragraph (a)</u> below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement) or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim will have agreed upon in writing; <u>*provided*</u>, <u>*however*</u>, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.

(a)    <u>Bar Date for Administrative Claims</u>

Except as otherwise provided in the Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order or the occurrence of the Effective Date (as applicable) no later than the Administrative Claims Bar Date; <u>*provided*</u> that the foregoing shall not apply to either the Holders of Claims arising under section 503(b)(1)(D) of the Bankruptcy Code or the Bankruptcy Court or United States Trustee as the Holders of Administrative Claims.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors and their respective Estates and property and such Administrative Claims shall be deemed discharged as of the Effective Date.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.2.G of the Plan.  Nothing in Article II.A.1 of the Plan shall limit, alter, or impair the terms and conditions of the Claims Bar Date Order with respect to the Claims Bar Date for filing administrative expense claims arising under Section 503(b)(9) of the Bankruptcy Code.

Objections to such requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims.

(b)      Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated in the Confirmation Order an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that, on or about the Effective Date, holders of Professional Fee Claims will provide a reasonable estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtors or their Estates as of the Effective Date (the "*Professional Fee Claims Estimate*"); provided further that such estimate will not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's request for payment of Professional Fee Claims.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than thirty (30) days after the Filing of the applicable final request for payment of the Professional Fee Claim.  Each Holder of an Allowed Professional Fee Claim will be paid in full in Cash by the Reorganized Debtors, including from the Carve Out Reserve, within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.  The Reorganized Debtors will not commingle any funds contained in the Carve Out Reserve and will use such funds to pay only the Professional Fee Claims, as and when allowed by order of the Bankruptcy Court.  Notwithstanding anything to the contrary contained herein or in the Plan, the failure of the Carve Out Reserve to satisfy in full the Professional Fee Claims will not, in any way, operate or be construed as a cap or limitation on the amount of Professional Fee Claims due and payable by the Reorganized Debtors. The Carve Out Reserve will be maintained in trust for the Professionals and will not be considered property of the Debtors' Estates; provided that the Reorganized Debtors will have a reversionary interest in the Unused Cash Reserve Amount.  To the extent that funds held in the Carve Out Reserve do not or are unable to satisfy the full amount of the Allowed Professional Fee Claims, such Professionals will have an Allowed Administrative Claim for any such deficiency, which will be satisfied in full in Cash accordance with Article II.A of the Plan.

The Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses from the Debtors and Reorganized Debtors for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

2.      **DIP Credit Agreement Claims**

On the Effective Date, the Allowed DIP Credit Agreement Claims will, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claims be indefeasibly paid in full in Cash from the proceeds of the Exit Facility Loans, and the DIP Credit Agreement Liens will be deemed discharged, released, and terminated for all purposes without further action of or by any Person or Entity.

The Debtors' contingent or unliquidated obligations under the DIP Loan Documents, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner acceptable to the DIP Facility Agent, any affected DIP Credit Agreement Lender, or any other holder of a DIP Credit Agreement Claim, as applicable, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

3.      **Priority Tax Claims**

Subject to Article IV.G of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less

favorable treatment as to which the Debtors (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement) or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim will have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made under clause (C) or (D) above will be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

**B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**1.    Summary**

The Plan constitutes a separate plan of reorganization for each Debtor.  All Claims and Equity Interests, except Administrative Claims, DIP Credit Agreement Claims, and Priority Tax Claims, are placed in the Classes set forth below. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be [__] Classes for each Debtor); *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.

**2.    Classification and Treatment of Claims and Equity Interests**

(a)    Class 1 – Other Priority Claims

o    *Classification*:  Class 1 consists of the Other Priority Claims.

o    *Treatment*: Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement): (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized

10

Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

o  *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(b)    Class 2 – Other Secured Claims

o  *Classification*:  Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim.

o  *Treatment*:  Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement): (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

o  *Voting*:  Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(c)    Class 3 – Secured Tax Claims

o  *Classification*:  Class 3 consists of the Secured Tax Claims.

o  *Treatment*:  Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable (with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement):  (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate

amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made under clause (D) or (E) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

o   *Voting*: Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

(d)    Class 4 – Prepetition Credit Agreement Claims

o   *Classification*: Class 4 consists of the Prepetition Credit Agreement Claims.

o   *Allowance*: The Prepetition Credit Agreement Claims are deemed Allowed Secured Claims in the aggregate principal amount of $[_____], plus contingent reimbursement obligations in respect of outstanding letters of credit in an aggregate face amount equal to $[___], and any accrued and unpaid interest payable on such amounts through the Effective Date.[11]

o   *Treatment*: On the Effective Date, the Allowed Prepetition Credit Agreement Claims shall, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claims, be indefeasibly paid in full in Cash from the proceeds of the Exit Facility Loans. Without affecting any additional Liens required by the Exit Facility Loan Documents, each Prepetition Credit Agreement Lien is stipulated to as valid, perfected, and not avoidable, and shall secure the Exit Facility Loans and all other indebtedness and obligations of the Reorganized Debtors under or secured by the Exit Facility Loan Documents and each such Prepetition Credit Agreement Lien shall, as of the Effective Date, (i) be ratified, reaffirmed and deemed granted by the Reorganized Debtors, (ii) remain attached to the Reorganized Debtors' assets and property, and (iii) not be, and shall not be deemed to be, impaired, discharged or released by the Plan, the Confirmation Order or on account of the Confirmation or Consummation of the Plan.

o   *Voting*: Class 4 is an Unimpaired Class, and the Holders of Claims in Class 4 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 4 are not entitled to vote to accept or reject the Plan.

(e)    Class 5 – Prepetition Notes Claims

---

[11]    The Allowed amount excludes any accrued fees, costs, and expenses (including all Prepetition Credit Agreement Agent and Lenders Fees and Expenses) that will be paid in cash on the Effective Date pursuant to the Plan or otherwise after the Effective Date in accordance with Article V.T of the Plan.

o   *Classification*:  Class 5 consists of the Prepetition Notes Claims.

o   *Allowance*: The Prepetition Notes Claims are deemed Allowed in the aggregate principal amount of $[_____], plus accrued and unpaid interest thereon as of the Petition Date.[12]

o   *Treatment*:

(i)   **IF AND ONLY IF CLASS 6 VOTES TO ACCEPT THE PLAN, THE FOLLOWING TREATMENT**:

On the Effective Date and in addition to the reimbursement described in Article V.S of the Plan, each Holder of an Allowed Prepetition Notes Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, its Pro Rata share of (1) the New Second Lien Notes; (2) the New Emerge GP Equity Interests; and (3) ninety-five percent (95%) of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity and any issuances pursuant to the New Warrants.

Without affecting any additional Liens required by the Exit Facility Loan Documents, each Prepetition Note Lien is stipulated to as valid, perfected, and not avoidable, and shall secure the Exit Facility Loans and all other indebtedness and obligations of the Reorganized Debtors under or secured by the Exit Facility Loan Documents and each such Prepetition Note Lien shall, as of the Effective Date, (i) be ratified, reaffirmed and deemed granted by the Reorganized Debtors, (ii) remain attached to the Reorganized Debtors' assets and property, and (iii) not be, and shall not be deemed to be, impaired, discharged or released by the Plan, the Confirmation Order or on account of the Confirmation or Consummation of the Plan.

(ii)   **IF AND ONLY IF CLASS 6 VOTES TO REJECT THE PLAN, THE FOLLOWING TREATMENT**:

On the Effective Date and in addition to the reimbursement described in Article V.S of the Plan, each Holder of an Allowed Prepetition Notes Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim, its Pro Rata share of (1) the New Second Lien Notes; (2) the New Emerge GP Equity Interests; and (3) one hundred percent (100%) of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity.

o   *Voting*: Class 5 is Impaired, and Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

(f)   Class 6 – General Unsecured Claims

o   *Classification*: Class 6 consists of the General Unsecured Claims.

o   *Treatment*:

(i)   **IF AND ONLY IF CLASS 6 VOTES TO ACCEPT THE PLAN, THE FOLLOWING TREATMENT:**

---

[12]   The Allowed amount excludes any unpaid Prepetition Noteholders Fees and Expenses that will be paid in Cash on the Effective Date pursuant to the Plan or otherwise after the Effective Date in accordance with Article V.T of the Plan.

Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 6 Claim is an Allowed Class 6 Claim as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 6 Claim, its Pro Rata share of (1) 5.0% of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity and any issuances pursuant to the New Warrants and (2) New Warrants representing 10.0% of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity.

**The foregoing is offered solely for settlement purposes as set forth in Article V of the Plan, and such settlement is conditioned on (i) Class 6 voting to accept the Plan, (ii) the Bankruptcy Court confirming the Plan, and (iii) the occurrence of the Effective Date.**

(ii)     **IF AND ONLY IF CLASS 6 VOTES TO REJECT THE PLAN, THE FOLLOWING TREATMENT:**

On the Effective Date, the Class 6 Claims will be discharged without further notice to, approval of or action by any Person or Entity, and each Holder of a Class 6 Claim shall not receive any distribution or retain any property on account of such Class 6 Claim.

o    *Voting*:  Class 6 is Impaired, and Holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

(g)     Class 7 – Intercompany Claims

o    *Classification*:  Class 7 consists of the Intercompany Claims.

o    *Treatment*:  Subject to the Restructuring Transactions, the Intercompany Claims shall be reinstated, compromised, or cancelled, at the option of the relevant Holder of such Intercompany Claims with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement.

o    *Voting*:  Class 7 is an Unimpaired Class, and the Holders of Claims in Class 7 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 7 are not entitled to vote to accept or reject the Plan.[13]

(h)     Class 8 –  Old Emerge GP Equity Interests

o    *Classification*:  Class 8 consists of the Old Emerge GP Equity Interests.

o    *Treatment*:  On the Effective Date, the Old Emerge GP Equity Interests will be cancelled without further notice to, approval of or action by any Person or Entity, and each Holder of an Old Emerge GP Equity Interest shall not receive any distribution or retain any property on account of such Old Emerge GP Equity Interests.

---

[13]     Even if Class 7 was an Impaired Class, because the Holders of such Claims are Affiliate Debtors, the Holders of such Claims would be conclusively deemed to have accepted the Plan since they are each plan proponents.

o   *Voting*:  Class 8 is an Impaired Class, and the Holders of Equity Interests in Class 8 will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Equity Interests in Class 8 will not be entitled to vote to accept or reject the Plan.

(i)   Class 9 – Old Emerge LP Equity Interests

o   *Classification*:  Class 9 consists of the Old Emerge LP Equity Interests.

o   *Treatment*:

(i)   **IF AND ONLY IF CLASS 6 VOTES TO ACCEPT THE PLAN, THE FOLLOWING TREATMENT:**

Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 9 Equity Interest is an Allowed Class 9 Equity Interest as of the Effective Date or (ii) the next Subsequent Distribution Date after the date on which such Class 9 Equity Interest becomes an Allowed Class 9 Equity Interest, each Holder of an Allowed Class 9 Equity Interest shall receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 9 Equity Interest, its Pro Rata share of New Warrants representing 5.0% of the New Limited Partnership Interests issued and outstanding on the Effective Date prior to dilution by the New Management Incentive Plan Equity.

**The foregoing is offered solely for settlement purposes as set forth in Article V of the Plan, and such settlement is conditioned on (i) Class 6 voting to accept the Plan, (ii) the Bankruptcy Court confirming the Plan, and (iii) the occurrence of the Effective Date.**

(ii)   **IF AND ONLY IF CLASS 6 VOTES TO REJECT THE PLAN, THE FOLLOWING TREATMENT:**

On the Effective Date, the Old Emerge LP Equity Interests will be cancelled without further notice to, approval of or action by any Person or Entity, and each Holder of an Old Emerge LP Equity Interest shall not receive any distribution or retain any property on account of such Old Emerge LP Equity Interests.

o   *Voting*:  Class 9 is an Impaired Class and, if the Class of General Unsecured Claims in Class 6 votes to reject the Plan, the Holders of Equity Interests in this Class 9 shall receive no distribution under the Plan on account of such Equity Interests. Therefore, the Holders of Equity Interests in this Class 9 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.  Such Holders of Equity Interests will, however, receive a Ballot to allow such Holders to affirmatively opt-out of the Third Party Release if they so choose.

(j)   Class 10 – Old Affiliate Equity Interests in any Emerge LP Subsidiary

o   *Classification*: Class 10 consists of the Old Affiliate Equity Interests in any Emerge LP Subsidiary.

o   *Treatment*: Subject to the Restructuring Transactions, the Old Affiliate Equity Interests shall remain effective and outstanding on the Effective Date and shall be

owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Equity Interests immediately prior to the Effective Date.

o   *Voting*: Class 10 is an Unimpaired Class, and the Holders of the Old Affiliate Equity Interests in Class 10 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of the Old Affiliate Equity Interests in Class 11 are not entitled to vote to accept or reject the Plan.

### 3.   Special Provision Governing Unimpaired Claims

Except as otherwise provided therein, nothing under the Plan will affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

### 4.   Elimination of Vacant Classes

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## C.   ACCEPTANCE OR REJECTION OF THE PLAN

### 1.   Presumed Acceptance of Plan

Classes 1, 2, 3, 4, 7 and 10 are Unimpaired under the Plan.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### 2.   Presumed Rejection of Plan

Class 8 Equity Interests are Impaired and shall receive no distribution under the Plan on account of such Equity Interests. Therefore, the Holders of Equity Interests in such Class are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Class 9 Equity Interests are Impaired and, if the Class of General Unsecured Claims votes to reject the Plan, the Holders of Equity Interests in such Class shall receive no distribution under the Plan on account of such Equity Interests. Therefore, the Holders of Equity Interests in such Class are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Such Holders of Equity Interests will, however, receive a Ballot to allow such Holders to affirmatively opt-out of the Third Party Release.

### 3.   Voting Classes

Classes 5 and 6 are Impaired under the Plan.  The Holders of Allowed Claims in such Classes as of the Voting Record Date are entitled to vote to accept or reject the Plan.

### 4.   Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5.       **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by either Class 5 or Class 6.  The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

6.       **Votes Solicited in Good Faith**

The Debtors have, and upon the Confirmation Date will be deemed to have, solicited votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Parties will be entitled to, and upon the Confirmation Date will be granted, the protections of section 1125(e) of the Bankruptcy Code.

D.       **MEANS FOR IMPLEMENTATION OF THE PLAN**

1.       **Global Settlement**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a compromise and settlement of various potential Claims and Causes of Action of the parties to the Restructuring Support Agreement, in the form of the Global Settlement.  The Global Settlement is a cornerstone of the Plan and necessary to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest.  The Plan will be deemed to constitute a motion pursuant to Bankruptcy Rule 9019, seeking approval of the Global Settlement, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such motion and each of the compromises or settlements that comprise the Global Settlement, and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their Creditors, and other parties-in-interest, and fair and equitable. Pursuant to the Global Settlement, solely if Class 6 votes to accept the Plan, the Majority Noteholders have agreed to carve-out from their collateral a settlement fund consisting of:

(1)   5% of the New Limited Partnership Interests, subject to dilution by the New Management Incentive Plan Equity and the New Warrants; and

(2)   New Warrants for 15% of the equity of the Reorganized Debtors, subject to dilution by the New Management Incentive Plan Equity.

2.        **Restructuring Transactions**

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order will constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate certain of the Debtors under the laws of jurisdictions other than the laws of which the applicable Debtors are presently formed or incorporated.  Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations, dissolutions, or creations of one or more new Entities, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate (with the consent of the Majority Noteholders), but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required hereunder or thereunder (collectively, the "**Restructuring Transactions**").

All such Restructuring Transactions taken, or caused to be taken, will be deemed to have been authorized and approved by the Bankruptcy Court.  The actions to effectuate the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; (iv) the creation of one or more new Entities; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder.

3.        **Continued Legal Existence**

Subject to the Restructuring Transactions permitted by Article V.A of the Plan, after the Effective Date, the Reorganized Debtors (other than Emerge GP) will continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or otherwise modified under the Plan. Notwithstanding anything to the contrary under the Plan, the Claims against a particular Debtor or Reorganized Debtor will remain the obligations solely of such Debtor or Reorganized Debtor and will not become obligations of any other Debtor or Reorganized Debtor solely by virtue of the Plan or the Chapter 11 Cases.

As soon as reasonably practicable after the Effective Date, Emerge GP shall wind-down and dissolve in accordance with applicable law; provided that, the Debtors shall establish a wind-down reserve to effectuate, and pay the fees, costs, and expenses incurred in connection with, such wind-down and dissolution in an aggregate amount not to exceed $125,000 (the "**Wind-Down Reserve**") without the consent of the Majority Noteholders in their sole discretion.

On the Effective Date, Emerge GP shall voluntarily withdraw (and, for the avoidance of doubt, shall be deemed to have withdrawn) as the general partner of Reorganized Emerge LP and shall in its place elect (and, for the avoidance of doubt, shall be deemed to have elected) the New General Partner as the general partner of Reorganized Emerge LP.

4.       **Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Litigation Claims of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan (other than the Carve Out Reserve and any rejected Executory Contracts and/or Unexpired Leases), will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in Article III of the Plan (including, without limitation, each Prepetition Debt Lien and Liens that secure the Exit Facility Loans).  On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

5.       **Exit Facility Loan Documents**

On the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will be authorized to execute and deliver, and to consummate the transactions contemplated by, the Exit Facility Loan Documents, in each case in form and substance acceptable to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the Exit Facility Loan Documents).  On the Effective Date, the Exit Facility Loan Documents shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtors (other than Emerge GP), enforceable in accordance with their respective terms and such indebtedness and obligations shall not be and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, the Confirmation Order or on account of the Confirmation or Consummation of the Plan.  For the avoidance of doubt, any letter of credit issued and outstanding under the Prepetition Credit Agreement on the Effective Date shall be deemed issued under the Exit Facility Credit Agreement.

On the Effective Date, the Prepetition Debt Liens in relation to the Exit Facility Loans and any and all additional liens and security interests to be granted in accordance with the Exit Facility Loan Documents (a) shall be legal, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Loan Documents, (b) shall be deemed automatically attached and perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Facility Loan Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the entities granted such liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors, the Reorganized Debtors, or the Exit Facility Agent that are necessary to release and/or extinguish such liens and security interests.

6.       **No Termination or Release of Prepetition Debt Liens**

Notwithstanding anything in the Plan to the contrary, all property and assets of the Estates of the Debtors, including, without limitation, all claims, rights and Litigation Claims of the Debtors and any property and assets acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan, will remain encumbered by and subject to the Prepetition Debt Liens, which, as of the Effective Date, will secure the Exit Facility Loans and the New Second Lien Notes, as applicable, and such Liens (x) will be and thereby are ratified, reaffirmed as valid, enforceable, and not avoidable, and deemed granted by the Reorganized Debtors and (y) will not be, and will not be deemed to be, impaired, terminated, discharged or released by the Plan, the Confirmation Order or on account of the Confirmation or Consummation of the Plan.

### 7.      New GP/ LP Equity Interests; Book Entry

On the Effective Date, subject to the terms and conditions of the Restructuring Transactions, the New General Partner and Reorganized Emerge LP will issue the New GP/ LP Equity Interests, as applicable, pursuant to the Plan and/ or the Amended/New Organizational Documents, as applicable.  Except as otherwise expressly provided in the Restructuring Documents, the New General Partner and Reorganized Emerge LP will not be obligated to register the New GP/ LP Equity Interests under the Securities Act or to list such Equity Interests for public trading on any securities exchange.

Distributions of the New GP/LP Equity Interests and New Warrants may be made by delivery or book-entry transfer thereof by the applicable Distribution Agent in accordance with the Plan and the Amended/New Organizational Documents.  Upon the Effective Date, after giving effect to the transactions contemplated by the Plan, the authorized capital stock or other equity securities of the New General Partner and Reorganized Emerge LP will be that number of interests or units of New GP/ LP Equity Interests as may be designated in the Amended/New Organizational Documents.

On and as of the Effective Date, all of the Holders of New GP/ LP Equity Interests will be bound by the terms and conditions of the Amended/New Organizational Documents, without the need for execution by such Holder.  The Amended/ New Organizational Documents will be binding on all Persons receiving, and all Holders of, the New GP/LP Equity Interests (and their respective successors and assigns), whether such interest is received or to be received on or after the Effective Date.

### 8.      New Management Incentive Plan

As soon as reasonably practicable after the Effective Date, the New General Partner will adopt and implement the New Management Incentive Plan, whose other terms and conditions, including recipients, individual awards and vesting periods, will be determined by the New Board.  The New Management Incentive Plan Equity will dilute all of the New Limited Partnership Interests equally.

### 9.      New Warrants

If the Class of General Unsecured Claims votes to accept the Plan, then on the Effective Date, consistent with the Global Settlement, Reorganized Emerge LP will enter into and consummate the transactions contemplated by the New Warrants Agreement (including issuing the New Warrants), which will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Warrants Agreement and the New Warrants, as applicable).

10.        **Plan Securities and Related Documentation; Exemption from Securities Laws**

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, will be authorized to and will provide or issue, as applicable, the New Second Lien Notes, the New GP/LP Equity Interests, the New Warrants, and any and all other securities to be distributed or issued under the Plan (collectively, the "**Plan Securities**") and any and all other notes, units, stock, instruments, certificates, and other documents or agreements required to be distributed, issued, executed or delivered pursuant to or in connection with the Plan (collectively, the "**Plan Securities and Documents**"), in each case in form and substance acceptable to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

The offer, distribution and issuance, as applicable, of the Plan Securities and Documents under the Plan will be exempt from registration and prospectus delivery requirements under applicable securities laws (including section 5 of the Securities Act or any similar state or local law requiring the registration and/or the delivery of a prospectus for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code and/or other applicable exemptions.  An offering of Plan Securities provided in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code.

All New GP/LP Equity Interests issued to Holders of Allowed Claims on account of their respective Claims may be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code.

Resales of any Plan Securities by Persons who receive any Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code, who are deemed to be "underwriters" (as such term is defined in section 1145(b)(1) of the Bankruptcy Code) (collectively, the "Restricted Holders") would not be exempted by section 1145 of the Bankruptcy Code from registration of Plan Securities under the Securities Act. Restricted Holders would, however, be permitted to resell the Plan Securities that are offered pursuant to an exemption under section 1145(a) of the Bankruptcy Code without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, or if such securities are registered with the Commission pursuant to a registration statement or otherwise.

The terms of the Restructuring Documents governing the New Limited Partnership Interests will provide registration rights to holders of the New Second Lien Notes (among other rights).

11.        **Release of Liens and Claims**

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided under the Plan (including, without limitation, Article V.D and V.E of the Plan) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates will be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.  The filing of the Confirmation Order with any federal, state, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens, Claims and other interests to the extent provided in the immediately preceding sentence.  Any Person or Entity holding such Liens, Claims or interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

12.        **Organizational Documents of the Reorganized Debtors**

The respective organizational documents of each of the Debtors will be amended and restated or replaced (as applicable) in form and substance satisfactory to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement and as necessary to satisfy the provisions of the Plan and the Bankruptcy Code.  Such organizational documents will (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of New GP/ LP Equity Interests in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of New GP/ LP Equity Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated under the Plan.  After the Effective Date, the Reorganized Debtors may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

### 13.    Directors and Officers of the Reorganized Debtors

The New Board will be identified in the Plan Supplement will be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.

Pursuant to and to the extent required by section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the New Board or as an officer of each of the Reorganized Debtors (other than Emerge GP), and, to the extent such Person is an insider other than by virtue of being a director, managing member or an officer, the nature of any compensation for such Person.  Each such director, manager, managing member and/ or officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of the applicable Reorganized Debtors.  The existing boards of directors and other governing bodies of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity.

### 14.    Legal Action

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the issuance and  the distribution of the securities to be issued pursuant hereto, in each case in form and substance acceptable to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, members, managers, officers or directors of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant to the Plan or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the unit holders, interest holders, stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by such Person or Entity, or the need for any approvals, authorizations, actions or consents of or from any such Person or Entity.

As of the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of managers, directors, managing members and/or officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case in form and substance acceptable to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement, and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.  The secretary and any assistant secretary of the Debtors and the Reorganized Debtors will be authorized to certify or attest to any of the foregoing actions.

### 15. Cancellation of Notes, Certificates and Instruments

On the Effective Date, except to the extent otherwise provided in the Plan (including, without limitation, Article V.D and Article V.E of the Plan) all notes, indentures, instruments, certificates, agreements and other documents evidencing or relating to any Impaired Claim will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity; provided that the Prepetition Credit Agreement and the Prepetition Notes Agreement shall each continue in effect for the limited purpose of allowing Holders of Claims thereunder to receive, and allowing and preserving the rights of the administrative agents thereunder to make, distributions under the Plan; provided further that, upon completion of all such distributions, the Prepetition Credit Agreement and the Prepetition Notes Agreement and any and all notes, securities and instruments issued in connection therewith will terminate completely without further notice or action and be deemed surrendered.

### 16. Old GP/LP Equity Interests; Old Affiliate Equity Interests

On the Effective Date, the Old GP/LP Equity Interests will be terminated and cancelled without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person or Entity.

On the Effective Date, the Old Affiliate Equity Interests will remain effective and outstanding, and will be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Equity Interests immediately prior to the Effective Date.  Each Emerge LP Subsidiary will continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by the Plan.

### 17. Sources of Cash for Plan Distributions

All Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to the Plan will be obtained from their respective Cash balances, including Cash from operations, the Wind-Down Reserve established pursuant to the Plan and solely in connection with Emerge GP's dissolution, and the Exit Facility Credit Agreement.  The Debtors and the Reorganized Debtors, as applicable, may also make such payments using Cash received from their subsidiaries through their respective consolidated cash management systems and the incurrence of intercompany transactions, but in all cases subject to the terms and conditions of the Restructuring Documents.

18.     **Continuing Effectiveness of Final Orders**

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court will continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

19.     **Funding and Use of Carve Out Reserve**

On or before the Effective Date, the Debtors will fund the Carve Out Reserve in Cash in the aggregate amount of the Professional Fee Claims Estimates unless such other amount is determined by agreement among the Debtors, the Majority Noteholders and the Professional, or by order of the Bankruptcy Court.

The Cash contained in the Carve Out Reserve will be used solely to pay the obligations and liabilities for which such reserve was established, with the Unused Cash Reserve Amount (if any) being returned to the Reorganized Debtors within three (3) Business Days after determining the Unused Cash Reserve Amount.  The Debtors and the Reorganized Debtors, as applicable, will maintain detailed records of all payments made from the Carve Out Reserve, such that all payments and transactions will be adequately and promptly documented in, and readily ascertainable from, their respective books and records.

After the Effective Date, neither the Debtors nor the Reorganized Debtors will deposit any other funds or property into the Carve Out Reserve without further order of the Bankruptcy Court or otherwise commingle funds in the Carve Out Reserve.  To the extent the Carve Out Reserve is insufficient to pay in full in Cash the obligations and liabilities for which such reserve was established, then the Reorganized Debtors shall, within five (5) Business Days, pay such obligations and liabilities from either Cash on hand or by drawing under the Exit Facility Credit Agreement to the extent of any availability thereunder.

20.     **Payment of Fees and Expenses of Certain Creditors**

The Debtors will, on and after the Effective Date and to the extent invoiced, pay (i) the Prepetition Credit Agreement Agent & Lenders Fees and Expenses, and the Prepetition Noteholders Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; provided, however, if the Debtors or Reorganized Debtors and any such Entity cannot agree with respect to the reasonableness of the fees and expenses (incurred prior to the Effective Date) to be paid to such party, the reasonableness of any such fees and expenses will be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors on or after the Effective Date (as applicable) and any disputed amounts to be escrowed by the Reorganized Debtors).  Notwithstanding anything to the contrary in the Plan, the fees and expenses described in this paragraph shall not be subject to the Administrative Claims Bar Date or Claims Bar Date.

E.     **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.     **Assumption of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed rejected by the Debtors in accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)     have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court;

(ii)     previously expired or terminated pursuant to its own terms or by agreement of the parties thereto;

(iii)     are the subject of a motion to assume filed by the Debtors pending on the Effective Date;

(iv)    are identified by the Debtors (with the consent of the Majority Noteholders) for assumption in the Plan Supplement, which may be amended by the Debtors (with the consent of the Majority Noteholders) to add or remove Executory Contracts and Unexpired Leases prior to the Effective Date; or

(iv)    are assumed by the Debtors pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such rejections and assumptions (as applicable) pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) (a) prohibits, restricts or conditions (or purports to prohibit, restrict or condition), (b) is modified, breached or terminated (or deemed modified, breached or terminated), (c) increases, accelerates or otherwise alters any obligations or liabilities of the Debtors or Reorganized Debtors (or purports to increase, accelerate or otherwise alter any obligations or liabilities of the Debtors or Reorganized Debtors), or (d) results in the creation or imposition of any Lien upon any property or asset of any of the Debtors or Reorganized Debtors (or purports to result in the creation or imposition of any Lien upon any property or asset or any of the Debtors or Reorganized Debtors), in each case as a result of (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of the Plan, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to modify declare a breach, terminate, increase, accelerate or alter any of the obligations or liabilities of the Debtors or the Reorganized Debtors under, or create or impose any Lien upon any property or asset of any of the Debtors or Reorganized Debtors under any such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease will be deemed satisfied by the Confirmation of the Plan.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to the Plan will revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of the Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The inclusion or exclusion of a contract or lease on any schedule or exhibit will not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

**2.    Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases**

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan will be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing (with the consent of the Majority Noteholders) (the "**Cure Claim Amount**").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, the Debtors will File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment (the "**Assumption Notice**"), which will: (a) list the applicable Cure Claim Amount, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court, including the date by which any objection to the Assumption Notice must be filed and received by the Debtors.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under the Plan, or any related cure amount must be Filed, served and actually received by the Debtors on the date specified in the Assumption Notice (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and cure amount. The Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption or assumption and assignment; provided, however, that following the resolution of any such dispute, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan will result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan, upon and as of the Effective Date, the applicable assignee will be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors will be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

### 3.        Rejection of Executory Contracts and Unexpired Leases

The Debtors reserve the right (with the consent of the Majority Noteholders), at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any Executory Contract or Unexpired Lease including any Executory Contract or Unexpired Lease previously assumed by the Debtors pursuant to an order of the Bankruptcy Court or identified in the Plan Supplement, and to file a motion requesting authorization for the rejection of any such contract or lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

### 4.        Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

26

Any Person or Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in <u>Article X.G</u> of the Plan.

**5.        D&O Liability Insurance Policies**

On the Effective Date, each D&O Liability Insurance Policy will be assumed by the Debtors pursuant to section 365(a) and section 1123 of the Bankruptcy Code as to which no Proof of Claim, request for administrative expense, or cure claim need be Filed. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies. In furtherance of the foregoing and subject to the terms and conditions of the D&O Liability Insurance Policies (including any "tail", "runoff" or extended reporting period coverage provision to the extent obtained by the Debtors in relation to any such insurance policies), the Reorganized Debtors will maintain and continue in full force and effect such D&O Liability Insurance Policies for the benefit of the insured Persons at levels (including with respect to coverage and amount) no less favorable than those existing as of the date of entry of the Confirmation Order for a period of no less than six (6) years following the Effective Date; <u>provided</u>, <u>however</u>, that, after assumption of the D&O Liability Insurance Policies, nothing in the Plan otherwise alters the terms and conditions of the D&O Liability Insurance Policies. Subject to the terms and conditions of the D&O Liability Insurance Policies (including any "tail", "runoff" or extended reporting period coverage provision to the extent obtained by the Debtors in relation to any such insurance policies), Confirmation and Consummation of the Plan will not impair or otherwise modify any available defenses of the Reorganized Debtors under the D&O Liability Insurance Policies. For the avoidance of doubt, the D&O Liability Insurance Policies will continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the D&O Liability Insurance Policies. The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the inception or binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of any "tail", "runoff" or extended reporting period coverage in relation to any such insurance policies, without further notice to or order of the Bankruptcy Court or approval or consent of any Person or Entity.

Notwithstanding anything to the contrary in any D&O Liability Insurance Policies issued prior to the Effective Date, the Reorganized Debtors shall not have any obligation or responsibility for the payment of any self-insured retention thereunder or in connection therewith, and no person or entity shall be entitled to seek reimbursement from or to subrogate against any Reorganized Debtors with respect to any payments made under such policies.

**6.        Indemnification Provisions**

On the Effective Date, each Indemnification Provision shall be deemed and treated as an Executory Contract that is and shall be assumed by each applicable Debtor pursuant to section 365(a) and section 1123 of the Bankruptcy Code, subject to and solely to the extent modified herein (as modified, the "**Assumed Indemnification Provisions**"); provided that as it relates to the indemnification of any Debtor's directors, managers and officers as of the Petition Date that were not members of the Special Restructuring Committee as of the Petition Date (the "**Previous D&Os**"), the aggregate liability of the Reorganized Debtors in connection therewith shall not exceed One Million Dollars ($1,000,000) beyond the extent of the coverage provided by the D&O Liability Insurance Policies; provided further, that the Assumed Indemnification Provisions shall not apply to the Previous D&Os with respect to any liabilities arising from or related to the failure of the Debtors to file its current, quarterly or annual reports as required under the rules promulgated by the Securities and Exchange Commission unless such failure is cured and the Debtors are brought back into compliance with the rules promulgated by the Securities and Exchange Commission in accordance with the milestones set forth in Section 6.16 of the DIP Credit Agreement. In connection with the Assumed Indemnification Provisions, no Proof of Claim, request for administrative expense, or cure claim need be Filed. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Assumed Indemnification Provisions. Confirmation and Consummation of the Plan shall not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Assumed Indemnification Provisions. For the avoidance of doubt, (i) the Assumed Indemnification Provisions shall continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the Assumed Indemnification Provisions, and (ii) the New General Partner shall not assume nor be deemed to assume any liabilities with respect to any Indemnification Provision of a Previous D&O.

7.      **Extension of Time to Assume or Reject**

Notwithstanding anything to the contrary set forth in Article VI of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed rejection provided for in Article VI.A of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

8.      **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed by the Debtors or the Reorganized Debtors will include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases will not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      **PROVISIONS GOVERNING DISTRIBUTIONS**

1.      **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on the Initial Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under the Plan on a day other than a Business Day will be made on the next succeeding Business Day. Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date will be made pursuant to Article VIII of the Plan.

2.      **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest will not accrue or be paid on any Claims and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

### 3. Distributions by Reorganized Debtors or Other Applicable Distribution Agent

Other than as specifically set forth below, the Reorganized Debtors or other applicable Distribution Agent will make all distributions required to be distributed under the Plan.  Distributions on account of the Allowed Prepetition Debt Claims and Allowed DIP Facility Claims will be made to the Prepetition Agents and the DIP Credit Agreement Agent, respectively, and such agent will be, and will act as, the Distribution Agent with respect to its respective Class of Claims in accordance with the terms and conditions of the Plan and the applicable loan documents.  All distributions to Holders of Prepetition Debt Claims and DIP Facility Claims will be deemed completed when made by the Reorganized Debtors to the Prepetition Agents and the DIP Credit Agreement Agent, as applicable.  The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by the Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business.  No Distribution Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 4. Delivery and Distributions; Undeliverable or Unclaimed Distributions

(a)     Record Date for Distributions

On the Distribution Record Date, the Claims Register (and the Debtors' books and records with respect to the Holders of Old GP/LP Equity Interests) will be closed.  Accordingly, the Debtors, the Reorganized Debtors, or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than DIP Credit Agreement Claims and Prepetition Debt Claims) or Allowed Equity Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes under the Plan to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than DIP Credit Agreement Claims and Prepetition Debt Claims) or Allowed Equity Interest who are Holders of such Claims or Equity Interests, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent will be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; provided, however, that the Distribution Record Date will not apply to the DIP Credit Agreement Claims or Prepetition Debt Claims.

(b)     Delivery of Distributions in General

Except as otherwise provided under the Plan, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, will make distributions to Holders of Allowed Claims and Allowed Equity Interests, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; provided, however, that the manner of such distributions will be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the DIP Credit Agreement and the relevant Prepetition Debt Documents, if applicable); provided further, that the address for each Holder of an Allowed Claim will be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date and the address for each Holder of an Allowed Equity Interest shall be deemed to be the address set forth in the Debtors' books and records, or as may be held by the applicable transfer agent or similar such agency.

(c)     Minimum Distributions

Notwithstanding anything under the Plan to the contrary, no Distribution Agent will be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars or New GP/LP Equity Interests, in each case with respect to Impaired Claims or Impaired Equity Interests.  With respect to Impaired Claims and Impaired Equity Interests, whenever any payment or distribution of a fraction of a dollar or share of New GP/LP Equity Interests under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share/unit of New GP/LP Equity Interest (up or down), with half dollars and half shares/units of New GP/LP Equity Interests or more being rounded up to the next higher whole number and with less than half dollars and half shares/units of New GP/LP Equity Interest being rounded down to the next lower whole number (and no Cash will be distributed in lieu of such fractional New GP/LP Equity Interest).

No Distribution Agent will have any obligation to make a distribution on account of an Allowed Claim that is Impaired under the Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which will be treated as an undeliverable distribution under <u>Article VII.D.4</u> of the Plan.

(d)      Undeliverable Distributions

<u>Holding of Certain Undeliverable Distributions</u>.   If the distribution to any Holder of an Allowed Claim or an Allowed Equity Interest is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions will be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address in accordance with the time frames described in Article VII.D.4(b) of the Plan, at which time all currently due but missed distributions will be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent).   Undeliverable distributions will remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to <u>Article VII.D.4.(b)</u> of the Plan, until such time as any such distributions become deliverable.   Undeliverable distributions will not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

<u>Failure to Claim Undeliverable Distributions</u>.   Any Holder of an Allowed Claim or an Allowed Equity Interest (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within ninety (90) days after the later of the Effective Date or the date such distribution is due will be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and will be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent.  In such case, any Cash, Plan Securities, or other property reserved for distribution on account of such Claim Equity Interest will become the property of the Reorganized Debtors, free and clear of any Claims or other rights of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary. Any such Cash, Plan Securities, or other property, will thereafter be distributed or allocated in accordance with the applicable terms and conditions of the Plan. Nothing contained in the Plan will require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim or an Allowed Equity Interest.

Failure to Present Checks.  Checks issued by the Distribution Agent on account of Allowed Claims or Allowed Equity Interests will be null and void if not negotiated within ninety (90) days after the issuance of such check.  Requests for reissuance of any check will be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim or Allowed Equity Interest with respect to which such check originally was issued.  Any Holder of an Allowed Claim or Allowed Equity Interest holding an un-negotiated check that does not request reissuance of such un-negotiated check within ninety (90) days after the date of mailing or other delivery of such check will have its rights for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such right against the Debtors, their Estates, the Reorganized Debtors or their respective assets or property.  In such case, any Cash held for payment on account of such Claims or Equity Interests shall become the property of the Reorganized Debtors, free and clear of any Claims or other rights of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary. Any such Cash shall thereafter be distributed or allocated in accordance with the applicable terms and conditions of the Plan.

5.    **Compliance with Tax Requirements**

In connection with the Plan and all distributions thereunder, the Reorganized Debtors or other applicable Distribution Agent will comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions thereunder will be subject to any such withholding and reporting requirements.  The Reorganized Debtors or other applicable Distribution Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  All Persons holding Claims or Equity Interests will be required to provide any information necessary to effect information reporting and the withholding of such taxes, and each Holder of an Allowed Claim or an Allowed Equity Interest will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

6.    **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.    **Means of Cash Payment**

Payments of Cash made pursuant to the Plan will be in U.S. dollars and will be made, at the option of the applicable Distribution Agent, by checks drawn on, or wire transfer from, a domestic bank selected by such Distribution Agent.  Cash payments to foreign creditors may be made, at the option of the applicable Distribution Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.    **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims will not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

9.       **Setoffs**

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are reserved under the Plan, the Debtors and the Reorganized Debtors, in consultation with the Majority Noteholders, may, but will not be required to, withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim (other than any Allowed Prepetition Credit Agreement Claims, Allowed DIP Credit Agreement Claims, and Allowed Prepetition Notes Claims) an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; provided that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, will provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved. In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim (other than any Allowed Prepetition Credit Agreement Claims, Allowed DIP Credit Agreement Claims, and Allowed Prepetition Notes Claims) and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to the Plan or the Confirmation Order.

G.       **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1.       **Resolution of Disputed Claims and Equity Interests**

(a)       Allowance of Claims and Equity Interests

After the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim or Equity Interest, including, without limitation, the right to assert any objection to Claims or Equity Interests based on the limitations imposed by section 502 or section 510 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or Disputed Equity Interest in the ordinary course of business in the manner and venue in which such Claim or Equity Interest would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

(b)       Prosecution of Objections to Claims and Equity Interests

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors will have the authority to File objections to Claims and Equity Interests (other than Claims that are Allowed under the Plan) and settle, compromise, withdraw or litigate to judgment objections to any and all such Claims and Equity Interests, regardless of whether such Claims and Equity Interests are in an Unimpaired Class or otherwise; provided, however, this provision will not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim and Disputed Equity Interest without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

(c)       Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such

Claim, whether for allowance or to determine the maximum amount of such Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation.

(d)        Deadline to File Objections to Claims and Equity Interests

Any objections to Claims will be Filed by no later than the Claims Objection Deadline; provided that nothing contained in the Plan will limit the Reorganized Debtors' right to object to Claims, if any, Filed or amended after the Claims Objection Deadline. Moreover, notwithstanding the expiration of such objection deadline, the Debtors or the Reorganized Debtors shall continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is Allowed. Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Reorganized Debtors shall continue to have the right to amend any claims or other objections and to File and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order.

Any objections to Equity Interests shall be Filed by no later than the Old GP/LP Objection Deadline. Moreover, notwithstanding the expiration of such objection deadline, the Reorganized Debtors shall continue to have the right to amend any objections and to file and prosecute supplemental objections and counterclaims to a Disputed Equity Interest until such Disputed Equity Interest is or becomes Allowed by Final Order.

**2.        No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature will be made with respect to all or any portion of a Disputed Claim or Disputed Equity Interest unless and until all objections to such Disputed Claim or Disputed Equity Interest have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim or Disputed Equity Interest is or becomes Allowed by Final Order.

**3.        Distributions on Account of Disputed Claims and Disputed Equity Interests Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims and Allowed Equity Interests**

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim and Disputed Equity Interest that has become Allowed during the preceding calendar quarter, and (b) on account of previously Allowed Claims and Allowed Equity Interests of property that would have been distributed to the Holders thereof on the dates distributions previously were made to Holders of Allowed Claims and Allowed Equity Interests in such Class had the Disputed Claims and Disputed Equity Interests that have become Allowed or Disallowed been Allowed or Disallowed, as applicable, on such dates.. Such distributions will be made pursuant to the applicable provisions of Article VII of the Plan. For the avoidance of doubt, but without limiting the terms or conditions of Article VII.B or Paragraph B of Article VIII.B of the Plan, any dividends or other distributions arising from property distributed to holders of Allowed Claims and Allowed Equity Interests in a Class and paid to such Holders under the Plan will also be paid, in the applicable amounts, to any Holder of a Disputed Claim and Disputed Equity Interest in such Class that becomes Allowed after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims and Allowed Equity Interests in such Class.

**4.        Reserve for Disputed Claims and Disputed Equity Interests**

The Debtors, the Reorganized Debtors, and the Distribution Agent may, in their respective sole discretion, establish such appropriate reserves for Disputed Claims and Disputed Equity Interests in the applicable Class(es) as it determines necessary and appropriate, in each case with the consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement or as approved by order of the Bankruptcy Court. Without limiting

the foregoing, reserves (if any) for Disputed Claims and Disputed Equity Interests will equal, as applicable, an amount of property equal to 100% of distributions to which Holders of Disputed Claims and Disputed Equity Interests in each applicable Class would otherwise be entitled under the Plan as of such date if such Disputed Claims and Disputed Equity Interests were Allowed in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim or Proof of Interest and the applicable bar date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, will have the right to file a motion seeking to estimate any Disputed Claims or Disputed Equity Interest.

## H.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Conditions Precedent to Confirmation

It will be a condition to Confirmation of the Plan that the following conditions will have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Plan and the Restructuring Documents will be in form and substance consistent in all material respects with the Restructuring Term Sheet and otherwise acceptable to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement; and

- The Confirmation Order will have been entered by the Bankruptcy Court, and such order shall be in form and substance consistent in all respects with the Restructuring Term Sheet and otherwise acceptable to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement.

### 2.    Conditions Precedent to Consummation

It will be a condition to Consummation of the Plan that the following conditions will have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Confirmation Order will have become a Final Order and such order shall not have been amended, modified, vacated, stayed, or reversed;

- The Confirmation Date will have occurred.

- The Bankruptcy Court will have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement, authorizing the assumption, assumption and assignment and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement;

- The Plan and the Restructuring Documents will not have been amended or modified other than in a manner in form and substance consistent in all respects with the Restructuring Term Sheet and otherwise acceptable to the Special Restructuring Committee and the Majority Noteholders in the manner set forth in the Restructuring Support Agreement.

- The Restructuring Documents will have been filed, tendered for delivery, and been effectuated or executed by all Entities party thereto (as appropriate), and in each case in full force and effect.  All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Exit Facility Loan Agreement and the New Second Lien Notes Agreement, will have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or will be satisfied concurrently with the occurrence of the Effective Date);

- All DIP Credit Agreement Claims will have been paid off in full in Cash, or will be paid in full in Cash simultaneously with the effectiveness of the Plan, in accordance with the terms of the DIP Credit Agreement;

- All consents, actions, documents, certificates and agreements necessary to implement the Plan and the transactions contemplated by the Plan will have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and in each case in full force and effect.

- All governmental approvals and consents, including Bankruptcy Court approval, that are applicable and legally required for the consummation of the Plan will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and to the extent applicable, all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, will have expired.

- The New Board will have been selected.

- The conditions to the effectiveness of the Exit Facility Credit Agreement and the New Second Lien Notes Agreement will have been satisfied or waived and such agreements will have closed or will close simultaneously with the effectiveness of the Plan.

- The Restructuring Support Agreement will be in full force and effect and will not have been terminated in accordance with its terms.

- The Carve Out Reserve will have been funded in full in Cash by the Debtors in accordance with the terms and conditions of the Plan.

- The Wind-Down Reserve shall have been funded in the amount of $125,000 by the Debtors in accordance with the terms and conditions of the Plan; and

- To the extent invoiced, all (i) Prepetition Credit Agreement Agent & Lenders Fees and Expenses and (ii) Prepetition Notes Fees and Expenses shall have been paid in full in Cash or reserved in a manner acceptable to the Majority Noteholders (or approved by order of the Bankruptcy Court) to the extent of any disputes related thereto.

### 3.  Waiver of Conditions

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in <u>Article IX</u> of the Plan may be waived by the Debtors, with the prior written consent of the Majority Noteholders in the manner set forth in the Restructuring Support Agreement, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

### 4.  Effect of Non-Occurrence of Conditions to Confirmation or Consummation

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan will, with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

I.    **RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS**

    1.    **General**

        Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and any Holders of Claims and Equity Interests and is fair, equitable and reasonable.

        Notwithstanding anything contained under the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments under the Plan, are settled, compromised, terminated and released pursuant to the Plan; *provided*, *however*, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan.

    2.    **Release of Claims and Causes of Action**

        (a)    <u>Release by the Debtors and their Estates</u>

        **Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in the Plan, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, and on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released will be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all claims, Causes of Action, Released and Settled Claims, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would**

have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release will not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (ii) any Causes of Action relating to the MSHA Action (other than against a member of the Special Restructuring Committee); and/or (iii) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.  The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in Article X.B of the Plan will or will be deemed to (i) prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors and/or (ii) operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in the Plan.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained under the Plan, and further, will constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

(b)        Release by Third Parties

Except as otherwise expressly provided in the Plan, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is thereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with the Debtor Releasing Parties, the "Releasing Parties") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released will be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all claims, Causes of Action, Released and Settled Claims, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors, including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of

the Released Parties; provided, however, that the foregoing provisions of this Third Party Release will not operate to waive or release (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (ii) any Causes of Action relating to the MSHA Action (other than against a member of the Special Restructuring Committee); and/or (iii) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court.  The foregoing release will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims released by the Third Party Release; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

### 3.      Waiver of Statutory Limitations on Releases

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

### 4.      Discharge of Claims and Equity Interests

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan (including, without limitation, Articles V.D, and V.E of the Plan) or the Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, including any interest accrued on such Claims or Equity Interests from and after the Petition Date, and regardless of whether any property will have been abandoned by order of the Bankruptcy Court, distributed or retained pursuant to the Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by the Plan (including, without limitation, Articles V.D and V.E, of the Plan) or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Such discharge will void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by the Plan (including, without limitation, Articles V.D and V.E, of the Plan) or the Confirmation Order, upon the Effective Date: (i) the rights afforded under the Plan and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto will be extinguished completely without further notice or action; and (iii) all Entities will be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

5.    **Exculpation**

Effective as of the Effective Date, the Exculpated Parties will neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or Released and Settled Claim arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of the Plan; _provided_, _however_, that the foregoing provisions of this exculpation will not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation will be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in Article X.E of the Plan will or will be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors or the Reorganized Debtors, in each case unless otherwise expressly provided for in the Plan.

6.    **Preservation of Causes of Action**

(a)    Maintenance of Causes of Action

Except as otherwise provided in Article X of the Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in Article X.B of the Plan and Exculpation contained in Article X.E of the Plan) or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases.  The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of such Litigation Claims without notice to or approval from the Bankruptcy Court.

(b)    Preservation of All Causes of Action Not Expressly Settled or Released

Except as otherwise expressly provided in the Plan, the Debtors expressly reserve all Causes of Action and Litigation Claims for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware

or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except in each case where such Causes of Action or Litigation Claims have been expressly waived, relinquished, released, compromised or settled in the Plan (including, without limitation, and for the avoidance of doubt, the Releases contained in <u>Article X.B</u> of the Plan and Exculpation contained in <u>Article X.E</u> of the Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

### 7. Injunction

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER AGAINST ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY PERSON OR ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

### J. BINDING NATURE OF THE PLAN

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL PERSONS AND ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THE PLAN, EACH PERSON AND ENTITY ACQUIRING PROPERTY UNDER THE PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH PERSON OR ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR**

**INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN, AFFIRMATIVELY VOTED TO REJECT THE PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THE PLAN.**

**K.      RELEASED AND SETTLED CLAIMS**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates an integrated compromise, settlement and release of the Released and Settled Claims, to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Released and Settled Claims and the Court's determination that such compromises and settlements are in the best interests of the Debtors, their estates, the Reorganized Debtors, creditors and all other parties in interest, and are fair, equitable and within the range of reasonableness. The compromises, settlements and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.

**L.      PROTECTION AGAINST DISCRIMINATORY TREATMENT**

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons and Entities, including Governmental Units, will not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or another Person or Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**M.      INTEGRAL PART OF PLAN**

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation.  Accordingly, each Entity that is a beneficiary of such provision will have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

**V.**
**CONFIRMATION AND CONSUMMATION PROCEDURES**

**A.     SOLICITATION OF VOTES**

The process by which the Debtors will solicit votes to accept or reject the Plan is summarized in Section I herein titled, "Executive Summary" and set forth in detail in the Disclosure Statement Order, which is attached as Exhibit B to this Disclosure Statement.

**PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

**B.     CONFIRMATION PROCEDURES**

**1.     Confirmation Hearing**

The Confirmation Hearing will commence at [●a.m.] prevailing Eastern Time on [●], 2019 before the Honorable Karen B. Owens, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom [●], Wilmington, Delaware 19801-3024.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

The Plan Objection Deadline is [●p.m.] prevailing Eastern Time on [●], 2019.

All Confirmation Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

> CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

**2.     Filing Objections to the Plan**

Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim or Equity Interest held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Plan Objection Deadline by the Notice Parties, as defined in Section I.F herein.

**C.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before the confirmation of the Plan is reasonable; or (b) if it is to be fixed after confirmation of the Plan, is subject to the approval of the Bankruptcy Court for the determination of reasonableness;

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan.  The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim will have accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such Voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, and that Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan; and

- All outstanding fees payable pursuant to section 1930 of title 28 of the United States Code will be paid when due.

### 1.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provide, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor or debtors are liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the Bankruptcy Court must:  (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the chapter 11 cases were converted to a chapter 7 case and the assets of the particular debtors' estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the chapter 11 plan that such holder would receive if the chapter 11 plan were confirmed.

In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtors, augmented by the unencumbered Cash held by the debtors at the time of the commencement of the liquidation. Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the debtor's business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the liquidation analysis attached hereto as Exhibit D (the "**Liquidation Analysis**"), the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interest in each Class with a recovery greater than or equal to the value of any distributions if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors. As set forth in the Liquidation Analysis, Holders of Claims in Class 6 would receive a recovery of between [●]% to [●]% of the amount of their Allowed Claims under a chapter 7 liquidation, which is substantially less than the projected [●]%recovery for such Class pursuant to the Plan, so the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

## 2.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. [Financial projections of the Reorganized Debtors for the six months ending December 31, 2019, and for the years ending 2020, 2021, and 2022 (the "**Financial Projections**") are attached hereto as Exhibit C. Additionally, the Debtors' consolidated historical financial statements for the quarter ending March 30, 2019 and for the years ending 2018 and 2017 are attached hereto as Exhibit E (the "**Historical Financial Statements**").]

In general, as illustrated by the Financial Projections, the Debtors believe that as a result of the transactions contemplated by the Plan, including the Exit Facility Credit Agreement, the Reorganized Debtors should have sufficient cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing business operations. The Debtors believe that confirmation and consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL

BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE FINANCIAL PROJECTIONS HAVE NOT BEEN EXAMINED OR COMPILED BY INDEPENDENT ACCOUNTANTS.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THEIR ABILITY TO ACHIEVE THE PROJECTED RESULTS.  MANY OF THE ASSUMPTIONS ON WHICH THE PROJECTIONS ARE BASED ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  INEVITABLY, SOME ASSUMPTIONS WILL NOT MATERIALIZE AND UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY AFFECT THE ACTUAL FINANCIAL RESULTS.  THEREFORE, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PERIOD OF THE FINANCIAL PROJECTIONS MAY VARY FROM THE PROJECTED RESULTS AND THE VARIATIONS MAY BE MATERIAL.  ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO EXAMINE CAREFULLY ALL OF THE ASSUMPTIONS ON WHICH THE FINANCIAL PROJECTIONS ARE BASED IN CONNECTION WITH THEIR EVALUATION OF THE PLAN.

BASED ON THE FINANCIAL PROJECTIONS SET FORTH IN <u>EXHIBIT C</u> HERETO, THE DEBTORS BELIEVE THAT THEY WILL BE ABLE TO MAKE ALL DISTRIBUTIONS AND PAYMENTS UNDER THE PLAN AND THAT CONFIRMATION OF THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OF THE REORGANIZED DEBTORS OR THE NEED FOR FURTHER FINANCIAL REORGANIZATION OF THE REORGANIZED DEBTORS.

### 3.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1, 2, 3, 4, 7 and 10 are not Impaired under the Plan, and, as a result, the Holders of such Claims and Interests are deemed to have accepted the Plan.

Claims in Classes 5, and 6 are Impaired under the Plan, and as a result, the Holders of Claims in Classes 5 and 6  are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to Classes 5 and 6 and without considering whether the Plan "discriminates unfairly" with respect to Classes 5 and 6, as both standards are described herein.  As explained above, each of Classes 5 and 6 will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount and a majority in number of the Claims of Classes 5 and 6, as applicable (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Equity Interests in Classes 8 and 9 are Impaired and deemed to have rejected the Plan.  The Debtors, therefore, will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code as more fully described below.

4.     **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

5.     **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

6.     **Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- <u>Secured Claims</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- <u>Unsecured Claims</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- <u>Equity Interests</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o   the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; <u>or</u>

  o   if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

**As noted above, the Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 8 and 9.**  To the extent that any of the Voting Classes votes to reject the Plan, the Debtors reserve the right to seek (a) confirmation of the

Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with <u>Article XII</u> of the Plan.

The votes of Holders of Equity Interests in Classes 8 and 9 are not being solicited because, under <u>Article III</u> of the Plan, there will be no distribution to Holders of Equity Interests in Class 8 and there will be no distribution to Holders of Equity Interests in Class 9 if Holders of Claims in Class 6 (General Unsecured Claims) vote to reject the Plan.  Therefore, such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  All Class 8 and 9 Equity Interests will be deemed cancelled and will be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding the deemed rejection by Classes 8 and 9, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

**D.      CONSUMMATION OF THE PLAN**

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see <u>Article IX.B</u> of the Plan.

# VI.
## PLAN-RELATED RISK FACTORS

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES, THE PLAN OR THE IMPLEMENTATION OF THE PLAN.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    The Debtors May Fail to Satisfy the Vote Requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan of reorganization.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

As discussed above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that:  (a) such plan does not "unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation were not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Section 1129(b)(1) of the Bankruptcy Code provides that, in the event an impaired class does not vote in favor of a plan, but all other requirements of section 1129(a) are satisfied, the Bankruptcy Court may only confirm such a plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan."  Subject to the Restructuring Transactions, the Plan contemplates that all Old Affiliate Interests in any Emerge Subsidiary will remain effective and outstanding on the

Effective Date and will be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests immediately prior to the Effective Date. The Plan's treatment of Old Affiliate Interests has no economic substance and does not enable any junior creditor or interest holder to retain or recover any value under the Plan. This technical preservation of Old Affiliate Interests is solely a means to preserve the corporate and organizational structure of the Debtors in order to avoid the unnecessary cost of reconstituting that structure. There can be no assurance, however, that the Bankruptcy Court will find that the Plan satisfies the requirements of section 1129(b)(1) of the Bankruptcy Code.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. Non-Consensual Confirmation of the Plan May Be Necessary.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that the Voting Classes do not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5. The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection. Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6. The Effective Date May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place. Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 7. The Exit Facility Credit Agreement and the Transactions Contemplated Thereby, May Not Become Effective.

Although the Debtors believe that the Exit Facility Credit Agreement will become effective shortly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Exit Facility Credit Agreement and the transactions contemplated thereunder, will become effective.

8. **Contingencies May Affect Votes of the Voting Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

9. **The Debtors Cannot State with Certainty What Recovery Will be Available to Holders of Allowed Claims.**

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated amounts contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed. Accordingly, because certain Claims under the Plan will be paid on a Pro Rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims.

10. **Releases, Injunctions, and Exculpation Provisions May Not Be Approved.**

The Plan provides for certain releases, injunctions, and exculpations. However, such releases, injunctions, and exculpations are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may not support the Plan.

**B. RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

1. **The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court.**

Parties in interest in these Chapter 11 Cases may oppose confirmation of the Plan by alleging that the value of the Reorganized Debtors is higher than estimated by the Debtors and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors. Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.

2. **The Estimated Valuation of the Reorganized Debtors, the New GP/ LP Equity Interests, the New Warrants, and the Plan Securities and the Estimated Recoveries to Holders of Allowed Claims and Equity Interests Are Not Intended to Represent the Private or Public Sale Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of the Reorganized Debtors' securities. The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

3. **There May Be a Lack of a Trading Market For the Plan Securities**

It is anticipated that there will be no active trading market for the Plan Securities. Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities. In addition, on the date of emergence, it is expected that the Reorganized Debtors will not be required under U.S. securities laws to file reports with the Securities and Exchange Commission or otherwise provide

financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

> **4.      The New Warrants May Not Become Exercisable Prior to Expiration.**

There can be no assurance that the total enterprise value of the Reorganized Debtors will ever reach the thresholds at which the New Warrants become exercisable prior to the expiration of the New Warrants.

> **5.      The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Service Their Debt.**

Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors there is no guarantee that the Financial Projections will be realized.  The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and Cash Flows assumed in projecting future business prospects.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and Cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs.  Any one of these failures may preclude the Reorganized Debtors from, among other things:  (a) taking advantage of future opportunities; (b) growing their businesses; or (c) responding to future changes in the oil and gas industry. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital.  The Reorganized Debtors may not be able to obtain such working capital when it is required.

> **6.      Pending Lawsuits May Affect the Value of Securities to Be Issued Under the Plan and Recoveries Under the Plan.**

The Debtors are subject to Claims in various legal proceedings, and the Debtors or the Reorganized Debtors may become subject to other legal proceedings in the future.  The Debtors believe there is no merit to the pending lawsuits, however, there can be no assurances that the Debtors will be successful in ultimately discharging or satisfying such claims.  The ultimate outcome of each of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated.  Any such liability may require the Debtors or Reorganized Debtors, as applicable, to reserve or issue additional securities to be issued under the Plan.  The liability the Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may potentially be material to the Debtors' or the Reorganized Debtors' business, financial condition, or operations and may ultimately affect the value of the Reorganized Debtors' securities to be issued under the Plan and recoveries under the Plan, including by diluting the value of the New Emerge GP/LP Equity Interests being issued pursuant to the Plan.  Even if the Debtors are ultimately successful, if any Claim related to a pending lawsuit is not resolved quickly, the Debtors may be required to reserve shares until such Claim is formally Disallowed, which may also, at least temporarily, affect the value of the Reorganized Debtors' securities to be issued under the Plan.

> **7.      The Prepetition Noteholders Will Control the Reorganized Debtors.**

Consummation of the Plan will result in the Prepetition Noteholders acquiring the New Emerge GP Equity Interests and all or substantially all of the New Limited Partnership Interests.  Accordingly, the Prepetition Noteholders will exercise a controlling influence over the business and affairs of the Reorganized Debtors.

C.    **RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' AND REORGANIZED DEBTORS' BUSINESS**[14]

   1.    **The Debtors' and Reorganized Debtors' operations are subject to the cyclical nature of the Debtors' and Reorganized Debtors' customers' businesses and depend upon the continued demand for crude oil and natural gas.**

         The Debtors' and Reorganized Debtors' frac sand sales are to customers in the oil and natural gas industry, a historically cyclical industry. This industry was adversely affected by the uncertain global economic climate in the second half of 2008 and in 2009. Natural gas, crude oil and NGL prices declined significantly in the second half of 2014 and have been negatively affected by a combination of factors, including weakening demand, increased production, the decision by the OPEC to keep production levels unchanged and a strengthening in the U.S. dollar relative to most other currencies. Further downward pressure on commodity prices continued throughout 2015 and the first nine months of 2016. Worldwide economic, political and military events, including war, terrorist activity, events in the Middle East and initiatives by OPEC have contributed, and are likely to continue to contribute, to commodity price volatility. Additionally, warmer than normal winters in North America and other weather patterns may adversely impact the short-term demand for oil and natural gas and, therefore, demand for the Debtors' and Reorganized Debtors' products.

         During periods of economic slowdown and long-term reductions in oil and natural gas prices, oil and natural gas exploration and production companies often reduce their oil and natural gas production rates and also reduce capital expenditures and defer or cancel pending projects, which results in decreased demand for frac sand. Such developments occur even among companies that are not experiencing financial difficulties. A continued or renewed economic downturn in one or more of the industries or geographic regions that the Debtors' and Reorganized Debtors' serve, or in the worldwide economy, could adversely affect the Debtors' and Reorganized Debtors' results of operations. In addition, any future decreases in the rate at which oil and natural gas reserves are discovered or developed, whether due to increased governmental regulation, limitations on exploration and drilling activity, a sustained decline in oil and natural gas prices, or other factors, could have a material adverse effect on the Debtors' and Reorganized Debtors' business, even in a stronger natural gas and oil price environment.

   2.    **The Debtors' and Reorganized Debtors' operations are subject to operating risks that are often beyond the Debtors' and Reorganized Debtors' control and could adversely affect production levels and costs.**

         The Debtors' and Reorganized Debtors' mining, processing and production facilities are subject to risks normally encountered in the frac sand industry. These risks include:

   - changes in the price and availability of transportation;

   - inability to obtain necessary production equipment or replacement parts;

   - inclement or hazardous weather conditions, including flooding, and the physical impacts of climate change;

   - unusual or unexpected geological formations or pressures;

   - unanticipated ground, grade or water conditions;

   - inability to acquire or maintain necessary permits or mining or water rights;

   - labor disputes and disputes with the Debtors' and Reorganized Debtors' excavation contractors;

   - late delivery of supplies;

   - changes in the price and availability of natural gas or electricity that the Debtors' and Reorganized Debtors' use as fuel sources for the Debtors' and Reorganized Debtors' frac sand plants and equipment;

---

[14]    Additional risk factors are provided in the Company's 10-K, filed with the Securities and Exchange Commission on [●], 2019.

- technical difficulties or failures;

- cave-ins or similar pit wall failures;

- environmental hazards, such as unauthorized spills, releases and discharges of wastes, tank ruptures and emissions of unpermitted levels of pollutants;

- industrial accidents;

- changes in laws and regulations (or the interpretation thereof) related to the mining and oil and natural gas industries, silica dust exposure or the environment;

- inability of the Debtors' and Reorganized Debtors' customers or distribution partners to take delivery;

- reduction in the amount of water available for processing;

- fires, explosions or other accidents; and

- facility shutdowns in response to environmental regulatory actions.

Any of these risks could result in damage to, or destruction of, the Debtors' and Reorganized Debtors' mining properties or production facilities, personal injury, environmental damage, delays in mining or processing, losses or possible legal liability. Any prolonged downtime or shutdowns at the Debtors' and Reorganized Debtors' mining properties or production facilities could have a material adverse effect on the Debtors and Reorganized Debtors.

Not all of these risks are reasonably insurable, and the Debtors' and Reorganized Debtors' insurance coverage contains limits, deductibles, exclusions and endorsements. The Debtors' and Reorganized Debtors' insurance coverage may not be sufficient to meet their needs in the event of loss, and any such loss may have a material adverse effect on the Debtors and Reorganized Debtors.

3.   **The Debtors and Reorganized Debtors may be adversely affected by decreased demand for frac sand or the development of either effective alternative proppants or new processes to replace hydraulic fracturing.**

Frac sand is a proppant used in the completion and re-completion of natural gas and oil wells through hydraulic fracturing. Frac sand is the most commonly used proppant and is less expensive than ceramic proppant, which is also used in hydraulic fracturing to stimulate and maintain oil and natural gas production. A significant shift in demand from frac sand to other proppants, such as ceramic proppants, could have a material adverse effect on the Debtors' and Reorganized Debtors' financial condition and results of operations. The development and use of other effective alternative proppants, or the development of new processes to replace hydraulic fracturing altogether, could also cause a decline in demand for the frac sand that the Debtors' and Reorganized Debtors' produce and could have a material adverse effect on the Debtors' and Reorganized Debtors' financial condition and results of operations.

4.   **The Debtors and Reorganized Debtors may be adversely affected by a reduction in horizontal drilling activity or the development of either effective alternative proppants or new processes to replace hydraulic fracturing**

Demand for frac sand is substantially higher in the case of horizontally drilled wells, which allow for multiple hydraulic fractures within the same well bore but are more expensive to develop than vertically drilled wells. The development and use of a cheaper, more effective alternative proppant, a reduction in horizontal drilling activity or the development of new processes to replace hydraulic fracturing altogether, could also cause a decline in demand for the frac sand the Debtors' and Reorganized Debtors' produce and could have a material adverse effect on the Debtors' and Reorganized Debtors' business, financial condition and results of operations. A reduction in demand for the frac sand the Debtors and Reorganized Debtors produce may cause the Debtors' and Reorganized Debtors' contractual arrangements to become economically unattractive and could have a material adverse effect on the Debtors' and Reorganized Debtors' business, financial condition, and results of operations.

5.     **A large portion of the Debtors' and Reorganized Debtors' sales is generated by a few large customers, and the loss of the Debtors' and Reorganized Debtors' largest customers or a significant reduction in purchases by those customers could adversely affect the Debtors' and Reorganized Debtors' operations.**

During 2018, the Debtors' and Reorganized Debtors' top five customers represented 62.7% of sales from their continuing operations. the Debtors' and Reorganized Debtors' customers who are not subject to firm contractual commitments may not continue to purchase the same levels of the Debtors' and Reorganized Debtors' products in the future due to a variety of reasons. For example, some of the Debtors' and Reorganized Debtors' top customers could go out of business or, alternatively, be acquired by other companies that purchase the same products and services provided by us from other third-party providers. The Debtors' and Reorganized Debtors' customers could also seek to capture and develop their own sources of frac sand. In addition, some of the Debtors' and Reorganized Debtors' customers may be highly leveraged and subject to their own operating and regulatory risks. If any of the Debtors' and Reorganized Debtors' major customers substantially reduces or altogether ceases purchasing their products, the Debtors' and Reorganized Debtors' could suffer a material adverse effect on their business, financial condition, results of operations, cash flows, and prospects. In addition, upon the expiration or termination of the Debtors' and Reorganized Debtors' existing contracts, the Debtors' and Reorganized Debtors' may not be able to enter into new contracts at all or on terms as favorable as their existing contracts. The Debtors' and Reorganized Debtors' may also choose to renegotiate the Debtors' and Reorganized Debtors' existing contracts on less favorable terms (including with respect to price and volumes) in order to preserve relationships with the Debtors' and Reorganized Debtors' customers.

In addition, the long-term sales agreements the Debtors' and Reorganized Debtors' have for their frac sand may negatively impact their results of operations. Certain of the Debtors' and Reorganized Debtors' long-term agreements are for sales at fixed prices that are adjusted only for certain cost increases. As a result, in periods with increasing frac sand prices, the Debtors' and Reorganized Debtors' contract prices may be lower than prevailing industry spot prices. The Debtors' and Reorganized Debtors' long-term sales agreements also contain provisions that allow prices to be adjusted downwards in the event of falling industry prices.

6.     **Any material nonpayment or nonperformance by any of the Debtors' and Reorganized Debtors' key customers could have a material adverse effect on their business and results of operations and their ability to make cash distributions to the Debtors' and Reorganized Debtors' unitholders.**

Any material nonpayment or nonperformance by any of their key customers could have a material adverse effect on the Debtors' and Reorganized Debtors' revenue and cash flows and the Debtors' and Reorganized Debtors' ability to make cash distributions to the Debtors' and Reorganized Debtors' unitholders. The long-term take-or-pay sales agreements with select customers contain provisions designed to compensate us, in part, for their lost margins on any unpurchased volumes; accordingly, in most circumstances, they would be paid less than the price per ton the Debtors' and Reorganized Debtors' would receive if their customers purchased the contractual tonnage amounts. Certain of their other long-term frac sand sales agreements provide for minimum tonnage orders by their customers but do not contain pre-determined liquidated damage penalties in the event the customers fail to purchase designated volumes. Instead, they would seek legal remedies against the non-performing customer or seek new customers to replace the Debtors' and Reorganized Debtors' lost sales volumes. Certain of their other long-term frac sand supply contracts are efforts-based and therefore do not require the customer to purchase minimum volumes of frac sand from them or contain take-or-pay provisions.

The Debtors' and Reorganized Debtors' different types of contracts with their frac sand customers provide for different potential remedies to them in the event a customer fails to purchase the minimum contracted amount of frac sand in a given period. If they were to pursue legal remedies in the event a customer failed to purchase the minimum contracted amount of sand under a fixed-volume contract or failed to satisfy the take-or-pay commitment under a take-or-pay contract, the Debtors' and Reorganized Debtors' may receive significantly less in a judgment or settlement of any claimed breach than they would have received had the customer fully performed under the contract. In the event of any customer's breach, they may also choose to renegotiate any disputed contract on less favorable terms (including with respect to price and volumes) to us to preserve the relationship with that customer. Accordingly, any material nonpayment or performance by the Debtors' and Reorganized Debtors' customers could have a material adverse effect on the Debtors' and Reorganized Debtors' revenue and cash flows and their ability to make distributions to their unitholders.

**7.    The Debtors' and Reorganized Debtors' long-term contracts may preclude them from taking advantage of increasing prices for frac sand or mitigating the effect of increased operational costs during the term of their long-term contracts, even though certain volumes under their long-term contracts are subject to annual fixed price escalators**

The long-term supply contracts they have may negatively impact the Debtors' and Reorganized Debtors' results of operations in future periods. Their long-term contracts require the Debtors' and Reorganized Debtors' customers to pay a specified price for a specified volume of frac sand over a specified period of time. As a result, in periods with increasing prices, their sales may not keep pace with market prices. Additionally, if their operational costs increase during the terms of their long-term supply contracts, they may not be able to pass any of those increased costs to their customers. If they are unable to otherwise mitigate these increased operational costs, their net income and available cash for distributions could decline.

**8.    The credit risks of the Debtors' and Reorganized Debtors' concentrated customer base could result in losses.**

This concentration of their customers in the energy industry may impact the Debtors' and Reorganized Debtors' overall exposure to credit risk as customers may be similarly affected by prolonged changes in economic and industry conditions. If a significant number of the Debtors' and Reorganized Debtors' customers experience a prolonged business decline or disruption, they may incur increased exposure to credit risk and bad debts. If they fail to adequately assess the creditworthiness of existing or future customers or unanticipated deterioration in their creditworthiness, any resulting increase in nonpayment or nonperformance by them and the Debtors' and Reorganized Debtors' inability to re-market or otherwise use the production could have a material adverse effect on their business, financial condition and results of operations.

**9.    Certain of the Debtors' and Reorganized Debtors' contracts contain provisions requiring us to meet minimum obligations to their customers and suppliers. If the Debtors' and Reorganized Debtors' are unable to meet their minimum requirements under these contracts, they may be required to pay penalties or the contract counterparty may be able to terminate the agreement.**

In certain instances, the Debtors' and Reorganized Debtors' commit to deliver products to their customers prior to production, under penalty of nonperformance. Depending on the contract, the Debtors' and Reorganized Debtors' inability to deliver the requisite tonnage of frac sand may permit their customers to terminate the agreement or require them to pay their customers a fee, the amount of which would be based on the difference between the amounts of tonnage contracted for and the amount delivered. The Debtors' and Reorganized Debtors' have significant long-term operating leases for railcars, both currently in service and yet to be delivered, under which they would still be obligated to pay despite any future decrease in the number of railcars needed to conduct their operations. Further, the Debtors' and Reorganized Debtors' agreement with certain railways requires them to provide minimum volumes of frac sand for shipping. If the Debtors' and Reorganized Debtors' do not provide the minimum volume of frac sand for shipping, they will be required to pay a per ton shortfall penalty, subject to certain exceptions. In addition, under the Debtors' and Reorganized Debtors' agreements with sand suppliers, they are obligated to order a minimum amount of wet sand per year or pay fees on the difference between the minimum and the amount they actually order. Similarly, the Debtors' and Reorganized Debtors' would be required to make

minimum payments to mineral rights owners at certain of their mines in the event they purchase less than the minimum volumes of sand specified under the particular royalty agreement in place. If the Debtors' and Reorganized Debtors' are unable to meet their obligations under any of these agreements, they may have to pay substantial penalties or the agreements may become subject to termination, as applicable. In such events, the Debtors' and Reorganized Debtors' business, financial condition, and results of operations may be materially adversely affected.

10.    **The Debtors' and Reorganized Debtors' must effectively manage their production capacity.**

To meet rapidly changing demand in the frac sand industry, the Debtors' and Reorganized Debtors' must effectively manage their resources and production capacity. During periods of decreasing demand for frac sand, the Debtors' and Reorganized Debtors' must be able to appropriately align their cost structure with prevailing market conditions and effectively manage their mining operations. The Debtors' and Reorganized Debtors' ability to rapidly and effectively reduce their cost structure in response to such downturns is limited by the fixed nature of many of their expenses in the near term and by their need to continue the Debtors' and Reorganized Debtors' investment in maintaining reserves and production capabilities. Conversely, when upturns occur in the markets the Debtors' and Reorganized Debtors' serve, they may have difficulty rapidly and effectively increasing the Debtors' and Reorganized Debtors' production capacity or procuring sufficient reserves to meet any sudden increases in the demand for frac sand that could result in the loss of business to their competitors and harm their relationships with their customers. The inability to timely and appropriately adapt to changes in the Debtors' and Reorganized Debtors' business environment could have a material adverse effect on their business, financial condition, results of operations or reputation.

11.    **Failure to maintain effective quality control systems at the Debtors' and Reorganized Debtors' mining, processing and production facilities could have a material adverse effect on their business and operations.**

The performance, quality, and safety of their products are critical to the success of their business. For instance, their frac sand must meet stringent International Organization for Standardization, or ISO, and API technical specifications, including sphericity, grain size, crush resistance, acid solubility, purity, and turbidity, as well as customer specifications, in order to be suitable for hydraulic fracturing purposes. If their frac sand fails to meet such specifications or their customers' expectations, they could be subject to significant contractual damages or contract terminations and face serious harm to their reputation, and their sales could be negatively affected. The performance, quality, and safety of their products depend significantly on the effectiveness of their quality control systems, which, in turn, depends on a number of factors, including the design of the Debtors' and Reorganized Debtors' quality control systems, their quality-training program and their ability to ensure that their employees adhere to the Debtors' and Reorganized Debtors' quality control policies and guidelines. Any significant failure or deterioration of their quality control systems could have a material adverse effect on their business, financial condition, results of operations and reputation.

12.    **Increasing costs or a lack of dependability or availability of transportation services or infrastructure could have an adverse effect on the Debtors' and Reorganized Debtors' ability to deliver their frac sand products at competitive prices.**

Because of the relatively low cost of producing frac sand, transportation and handling costs tend to be a significant component of the total delivered cost of sales. The bulk of their currently contracted sales involve their customers also contracting with truck and rail services to haul their frac sand to end users. If there are increased costs under those contracts, and their customers are not able to pass those increases along to end users, the Debtors' and Reorganized Debtors' customers may find alternative providers. They have provided fee-based transportation and logistics (including railcar procurement, freight management, and product storage) services for both their spot market and contract customers. Should they fail to properly manage the customer's logistics needs under those instances where they have agreed to provide them, they may face increased costs, and their customers may choose to purchase sand from other suppliers. Labor disputes, derailments, adverse weather conditions or other environmental events, tight railcar leasing markets and changes to rail freight systems could interrupt or limit available transportation services. For example, harsh weather conditions and the continued surge in frac sand demand are currently straining railroad networks across the country and leading to service disruptions. A significant increase in

transportation service rates, a reduction in the dependability or availability of transportation services, prolonged rail service disruptions or relocation of their customers' businesses to areas that are not served by the rail systems accessible from their production facilities could impair their customers' ability to access their products and their ability to expand their markets or lead their customers to seek alternative sources of frac sand, which may have an adverse effect on their business, financial condition, and results of operations.

13.     **The Debtors and Reorganized Debtors face significant competition that may cause them to lose market share and reduce their ability to make distributions to their unitholders.**

The frac sand industries are highly competitive. The frac sand market is characterized by a small number of large, national producers and a larger number of small, regional, or local producers. Competition in this industry is based on price, consistency and quality of product, site location, distribution capability, customer service, reliability of supply, breadth of product offering and technical support.

Some of their competitors have greater financial and other resources than they do. In addition, their larger competitors may develop technology superior to them or may have production facilities that offer lower-cost transportation to certain specific customer locations than they do. In recent years there has been an increase in the number of small, regional producers servicing the frac sand market due to an increased demand for hydraulic fracturing services and to the growing number of unconventional resource formations being developed in the United States. Should the demand for hydraulic fracturing services decrease or the supply of frac sand available in the market increase, prices in the frac sand market could materially decrease as less-efficient producers exit the market, selling frac sand at below market prices. Furthermore, oil and natural gas exploration and production companies and other providers of hydraulic fracturing services have acquired and in the future may acquire their own frac sand reserves to fulfill their proppant requirements, and these other market participants may expand their existing frac sand production capacity, all of which would negatively impact demand for the Debtors' and Reorganized Debtors' frac sand products. In addition, increased competition in the frac sand industry could have an adverse impact on their ability to enter into long-term contracts or to enter into contracts on favorable terms.

14.     **The Debtors' and Reorganized Debtors' cash flows fluctuate on a seasonal basis and severe weather conditions could have a material adverse effect on their business.**

Because raw sand cannot be wet-processed during extremely cold temperatures, frac sand is typically washed only eight months out of the year at their Wisconsin operations. Their inability to wash frac sand year round in Wisconsin results in a seasonal build-up of inventory as they excavate excess sand to build a stockpile that will feed the dry plant during the winter months. This seasonal build-up of inventory causes their average inventory balance to fluctuate from a few weeks in early spring to more than 100 days in early winter. As a result, the cash flows of their continuing sand operations fluctuate on a seasonal basis based on the length of time Wisconsin wet plant operations must remain shut down due to harsh winter weather conditions. They may also be selling frac sand for use in oil and gas-producing basins where severe weather conditions may curtail drilling activities and, as a result, their sales volumes to customers in those areas may be adversely affected. For example, they could experience a decline in volumes sold for the second quarter relative to the first quarter each year due to seasonality of frac sand sales to customers in western Canada as sales volumes are generally lower during the months of April and May due to limited drilling activity as a result of that region's annual thaw. Unexpected winter conditions (if winter comes earlier than expected or lasts longer than expected) may lead to them not having a sufficient sand stockpile to supply feedstock for their dry plant during winter months and result in them being unable to meet their contracted sand deliveries during such time, or may drive frac sand sales volumes down by affecting drilling activity among the Debtors' and Reorganized Debtors' customers, each of which could lead to a material adverse effect on the Debtors' and Reorganized Debtors' business, financial condition, results of operation and reputation. The inability of their logistics partners, including rail companies, to manage their own operations efficiently during inclement weather could have an effect on their ability to serve their customers where they are relying on their logistics partners to provide certain transportation services.

15.     **Diminished access to water may adversely affect operations and the operations of customers**

While much of the Debtors' and Reorganized Debtors' process water is recycled and recirculated, the mining and processing activities in which they engage at their wet plant facilities require significant amounts of

water. During extreme drought conditions, some of their facilities are located in areas that can become water-constrained. They have obtained water rights and have installed high capacity wells on their properties that they currently use to service the activities on their properties, and they plan to obtain all required water rights to service other properties they may develop or acquire in the future. However, the amount of water that they are entitled to use pursuant to their water rights must be determined by the appropriate regulatory authorities in the jurisdictions in which they operate. Such regulatory authorities may amend the regulations regarding such water rights, increase the cost of maintaining such water rights or eliminate their current water rights, and they may be unable to retain all or a portion of such water rights. Such changes in laws, regulations or government policy and related interpretations pertaining to water rights may alter the environment in which they do business, which may negatively affect the Debtors' and Reorganized Debtors' financial condition and results of operations.

Similarly, their customers' performance of hydraulic fracturing activities may require the use of large amounts of water. The ability of their customers' to obtain the necessary amounts of water sufficient to perform hydraulic fracturing activities may well depend on those customers ability to acquire water by means of contract, permitting, or spot purchase. The ability of their customers to obtain and maintain sufficient levels of water for these fracturing activities are similarly subject to regulatory authority approvals, changes in applicable laws or regulations, potentially differing interpretations of contract terms, increases in costs to provide such water, and even changes in weather that could make such water resources more scarce.

16.    **The Debtors' and Reorganized Debtors' ability to manage and grow the business effectively may be adversely affected if the Debtors and Reorganized Debtors lose management or operational personnel.**

The Debtors' and Reorganized Debtors' depend on the continuing efforts of their executive officers. The departure of any of the Debtors' and Reorganized Debtors' executive officers could have a significant negative effect on their business, operating results, financial condition and on their ability to compete effectively in the marketplace.

Additionally, the Debtors' and Reorganized Debtors' ability to hire, train and retain qualified personnel will continue to be important and will become more challenging as they grow and if energy industry market conditions continue to be positive. When general industry conditions are good, the competition for experienced operational personnel increases as other energy and manufacturing companies' personnel needs increase. The Debtors' and Reorganized Debtors' ability to grow or even to continue their current level of service to their current customers will be adversely impacted if the Debtors' and Reorganized Debtors' are unable to successfully hire, train and retain these important personnel.

17.    **Inaccuracies in the Debtors' and Reorganized Debtors' estimates of mineral reserves could result in lower than expected sales and higher than expected costs.**

The Debtors and Reorganized Debtors base their mineral reserve estimates on engineering, economic, and geological data assembled and analyzed by their engineers and geologists, which are reviewed by outside firms. However, sand reserve estimates are necessarily imprecise and depend to some extent on statistical inferences drawn from available drilling data, which may prove unreliable. There are numerous uncertainties inherent in estimating quantities and qualities of mineral reserves and in estimating costs to mine recoverable reserves, including many factors beyond their control. Estimates of recoverable mineral reserves necessarily depend on a number of factors and assumptions, all of which may vary considerably from actual results, such as:

- geological and mining conditions and/or effects from prior mining that may not be fully identified by available data or that may differ from experience;

- assumptions concerning future prices of frac sand products, operating costs, mining technology improvements, development costs and reclamation costs; and

- assumptions concerning future effects of regulation, including the Debtors' and Reorganized Debtors' ability to obtain required permits and the imposition of taxes by governmental agencies.

Any inaccuracy in their estimates related to their mineral reserves could result in lower than expected sales and higher than expected costs and have an adverse effect on their cash reserves.

18.    **The Debtors' and Reorganized Debtors' operations are dependent on the Debtors' and Reorganized Debtors' rights and ability to mine their properties and on their having renewed or received the required permits and approvals from governmental authorities and other third parties.**

The Debtors and Reorganized Debtors hold numerous governmental, environmental, mining, and other permits, water rights and approvals authorizing operations at each of the Debtors' and Reorganized Debtors' sand facilities. A decision by a governmental agency or other third party to deny or delay issuing a new or renewed permit, water right or approval, or to revoke or substantially modify an existing permit, water right or approval, could have a material adverse effect on the Debtors' and Reorganized Debtors' ability to continue operations at the affected facility. Expansion of their existing operations is also predicated on securing the necessary environmental or other permits, water rights or approvals, which they may not receive in a timely manner or at all.

19.    **The Debtors and Reorganized Debtors are subject to compliance with stringent environmental laws and regulations that may expose them to substantial costs and liabilities.**

The Debtors' and Reorganized Debtors' sand and mining operations are subject to increasingly stringent and complex federal, state and local environmental laws, regulations and standards governing the discharge of materials into the environment or otherwise relating to environmental protection. These laws, regulations and standards impose numerous obligations that are applicable to the Debtors' and Reorganized Debtors' operations, including the acquisition of permits to conduct regulated activities; the incurrence of significant capital expenditures to limit or prevent releases of materials from the Debtors' and Reorganized Debtors' processors, terminals, and related facilities; and the imposition of remedial actions or other liabilities for pollution conditions caused by the Debtors' and Reorganized Debtors' operations or attributable to former operations. Numerous governmental authorities, such as the EPA, and similar state agencies, have the power to enforce compliance with these laws, regulations and standards and the permits issued under them, often requiring difficult and costly actions.

Failure to comply with environmental laws, regulations, standards, permits, and orders may result in the assessment of administrative, civil and criminal penalties, the imposition of remedial obligations, and the issuance of injunctions limiting or preventing some or all of the Debtors' and Reorganized Debtors' operations. Certain environmental laws impose strict liability for the remediation of spills and releases of oil and hazardous substances that could subject us to liability without regard to whether the Debtors' and Reorganized Debtors' were negligent or at fault. In addition, changes in environmental laws and regulations occur frequently, and any such changes that result in more stringent and costly waste handling, storage, transport, disposal or remediation requirements with respect to the Debtors' and Reorganized Debtors' operations or more stringent or costly well drilling, construction, completion or water management activities with respect to their customers' operations could adversely affect their operations, financial results and cash available for distribution.

Increasingly stringent environmental laws and regulations, unanticipated remediation obligations or emissions control expenditures and claims for penalties or damages could result in substantial costs and liabilities, and their ability to make distributions to their unitholders could suffer as a result. Neither the owners of their general partner nor their affiliates will indemnify them for any environmental liabilities, including those arising from non-compliance or pollution, that may be discovered at, on or under, or arise from, their operations or assets. As such, they can expect no economic assistance from any of them in the event that they are required to make expenditures to investigate, correct or remediate any petroleum hydrocarbons, hazardous substances, wastes or other materials. Please see "Environmental and Occupational Health and Safety Regulations" for more detail regarding the environmental and occupational health and safety rules that impact the Debtors' and Reorganized Debtors' operations.

**20.    Government action on climate change could result in increased compliance costs for us and the Debtors' and Reorganized Debtors' customers.**

Methane, a primary component of natural gas, and carbon dioxide, a byproduct of the burning of natural gas, are examples of greenhouse gases ("GHGs"). In recent years, the U.S. Congress has considered legislation to reduce emissions of GHGs. It presently appears unlikely that comprehensive climate legislation will be passed by either house of Congress in the near future, although energy legislation and other regulatory initiatives are expected to be proposed that may be relevant to GHG emissions issues. In addition, almost half of the states have begun to address GHG emissions, primarily through the planned development of emission inventories or regional GHG cap and trade programs. Depending on the particular program, the Debtors' and Reorganized Debtors' could be required to control GHG emissions or to purchase and surrender allowances for GHG emissions resulting from the Debtors' and Reorganized Debtors' operations.

Independent of Congress, the EPA has adopted regulations controlling GHG emissions under its existing authority under the CAA. For example, the EPA has adopted rules requiring the reporting of GHG emissions in the United States from specified large GHG emission sources. The EPA also has adopted rules establishing construction and operating permit requirements for certain large stationary sources of GHG emissions that are already potential major sources of critical pollutants.

Although it is not currently possible to predict how any such proposed or future GHG legislation or regulation by Congress, the EPA, the states or multi-state regions will impact their business, any legislation or regulation of GHG emissions that may be imposed in areas in which they conduct business could result in increased compliance costs or additional operating restrictions or reduced demand for their services, and could have a material adverse effect on their business, financial condition and results of operations.

Further, in December 2015, over 190 countries, including the United States, reached an agreement to reduce global greenhouse gas emissions. The agreement entered into force in November 2016 after more than 70 countries, including the United States, ratified or otherwise consented to be bound by the agreement. To the extent the United States or any other country implements this agreement or impose other climate change regulations on the oil and gas industry, it could have an adverse direct or indirect effect on their business.

**21.    Mine closures entail substantial costs, and if the Debtors and Reorganized Debtors close one or more of their mines sooner than anticipated, their results of operations may be adversely affected.**

The Debtors and Reorganized Debtors base their assumptions regarding the life of their mines on detailed studies that they perform from time to time, but their studies and assumptions do not always prove to be accurate. If they close any of their mines sooner than expected, sales will decline unless they are able to increase production at any of their other mines, which may not be possible.

Applicable statutes and regulations require that mining property be reclaimed following a mine closure in accordance with specified standards and an approved reclamation plan. The plan addresses matters such as decommissioning and removal of facilities and equipment, re-grading, prevention of erosion and other forms of water pollution, re-vegetation and post-mining monitoring and land use. They may be required to post a surety bond or other form of financial assurance equal to the cost of reclamation as set forth in the approved reclamation plan. The establishment of the final mine closure reclamation liability is based on permit requirements and requires various estimates and assumptions, principally associated with reclamation costs and production levels. If accruals for expected reclamation and other costs associated with mine closures for which they will be responsible were later determined to be insufficient, or if they were required to expedite the timing for performance of mine closure activities as compared to estimated timelines, their business, results of operations and financial condition could be adversely affected.

**22.    The Debtors and Reorganized Debtors may record impairment charges on the assets that would adversely impact their results of operations and financial condition.**

The Debtors and Reorganized Debtors are required to perform impairment tests on their assets if events or changes in circumstances modify the estimated useful life of or estimated future cash flows from an asset (such that the carrying amount of such asset may not be recoverable) or if management's plans change with respect to such asset. An impairment in one period may not be reversed in a later period even if prices increase. If the Debtors and Reorganized Debtors are required to recognize impairment charges in the future, their results of operations and financial condition may be materially and adversely affected.

**23.    Federal, state and local legislative and regulatory initiatives relating to hydraulic fracturing and the potential for related regulatory action or litigation could result in increased costs and additional operating restrictions or delays for their customers, which could negatively impact their business, financial condition and results of operations and cash flows.**

A significant portion of their business supplies frac sand to oil and natural gas industry customers performing hydraulic fracturing activities. Increased regulation of hydraulic fracturing may adversely impact their business, financial condition, and results of operations.

Hydraulic fracturing involves the injection of water, sand, and chemicals under pressure into the formation to stimulate gas production. Legislation to amend the Safe Drinking Water Act (the "SDWA") to repeal the exemption for hydraulic fracturing from the definition of "underground injection" and require federal permitting and regulatory control of hydraulic fracturing, as well as legislative proposals to require disclosure of the chemical constituents of the fluids used in the fracturing process, were proposed in recent sessions of Congress. They cannot predict whether any such legislation will ever be enacted and, if so, what its provisions would be. Scrutiny of hydraulic fracturing activities continues in other ways, with the EPA having released a final report regarding the impacts of hydraulic fracturing on drinking water resources in 2016. The report concluded that certain activities associated with hydraulic fracturing may impact drinking water resources under certain circumstances. In addition, the U.S. Department of energy released a series of recommendations for improving the safety of the process in 2011. Further, the EPA and the U.S. Department of the Interior (the "DOI") have proposed and adopted new regulations for certain aspects of the process. For example, the EPA finalized effluent limitations for the treatment and discharge of wastewater resulting from hydraulic fracturing. The DOI adopted rules that require disclosure of chemicals used in hydraulic fracturing activities upon federal and Indian lands and also would strengthen standards for well-bore integrity and the management of fluids that return to the surface during and after fracturing operations on federal and Indian lands (although implementation of this rule has been stayed pending the resolution of legal challenges).

In addition, various state, local and foreign governments have implemented, or are considering, increased regulatory oversight of hydraulic fracturing through additional permitting requirements, operational restrictions, disclosure requirements and temporary or permanent bans on hydraulic fracturing in certain areas, such as environmentally sensitive watersheds. For example, many states - including the major oil and gas producing states of North Dakota, Ohio, Oklahoma, Pennsylvania, Texas, and West Virginia - have imposed disclosure requirements on hydraulic fracturing well owners and operators. The availability of public information regarding the constituents of hydraulic fracturing fluids could make it easier for third parties opposing the hydraulic fracturing process to initiate individual or class action legal proceedings based on allegations that specific chemicals used in the hydraulic fracturing process could adversely affect groundwater and drinking water supplies or otherwise cause harm to human health or the environment. Moreover, disclosure to third parties or to the public, even if inadvertent, of their customers' proprietary chemical formulas could diminish the value of those formulas and result in competitive harm to their customers, which could indirectly impact the Debtors' and Reorganized Debtors' business, financial condition and results of operations. The adoption of new laws or regulations at the federal, state, local or foreign levels imposing reporting obligations on, or otherwise limiting or delaying, the hydraulic fracturing process could make it more difficult to complete natural gas wells in shale formations, increase the Debtors' and Reorganized Debtors' customers' costs of compliance and doing business and otherwise adversely affect the hydraulic fracturing services they perform, which could negatively impact demand for their frac sand products. In addition, heightened political, regulatory, and public scrutiny of hydraulic fracturing practices could potentially expose them or their customers to increased legal and regulatory proceedings, and any such proceedings could be time-consuming, costly or result in substantial legal liability or significant reputational harm. Any such developments could have a material

adverse effect on the Debtors' and Reorganized Debtors' business, financial condition, and results of operations, whether directly or indirectly. For example, they could be directly affected by adverse litigation involving them, or indirectly affected if the cost of compliance limits the ability of their customers to operate in the geographic areas they serve.

24.     **The Debtors and Reorganized Debtors are subject to the Federal Mine Safety and Health Act of 1977, which imposes stringent health and safety standards on numerous aspects of their operations.**

The Debtors' and Reorganized Debtors' operations are subject to the Federal Mine Safety and Health Act of 1977, as amended by the Mine Improvement and New Emergency Response Act of 2006, which imposes stringent health and safety standards on numerous aspects of mineral extraction and processing operations, including the training of personnel, operating procedures and operating equipment. They are also subject to standards imposed by MSHA and other federal and state agencies relating to workplace exposure to crystalline silica. Their failure to comply with such standards, or changes in such standards or the interpretation or enforcement thereof, could have a material adverse effect on the Debtors' and Reorganized Debtors' business and financial condition or otherwise impose significant restrictions on their ability to conduct mineral extraction and processing operations.

25.     **The Debtors and Reorganized Debtors and their customers are subject to other extensive regulations, including licensing, protection of plant and wildlife endangered and threatened species, and reclamation regulation, that impose, and will continue to impose, significant costs and liabilities. In addition, future regulations, or more stringent enforcement of existing regulations, could increase those costs and liabilities, which could adversely affect their results of operations.**

In addition to the regulatory matters described above, the Debtors and Reorganized Debtors and their customers are subject to extensive governmental regulation on matters such as permitting and licensing requirements, plant and wildlife threatened and endangered species protection, jurisdictional wetlands protection, reclamation and restoration activities at mining properties after mining is completed, the discharge of materials into the environment and the effects that mining and hydraulic fracturing have on groundwater quality and availability. Their future success depends, among other things, on the quantity of their frac sand and other mineral deposits and their ability to extract these deposits profitably, and the Debtors' and Reorganized Debtors' customers being able to operate their businesses as they currently do.

In order to obtain permits and renewals of permits in the future, they may be required to prepare and present data to governmental authorities pertaining to the potential adverse impact that any proposed mining and processing activities may have on the environment, individually or in the aggregate, including on public lands. Certain approval procedures may require preparation of archaeological surveys, endangered species studies and other studies to assess the environmental impact of new sites or the expansion of existing sites. Compliance with these regulatory requirements is expensive and significantly lengthens the time needed to develop a site. Finally, obtaining or renewing required permits is sometimes delayed or prevented due to community opposition and other factors beyond the Debtors' and Reorganized Debtors' control. The denial of a permit essential to the Debtors' and Reorganized Debtors' operations or the imposition of conditions with which it is not practicable or feasible to comply could impair or prevent the Debtors' and Reorganized Debtors' ability to develop or expand a site. Significant opposition to a permit by neighboring property owners, members of the public or non-governmental organizations, or other third parties or delay in the environmental review and permitting process also could impair or delay their ability to develop or expand a site. New legal requirements, including those related to the protection of the environment, could be adopted that could materially adversely affect the Debtors' and Reorganized Debtors' mining operations (including their ability to extract or the pace of extraction of mineral deposits), their cost structure or their customers' ability to use their frac sand products. Such current or future regulations could have a material adverse effect on their business and they may not be able to obtain or renew permits in the future.

26.     **Terrorist attacks, the threat of terrorist attacks, hostilities in the Middle East, or other sustained military campaigns may adversely impact their results of operations.**

The long-term impact of terrorist attacks, such as the attacks that occurred on September 11, 2001, and the magnitude of the threat of future terrorist attacks on the energy industry in general and on them in particular are not known at this time. Uncertainty surrounding hostilities in the Middle East or other sustained military campaigns may affect their operations in unpredictable ways, including disruptions of markets for frac sand and the possibility that infrastructure facilities and pipelines could be direct targets of, or indirect casualties of, an act of terror. Changes in the insurance markets attributable to terrorist attacks may make certain types of insurance more difficult for them to obtain. Moreover, the insurance that may be available to them may be significantly more expensive than their existing insurance coverage. Instability in the financial markets as a result of terrorism or war could also affect their ability to raise capital.

27.     **A failure in the Debtors' and Reorganized Debtors' operational and communications systems, loss of power, natural disasters, or cyber security attacks on any of their facilities, or those of third-parties, may adversely affect their financial results.**

The Debtors' and Reorganized Debtors' business is dependent upon their operational systems to process a large amount of data and a substantial number of transactions. If any of their financial, operational or other data processing systems fail or have other significant shortcomings, their financial results could be adversely affected. Their financial results could also be adversely affected if an employee causes their operational or financial systems to fail, either as a result of inadvertent error or by deliberately tampering with or manipulating the Debtors' and Reorganized Debtors' operational systems. In addition, dependence upon automated systems may further increase the risk that operational system flaws, employee tampering or manipulation of those systems will result in losses that are difficult to detect.

Due to technology advances, they have become more reliant on technology to help increase efficiency in their business. They use computer programs to help run the Debtors' and Reorganized Debtors' financial and operations processes, and this may subject their business to increased risks. Any future cyber security attacks that affect the Debtors' and Reorganized Debtors' facilities, communications systems, their customers or any of their financial data could have a material adverse effect on the Debtors' and Reorganized Debtors' business. In addition, cyber-attacks on their customer and employee data may result in a financial loss and may negatively impact their reputation. They do not maintain specialized insurance for possible liability resulting from a cyber-attack on their assets that may shut down all or part of their business. Third-party systems on which they rely could also suffer operational system failure. Any of these occurrences could disrupt their business, result in potential liability or reputational damage or otherwise have an adverse effect on their financial results.

D.      **RISKS ASSOCIATED WITH FORWARD-LOOKING STATEMENTS**

1.      **The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

**The financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.      **Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or

estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' and Reorganized Debtors' ability to maintain market strength and receive vendor support by way of favorable commercial terms; and (f) anticipated future commodity prices.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES. WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

## E.    DISCLOSURE STATEMENT DISCLAIMER

### 1.    The Information Contained Herein Is for Soliciting Votes Only.

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purpose.

### 2.    This Disclosure Statement Was Not Approved by the Securities and Exchange Commission.

This Disclosure Statement has not been filed with the Securities and Exchange Commission or any state regulatory authority. Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.    The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws. All New Emerge GP/LP Equity Interests issued to Holders of Claims on account of their respective Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the distribution and issuance, as applicable, of the Plan Securities and Documents will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code.

### 4.    This Disclosure Statement Contains Forward-Looking Statements.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims

may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5. **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6. **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, any Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

7. **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims or causes of action and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims, causes of action or objections to Claims.

8. **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or its Estate are specifically or generally identified herein.

9. **The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10. **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11. **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the United States Trustee.

# VII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If the Plan or an alternative chapter 11 plan of reorganization cannot be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Section V.C herein, titled "Statutory Requirements for Confirmation of the Plan."  The Debtors believe that liquidation under chapter 7 would result in (i) smaller or equal distributions being made to creditors entitled to a recovery than those provided for in the Plan based on the liquidation value of the Debtors' assets and because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

**B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.  As discussed above, during the negotiations prior to the filing of the Chapter 11 Cases and the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan, and the associated Exit Facility Credit Agreement and Restructuring Transactions, enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserving their businesses and allowing their creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

The prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' businesses and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' vendors and service providers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also result in the termination of the Restructuring Support Agreement.  In addition, the Debtors may no longer be permitted to use cash collateral on a consensual basis.  Under these circumstances, it is unlikely the Debtors could successfully reorganize without damage to their business operations and material decreases in recoveries for creditors.

C.    **DISTRIBUTIONS BY THE REORGANIZED DEBTORS OR OTHER APPLICABLE DISTRIBUTION AGENT**

Other than as specifically set forth below, the Reorganized Debtors or other applicable Distribution Agent shall make all distributions required to be distributed under the Plan.  Distributions on account of the Allowed Prepetition Debt Claims and Allowed DIP Facility Claims shall be made to the Prepetition Agents and the DIP Credit Agreement Agent, respectively, and such agent will be, and shall act as, the Distribution Agent with respect to its respective Class of Claims in accordance with the terms and conditions of the Plan and the applicable loan documents.  All distributions to Holders of Prepetition Debt Claims and DIP Facility Claims shall be deemed completed when made by the Reorganized Debtors to the Prepetition Agents and the DIP Credit Agreement Agent, as applicable.  The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by the Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.    **DELIVERY AND DISTRIBUTIONS; UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS**

1.    **Record Date for Distributions**

On the Distribution Record Date, the Claims Register (and the Debtors' books and records with respect to the Holders of Old GP/LP Equity Interests) shall be closed.  Accordingly, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim (other than DIP Credit Agreement Claims and Prepetition Debt Claims) or Allowed Equity Interest that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims (other than DIP Credit Agreement Claims and Prepetition Debt Claims) or Allowed Equity Interest who are Holders of such Claims or Equity Interests, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date; provided, however, that the Distribution Record Date shall not apply to the DIP Credit Agreement Claims or Prepetition Debt Claims.

2.    **Delivery of Distributions in General**

Except as otherwise provided herein, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims and Allowed Equity Interests, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the DIP Credit Agreement and the relevant Prepetition Debt Documents, if applicable); provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date and the address for each Holder of an Allowed Equity Interest shall be deemed to be the address set forth in the Debtors' books and records, or as may be held by the applicable transfer agent or similar such agency.

**3.    Minimum Distributions**

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars or New GP/LP Equity Interests, in each case with respect to Impaired Claims or Impaired Equity Interests.  With respect to Impaired Claims and Impaired Equity Interests, whenever any payment or distribution of a fraction of a dollar or share/unit of New GP/LP Equity Interest under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share/unit of New GP/LP Equity Interest (up or down), with half dollars and half shares/units of New GP/LP Equity Interest or more being rounded up to the next higher whole number and with less than half dollars and half shares/units of New GP/LP Equity Interest being rounded down to the next lower whole number (and no Cash shall be distributed in lieu of such fractional New GP/LP Equity Interest).

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim that is Impaired under the Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which shall be treated as an undeliverable distribution under IV.F.4(d) of the Plan.

**4.    Undeliverable Distributions**

(a)    Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim or an Allowed Equity Interest is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address in accordance with the time frames described in 0 of the Plan, at which time all currently due but missed distributions shall be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent).  Undeliverable distributions shall remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to 0 of the Plan, until such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(b)    Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim or an Allowed Equity Interest (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within ninety (90) days after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors or their respective assets or property, or any Distribution Agent.  In such case, any Cash, Plan Securities, or other property reserved for distribution on account of such Claim or Equity Interest shall become the property of the Reorganized Debtors, free and clear of any Claims or other rights of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.  Any such Cash, Plan Securities, or other property shall thereafter be distributed or allocated in accordance with the applicable terms and conditions of the Plan.  Nothing contained in the Plan shall require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim or an Allowed Equity Interest.

(c)    Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims or Allowed Equity Interests shall be null and void if not negotiated within ninety (90) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim or Allowed Equity Interest with respect to which such check originally was issued. Any Holder of an Allowed Claim or Allowed Equity Interest holding an un-negotiated check that does not request reissuance of such un-negotiated check within ninety (90) days after the date of mailing or other delivery of such check shall have its rights for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such right against the Debtors, their Estates, the Reorganized Debtors, or their respective assets or property. In such case, any Cash held for payment on account of such Claims or Equity Interests shall become the property of the Reorganized Debtors, free and clear of any Claims or other rights of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary. Any such Cash shall thereafter be distributed or allocated in accordance with the applicable terms and conditions of the Plan.

**B.      COMPLIANCE WITH TAX REQUIREMENTS**

In connection with the Plan and all distributions hereunder, the Reorganized Debtors or other applicable Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors or other applicable Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Persons holding Claims or Equity Interests shall be required to provide any information necessary to effect information reporting and the withholding of such taxes, and each Holder of an Allowed Claim or an Allowed Equity Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

**C.      ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**D.      MEANS OF CASH PAYMENT**

Payments of Cash made pursuant to the Plan shall be in U.S. dollars and shall be made, at the option of the applicable Distribution Agent, by checks drawn on, or wire transfer from, a domestic bank selected by such Distribution Agent. Cash payments to foreign creditors may be made, at the option of the applicable Distribution Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**E.      TIMING AND CALCULATION OF AMOUNTS TO BE DISTRIBUTED**

Except as otherwise provided in the "Treatment" sections in **Error! Reference source not found.** of the Plan or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in **Error! Reference source not found.** of the Plan. Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**F.     SETOFFS**

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors and the Reorganized Debtors may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim; provided that, at least ten (10) days prior to effectuating such withholding, the Debtors or the Reorganized Debtors, as applicable, shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors and the Reorganized Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to the Plan or the Confirmation Order.

# VIII.
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

### A.    PLAN SECURITIES

The Plan provides for the Reorganized Debtors to distribute New Second Lien Notes, New GP/LP Equity Interests and New Warrants to certain Holders of Allowed Claims in Classes 5 through 9, as applicable.

### B.    ISSUANCE AND RESALE OF PLAN SECURITIES UNDER THE PLAN

#### 1.    Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (x) the offer or sale occurs under a plan of reorganization; (y) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (z) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon this exemption, the offer, issuance and distribution of Plan Securities to Holders of Allowed Claims will not be registered under the Securities Act or any applicable state Blue Sky Laws.

The issuance of Plan Securities to Holders of Allowed Claims is covered by section 1145 of the Bankruptcy Code, and as a result the Plan Securities that issued to Holders of Allowed Claims may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in 1145 of the Bankruptcy Code. In addition, Plan Securities governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Recipients of Plan Securities are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to the Plan Securities and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to availability.

#### 2.    Resales of Plan Securities; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to Plan Securities and, in turn, whether any Person may freely resell Plan Securities. The Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

# IX.
## CERTAIN U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

**A.    IN GENERAL**

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is for general information purposes only and describes the expected tax consequences to only the Partnership, Reorganized Emerge LP and Holders of Prepetition Notes Claims, General Unsecured Claims and Old Emerge LP Equity Interests. It is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or U.S. federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion assumes that Holders of Prepetition Notes Claims, General Unsecured Claims, and Old Emerge LP Equity Interests have held such property as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code (generally, property held for investment) and will hold the New Second Lien Notes, New Limited Partnership Interests and the New Warrants as capital assets. This discussion also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of Section 897 of the Internal Revenue Code.

This discussion does not address all U.S. federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances. In addition, it does not address considerations relevant to Holders subject to special rules under the U.S. federal income tax laws, such as, certain foreign persons (including, without limitation, controlled foreign corporations, passive foreign investment companies and foreign persons eligible for the benefits of an applicable income tax treaty with the United States), real estate investment trusts (REITs) or mutual funds, "qualified foreign pension funds" (as defined in Section 897(l)(2) of the Internal Revenue Code), entities all of the interests of which are held by qualified foreign pension funds, financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, Holders subject to the alternative minimum tax, Holders who utilize installment method reporting with respect to their Claims, Holders holding the Prepetition Notes Claims, General Unsecured Claims, Old Emerge LP Equity Interests, New Limited Partnership Interests or New Warrants as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders subject to special tax accounting rules as a result of any item of gross income with respect to the Prepetition Notes Claims or General Unsecured Claims being taken into account in an applicable financial statement and U.S. Holders (as defined below) who have a functional currency other than the U.S. dollar. This discussion also does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan (other than Holders of Old Emerge LP Equity Interests (the "**Old Emerge Unitholders**")). Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim. This summary also does not discuss the treatment of the receipt of New Limited Partnership Interests pursuant to the New Management Incentive Plan.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF NEW LIMITED PARTNERSHIP INTERESTS AND NEW WARRANTS

RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER U.S. FEDERAL TAX LAWS.  THE DEBTORS AND THE REORGANIZED DEBTORS SHALL NOT BE LIABLE TO ANY PERSON FOR ANY TAX LIABILITY WITH RESPECT TO SUCH HOLDERS' TAX LIABILITY IN WHATSOEVER MANNER.

## B.      PARTNERSHIP STATUS

A partnership is not a taxable entity and incurs no U.S. federal income tax liability. Instead, each partner of a partnership is required to take into account his share of items of income, gain, loss and deduction of the partnership in computing his U.S. federal income tax liability, regardless of whether cash distributions are made to him by the partnership. Distributions by a partnership to a partner are generally not taxable to the partnership or the partner unless the amount of cash distributed to him is in excess of the partner's adjusted basis in his partnership interest. Section 7704 of the Internal Revenue Code provides that publicly traded partnerships will, as a general rule, be taxed as corporations. However, an exception, referred to as the "Qualifying Income Exception," exists with respect to publicly traded partnerships of which 90% or more of the gross income for every taxable year consists of "qualifying income." Qualifying income includes income and gains derived from the processing, refining, transportation and marketing of certain minerals and natural resources, including silica sand and crude oil, natural gas and other products of a type that are produced in a petroleum refinery or natural gas processing plant, the retail and wholesale marketing of propane, the transportation of propane and natural gas liquids, certain related hedging activities, certain activities that are intrinsic to other qualifying activities, and our (as used in this Section IX, references to "**we**," "**us**" or "**our**" are references to Old Emerge LP or Reorganized Emerge LP, as the case may be) allocable share of our subsidiaries' income from these sources. Other types of qualifying income include interest (other than from a financial business), dividends, real property rents, gains from the sale of real property and gains from the sale or other disposition of capital assets held for the production of income that otherwise constitutes qualifying income. The portion of our income that is qualifying income may change from time to time.  The IRS has made no determination as to our status or the status of our operating subsidiaries for U.S. federal income tax purposes or whether our operations generate "qualifying income" under Section 7704 of the Internal Revenue Code. We believe that we are, and have been since our initial public offering, properly classified as a partnership for U.S. federal income tax purposes.

If we fail to meet the Qualifying Income Exception, other than a failure that is determined by the IRS to be inadvertent and that is cured within a reasonable time after discovery (in which case the IRS may also require us to make adjustments with respect to Old Emerge Unitholders or Holders of New Limited Partnership Interests ("**Unitholders**") or pay other amounts), we will be treated as if we had transferred all of our assets, subject to liabilities, to a newly formed corporation, on the first day of the year in which we fail to meet the Qualifying Income Exception, in return for stock in that corporation, and then distributed that stock to the Unitholders in liquidation of their interests in us. This deemed contribution and liquidation should be tax-free to Unitholders and us so long as we, at that time, do not have liabilities in excess of the tax basis of our assets. Thereafter, we would be treated as a corporation for U.S. federal income tax purposes.

If we were treated as an association taxable as a corporation in any taxable year, either as a result of a failure to meet the Qualifying Income Exception or otherwise, our items of income, gain, loss and deduction would be reflected only on our tax return rather than being passed through to our Unitholders, and our net income would be taxed to us at corporate rates. In addition, any distribution made to a Unitholder would be treated as taxable dividend income, to the extent of our current and accumulated earnings and profits, or, in the absence of earnings and profits, a nontaxable return of capital, to the extent of the Unitholder's tax basis in his New Limited Partnership Interests, or taxable capital gain, after the Unitholder's tax basis in his New Limited Partnership Interests is reduced to zero.

**THE DISCUSSION BELOW ASSUMES THAT WE ARE CURRENTLY AND, FOLLOWING CONSUMMATION OF THE PLAN, WILL CONTINUE TO BE, CLASSIFIED AS A PARTNERSHIP FOR U.S. FEDERAL INCOME TAX PURPOSES.**

## C.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS AND THE HOLDERS OF THE OLD EMERGE LP EQUITY INTERESTS

The Partnership is classified as a partnership for U.S. federal income tax purposes and each of the other Debtors that is a subsidiary of the Partnership is classified as a disregarded entity for U.S. federal income tax purposes, with the exception of Emerge Energy Services Finance Corp.  In connection with the implementation of the Plan, the Partnership will recognize cancellation of debt ("**COD**") income for U.S. federal income tax purposes, including as a result of the discharge of certain Claims pursuant to the Restructuring Transactions. COD income is generally the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor.

As described above, because the Partnership is a partnership for U.S. federal income tax purposes, such COD income and any other income recognized by the Debtors upon implementation of the Plan will be allocated to the Old Emerge Unitholders. Certain statutory or judicial exceptions potentially can apply to limit the amount of COD income required to be included in income by the Old Emerge Unitholders, depending on the Old Emerge Unitholders' circumstances. In particular, exceptions are available that would allow COD income to be excluded from gross income if the COD income is taken into account by a taxpayer that is insolvent (but only to the extent of insolvency) or in bankruptcy. These exceptions apply at the "partner" level and thus depend on whether the partner, i.e., the Old Emerge Unitholder to whom the COD income is allocated, is itself insolvent or in bankruptcy. The fact that the Debtors are insolvent and in bankruptcy is not relevant for this purpose. For purposes of determining an Old Emerge Unitholder's insolvency (measured immediately prior to the Effective Date), the Old Emerge Unitholder would be treated as if it were individually liable for an amount of partnership debt equal to the allocated amount of the COD income. To the extent any amount of COD income is excludable by an Old Emerge Unitholder by reason of the insolvency or bankruptcy exception, the Old Emerge Unitholder generally would be required to reduce certain tax attributes (such as net operating losses, tax credits, possibly tax basis in assets and passive losses) after the determination of its tax liability for the taxable year.

An Old Emerge Unitholder's adjusted tax basis in its Old Emerge LP Equity Interests will be increased to the extent of any income or gain allocated to such partner and decreased (but not below zero) to the extent of any loss or deduction allocated to such partner, whether or not such loss is disallowed and thus not deductible.

To the extent an Old Emerge Unitholder was allocated losses in taxable years ending prior to the Effective Date, such losses may have been suspended by reason of certain provisions of the Internal Revenue Code (in particular, those relating to so-called "passive activity losses" or the "at risk" rules). As a result of the transaction, all or part of such losses may become deductible.

For U.S. federal income tax purposes, the discharge of the Partnership's indebtedness pursuant to the Plan will result in a deemed cash distribution to each Old Emerge Unitholder based on the amount of the indebtedness allocable to such Old Emerge Unitholder's Old Emerge LP Equity Interests. To the extent that any such deemed cash distribution exceeds the Old Emerge Unitholder's adjusted tax basis in its Old Emerge LP Equity Interests (after adjustment for net gain or loss allocable to the Old Emerge Unitholder as described above), such Old Emerge Unitholder will recognize capital gain. Any such capital gain generally should be long-term if the Old Emerge Unitholder's holding period in its Old Emerge LP Equity Interests is more than one year and otherwise should be short-term. An Old Emerge Unitholder's adjusted tax basis in its Old Emerge LP Equity Interests will be decreased (but not below zero) to the extent of any such deemed cash distribution.

***The U.S. federal income tax consequences of the Plan are complex, and may be particularly adverse for Old Emerge Unitholders. Accordingly, all Old Emerge Unitholders are urged to consult their tax advisors regarding the U.S. federal income tax consequences to them (taking into account their personal circumstances), including the potential for substantial allocations of taxable income without the receipt of cash distributions.***

### D.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

#### 1.    Definition of U.S. Holder and Non-U.S. Holder

A "**U.S. Holder**" is a beneficial owner of Prepetition Notes Claims, General Unsecured Claims, Old Emerge LP Equity Interests, New Limited Partnership Interests or New Warrants that, for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;

- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Internal Revenue Code), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

A "**Non-U.S. Holder**" means a beneficial owner of Prepetition Notes Claims, General Unsecured Claims, Old Emerge LP Equity Interests, New Limited Partnership Interests or New Warrants that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity classified as a corporation for U.S. federal income tax purposes), estate or trust.

A "**Holder**" means either a U.S. Holder or a Non-U.S. Holder.

If a partnership or other entity or arrangement classified as a partnership for U.S. federal income tax purposes holds Prepetition Notes Claims, General Unsecured Claims, Old Emerge LP Equity Interests, New Limited Partnership Interests or New Warrants, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Beneficial owners of Prepetition Notes Claims, General Unsecured Claims, Old Emerge LP Equity Interests, New Limited Partnership Interests and/or New Warrants who are partners in a partnership holding any of such instruments should consult their tax advisors.

#### 2.    U.S. Holders of Prepetition Notes Claims (Class 5)

(a)    <u>Exchanges of Prepetition Notes Claims for New Second Lien Notes and New Limited Partnership Interests</u>

*Treatment of Exchanges.*  An actual exchange of debt instruments will be treated as an exchange, rather than as a continuation of the old debt instrument, for U.S. federal income tax purposes if the differences between the old and new debt instrument constitute a "significant modification" of the old debt instrument under applicable Treasury Regulations. A "significant modification" occurs if, based on all the facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered is "economically significant." The remainder of this discussion assumes that an exchange of Prepetition Notes Claims for New Second Lien Notes (the "**Notes Exchange**") is a significant modification.

The exchange of Prepetition Notes Claims for New Emerge GP Equity Interests and New Limited Partnership Interests (the "**Equity Exchange**") is an exchange, subject to Section 721 of the Internal Revenue Code.

*Recognition of Gain or Loss on Notes Exchange*. A U.S. Holder of Prepetition Notes Claims should recognize gain or loss on the Notes Exchange. The amount of such gain or loss will equal the difference between the "issue price" of the New Second Lien Notes (less amounts attributable to any accrued but unpaid interest, which will be taxable as interest to the extent not previously included in income) and the U.S. Holder's adjusted tax basis in the Prepetition Notes Claims to the extent exchanged pursuant to the Notes Exchange. A U.S. Holder's adjusted tax basis in the Prepetition Notes Claims generally will be equal to the amount the U.S. Holder paid for the Prepetition Notes Claims (reduced by any payments on the Prepetition Notes Claims, other than payments of qualified stated interest). Any gain or loss will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the Prepetition Notes Claims for more than one year at the time of the Notes Exchange. Otherwise, such gain or loss will be short-term capital gain or loss. The U.S. Holder's initial tax basis in the New Second Lien Notes should be equal to their "issue price" on the Effective Date. The U.S. Holder's holding period in the New Second Lien Notes should begin on the day after the Effective Date.

A U.S. Holder that acquired Prepetition Notes Claims at any time other than at its original issuance at a market discount generally will be required to treat any gain recognized on the Prepetition Notes Claims Exchange as ordinary income to the extent of accrued market discount, unless an election to include market discount income currently as it accrues was made by the U.S. Holder. A U.S. Holder will be considered to have acquired Prepetition Notes Claims at a market discount if its tax basis in the Prepetition Notes Claims immediately after acquisition was less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, unless the difference is less than 0.25% of the Prepetition Notes Claims' issue price multiplied by the number of complete years from the acquisition date to maturity (in which case, the difference is de minimis market discount).

*Recognition of Gain or Loss on Equity Exchange*. A U.S. Holder of Prepetition Notes Claims should not recognize gain or loss on the Equity Exchange, except to the extent that New Limited Partnership Interests are received in exchange for accrued but unpaid interest (which will be taxable as interest to the extent not previously included in income). The U.S. Holder's initial tax basis in the New Limited Partnership Interests received in exchange for Prepetition Notes Claims should be equal to the U.S. Holder's adjusted tax basis in the Prepetition Notes Claims to the extent exchanged pursuant to the Equity Exchange. The U.S. Holder's holding period in the New Limited Partnership Interest should include the U.S. Holder's holding period for the Prepetition Notes Claims.

(b)    Ownership and Disposition of New Second Lien Notes

*Issue Price*. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered "traded on an established market" ("**publicly traded**"). The Debtor believes the Prepetition Notes Claims are not treated as publicly traded. If the New Second Lien Notes are treated as publicly traded for U.S. federal income tax purposes, the "issue price" of the New Second Lien Notes will be the fair market value of the New Second Lien Notes as of their issue date. If, however, the New Second Lien Notes are also not treated as publicly traded, then the issue price of the New Second Lien Notes issued in exchange for the Prepetition Notes Claims will be the principal amount of such New Second Lien Notes.

The New Second Lien Notes will be considered to be publicly traded if, at any time during the 31-day period ending 15 days after their issue date, the New Second Lien Notes are traded on an "established market." The New Second Lien Notes will be considered to trade on an established market if (i) there is a price for an executed purchase or sale of the New Second Lien Notes that is reasonably available within a reasonable period of time after the sale; (ii) there is at least one price quote for the New Second Lien Notes from at least one reasonably identifiable broker, dealer or pricing service, which price quote is substantially the same as the price for which the person receiving the quoted price could purchase or sell the New Second Lien Notes (a "**firm quote**"), or (iii) there is at least one price quote for the New Second Lien Notes other than a firm quote, available from at least one such broker, dealer, or pricing service.

The Treasury Regulations require the Reorganized Debtors to make a determination as to whether the New Second Lien Notes are publicly traded, and if the Reorganized Debtors determine that the New Second Lien Notes are publicly traded, to determine the fair market value of the New Second Lien Notes on their issue date. The Treasury Regulations require the Reorganized Debtors to make such determinations available to U.S. Holders in a commercially reasonable fashion, including by electronic publication, within 90 days of the issue date of the

New Second Lien Notes.  The Treasury Regulations provide that each of these determinations is binding on a Holder unless the Holder satisfies certain conditions.  Certain rules apply as to whether a sales price or quote may establish the fair market value of the New Second Lien Notes and under what conditions the Reorganized Debtors may otherwise establish the fair market value of the New Second Lien Notes.

Because the relevant trading period for determining whether the New Second Lien Notes are publicly traded and the issue price of the New Second Lien Notes has not yet occurred, the Debtors are unable to determine the issue price of the New Second Lien Notes at this time.

*Payments of Qualified Stated Interest.*  Payments of qualified stated interest on New Second Lien Notes generally will be taxable to a U.S. Holder as ordinary income at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes. Qualified stated interest generally means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate.

*Original Issue Discount.*  The New Second Lien Notes will be treated as issued with original issue discount ("**OID**") for U.S. federal income tax purposes if the "stated redemption price at maturity" exceeds their "issue price" (see "—*New Second Lien Notes—Issue Price*" above) by an amount equal to or more than a statutorily defined de minimis amount (generally, 0.25% multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity).  The "stated redemption price at maturity" of the New Second Lien Notes is the total of all payments to be made under the New Second Lien Notes other than qualified stated interest.

If the New Second Lien Notes were treated as having been issued with more than *de minimis* OID, U.S. Holders would be required to include the OID in ordinary income on an annual basis under a constant yield accrual method regardless of such U.S. Holder's regular method of accounting for U.S. federal income tax purposes.  A U.S. Holder must include in income in each taxable year the sum of the daily portions of OID for each day on which it held a New Second Lien Note during the taxable year.  To determine the daily portions of OID, the amount of OID allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period.  An accrual period may be of any length and the length of the accrual periods may vary over the life of the New Second Lien Notes, provided that no accrual period may be longer than one year and each scheduled payment of interest or principal on the New Second Lien Notes must occur on either the first day or last day of an accrual period.  The amount of OID allocable to an accrual period will equal (A) the product of (i) the New Second Lien Notes' adjusted issue price at the beginning of the accrual period and (ii) the New Second Lien Notes' yield to maturity (adjusted to reflect the length of the accrual period), less (B) any qualified stated interest allocable to the accrual period.

A New Second Lien Note's adjusted issue price at any time generally will be its original issue price, increased by the amount of OID on such New Second Lien Note accrued for each prior accrual period and decreased by the amount of payments on such New Second Lien Note other than payments of qualified stated interest.  A New Second Lien Note's yield to maturity is the discount rate that, when used in computing the present value of all principal and interest payments to be made on the New Second Lien Note, produces an amount equal to the New Second Lien Note's original issue price.

*Bond Premium.* If a U.S. Holder's initial tax basis in a New Second Lien Note exceeds such New Second Lien Note's stated redemption price at maturity, the New Second Lien Note will be treated as acquired by such U.S. Holder with bond premium. In such case, the U.S. Holder will not be required to accrue any OID on such New Second Lien Note. Generally, a U.S. Holder may elect to amortize such bond premium (or, if it results in a smaller premium, an amount computed with reference to the amount payable on an earlier call date) as an offset to interest income in respect of a New Second Lien Note, using a constant yield method as prescribed under the applicable Treasury Regulations, over the remaining term of the New Second Lien Note. A U.S. Holder that elects or has elected to amortize bond premium must reduce its basis in a New Second Lien Note by the amount of premium used to offset interest. An election to amortize bond premium, once made, applies to all debt instruments held or subsequently acquired by the U.S. Holder on or after the first day of the first taxable year to which the election applied and may not be revoked without the consent of the IRS.

U.S. Holders should consult their tax advisors regarding the availability and impact of premium for U.S. federal income tax purposes.

*Sale, Retirement or Other Taxable Disposition*.  A U.S. Holder of New Second Lien Notes will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the New Second Lien Notes equal to the difference between the amount realized upon the disposition (less a portion allocable to any accrued interest that has not yet been included in income by the U.S. Holder, which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in the New Second Lien Notes.  A U.S. Holder's tax basis in a New Second Lien Note should be its "issue price" unless the New Second Lien Note was issued with OID in excess of the de minimis amount, in which case its tax basis would be its "adjusted issue price" at the time of the disposition.  Any gain or loss on the sale, redemption, retirement or other taxable disposition of the New Second Lien Notes generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Second Lien Notes for more than one year as of the date of disposition. U.S. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(c)      Ownership and Disposition of New Limited Partnership Interests

The U.S. federal income tax consequences to a U.S. Holder of ownership and disposition of New Limited Partnership Interests are described below in "*Certain U.S. Federal Income Tax Consequences of Ownership of New Limited Partnership Interests.*"

**3.      U.S. Holders of General Unsecured Claims (Class 6)**

The consideration to be received by U.S. Holders of General Unsecured Claims depends on whether Class 6 votes to accept the Plan or votes to reject the Plan.

(a)      Exchanges of General Unsecured Claims for New Limited Partnership Interests and New Warrants

*Treatment of Exchanges.*  If Class 6 votes to accept the Plan and a U.S. Holder of General Unsecured Claims receives New Limited Partnership Interests and New Warrants, then the exchange of General Unsecured Claims for New Limited Partnership Interests (the "**GUC Equity Exchange**") should be an exchange subject to Section 721 of the Internal Revenue Code.  The exchange of General Unsecured Claims for New Warrants (the "**GUC Warrant Exchange**") should be an exchange subject to Section 1001 of the Internal Revenue Code.

*Recognition of Gain or Loss.*  A U.S. Holder of General Unsecured Claims should not recognize gain or loss on the GUC Equity Exchange, except to the extent that New Limited Partnership Interests are received in exchange for accrued but unpaid interest (which will be taxable as interest to the extent not previously included in income).  The U.S. Holder's initial tax basis in the New Limited Partnership Interests received in exchange for General Unsecured Claims should be equal to the U.S. Holder's adjusted tax basis in the General Unsecured Claims. The U.S. Holder's holding period in the New Limited Partnership Interest should include the U.S. Holder's holding period for the General Unsecured Claims.

A U.S. Holder of General Unsecured Claims will recognize gain or loss on the GUC Warrant Exchange. The amount of such gain or loss will equal the difference between the fair market value of the New Warrants and the U.S. Holder's adjusted tax basis in the GUC Unsecured Claims.  The U.S. Holder's initial tax basis in the New Warrants received in exchange for General Unsecured Claims should be equal to the fair market value of the New Warrants. The U.S. Holder's holding period in the New Warrants should start on the day after the Effective Date.

(b)      Cancellation of General Unsecured Claims

If Class 6 votes to reject the Plan, then the General Unsecured Claims will be cancelled and Holders of General Unsecured Claims will receive no consideration.  A U.S. Holder of a General Unsecured Claims who receives no consideration generally may recognize an ordinary loss in respect of such General Unsecured Claims upon the worthlessness of such General Unsecured Claim in the amount of such U.S. Holder's basis in such General Unsecured Claim.

(c)      Ownership and Disposition of New Limited Partnership Interest and New Warrants

The U.S. federal income tax consequences to a U.S. Holder of ownership and disposition of New Limited Partnership Interests and ownership, exercise and disposition of New Warrants are described below in "*Certain U.S. Federal Income Tax Consequences of Ownership of New Limited Partnership Interests*" and "*Certain U.S. Federal Income Tax Consequences of Ownership of New Warrants.*"

**4.      U.S. Holders of Old Emerge LP Equity Interests (Class 9)**

The consideration to be received by U.S. Holders of Old Emerge LP Equity Interests depends on whether Class 6 votes to accept the Plan or votes to reject the Plan.

(a)      Exchange of Old Emerge LP Equity Interests for New Limited Partnership Interests and New Warrants

If Class 6 votes to accept the Plan, a U.S. Holder of Old Emerge LP Equity Interests will receive New Limited Partnership Interests and New Warrants.  We intend to treat the exchange of Old Emerge LP Equity Interests for New Limited Partnership Interests as a non-taxable exchange.  Although the treatment is not certain and meritorious arguments exist to the contrary, for reasons, including that the New Warrants are freely tradeable as a separate security, the Reorganized Debtors intend to treat the exchange of Old Emerge LP Equity Interests for New Warrants as a distribution of the New Warrants to U.S. Holders of Old Emerge LP Equity Interests (the "**Warrant Distribution**") and the New Warrants as "marketable securities" under Section 731(c) of the Internal Revenue Code. In that case, the distribution of the New Warrants will be treated as a cash distribution from Reorganized Debtors of an amount equal to the fair market value of the New Warrants if the cash distribution would be taxable to a U.S. Holder of Old Emerge LP Equity Interests. Cash distributions made by the Reorganized Debtors to such U.S. Holders generally will not be taxable to such U.S. Holders for U.S. federal income tax purposes, except to the extent the amount of any such cash distributions exceeds such U.S. Holder's adjusted tax basis in its Old Emerge LP Equity Interests (after adjustment for any COD income and any deemed distribution as described above). Cash distributions made by the Reorganized Debtors to U.S. Holders of Old Emerge LP Equity Interests in an amount in excess of such U.S. Holder's tax basis in its Old Emerge LP Equity Interests (after adjustment for any COD income and any deemed distribution as described above) generally will be considered to be gain from the sale or exchange of those Old Emerge LP Equity Interests.

A U.S. Holder will have an adjusted tax basis in its New Limited Partnership Interests equal to its adjusted tax basis in in its Old Emerge LP Equity Interests (after adjustment for any COD income and any deemed distribution as described above), decreased by the fair market value of the New Warrants received in the Warrant Distribution.  A U.S. Holder will have an adjusted tax basis in the New Warrants equal to the amount of gain (if any) recognized as a result of the Warrant Distribution. The U.S. Holder's holding period for the New Limited Partnership Interests should include the U.S. Holder's holding period for the Old Emerge LP Equity Interests.  The U.S. Holder's holding period for the New Warrants will begin on the day after the Effective Date.

(b)      Cancellation of Old Emerge LP Equity Interests

If Class 6 votes to reject the Plan, then the Old Emerge LP Equity Interests will be cancelled and Holders of Old Emerge LP Equity Interests will receive no consideration. A U.S. Holder who receives no consideration for its Old Emerge LP Equity Interests will generally be treated as receiving a deemed distribution equal to the amount of liabilities previously allocated to such U.S. Holder. A U.S. Holder may recognize a capital gain or loss (subject to recharacterization as ordinary income in the event of recapture, as described in "—*Certain U.S. Federal Income Tax Consequences of Ownership of New Limited Partnership Interests—Tax Consequences of New Limited Partnership Interest Ownership—Treatment of Distributions*) based on the difference between that deemed distribution and such U.S. Holder's tax basis in its Old Emerge LP Equity Interests (after adjustment for any COD income).

(c)      Ownership and Disposition of New Limited Partnership Interest and New Warrants

The U.S. federal income tax consequences to a U.S. Holder of ownership and disposition of New Limited Partnership Interests and ownership, exercise and disposition of New Warrants are described below in "*Certain U.S. Federal Income Tax Consequences of Ownership of New Limited Partnership Interests*" and "*Certain U.S. Federal Income Tax Consequences of Ownership of New Warrants*."

**5.      Non-U.S. Holders**

Whether a Non-U.S. Holder realizes gain or loss on an exchange and the amount of such gain or loss will generally be determined in the same manner as set forth above in connection with U.S. Holders.

(a)      Gain Recognition

Any gain recognized by a Non-U.S. Holder on the Notes Exchange, the Equity Exchange, the GUC Equity Exchange, the GUC Warrants Exchange or the Warrants Distribution (to the extent a Non-U.S. Holder of Old Emerge LP Equity Interests is treated as receiving a distribution in excess of such Non-U.S. Holder's basis in its Old Emerge LP Equity Interests (after adjustment for any COD income and any deemed distribution as described above)) or a subsequent sale or other taxable disposition of the New Second Lien Notes generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the relevant sale, exchange or other taxable disposition occurs and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). The U.S. federal income tax considerations applicable to a subsequent sale or other taxable disposition of the New Limited Partnership Interests is discussed below in "—*Certain U.S. Federal Income Tax Consequences of Ownership of the New Limited Partnership Interests.*" The U.S. federal income tax consequences applicable to a subsequent sale or other taxable disposition of the New Warrants is discussed below in "—*Certain U.S. Federal Income Tax Consequences of Ownership of the New Warrants.*"

If the first exception above applies, to the extent that any gain is recognized, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed its capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception above applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain recognized in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. As described below in "—*Certain U.S. Federal Income Tax Consequences of Ownership of the New Limited Partnership Interests—Tax-Exempt Organizations and Other Investors*," gain in respect of a Non-U.S. Holder's ownership of Old Emerge LP Equity Interests will be treated as effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

(b)      Interest

Payments to a Non-U.S. Holder that are attributable to interest that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person.  Interest income, however, may be subject to U.S. withholding tax if, at the applicable time:

- the Non-U.S. Holder actually or constructively owns 10% or more of the total capital or profits interests in Old Emerge LP (with respect to payments of interest on the Prepetition Notes Claims) or Reorganized Emerge LP (with respect to payments of interest on the New Second Lien Notes);

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" (each, within the meaning of the Internal Revenue Code) with respect to Old Emerge LP (with respect to payments of interest on the Prepetition Notes Claims) or Reorganized Emerge LP (with respect to payments of interest on the New Second Lien Notes); or

- the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the Internal Revenue Code.

If interest paid to a Non-U.S. Holder is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such interest is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), the Non-U.S. Holder generally will not be subject to U.S. federal withholding tax but will be subject to U.S. federal income tax with respect to such interest in the same manner as a U.S. Holder under rules similar to those discussed above with respect to gain that is effectively connected with the conduct of a trade or business in the United States (see *"—Gain Recognition"* above).

A Non-U.S. Holder that does not qualify for the above exemption with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax on such interest at a 30% rate, unless such Non-U.S. Holder is entitled to a reduction in or exemption from withholding on such interest as a result of an applicable income tax treaty.  To claim such entitlement, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E claiming a reduction in or exemption from withholding tax on such payments of interest under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(c)      Ownership and Disposition of New Limited Partnership Interests and New Warrants

The U.S. federal income tax consequences to a Non-U.S. Holder of ownership and disposition of New Limited Partnership Interests and ownership, exercise and disposition of New Warrants are described below in "*Certain U.S. Federal Income Tax Consequences of Ownership of New Limited Partnership Interests*" and "*Certain U.S. Federal Income Tax Consequences of Ownership of New Warrants.*"

(d)      FATCA

Withholding taxes may apply to certain types of payments made to "foreign financial institutions" (as specially defined in the Internal Revenue Code) and certain other foreign entities. Specifically, a 30% withholding tax may be imposed on interest, dividends and other fixed or determinable annual or periodical gains, profits and income from sources within the United States ("**FDAP Income**"), or subject to the proposed Treasury Regulations discussed below, gross proceeds from the sale or other disposition of any property of a type that can produce interest or dividends from sources within the United States ("**Gross Proceeds**") paid to a foreign financial institution or to a "non-financial foreign entity" (as specially defined in the Internal Revenue Code), unless (i) the foreign financial institution undertakes certain diligence and reporting, (ii) the non-financial foreign entity either certifies it does not

have any substantial U.S. owners or furnishes identifying information regarding each substantial U.S. owner or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in clause (i) above, it must enter into an agreement with the U.S. Department of Treasury requiring, among other things, that it undertake to identify accounts held by certain U.S. persons or U.S.-owned foreign entities, annually report certain information about such accounts, and withhold 30% on payments to noncompliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these requirements may be subject to different rules.

These rules generally apply to payments of FDAP Income (including interest payable on the New Second Lien Notes) currently and, while these rules generally would have applied to payments of relevant Gross Proceeds made on or after January 1, 2019, recent proposed Treasury Regulations eliminate these withholding taxes on payments of Gross Proceeds entirely. Non-U.S. Holders of New Second Lien Notes generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

## 6.      Accrued Interest

To the extent a Holder receives consideration that is attributable to unpaid accrued interest, the Holder may be required to treat such consideration as a payment of interest. In this regard, the Plan provides that distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Allowed Claims. Notwithstanding this Plan provision, there is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder. A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

## 7.      Information Reporting and Backup Withholding

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**E.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF OWNERSHIP OF NEW LIMITED PARTNERSHIP INTERESTS**

**1.    Limited Partner Status**

Unitholders of Reorganized Emerge LP will be treated as partners of Reorganized Emerge LP for U.S. federal income tax purposes. Also, Unitholders whose New Limited Partnership Interests are held in street name or by a nominee and who have the right to direct the nominee in the exercise of all substantive rights attendant to the ownership of their New Limited Partnership Interests will be treated as partners of Reorganized Emerge LP for U.S. federal income tax purposes.

A beneficial owner of New Limited Partnership Interests whose New Limited Partnership Interests have been transferred to a short seller to complete a short sale would appear to lose his status as a partner with respect to those New Limited Partnership Interests for U.S. federal income tax purposes. Please read "—*Tax Consequences of New Limited Partnership Interest Ownership—Treatment of Short Sales.*"

Income, gains, losses or deductions would not appear to be reportable by a Unitholder who is not a partner for U.S. federal income tax purposes, and any cash distributions received by a Unitholder who is not a partner for U.S. federal income tax purposes would therefore appear to be fully taxable as ordinary income. These Holders are urged to consult their tax advisors with respect to the tax consequences to them of holding New Limited Partnership Interests in Reorganized Emerge LP. The references to "Unitholders" in the discussion that follows are to persons who are treated as partners in Reorganized Emerge LP for U.S. federal income tax purposes.

**2.    Tax Consequences of New Limited Partnership Interest Ownership**

(a)    Flow-Through of Taxable Income

Subject to the discussion below under "—*Entity-Level Collections,*" we will not pay any U.S. federal income tax. Instead, each Unitholder will be required to report on his income tax return his share of our income, gains, losses and deductions without regard to whether we make cash distributions to him. Consequently, we may allocate income to a Unitholder even if he has not received a cash distribution. Each Unitholder will be required to include in income his allocable share of our income, gains, losses and deductions for our taxable year ending with or within his taxable year. Our taxable year ends on December 31.

(b)    Treatment of Distributions

Distributions by us to a Unitholder generally will not be taxable to the Unitholder for U.S. federal income tax purposes, except to the extent the amount of any such cash distribution exceeds his tax basis in his New Limited Partnership Interests immediately before the distribution. Our cash distributions in excess of a Unitholder's tax basis generally will be considered to be gain from the sale or exchange of the New Limited Partnership Interests, taxable in accordance with the rules described under "—*Disposition of New Limited Partnership Interests.*" Any reduction in a Unitholder's share of our liabilities for which no partner, including the general partner, bears the economic risk of loss, known as "nonrecourse liabilities," whether as a result of an exercise of New Warrants as described below in "—Certain U.S. Federal Income Tax Consequences of Ownership of New Warrants— Potential for Income or Gain Recognition as a Result of Reducing Debt Shifts" or otherwise, will be treated as a distribution by us of cash to that Unitholder. To the extent our distributions cause a Unitholder's "at-risk" amount to be less than zero at the end of

any taxable year, he must recapture any losses deducted in previous years. Please read "—*Limitations on Deductibility of Losses.*"

A decrease in a Unitholder's percentage interest in us because of our issuance of additional New Limited Partnership Interests will decrease his share of our nonrecourse liabilities, and thus will result in a corresponding deemed distribution of cash. This deemed distribution may constitute a non-pro rata distribution. A non-pro rata distribution of money or property may result in ordinary income to a Unitholder, regardless of his tax basis in his New Limited Partnership Interests, if the distribution reduces the Unitholder's share of our "unrealized receivables," including depreciation, recapture and/or substantially appreciated "inventory items," each as defined in the Internal Revenue Code, and collectively, "Section 751 Assets." To that extent, the Unitholder will be treated as having been distributed his proportionate share of the Section 751 Assets and then having exchanged those assets with us in return for the non-pro rata portion of the actual distribution made to him. This latter deemed exchange will generally result in the Unitholder's realization of ordinary income, which will equal the excess of (i) the non-pro rata portion of that distribution over (ii) the Unitholder's tax basis (often zero) for the share of Section 751 Assets deemed relinquished in the exchange.

(c)        Basis of New Limited Partnership Interests

Except as described above, a Unitholder's initial tax basis for his New Limited Partnership Interests will be the amount he paid for the New Limited Partnership Interests plus his share of our nonrecourse liabilities. That basis will be increased by his share of our income, by any increases in his share of our nonrecourse liabilities and, on the disposition of a New Limited Partnership Interest, by his share of certain items related to business interest not yet deductible by him due to applicable limitations. Please read "—*Limitations on Interest Deductions.*" That basis will be decreased, but not below zero, by distributions from us, by the Unitholder's share of our losses, by any decreases in his share of our nonrecourse liabilities, by his share of our excess business interest (generally, the excess of our business interest over the amount that is deductible) and by his share of our expenditures that are not deductible in computing taxable income and are not required to be capitalized. A Unitholder will generally have a share of our nonrecourse liabilities based on his or her share of our profits. Please read "—*Disposition of New Limited Partnership Interests—Recognition of Gain or Loss.*"

(d)        Limitations on Deductibility of Losses

The deduction by a Unitholder of his share of our losses will be limited to the tax basis in his New Limited Partnership Interests and, in the case of an individual Unitholder, estate, trust, or corporate Unitholder (if more than 50% of the value of the corporate Unitholder's stock is owned directly or indirectly by or for five or fewer individuals or some tax-exempt organizations), to the amount for which the Unitholder is considered to be "at risk" with respect to our activities, if that is less than his tax basis. A Unitholder subject to these limitations must recapture losses deducted in previous years to the extent that distributions cause his at-risk amount to be less than zero at the end of any taxable year. Losses disallowed to a Unitholder or recaptured as a result of these limitations will carry forward and will be allowable as a deduction to the extent that his at-risk amount is subsequently increased, provided such losses do not exceed such Holder's tax basis in his New Limited Partnership Interests. Upon the taxable disposition of a New Limited Partnership Interest, any gain recognized by a Unitholder can be offset by losses that were previously suspended by the at-risk limitation but may not be offset by losses suspended by the basis limitation. Any loss previously suspended by the at-risk limitation in excess of that gain would no longer be utilizable.

In general, a Unitholder will be at risk to the extent of the tax basis of his New Limited Partnership Interests, excluding any portion of that basis attributable to his share of our nonrecourse liabilities, reduced by (i) any portion of that basis representing amounts otherwise protected against loss because of a guarantee, stop loss agreement or other similar arrangement and (ii) any amount of money he borrows to acquire or hold his New Limited Partnership Interests, if the lender of those borrowed funds owns an interest in us, is related to the Unitholder or can look only to the New Limited Partnership Interests for repayment. A Unitholder's at-risk amount will increase or decrease as the tax basis of the Unitholder's New Limited Partnership Interests increases or decreases, other than tax basis increases or decreases attributable to increases or decreases in his share of our nonrecourse liabilities.

86

In addition to the basis and at-risk limitations on the deductibility of losses, the passive activity loss limitations generally provide that individuals, estates, trusts and some closely-held corporations and personal service corporations can deduct losses from passive activities, which are generally trade or business activities in which the taxpayer does not materially participate, only to the extent of the taxpayer's income from those passive activities. The passive activity loss limitations are applied separately with respect to each publicly traded partnership. Consequently, any passive activity losses we generate will only be available to offset our passive income generated in the future and will not be available to offset income from other passive activities or investments, including our investments or a Unitholder's investments in other publicly traded partnerships, or the Unitholder's salary, active business or other income. Passive activity losses that are not deductible because they exceed a Unitholder's share of income we generate may be deducted in full when he disposes of his entire investment in us in a fully taxable transaction with an unrelated party. The passive activity loss limitations are applied after other applicable limitations on deductions, including the at-risk rules and the basis limitation.

A Unitholder's share of our net income may be offset by any of our suspended passive activity losses, but it may not be offset by any other current or carryover losses from other passive activities, including those attributable to other partnerships.

An additional loss limitation may apply to certain of our Unitholders for taxable years beginning after December 31, 2017, and before January 1, 2026. A non-corporate Unitholder will not be allowed to take a deduction for certain excess business losses in such taxable years. An excess business loss is the excess (if any) of a taxpayer's aggregate deductions for the taxable year that are attributable to the trades or businesses of such taxpayer (determined without regard to the excess business loss limitation) over the aggregate gross income or gain of such taxpayer for the taxable year that is attributable to such trades or businesses plus a threshold amount. The threshold amount is equal to $250,000, or $500,000 for taxpayers filing a joint return. Any losses disallowed in a taxable year due to the excess business loss limitation may be used by the applicable Unitholder in the following taxable year if certain conditions are met. Unitholders to which this excess business loss limitation applies will take their allocable share of our items of income, gain, loss and deduction into account in determining this limitation. This excess business loss limitation will be applied to a non-corporate Unitholder after the passive activity loss limitations and may limit such Unitholders' ability to utilize any losses we generate allocable to such Unitholder that are not otherwise limited by the basis, at-risk and passive activity loss limitations described above.

(e)      Limitations on Interest Deductions

Our ability to deduct interest paid or accrued on indebtedness properly allocable to a trade or business, "business interest", may be limited in certain circumstances. Should our ability to deduct business interest be limited, the amount of taxable income allocated to our Unitholders in the taxable year in which the limitation is in effect may increase. However, in certain circumstances, a Unitholder may be able to utilize a portion of a business interest deduction subject to this limitation in future taxable years. Prospective Unitholders should consult their tax advisors regarding the impact of this business interest deduction limitation on an investment in our New Limited Partnership Interests.

In addition, the deductibility of a non-corporate taxpayer's "investment interest expense" is generally limited to the amount of that taxpayer's "net investment income." Investment interest expense includes:

- interest on indebtedness properly allocable to property held for investment;

- our interest expense attributed to portfolio income; and

- the portion of interest expense incurred to purchase or carry an interest in a passive activity to the extent attributable to portfolio income.

The computation of a Unitholder's investment interest expense will take into account interest on any margin account borrowing or other loan incurred to purchase or carry a unit. Net investment income includes gross income from property held for investment and amounts treated as portfolio income under the passive activity loss rules, less deductible expenses, other than interest, directly connected with the production of investment income, but generally

does not include gains attributable to the disposition of property held for investment or (if applicable) qualified dividend income. The IRS has indicated that the net passive income earned by a publicly traded partnership will be treated as investment income to its Unitholders. In addition, the Unitholder's share of our portfolio income will be treated as investment income.

(f)      Entity-Level Collections

If we are required or elect under applicable law to pay any U.S. federal, state, local or foreign income tax on behalf of any Unitholder or any former Unitholder, we are authorized to pay those taxes from our funds. That payment, if made, will be treated as a distribution of cash to the Unitholder on whose behalf the payment was made. If the payment is made on behalf of a person whose identity cannot be determined, we are authorized to treat the payment as a distribution to all current Unitholders. We are authorized to amend our partnership agreement in the manner necessary to maintain uniformity of intrinsic tax characteristics of New Limited Partnership Interests and to adjust later distributions, so that after giving effect to these distributions, the priority and characterization of distributions otherwise applicable under our partnership agreement is maintained as nearly as is practicable. Payments by us as described above could give rise to an overpayment of tax on behalf of an individual Unitholder in which event the Unitholder would be required to file a claim in order to obtain a credit or refund.

(g)      Allocation of Income, Gain, Loss and Deduction

In general our items of income, gain, loss and deduction will be allocated among the Unitholders in accordance with their percentage interests in us. Although we do not expect that our operations will result in the creation of negative capital accounts, if negative capital accounts nevertheless result, items of our income and gain will be allocated in an amount and manner sufficient to eliminate the negative balance as quickly as possible.

Specified items of our income, gain, loss and deduction will be allocated to account for any difference between the tax basis and fair market value of any property contributed to us that exists at the time of such contribution, referred to in this discussion as the "**Contributed Property**." The effect of these allocations, referred to as Section 704(c) Allocations, to a Unitholder receiving New Limited Partnership Interests in the Equity Exchange or the GUC Equity Exchange will be essentially the same as if the tax bases of our assets were equal to their fair market values at the time of the offering. In the event we issue additional New Limited Partnership Interests or engage in certain other transactions in the future, "**reverse Section 704(c) Allocations**," similar to the Section 704(c) Allocations described above, will be made to all of our Unitholders immediately prior to such issuance or other transactions to account for the difference between the "book" basis for purposes of maintaining capital accounts and the fair market value of all property held by us at the time of such issuance or future transaction. In addition, items of recapture income will be allocated to the Unitholder who was allocated the deduction giving rise to the treatment of that gain as recapture income in order to minimize the recognition of ordinary income by some Unitholders. Finally, although we do not expect that our operations will result in the creation of negative capital accounts (subject to certain adjustments), if negative capital accounts (subject to certain adjustments) nevertheless result, items of our income and gain will be allocated in an amount and manner sufficient to eliminate such negative balance as quickly as possible.

An allocation of items of our income, gain, loss or deduction, other than an allocation required by the Internal Revenue Code to eliminate the difference between a partner's "book" capital account, credited with the fair market value of Contributed Property, and "tax" capital account, credited with the tax basis of Contributed Property, referred to in this discussion as the "**Book-Tax Disparity**," will generally be given effect for U.S. federal income tax purposes in determining a partner's share of an item of income, gain, loss or deduction only if the allocation has "substantial economic effect." In any other case, a partner's share of an item will be determined on the basis of his interest in us, which will be determined by taking into account all the facts and circumstances, including:

- his relative contributions to us;

- the interests of all the partners in profits and losses;

88

- the interest of all the partners in cash flow; and

- the rights of all the partners to distributions of capital upon liquidation.

We intend to take the position that allocations under our partnership agreement will be given effect for U.S. federal income tax purposes in determining a partner's share of an item of income, gain, loss or deduction.

(h)    Treatment of Short Sales

A Unitholder whose New Limited Partnership Interests are loaned to a "short seller" to cover a short sale of New Limited Partnership Interests may be considered as having disposed of those New Limited Partnership Interests. If so, he would no longer be treated for tax purposes as a partner with respect to those New Limited Partnership Interests during the period of the loan and may recognize gain or loss from the disposition. As a result, during this period:

- any of our income, gain, loss or deduction with respect to those New Limited Partnership Interests would not be reportable by the Unitholder;

- any cash distributions received by the Unitholder as to those New Limited Partnership Interests would be fully taxable; and

- while not entirely free from doubt, all of these distributions would appear to be ordinary income.

Because there is no direct or indirect controlling authority on the issue relating to partnership interests, Unitholders desiring to assure their status as partners and avoid the risk of gain recognition from a loan to a short seller are urged to consult a tax advisor to discuss whether it is advisable to modify any applicable brokerage account agreements to prohibit their brokers from borrowing and loaning their New Limited Partnership Interests. The IRS has previously announced that it is studying issues relating to the tax treatment of short sales of partnership interests. Please also read "—*Disposition of New Limited Partnership Interests—Recognition of Gain or Loss*."

(i)    Tax Rates

Currently, the highest marginal U.S. federal income tax rate applicable to ordinary income of individuals is 37% and the highest marginal U.S. federal income tax rate applicable to long-term capital gains (generally, capital gains on certain assets held for more than twelve months) of individuals is 20%. Such rates are subject to change by new legislation at any time.

In addition, a 3.8% Medicare tax ("**NIIT**") is imposed on certain net investment income earned by individuals, estates and trusts. For these purposes, net investment income generally includes a Unitholder's allocable share of our income and gain realized by a Unitholder from a sale of New Limited Partnership Interests. In the case of an individual, the tax will be imposed on the lesser of (i) the Unitholder's net investment income or (ii) the amount by which the Unitholder's modified adjusted gross income exceeds $250,000 (if the Unitholder is married and filing jointly or a surviving spouse), $125,000 (if the Unitholder is married and filing separately) or $200,000 (in any other case). In the case of an estate or trust, the tax will be imposed on the lesser of (i) undistributed net investment income, or (ii) the excess adjusted gross income over the dollar amount at which the highest income tax bracket applicable to an estate or trust begins for such taxable year. The U.S. Department of the Treasury and the IRS have issued Treasury Regulations that provide guidance regarding the NIIT. Prospective Unitholders are urged to consult with their tax advisors as to the impact of the NIIT on ownership of our New Limited Partnership Interests.

For taxable years beginning after December 31, 2017, and ending on or before December 31, 2025, a non-corporate Unitholder is entitled to a deduction equal to 20% of its "qualified business income" attributable to us, subject to certain limitations.  For purposes of this deduction, a Unitholder's "qualified business income"

attributable to us is equal to the sum of:

- the net amount of such Unitholder's allocable share of certain of our items of income, gain, deduction and loss (generally excluding certain items related to our investment activities, including capital gains and dividends, which are subject to a federal income tax rate of 20%); and

- any gain recognized by such Unitholder on the disposition of its New Limited Partnership Interests to the extent such gain is attributable to certain Section 751 Assets, including depreciation recapture and "inventory items" we own.

Prospective Unitholders should consult their tax advisors regarding the application of this deduction and its interaction with the overall deduction for qualified business income.

(j)        Section 754 Election

We have made the election permitted by Section 754 of the Internal Revenue Code. That election is irrevocable without the consent of the IRS. The election generally permits us to adjust a New Limited Partnership Interest purchaser's tax basis in our assets ("**inside basis**") under Section 743(b) of the Internal Revenue Code to reflect his purchase price. This election does not apply with respect to a person who purchases New Limited Partnership Interests directly from us. The Section 743(b) adjustment belongs to the purchaser and not to other Unitholders. For purposes of this discussion, the inside basis in our assets with respect to a Unitholder will be considered to have two components: (i) his share of our tax basis in our assets ("**common basis**") and (ii) his Section 743(b) adjustment to that basis.

We have adopted the remedial allocation method as to all our properties. Where the remedial allocation method is adopted, the Treasury Regulations under Section 743 of the Internal Revenue Code require a portion of the Section 743(b) adjustment that is attributable to recovery property that is subject to depreciation under Section 168 of the Internal Revenue Code and whose book basis is in excess of its tax basis to be depreciated over the remaining cost recovery period for the property's unamortized Book-Tax Disparity. Under Treasury Regulation Section 1.167(c)-1(a)(6), a Section 743(b) adjustment attributable to property subject to depreciation under Section 167 of the Internal Revenue Code, rather than cost recovery deductions under Section 168, is generally required to be depreciated using either the straight-line method or the 150% declining balance method. Under our partnership agreement, our general partner is authorized to take a position to preserve the uniformity of New Limited Partnership Interests even if that position is not consistent with these and any other Treasury Regulations. Please read "—*Uniformity of New Limited Partnership Interests.*"

We depreciate the portion of a Section 743(b) adjustment attributable to unrealized appreciation in the value of Contributed Property, to the extent of any unamortized Book-Tax Disparity, using a rate of depreciation or amortization derived from the depreciation or amortization method and useful life applied to the property's unamortized Book-Tax Disparity, or treat that portion as non-amortizable to the extent attributable to property that is not amortizable. This method is consistent with the methods employed by other publicly traded partnerships but is arguably inconsistent with Treasury Regulation Section 1.167(c)-1(a)(6), which is not expected to directly apply to a material portion of our assets. To the extent this Section 743(b) adjustment is attributable to appreciation in value in excess of the unamortized Book-Tax Disparity, we will apply the rules described in the Treasury Regulations and legislative history. If we determine that this position cannot reasonably be taken, we may take a depreciation or amortization position under which all purchasers acquiring New Limited Partnership Interests in the same month would receive depreciation or amortization, whether attributable to common basis or a Section 743(b) adjustment, based upon the same applicable rate as if they had purchased a direct interest in our assets. This kind of aggregate approach may result in lower annual depreciation or amortization deductions than would otherwise be allowable to some Unitholders. Please read "—*Uniformity of New Limited Partnership Interests.*" A Unitholder's tax basis for his New Limited Partnership Interests is reduced by his share of our deductions (whether or not such deductions were claimed on an individual's income tax return) so that any position we take that understates deductions will overstate such Unitholder's basis in his New Limited Partnership Interests, which may cause the Unitholder to understate gain or overstate loss on any sale of such New Limited Partnership Interests. Please read "—*Disposition of New Limited Partnership Interests—Recognition of Gain or Loss.*" Our method for taking into account Section 743 adjustments

may not be sustainable for property subject to depreciation under Section 167 of the Internal Revenue Code or if we use an aggregate approach as described above, as there is no direct or indirect controlling authority addressing the validity of these positions. Moreover, the IRS may challenge our position with respect to depreciating or amortizing the Section 743(b) adjustment we take to preserve the uniformity of the New Limited Partnership Interests. If such a challenge were sustained, the gain from the sale of New Limited Partnership Interests might be increased without the benefit of additional deductions.

Subject to certain limitations, a Section 743(b) adjustment may create additional depreciable basis that is eligible for bonus depreciation under Section 168(k) of the Internal Revenue Code to the extent the adjustment is attributable to depreciable property and not to goodwill or real property. However, because we may not be able to determine whether transfers of our New Limited Partnership Interests satisfy all of the eligibility requirements and due to other limitations regarding administrability, we may elect out of the bonus depreciation provisions of Section 168(k) of the Internal Revenue Code with respect to basis adjustments under Section 743(b).

A Section 754 election is advantageous if the transferee's tax basis in his New Limited Partnership Interests is higher than the New Limited Partnership Interests' share of the aggregate tax basis of our assets immediately prior to the transfer. Conversely, a Section 754 election is disadvantageous if the transferee's tax basis in his New Limited Partnership Interests is lower than those New Limited Partnership Interests' share of the aggregate tax basis of our assets immediately prior to the transfer. Thus, the fair market value of the New Limited Partnership Interests may be affected either favorably or unfavorably by the election. A basis adjustment is required regardless of whether a Section 754 election is made in the case of a transfer of an interest in us if we have a substantial built-in loss immediately after the transfer. Generally, a built-in loss is substantial if (i) it exceeds $250,000 or (ii) the transferee would be allocated a net loss in excess of $250,000 on a hypothetical sale of our assets for their fair market value immediately after a transfer of the interests at issue. In addition, a basis adjustment is required regardless of whether a Section 754 election is made if we distribute property and have a substantial basis reduction. A substantial basis reduction exists if, on a liquidating distribution of property to a Unitholder, there would be a negative basis adjustment to our assets in excess of $250,000 if a Section 754 election were in place.

The calculations involved in the Section 754 election are complex and will be made on the basis of assumptions as to the value of our assets and other matters. For example, the allocation of the Section 743(b) adjustment among our assets must be made in accordance with the Internal Revenue Code. The IRS could seek to reallocate some or all of any Section 743(b) adjustment allocated by us to our tangible assets to goodwill instead. Goodwill, as an intangible asset, is generally nonamortizable or amortizable over a longer period of time or under a less accelerated method than our tangible assets. We cannot assure you that the determinations we make will not be successfully challenged by the IRS and that the deductions resulting from them will not be reduced or disallowed altogether. Should the IRS require a different basis adjustment to be made, and should, in our opinion, the expense of compliance exceed the benefit of the election, we may seek permission from the IRS to revoke our Section 754 election. If permission is granted, a subsequent purchaser of New Limited Partnership Interests may be allocated more income than he would have been allocated had the election not been revoked.

**3.      Tax Treatment of Operations**

(a)      <u>Accounting Method and Taxable Year</u>

We use the year ending December 31 as our taxable year and the accrual method of accounting for U.S. federal income tax purposes. Each Unitholder will be required to include in income his share of our income, gain, loss and deduction for our taxable year ending within or with his taxable year. In addition, a Unitholder who has a taxable year ending on a date other than December 31 and who disposes of all of his New Limited Partnership Interests following the close of our taxable year but before the close of his taxable year must include his share of our income, gain, loss and deduction in income for his taxable year, with the result that he will be required to include in income for his taxable year his share of more than twelve months of our income, gain, loss and deduction. Please read "—*Disposition of New Limited Partnership Interests—Allocations Between Transferors and Transferees.*"

(b)    Tax Basis, Depreciation and Amortization

The tax basis of our assets will be used for purposes of computing depreciation and cost recovery deductions and, ultimately, gain or loss on the disposition of these assets. The U.S. federal income tax burden associated with the difference between the fair market value of our assets and their tax basis immediately prior to any future offering will be borne by our Unitholders holding interests in us prior to any such offering. Please read "—*Tax Consequences of New Limited Partnership Interest Ownership—Allocation of Income, Gain, Loss and Deduction*."

To the extent allowable, we may use the depreciation and cost recovery methods, including bonus depreciation to the extent available, that will result in the largest deductions being taken in the early years after assets subject to these allowances are placed in service. Property we subsequently acquire or construct may be depreciated using accelerated methods permitted by the Internal Revenue Code.

If we dispose of depreciable property by sale, foreclosure or otherwise, all or a portion of any gain, determined by reference to the amount of depreciation previously deducted and the nature of the property, may be subject to the recapture rules and taxed as ordinary income rather than capital gain. Similarly, a Unitholder who has taken cost recovery or depreciation deductions with respect to property we own will likely be required to recapture some or all of those deductions as ordinary income upon a sale of his interest in us. Please read "—*Tax Consequences of New Limited Partnership Interest Ownership—Allocation of Income, Gain, Loss and Deduction*" and "—*Disposition of New Limited Partnership Interests—Recognition of Gain or Loss*."

The costs we incur in selling any New Limited Partnership Interests (called "**syndication expenses**") must be capitalized and cannot be deducted currently, ratably or upon our termination. There are uncertainties regarding the classification of costs as organization expenses, which may be amortized by us, and as syndication expenses, which may not be amortized by us. The underwriting discounts and commissions we incur will be treated as syndication expenses.

(c)    Valuation and Tax Basis of Our Properties

The U.S. federal income tax consequences of the ownership and disposition of New Limited Partnership Interests will depend in part on our estimates of the relative fair market values, and the initial tax bases, of our assets. Although we may from time to time consult with professional appraisers regarding valuation matters, we will make many of the relative fair market value estimates ourselves. These estimates and determinations of basis are subject to challenge and will not be binding on the IRS or the courts. If the estimates of fair market value or determinations of basis are later found to be incorrect, the character and amount of items of income, gain, loss or deductions previously reported by Unitholders might change, and Unitholders might be required to adjust their tax liability for prior years and incur interest and penalties with respect to those adjustments.

(d)    Silica Sand Depletion

In general, we are entitled to depletion deductions with respect to silica sand mined from the underlying mineral property. We generally are entitled to the greater of cost depletion limited to the basis of the property or percentage depletion. The percentage depletion rate for silica sand is 5%.

Depletion deductions we claim generally will reduce the tax basis of the underlying mineral property. Depletion deductions can, however, exceed the total tax basis of the mineral property. Upon the disposition of the mineral property, a portion of the gain, if any, equal to the lesser of the deductions for depletion which reduce the adjusted tax basis of the mineral property plus deductible development and mining exploration expenses (discussed below), or the amount of gain realized upon the disposition, will be treated as ordinary income to us.

(e)     <u>Mining Exploration and Development Expenditures</u>

We have elected to currently deduct mining exploration expenditures that we pay or incur to determine the existence, location, extent or quality of silica sand deposits prior to the time the existence of silica sand in commercially marketable quantities has been disclosed.

If a mine reaches the producing stage in any taxable year, amounts we deducted for mine exploration expenditures must be recaptured and reduce future depletion deductions by the amount of the recapture, as described below. In the alternative, we may elect, in such taxable year and with respect to all such mines reaching the producing stage during such taxable year, to include such amount in our taxable income. A mine reaches the producing stage when the major part of the silica sand production is obtained from working mines rather than those opened for the purpose of development or the principal activity of the mine is the production of developed silica sand rather than the development of additional silica sand for mining. Assuming the election described above is not made, this recapture is accomplished through the disallowance of both cost and percentage depletion deductions on the particular mine reaching the producing stage. This disallowance of depletion deductions continues until the amount of adjusted exploration expenditures with respect to the mine has been fully recaptured. This recapture is not applied to the full amount of the previously deducted exploration expenditures. Instead these expenditures are reduced by the amount of percentage depletion, if any, that was lost as a result of deducting these exploration expenditures.

We generally elect to defer mine development expenses, consisting of expenditures incurred in making silica sand accessible for extraction, after the exploration process has disclosed the existence of silica sand in commercially marketable quantities, and deduct them on a ratable basis as the silica sand benefited by the expenses is sold.

Mine exploration and development expenditures are subject to recapture as ordinary income to the extent of any gain upon a sale or other disposition of our property or of New Limited Partnership Interests. Please read "—*Disposition of New Limited Partnership Interests*." Corporate Unitholders are subject to an additional rule that requires them to capitalize a portion of their otherwise deductible mine exploration and development expenditures. Corporate Unitholders, other than some S corporations, are required to reduce their otherwise deductible exploration expenditures by 30%. These capitalized mine exploration and development expenditures must be amortized over a 60-month period, beginning in the month paid or incurred, using a straight-line method and may not be treated as part of the basis of the property for purposes of computing depletion.

(f)     <u>Sales of Silica Sand Reserves</u>

If any silica sand reserves are sold or otherwise disposed of in a taxable transaction, we will recognize gain or loss measured by the difference between the amount realized (including the amount of any indebtedness assumed by the purchaser upon such disposition or to which such property is subject) and the adjusted tax basis of the property sold. Generally, the character of any gain or loss recognized upon that disposition will depend upon whether our silica sand reserves or the mined silica sand sold are held by us:

- for sale to customers in the ordinary course of business (i.e., we are a "dealer" with respect to that property);
- for use in a trade or business within the meaning of Section 1231 of the Internal Revenue Code; or
- as a capital asset within the meaning of Section 1221 of the Internal Revenue Code.

In determining dealer status with respect to silica sand reserves and other types of real estate, the courts have identified a number of factors for distinguishing between a particular property held for sale in the ordinary course of business and one held for investment. Any determination must be based on all the facts and circumstances surrounding the particular property and sale in question.

We intend to hold our silica sand reserves for use in a trade or business and achieve long-term capital appreciation. Although our general partner may consider strategic sales of silica sand reserves consistent with achieving long-term capital appreciation, our general partner does not anticipate frequent sales of silica sand reserves. Thus, the general partner does not believe we will be viewed as a dealer. In light of the factual nature of this question, however, there is no assurance that our purposes for holding our properties will not change and that our future activities will not cause us to be a "dealer" in silica sand reserves.

If we are not a dealer with respect to our silica sand reserves and we have held the disposed property for more than a one-year period primarily for use in our trade or business, the character of any gain or loss realized from a disposition of the property will be determined under Section 1231 of the Internal Revenue Code. If we have not held the property for more than one year at the time of the sale, gain or loss from the sale will be taxable as ordinary income.

A Unitholder's distributive share of any Section 1231 gain or loss generated by us will be aggregated with any other gains and losses realized by that unitholder from the disposition of property used in the trade or business, as defined in Section 1231(b) of the Internal Revenue Code, and from the involuntary conversion of such properties and of capital assets held in connection with a trade or business or a transaction entered into for profit for the requisite holding period. If a net gain results, all such gains and losses will be long-term capital gains and losses; if a net loss results, all such gains and losses will be ordinary income and losses. Net Section 1231 gains will be treated as ordinary income to the extent of prior net Section 1231 losses of the taxpayer or predecessor taxpayer for the five most recent prior taxable years to the extent such losses have not previously been offset against Section 1231 gains. Losses are deemed recaptured in the chronological order in which they arose.

If we are not a dealer with respect to our silica sand reserves and that property is not used in a trade or business, the property will be a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code. Gain or loss recognized from the disposition of that property will be taxable as capital gain or loss, and the character of such capital gain or loss as long-term or short-term will be based upon our holding period of such property at the time of its sale. The requisite holding period for long-term capital gain is more than one year.

Upon a disposition of silica sand reserves, a portion of the gain, if any, equal to the lesser of (1) the depletion deductions that reduced the tax basis of the disposed mineral property plus deductible development and mining exploration expenses or (2) the amount of gain recognized on the disposition, will be treated as ordinary income to us.

### 4.    Disposition of New Limited Partnership Interests

(a)    <u>Recognition of Gain or Loss</u>

Gain or loss will be recognized on a sale of New Limited Partnership Interests equal to the difference between the amount realized and the Unitholder's tax basis for the New Limited Partnership Interests sold. A Unitholder's amount realized will be measured by the sum of the cash or the fair market value of other property received by him plus his share of our nonrecourse liabilities. Because the amount realized includes a Unitholder's share of our nonrecourse liabilities, the gain recognized on the sale of New Limited Partnership Interests could result in a tax liability in excess of any cash received from the sale.

Prior distributions from us that in the aggregate were in excess of cumulative net taxable income for a New Limited Partnership Interest and, therefore, decreased a Unitholder's tax basis in that New Limited Partnership Interest will, in effect, become taxable income if the New Limited Partnership Interest is sold at a price greater than the Unitholder's tax basis in that New Limited Partnership Interest, even if the price received is less than his original cost.

Except as noted below, gain or loss recognized by a Unitholder, other than a "dealer" in New Limited Partnership Interests, on the sale or exchange of a New Limited Partnership Interest will generally be taxable as capital gain or loss. Capital gain recognized by an individual on the sale of New Limited Partnership Interests held

for more than twelve months will generally be taxed at the U.S. federal income tax rate applicable to long-term capital gains. However, a portion of this gain or loss, which will likely be substantial, will be separately computed and taxed as ordinary income or loss under Section 751 of the Internal Revenue Code to the extent attributable to assets giving rise to "unrealized receivables," including potential recapture items such as depreciation recapture, or to "inventory items" we own. Ordinary income attributable to unrealized receivables and inventory items may exceed net taxable gain realized upon the sale of a New Limited Partnership Interest and may be recognized even if there is a net taxable loss realized on the sale of a unit. Thus, a Unitholder may recognize both ordinary income and a capital loss upon a sale of New Limited Partnership Interests. Capital losses may offset capital gains and no more than $3,000 of ordinary income, in the case of individuals, and may only be used to offset capital gains in the case of corporations.  Ordinary income recognized by a Unitholder on disposition of our New Limited Partnership Interests may be reduced by such Unitholder's deduction for qualified business income.  Both ordinary income and capital gain recognized on a sale of New Limited Partnership Interests may be subject to the NIIT in certain circumstances. Please read "—*Tax Consequences of New Limited Partnership Interest Ownership—Tax Rates*."

The IRS has ruled that a partner who acquires interests in a partnership in separate transactions must combine those interests and maintain a single adjusted tax basis for all those interests. Upon a sale or other disposition of less than all of those interests, a portion of that tax basis must be allocated to the interests sold using an "equitable apportionment" method, which generally means that the tax basis allocated to the interest sold equals an amount that bears the same relation to the partner's tax basis in his entire interest in the partnership as the value of the interest sold bears to the value of the partner's entire interest in the partnership. Treasury Regulations under Section 1223 of the Internal Revenue Code allow a selling Unitholder who can identify New Limited Partnership Interests transferred with an ascertainable holding period to elect to use the actual holding period of the New Limited Partnership Interests transferred. Thus, according to the ruling discussed above, a Unitholder will be unable to select high or low basis New Limited Partnership Interests to sell as would be the case with corporate stock, but, according to the Treasury Regulations, he may designate specific New Limited Partnership Interests sold for purposes of determining the holding period of New Limited Partnership Interests transferred. A Unitholder electing to use the actual holding period of New Limited Partnership Interests transferred must consistently use that identification method for all subsequent sales or exchanges of New Limited Partnership Interests. A Unitholder considering the purchase of additional New Limited Partnership Interests or a sale of New Limited Partnership Interests purchased in separate transactions is urged to consult his tax advisor as to the possible consequences of this ruling and application of the Treasury Regulations.

Specific provisions of the Internal Revenue Code affect the taxation of some financial products and securities, including partnership interests, by treating a taxpayer as having sold an "appreciated" partnership interest, one in which gain would be recognized if it were sold, assigned or terminated at its fair market value, if the taxpayer or related persons enter(s) into:

- a short sale;

- an offsetting notional principal contract; or

- a futures or forward contract;

in each case, with respect to the partnership interest or substantially identical property.

Moreover, if a taxpayer has previously entered into a short sale, an offsetting notional principal contract or a futures or forward contract with respect to the partnership interest, the taxpayer will be treated as having sold that position if the taxpayer or a related person then acquires the partnership interest or substantially identical property. The Secretary of the Treasury is also authorized to issue regulations that treat a taxpayer that enters into transactions or positions that have substantially the same effect as the preceding transactions as having constructively sold the financial position.

(b)    Allocations Between Transferors and Transferees

In general, our taxable income and losses will be determined annually, will be prorated on a monthly basis in proportion to the number of days in each month and will be subsequently apportioned among our Unitholders in proportion to the number of New Limited Partnership Interests owned by each of them as of the opening of the applicable exchange on the first business day of the month, which we refer to in this prospectus as the "**Allocation Date**." However, gain or loss realized on a sale or other disposition of our assets other than in the ordinary course of business will be allocated among our Unitholders on the Allocation Date in the month in which that gain or loss is recognized. As a result, a Unitholder transferring New Limited Partnership Interests may be allocated income, gain, loss and deduction realized after the date of transfer.

The U.S. Department of Treasury and the IRS have issued Treasury Regulations that permit publicly traded partnerships to use a monthly simplifying convention that is similar to ours, but they do not specifically authorize all aspects of the proration method we have adopted. If this method is not allowed under the Treasury Regulations, our taxable income or losses might be reallocated among the Unitholders. We are authorized to revise our method of allocation between transferor and transferee Unitholders, as well as Unitholders whose interests vary during a taxable year.

A Unitholder who owns New Limited Partnership Interests at any time during a quarter and who disposes of them prior to the record date set for a cash distribution for that quarter will be allocated items of our income, gain, loss and deductions attributable to that quarter through the month of disposition but will not be entitled to receive that cash distribution.

(c)    Notification Requirements

A Unitholder who sells any of his New Limited Partnership Interests is generally required to notify us in writing of that sale within 30 days after the sale (or, if earlier, January 15 of the year following the sale). A purchaser of New Limited Partnership Interests who purchases New Limited Partnership Interests from another Unitholder is also generally required to notify us in writing of that purchase within 30 days after the purchase. Upon receiving such notifications, we are required to notify the IRS of that transaction and to furnish specified information to the transferor and transferee. Failure to notify us of a purchase may, in some cases, lead to the imposition of penalties. However, these reporting requirements do not apply to a sale by an individual who is a citizen of the United States and who effects the sale or exchange through a broker who will satisfy such requirements.

**5.    Uniformity of New Limited Partnership Interests**

Because we cannot match transferors and transferees of New Limited Partnership Interests, we must maintain uniformity of the economic and tax characteristics of the New Limited Partnership Interests to a purchaser of these New Limited Partnership Interests. In the absence of uniformity, we may be unable to completely comply with a number of U.S. federal income tax requirements, both statutory and regulatory. A lack of uniformity can result from a literal application of Treasury Regulation Section 1.167(c)-1(a)(6). Any non-uniformity could have a negative impact on the value of the New Limited Partnership Interests. Please read "—*Tax Consequences of New Limited Partnership Interest Ownership—Section 754 Election*." We depreciate the portion of a Section 743(b) adjustment attributable to unrealized appreciation in the value of Contributed Property, to the extent of any unamortized Book-Tax Disparity, using a rate of depreciation or amortization derived from the depreciation or amortization method and useful life applied to the property's unamortized Book-Tax Disparity, or treat that portion as nonamortizable, to the extent attributable to property the common basis of which is not amortizable, consistent with the regulations under Section 743 of the Internal Revenue Code, even though that position may be inconsistent with Treasury Regulation Section 1.167(c)-1(a)(6), which is not expected to directly apply to a material portion of our assets. Please read "—*Tax Consequences of New Limited Partnership Interest Ownership—Section 754 Election*." To the extent that the Section 743(b) adjustment is attributable to appreciation in value in excess of the unamortized Book-Tax Disparity, we will apply the rules described in the Treasury Regulations and legislative history. If we determine that this position cannot reasonably be taken, we may adopt a depreciation and amortization

position under which all purchasers acquiring New Limited Partnership Interests in the same month would receive depreciation and amortization deductions, whether attributable to common basis or a Section 743(b) adjustment, based upon the same applicable rate as if they had purchased a direct interest in our assets. If this position is adopted, it may result in lower annual depreciation and amortization deductions than would otherwise be allowable to some Unitholders and risk the loss of depreciation and amortization deductions not taken in the year that these deductions are otherwise allowable. This position will not be adopted if we determine that the loss of depreciation and amortization deductions will have a material adverse effect on the Unitholders. If we choose not to utilize this aggregate method, we may use any other reasonable depreciation and amortization method to preserve the uniformity of the intrinsic tax characteristics of any New Limited Partnership Interests that would not have a material adverse effect on the Unitholders. Moreover, the IRS may challenge any method of depreciating the Section 743(b) adjustment described in this paragraph. If this challenge were sustained, the uniformity of New Limited Partnership Interests might be affected, and the gain from the sale of New Limited Partnership Interests might be increased without the benefit of additional deductions. Please read "—*Disposition of New Limited Partnership Interests—Recognition of Gain or Loss*."

### 6.     Tax-Exempt Organizations and Other Investors

Ownership of New Limited Partnership Interests by employee benefit plans, other tax-exempt organizations, non-resident aliens, foreign corporations and other foreign persons raises issues unique to those investors and, as described below to a limited extent, may have substantially adverse tax consequences to them. If you are a tax-exempt entity or a foreign person, you should consult your tax advisor before investing in our New Limited Partnership Interests.

Employee benefit plans and most other organizations exempt from U.S. federal income tax, including IRAs and other retirement plans, are subject to U.S. federal income tax on unrelated business taxable income. Virtually all of our income allocated to a Unitholder that is a tax-exempt organization will be unrelated business taxable income and will be taxable to it.  Further, a tax exempt organization with more than one unrelated trade or business (including by attribution from investments in a partnership, such as us, that is engaged in one or more unrelated trades or businesses) must compute its unrelated business taxable income separately for each such trade or business, including for purposes of determining any net operating loss deduction.  As a result, it may not be possible for tax exempt organizations to use losses from an investment in us to offset taxable income from another unrelated trade or business.

Non-resident aliens and foreign corporations, trusts or estates that own New Limited Partnership Interests will be considered to be engaged in business in the United States because of the ownership of New Limited Partnership Interests. As a consequence, they will be required to file U.S. federal income tax returns to report their share of our income, gain, loss or deduction and pay U.S. federal income tax at regular rates on their share of our net income or gain. Moreover, under rules applicable to publicly traded partnerships, our quarterly distribution to foreign Unitholders will be subject to withholding at the highest applicable effective tax rate. Each foreign Unitholder must obtain a taxpayer identification number from the IRS and submit that number to our transfer agent on a Form W-8BEN, W-8BEN-E or applicable substitute form in order to obtain credit for these withholding taxes. A change in applicable law may require us to change these procedures.

In addition, because a foreign corporation that owns New Limited Partnership Interests will be treated as engaged in a U.S. trade or business, that corporation may be subject to the U.S. branch profits tax at a rate of 30%, in addition to regular U.S. federal income tax, on its share of our earnings and profits, as adjusted for changes in the foreign corporation's "U.S. net equity," that is effectively connected with the conduct of a U.S. trade or business. That tax may be reduced or eliminated by an income tax treaty between the United States and the country in which the foreign corporate Unitholder is a "qualified resident." In addition, this type of Unitholder is subject to special information reporting requirements under Section 6038C of the Internal Revenue Code.

A foreign Unitholder who sells or otherwise disposes of a New Limited Partnership Interest will be subject to U.S. federal income tax on gain realized from the sale or disposition of that New Limited Partnership Interest to the extent the gain is effectively connected with a U.S. trade or business of the foreign Unitholder. Generally, gain on the sale or disposition of a New Limited Partnership Interest will be treated as effectively connected with a U.S.

trade or business to the extent that a foreign Unitholder would recognize gain effectively connected with a U.S. trade or business upon the hypothetical sale of our assets at fair market value on the date of the sale or exchange of that unit.  However, since more than 50% of the fair market value of all of our assets currently consists of United States real property interests ("USRPIs") and we do not expect that to change in the foreseeable future, for so long as Reorganized Emerge LP is publicly traded, the entire amount of gain on the sale or disposition of a New Limited Partnership Interest will be treated as effectively connected with a U.S. trade or business for a foreign Unitholder who owned (directly or constructively applying certain attribution rules) more than 5% of our New Limited Partnership Interests at any time during the five-year period ending on the date of such disposition.

Upon the sale, exchange or other disposition of a New Limited Partnership Interest (including as a result of a deemed distribution resulting in a deemed sale or exchange) by a foreign Unitholder,  the transferee is generally required to withhold 10% of the amount realized on such sale, exchange or other disposition if any portion of the gain on such sale, exchange or other disposition would be treated as effectively connected with a U.S. trade or business.  Under recently proposed Treasury Regulations, a transfer of a New Limited Partnership Interest that is effected through a broker will be subject to withholding at a rate of 10% of the gross proceeds paid or credited upon transfer of the New Limited Partnership Interest, unless a Unitholder provides an IRS Form W-9 (or other substitute form) to the broker, the foreign Unitholder is a foreign qualified intermediary or the U.S. branch of such foreign person, or certain other limited exceptions apply.

Additional withholding requirements may also affect certain foreign Unitholders. Please read "— *Administrative Matters—Additional Withholding Requirements.*"

**7.      Administrative Matters**

(a)      Information Returns and Audit Procedures

We intend to furnish to each Unitholder, within 90 days after the close of each calendar year, specific tax information, including a Schedule K-1, which describes his share of our income, gain, loss and deduction for our preceding taxable year. In preparing this information, which will not be reviewed by counsel, we will take various accounting and reporting positions, some of which have been mentioned earlier, to determine each Unitholder's share of income, gain, loss and deduction. We cannot assure you that those positions will yield a result that conforms to the requirements of the Internal Revenue Code, Treasury Regulations or administrative interpretations of the IRS. We cannot assure prospective Unitholders that the IRS will not successfully contend in court that those positions are impermissible. Any challenge by the IRS could negatively affect the value of the New Limited Partnership Interests.

The IRS may audit our U.S. federal income tax information returns. Adjustments resulting from an IRS audit may require each Unitholder to adjust a prior year's tax liability, and possibly may result in an audit of his return. Any audit of a Unitholder's return could result in adjustments not related to our returns as well as those related to our returns.

Partnerships generally are treated as separate entities for purposes of U.S. federal tax audits, judicial review of administrative adjustments by the IRS and tax settlement proceedings. The tax treatment of partnership items of income, gain, loss and deduction are determined in a partnership proceeding rather than in separate proceedings with the partners. For taxable years beginning on or before December 31, 2017, the Internal Revenue Code requires that one partner be designated as the "**Tax Matters Partner**" for these purposes. Our partnership agreement names our general partner as our Tax Matters Partner.

For such taxable years, the Tax Matters Partner has made and will make some elections on our behalf and on behalf of Unitholders. In addition, the Tax Matters Partner can extend the statute of limitations for assessment of tax deficiencies against Unitholders for items in our returns. The Tax Matters Partner may bind a Unitholder with less than a 1% profits interest in us to a settlement with the IRS unless that Unitholder elects, by filing a statement with the IRS, not to give that authority to the Tax Matters Partner. The Tax Matters Partner may seek judicial review, by which all the Unitholders are bound, of a final partnership administrative adjustment and, if the Tax

Matters Partner fails to seek judicial review, judicial review may be sought by any Unitholder having at least a 1% interest in profits or by any group of Unitholders having in the aggregate at least a 5% interest in profits. However, only one action for judicial review will go forward, and each Unitholder with an interest in the outcome may participate.

A Unitholder must file a statement with the IRS identifying the treatment of any item on his U.S. federal income tax return that is not consistent with the treatment of the item on our return. Intentional or negligent disregard of this consistency requirement may subject a Unitholder to substantial penalties.

Pursuant to the Bipartisan Budget Act of 2015, for taxable years beginning after December 31, 2017, if the IRS makes audit adjustments to our income tax returns, it may assess and collect any taxes (including any applicable penalties and interest) resulting from such audit adjustment directly from us. Similarly, for such taxable years, if the IRS makes audit adjustments to income tax returns filed by an entity in which we are a member or partner, it may assess and collect any taxes (including penalties and interest) resulting from such audit adjustment directly from such entity. If, as a result of any such audit adjustment, we are required to make payments of taxes, penalties and interest, our cash available for distribution to our Unitholders might be substantially reduced.

Additionally, pursuant to the Bipartisan Budget Act of 2015, the Internal Revenue Code will no longer require that we designate a Tax Matters Partner. Instead, for taxable years beginning after December 31, 2017, we will be required to designate a partner, or other person, with a substantial presence in the United States as the partnership representative ("**Partnership Representative**"). The Partnership Representative will have the sole authority to act on our behalf for purposes of, among other things, U.S. federal income tax audits and judicial review of administrative adjustments by the IRS. If we do not make such a designation, the IRS can select any person as the Partnership Representative. We will designate our general partner as our Partnership Representative. Further, any actions taken by us or by the Partnership Representative on our behalf with respect to, among other things, U.S. federal income tax audits and judicial review of administrative adjustments by the IRS, will be binding on us and all of our Unitholders.

(b)    <u>Additional Withholding Requirements</u>

As discussed above, withholding taxes may apply to certain types of payments made to "foreign financial institutions" (as specially defined in the Internal Revenue Code) and certain other foreign entities. Specifically, a 30% withholding tax may be imposed on FDAP Income, or subject to the proposed Treasury Regulations discussed below, Gross Proceeds paid to a foreign financial institution or to a "non-financial foreign entity" (as specially defined in the Internal Revenue Code), unless (i) the foreign financial institution undertakes certain diligence and reporting, (ii) the non-financial foreign entity either certifies it does not have any substantial U.S. owners or furnishes identifying information regarding each substantial U.S. owner or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in clause (i) above, it must enter into an agreement with the U.S. Department of Treasury requiring, among other things, that it undertake to identify accounts held by certain U.S. persons or U.S.-owned foreign entities, annually report certain information about such accounts, and withhold 30% on payments to noncompliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these requirements may be subject to different rules.

These rules generally apply to payments of FDAP Income currently and, while these rules generally would have applied to payments of relevant Gross Proceeds made on or after January 1, 2019, recently proposed Treasury Regulations eliminate these withholding taxes on payments of Gross Proceeds entirely. Unitholders generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.  Thus, to the extent we have FDAP Income that is not treated as effectively connected with a U.S. trade or business (please read "—*Tax-Exempt Organizations and Other Investors*"), Unitholders who are foreign financial institutions or certain other foreign entities, or persons that hold their New Limited Partnership Interests through such foreign entities, may be subject to withholding on distributions they receive from us, or their distributive share of our income, pursuant to the rules described above.

Prospective Unitholders should consult their own tax advisors regarding the potential application of these withholding provisions to our New Limited Partnership Interests.

(c)    Nominee Reporting

Persons who hold an interest in us as a nominee for another person are required to furnish to us:

- the name, address and taxpayer identification number of the beneficial owner and the nominee;

- whether the beneficial owner is:

  - a person that is not a U.S. person;

  - a foreign government, an international organization or any wholly owned agency or instrumentality of either of the foregoing; or

  - a tax-exempt entity;

- the amount and description of New Limited Partnership Interests held, acquired or transferred for the beneficial owner; and

- specific information including the dates of acquisitions and transfers, means of acquisitions and transfers, and acquisition cost for purchases, as well as the amount of net proceeds from dispositions.

Brokers and financial institutions are required to furnish additional information, including whether they are U.S. persons and specific information on New Limited Partnership Interests they acquire, hold or transfer for their own account. A penalty of $260 per failure, up to a maximum of $3,218,500 per calendar year, is imposed by the Internal Revenue Code for failure to report that information to us. The nominee is required to supply the beneficial owner of the New Limited Partnership Interests with the information furnished to us.

(d)    Accuracy-Related Penalties

Certain penalties may be imposed on taxpayers as a result of an underpayment of tax that is attributable to one or more specified causes, including: (i) negligence or disregard of rules or regulations, (ii) substantial understatements of income tax, (iii) substantial valuation misstatements and (iv) the disallowance of claimed tax benefits by reason of a transaction lacking economic substance or failing to meet the requirements of any similar rule of law. Except with respect to the disallowance of claimed tax benefits by reason of a transaction lacking economic substance or failing to meet the requirements of any similar rule of law, however, no penalty will be imposed for any portion of any such underpayment if it is shown that there was a reasonable cause for the underpayment of that portion and that the taxpayer acted in good faith regarding the underpayment of that portion.

With respect to substantial understatements of income tax, the amount of any understatement subject to penalty generally is reduced by that portion of the understatement which is attributable to a position adopted on the return: (A) for which there is, or was, "substantial authority"; or (B) as to which there is a reasonable basis and the relevant facts of that position are adequately disclosed on the return. If any item of income, gain, loss or deduction included in the distributive shares of Unitholders might result in that kind of an "understatement" of income for which no "substantial authority" exists, we must adequately disclose the relevant facts on our return. In addition, we will make a reasonable effort to furnish sufficient information for Unitholders to make adequate disclosure on their returns and to take other actions as may be appropriate to permit Unitholders to avoid liability for this penalty.

8.      **Recent Legislative Developments**

The present U.S. federal income tax treatment of publicly traded partnerships, including us, or an investment in our New Limited Partnership Interests may be modified by administrative, legislative or judicial interpretation at any time. For example, from time to time, members of Congress and the President propose and consider substantive changes to the existing federal income tax laws that affect publicly traded partnerships, including the elimination of partnership tax treatment for publicly traded partnerships.

Additional modifications to the U.S. federal income tax laws and interpretations thereof may or may not be retroactively applied and could make it more difficult or impossible to meet the exception for us to be treated as a partnership for U.S. federal income tax purposes. Please read "—*Partnership Status*." We are unable to predict whether any such changes will ultimately be enacted. However, it is possible that a change in law could affect us, and any such changes could negatively impact the value of an investment in our New Limited Partnership Interests.

F.      **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF OWNERSHIP OF NEW WARRANTS**

1.      **Non-Partner Status of Holders of New Warrants**

The New Warrants should be treated as "noncompensatory options" pursuant to Treasury Regulation Sections 1.704-1, 1.721-2 and 1.761-3 (the "**Noncompensatory Option Regulations**").  Accordingly, ownership of a New Warrant alone should not cause you to be treated as one of our partners, as the New Warrants do not convey any interest in our capital or profits unless or until the point at which a Warrant is exercised and a newly issued common unit is issued.

2.      **Disposition of a New Warrant**

In general, a Holder will recognize gain or loss for U.S. federal income tax purposes upon the sale, exchange or other taxable disposition of a New Warrant in an amount equal to the difference, if any, between the amount realized and such Holder's adjusted tax basis in the New Warrant being sold (discussed above in "—*U.S. Holders of General Unsecured Claims—Exchange of General Unsecured Claims for New Limited Partnership Interests and New Warrants*" and "—*U.S. Holders of Old Emerge LP Equity Interests—Exchange of Old Emerge LP Equity Interests for New Limited Partnership Interests and New Warrants*").  The amount realized upon the sale of the New Warrants will be measured by the sum of all consideration received. Any gain or loss from the disposition of such New Warrants should be capital gain or loss.

3.      **Exercise of New Warrants**

An exercising Holder of a New Warrant will be treated as having contributed, in exchange for a newly issued common unit an amount of money equal the amount paid to exercise such New Warrant and purchase the common unit (the "**Warrant Contributed Capital**"). It is anticipated that the Warrant Contributed Capital will be less than such exercising Holder's proportionate share of our capital after the exercise (the "**Fair Value Capital**"). However, we are required to maintain uniformity of the economic and tax characteristics of the common units to a purchaser of these common units. To address this potential for a discrepancy among the capital accounts of the common units issued upon exercise of New Warrants and other common units currently outstanding, our partnership agreement adopts the methods and principles in the Noncompensatory Option Regulations. In accordance with the Noncompensatory Option Regulations, our partnership agreement provides (i) a method for interim adjustments to the capital accounts upon certain unrelated events, such as the issuances of additional common units by us in exchange for either cash or property contributions, while the New Warrants are outstanding, (ii) a method for adjustments to the capital accounts upon the exercise of a New Warrant, and (iii) the use of special allocations among the Unitholders to address any discrepancy between the Warrant Contributed Capital and the Fair Value Capital per common unit at the time the New Warrants are exercised. Pursuant to these methods and principles, if you exercise a New Warrant, you will bear the burden of the difference between the Warrant Contributed Capital and the Fair Value Capital per common unit over a number of years in a manner that is consistent with the treatment of the contribution of appreciated property to us. The net effect of these special allocations to any current Unitholder

101

will depend upon many factors, including the level of participation among all Holders of New Warrants, the size of the discrepancy between the Warrant Contributed Capital and the Fair Value Capital per common unit and the tax life of the assets held by us at the time the New Warrants are being exercised.

### 4. Lapse of the New Warrants

Upon the lapse of a New Warrant, it is anticipated that you would recognize a capital loss equal to the portion of the adjusted tax basis (if any) of the New Warrant. See "—*U.S. Holders of Old Emerge LP Equity Interests—Exchange of Old Emerge LP Equity Interests for New Limited Partnership Interests and New Warrants*."

### 5. Potential for Income or Gain Recognition as a Result of Reducing Debt Shifts

As a result of exercise of the New Warrants, a portion of our liabilities currently allocable to our existing Unitholders will be shifted to the Holders of new common units issued upon the exercise of the New Warrants. A Unitholder will not recognize taxable gain as a result of the shift in our liabilities if its tax basis in its common units is positive without including any basis associated with its allocable share of our liabilities. A significant portion of our liabilities are considered nonrecourse liabilities. For these purposes, "nonrecourse liabilities" are our liabilities for which no partner, including the general partner, bears the economic risk of loss. Our nonrecourse liabilities generally are allocated among our Unitholders based on each unitholder's share of our profits. As stated above, exercise of a New Warrant may result in a reduction in a Unitholder's allocable share of our liabilities, which is referred to as a "**reducing debt shift**." In such case, you will be deemed to have received a cash distribution equal to the amount of the reducing debt shift.

Distributions to Unitholders generally will not be taxable for U.S. federal income tax purposes, except to the extent the amount of any such cash distribution exceeds such Unitholder's tax basis in its common units immediately before the distribution. Cash distributions that are in excess of a Unitholder's tax basis generally will be considered to be gain from the sale or exchange of common units. Thus, if a reducing debt shift results in a deemed cash distribution that exceeds A Unitholder's basis in its common units, such Unitholder would recognize gain in an amount equal to such excess. However, such Unitholder generally would not recognize taxable gain if its tax basis in its common units is positive without including any basis associated with its share of our liabilities.

**THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN DESCRIBED HEREIN, AS WELL AS ANY OTHER TAX CONSEQUENCES, INCLUDING ANY TAX CONSEQUENCES ARISING UNDER STATE, LOCAL OR FOREIGN TAX LAWS. NEITHER THE PROPONENTS OF THE PLAN NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL, FOREIGN OR ANY OTHER TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

**RECOMMENDATION**

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ _____

Emerge Energy Services LLC

By:        [●]

Title:     [●]

Dated:    [●], 2019

Prepared by:

<table>
<tr><td><b>RICHARDS, LAYTON & FINGER, P.A.</b></td><td><b>LATHAM & WATKINS LLP</b></td></tr>
<tr><td>John H. Knight (No. 3848)</td><td>George A. Davis</td></tr>
<tr><td>Paul N. Heath (No. 3704)</td><td>Keith A. Simon</td></tr>
<tr><td>Zachary I. Shapiro (No. 5103)</td><td>Hugh K. Murtagh</td></tr>
<tr><td>Brett M. Haywood (No. 6166)</td><td>Liza L. Burton</td></tr>
<tr><td>One Rodney Square</td><td>885 Third Avenue</td></tr>
<tr><td>920 North King Street</td><td>New York, New York 10022</td></tr>
<tr><td>Wilmington, Delaware 19801</td><td>Telephone:  (212) 906-1200</td></tr>
<tr><td>Telephone:  (302) 651-7700</td><td>Facsimile:   (212) 751–4864</td></tr>
<tr><td>Facsimile:  (302) 651-7701</td><td></td></tr>
</table>

*Proposed Counsel for the Debtors and Debtors in Possession*