**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| EMERGE ENERGY SERVICES LP, *et al.*,[1] | Case No. 19- 11563 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: September 5, 2019 at 11:00 a.m. (ET)** |
| | **Extended Objection Deadline: August 30, 2019 at 4:00 p.m. (ET)** |
| | **Related Docket Nos.: 98, 99, 247, 268, 269, 270, 271** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING
THE DISCLOSURE STATEMENT, (II) ESTABLISHING THE VOTING
RECORD DATE, VOTING DEADLINE AND OTHER DATES, (III) APPROVING
PROCEDURES FOR SOLICITING, RECEIVING AND TABULATING VOTES
ON THE PLAN AND FOR FILING OBJECTIONS TO THE PLAN,
(IV) APPROVING THE MANNER AND FORMS OF NOTICE AND
<u>OTHER RELATED DOCUMENTS, AND (V) GRANTING RELATED RELIEF</u>**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Emerge Energy Services LP (2937), Emerge Energy Services GP LLC (4683), Emerge Energy Services Operating LLC (2511), Superior Silica Sands LLC (9889), and Emerge Energy Services Finance Corporation (9875). The Debtors' address is 5600 Clearfork Main Street, Suite 400, Fort Worth, Texas 76109.

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of the debtors and debtors-in-possession in the above-captioned cases (collectively, the "<u>Debtors</u>" or the "<u>Company</u>," as applicable), by and through its undersigned proposed counsel, hereby submits this objection (the "<u>Objection</u>") to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement, (II) Establishing the Voting Record Date, Voting Deadline and Other Dates, (III) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan, (IV) Approving the Manner and Forms of Notice and Other Related Documents, and (V) Granting Related Relief* [D.I. 247] (the "<u>Disclosure Statement Motion</u>").  In support of this Objection, the Committee respectfully represents as follows:

## <u>PRELIMINARY STATEMENT</u>[2]

1.     Pursuant to the terms of an agreement mandated by HPS Investment Partners, LLC ("<u>HPS</u>"), which holds dominant, controlling positions in each layer of the Debtors' pre-petition and post-petition secured debt, the Debtors seek approval of a disclosure statement and authority to solicit a plan that, if confirmed, would deliver substantially all (or potentially all) of the Reorganized Debtors' value (in the form of debt and equity) to the HPS-controlled Prepetition Noteholders just over 100 days from the Petition Date.  In mid-January 2019, the Debtors' senior management described in a presentation to the Debtors' board of directors' (the "<u>Board</u>") that the Debtors' lenders "have become more aggressive and are now dictating what the company can and cannot do."  *See* Board Presentation Fourth Quarter 2018 Review.[3]  Indeed, over the past eight months, HPS has maneuvered to put itself in a position to exercise undue control over the Debtors and these Chapter 11 Cases so as to fast track the restructuring set forth

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them below or in the Disclosure Statement Motion, the Plan, the Disclosure Statement, or the RSA, as applicable.

[3] As the Board Presentation Fourth Quarter 2018 Review is governed by confidentiality, a copy has not been attached.

in the pre-negotiated RSA and attendant Plan, thereby achieving its goal of wiping out hundreds of millions of dollars of debt (including, by the Debtors' estimation, a staggering $574 million of unsecured debt) for its own benefit.

2.    Yet, the Disclosure Statement is nearly devoid of detail regarding, among other things, HPS's role in hand-picking the two members of the Special Restructuring Committee created by the RSA and empowered with sole authority to act for the Debtors in prosecuting the onerous one-sided Plan[4], and HPS's role in "negotiating" the so-called Global Settlement (which is anything but 'global') and releases, touted as the very *cornerstone* of the Plan and the RSA.[5] Remarkably, the RSA also provides that if the Court does not confirm a plan containing the release and exculpation provisions set forth in the Term Sheet attached to the RSA, then HPS, as the controlling owner post-Effective Date, will cause the Reorganized Debtors to agree to provide such releases and exculpation "as promptly as reasonably possible after the occurrence of the Effective Date." *See* RSA ¶ 5(b).  Not only has HPS stacked the deck in order to control the Debtors' restructuring, but HPS also intends, as the proposed majority owner of the post-emergence Reorganized Debtors, to grant *itself* and others, including the directors and officers, a release, even if this Court does not do so.

3.    Perhaps equally culpable is Insight Equity, the Debtors' controlling equityholder, in enabling the undue control exercised by HPS over the RSA, the Special Restructuring Committee, these Chapter 11 Cases and the Plan process in exchange for an improper payoff:

---

[4] The Special Restructuring Committee was vested with its power through the implementation of HPS's mandate that the board of directors of Emerge Energy Services GP LLC abdicate its decision-making control and authority over the Debtors' restructuring and Plan to the Special Restructuring Committee. *See* First Day Declaration ¶ 10; *see also* RSA.

[5] While certain of this information is contained in the First Day Declaration, the Disclosure Statement, which is required to include "adequate information" pursuant to section 1125(a) of the Bankruptcy Code, does not contain such information.

warrants for reorganized equity (despite the virtually nonexistent recovery of 0.4% - 0.8% for, by the Debtors' estimation, approximately $574 million in general unsecured claims) **and** a coveted full release of claims against it by the Debtors (and most creditors).  This suspect and manipulative conduct by HPS, Insight Equity, and the other parties to the RSA cannot be swept under the rug by the Debtors through a lack of disclosure to creditors.  In fact, the Committee has already sought discovery by way of a Bankruptcy Rule 2004 motion in an effort to determine whether any of HPS's, Insight Equity's or the Debtors' directors' and officers' prepetition conduct may be actionable.[6]

4.    According to the Disclosure Statement, only two classes of creditors are entitled to vote: (1) holders of the Prepetition Notes Claims (Class 5), which class is controlled by HPS; and (2) holders of General Unsecured Claims (Class 6) (the "General Unsecured Creditors").  As the holders of the Prepetition Notes Claims will be the majority equity owners post-Effective Date and thus, will undoubtedly vote to accept the Plan, holders of General Unsecured Claims are the only "hypothetical investors" whose vote on the Plan actually matters.  11 U.S.C. § 1125(a).  Accordingly, it is imperative that unsecured creditors have adequate information to make an informed decision regarding the Plan.[7]

---

[6] On August 22, 2019, the Committee filed its *Motion of Official Committee of Unsecured Creditors for an Order, Pursuant to Section 105(a) of the Bankruptcy Code, Bankruptcy Rule 2004, and Local Bankruptcy Rule 2004-1, Authorizing and Directing the Examination of the Debtors and Certain Third Parties* [D.I. 246], seeking discovery and deposition testimony from the Debtors, Insight Equity, HPS, the CRO and the members of the Special Restructuring Committee concerning, among other things, the negotiation of the RSA, the creation of the Special Restructuring Committee, the Debtors' business plan, and valuation.  The Committee's Rule 2004 motion is scheduled for hearing on the same day as the Disclosure Statement Motion.

[7] Unfortunately, the Disclosure Statement, as originally filed, did not include, in addition to the disclosures regarding the conduct described above, (i) the anticipated recovery for unsecured creditors; (ii) financial projections to demonstrate that the Plan is feasible; (iii) the estimated value of the Reorganized Debtors on a go-forward basis; (iv) the Debtors' go-forward business plan, including its intentions for significant assets that have been abandoned or at which operations were curtailed; (v) the treatment creditors would receive if the Debtors' assets were liquidated; (vi) the terms of the Exit Facility; and (vii) the final amount and terms of the New Second Lien Notes. The Financial Projections, Valuation Analysis and Liquidation Analysis were filed less than 14 hours prior to the original objection deadline of August 29, 2019 at 4:00 p.m. (ET) and just seven days prior to hearing on the

5.      Despite the Debtors' apparent ability to fast track a chapter 11 process, the Debtors have been unable, or more likely unwilling, to timely provide even the most basic information necessary for unsecured creditors to assess the Plan.  For these reasons and others set forth herein, the Disclosure Statement does not enable a "hypothetical reasonable investor" to make an educated decision as to whether to vote for or against the Plan.  *See* 11 U.S.C. § 1125(a).

6.      The upshot of these deficiencies and last minute filings is that the Debtors are seeking this Court's approval of an inadequate Disclosure Statement for a Plan that, unless substantially revised, is targeted to virtually eliminate unsecured creditor recoveries and expose the Debtors' estates to protracted litigation.  Even if the pervasive informational deficiencies discussed herein could be remedied with appropriate disclosures, the Disclosure Statement Motion should nevertheless be denied as the Plan described therein is unconfirmable as a matter of law.  Courts have long acknowledged that solicitation of a Plan that is unconfirmable on its face wastes estate resources and, in such instances, courts have not authorized solicitation of the Plan to proceed.  *See In re Am. Capital Equip., LLC*, 688 F.3d at 154 (3d Cir. 2012).

7.      The Plan the Debtors seek to solicit by way of the Disclosure Statement Motion is patently unconfirmable in that it impermissibly provides for the release of all claims (including derivative claims) of the Debtors and their estates in favor of the Prepetition Secured Parties, the Debtors' current and former officers and directors, Insight Equity and numerous related parties, for no material, tangible consideration paid or exchanged.  The proposed Debtor Releases are particularly egregious and inappropriate in light of the pending discovery surrounding the Board's abdication of many of its powers, authority and fiduciary duties to the hand-picked

---

Disclosure Statement Motion.  Seven days' notice of crucial financial information necessary to determine the adequacy of the Disclosure Statement is in contravention of the 28 days' notice required by the Bankruptcy Rules and Local Rules.  *See* Fed. R. Bankr. P. 2002(b); Del. Bankr. L.R. 3017-1(a).

Special Restructuring Committee and Insight Equity's "global" deal that enabled such abdication in HPS's favor. The Plan also contains improper and unjustified third party releases and overly broad exculpation provisions that violate applicable law.

8.     The Committee respectfully submits that in light of these substantive flaws, instead of proceeding with solicitation of the Plan at this time, the Disclosure Statement Motion should be denied. The Debtors and HPS should engage with the Committee to develop a negotiated plan that is fair to all stakeholders and legally supportable and generate a disclosure statement that provides adequate information so that a plan can be confirmed with a minimum of litigation expense.[8]

## BACKGROUND

### A.     General Background

9.     On July 15, 2019 (the "Petition Date"), the Debtors each filed a voluntary petition for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). The Debtors continue to manage and operate their business as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

10.     On July 30, 2019, the Office of the United States Trustee for the District of Delaware appointed the Committee. The members of the Committee are: (i) Trinity Industries Leasing Company; (ii) The Andersons, Inc.; (iii) Iron Mountain Trap Rock Co.; (iv) Greenbrier Leasing Company, LLC; and (v) BMT Consulting Group LLC. [D.I. 111].

11.     On July 16, 2019, the Debtors filed the *Declaration of Bryan M. Gaston, Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings*

---

[8] As noted *infra*, there are many other objectionable provisions of the Plan that the Committee intends to raise at confirmation.

(the "First Day Declaration") [D.I. 14].  Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the First Day Declaration.

12.     On July 25, 2019, the Debtors filed the *Disclosure Statement for the Joint Plan of Reorganization for Emerge Energy Services LP and its Affiliate Debtors under Chapter 11 of the Bankruptcy Code* (as amended, the "Disclosure Statement") [D.I. 99] and the *Joint Plan of Reorganization for Emerge Energy Services LP and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (as amended, the "Plan") [D.I. 98].

13.     On August 22, 2019, the Debtors filed the Disclosure Statement Motion.  *See* D.I. 247.

14.     On August 29, 2019, less than 14 hours prior to the original objection deadline, the Debtors filed the *Disclosure Statement for First Amended Joint Plan of Reorganization for Emerge Energy Services LP and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [D.I. 269] and the *First Amended Joint Plan of Reorganization for Emerge Energy Services LP and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [D.I. 268].

15.     The Disclosure Statement Motion is scheduled for hearing on September 5, 2019 at 11:00 a.m. (ET).

   **B.      Special Restructuring Committee, Restructuring Support Agreement and the Debtors' Proposed Plan of Reorganization**

16.     Less than three months prior to the Petition Date, the Debtors entered into a Restructuring Support Agreement (the "RSA"), dated April 18, 2019, by and among (i) the Debtors, (ii) the Consenting Equity Holders (Insight Equity), and (iii) HPS, as administrative and collateral agent under the Revolving Loan Agreement and as notes and collateral agent under the

Notes Purchase Agreement, the Consenting Revolving Loan Lenders, and the Consenting Noteholders.  *See* First Day Declaration, Exhibit B.

17.     The RSA created the Special Restructuring Committee that was empowered with control and decision-making authority to approve and implement the terms of the RSA on terms that the Special Restructuring Committee determined to be necessary in order to confirm a chapter 11 plan.  *See* First Day Declaration ¶ 33.  The Special Restructuring Committee has two members that were allegedly elected by the Debtors' Insight Equity-dominated Board from a "slate" of candidates selected by and acceptable to the secured lenders: Mr. Eugene I. Davis and Mr. William L. Transier.  *See* RSA, Exhibit B.

18.     As required, in part, by the RSA, the Plan provides that (i) the Prepetition Credit Agreement Lenders will receive payment in full through the refinancing of the approximately $67 million Prepetition Credit Agreement Claims through the proposed Exit Facility; (ii) the Prepetition Noteholders will convert an ***unknown*** portion of the Prepetition Notes into New Second Lien Notes in an amount ***still to be finally determined***; and (iii) the Prepetition Noteholders will receive the New Emerge GP Equity Interests, 100% of the Perpetual Preferred Interests, and at least 95% of the New Limited Partnership Interests.  The Plan also proposes a "death trap" treatment for Class 6 General Unsecured Claims.  Should the class of General Unsecured Claims (Class 6) vote in favor of the Plan, Holders of General Unsecured Claims will receive their Pro Rata share of 5.0% of the New Limited Partnership Interests and New Warrants representing 10.0% of the New Limited Partnership Interests.  Should the class of General Unsecured Claims (Class 6) vote against the Plan, there will be no distribution to Class 6.  Plan § III.B.  Inexplicably, Class 9 Holders of Old Emerge LP Equity Interests will receive a Pro Rata

share of New Warrants representing 5.0% of the New Limited Partnership Interests, if Class 6 General Unsecured Claims votes to accept the Plan.  Plan § III.B.9.

## ARGUMENT

19.     The Court should not approve the Disclosure Statement Motion because the Disclosure Statement (i) does not contain adequate information as required by section 1125 of the Bankruptcy Code; and (ii) describes a Plan that is patently unconfirmable.  In addition, certain of the solicitation materials should be revised if the Plan confirmation process is permitted to move forward.  Accordingly, the Disclosure Statement cannot be approved at this time and, therefore, the Disclosure Statement Motion should be denied.

## I.     THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION

### A.     Applicable Law

20.     It is well-settled that a debtor may only solicit votes to accept or reject a chapter 11 plan after the Court has approved the debtor's written disclosure statement for that plan as containing "adequate information."   11 U.S.C. § 1125(b).  Section 1125(a) of the Bankruptcy Code defines "adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to . . . a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a)(1).

21.     The Third Circuit has stressed the importance of adequate disclosure in connection with proposed chapter 11 plans: "we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code['s] standard of 'adequate information.'"   *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988); *see also Krystal*

*Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) (citing 11 U.S.C. § 1125(a)(1) and observing that plan proponent has "an affirmative duty to provide creditors with a disclosure statement containing 'adequate information' to 'enable a creditor to make an informed judgment'" about the proposed plan).

22.    Although courts assess adequacy of disclosure on a case-by-case basis, every disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("the importance of full and honest disclosure cannot be overstated"). In essence, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *see also Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote"); 11 Collier on Bankruptcy, ¶ 1125.03[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (courts should "consider the needs of the claims or interest of the class as a whole and not the needs of the most sophisticated or least sophisticated members of a particular class"). In determining whether a disclosure statement satisfies section 1125 of the Bankruptcy Code, courts consider whether it provides creditors with the necessary information regarding the following, *inter alia*:

- the events which led to the filing of a bankruptcy petition;
- the relationship of the debtor with its affiliates;
- a description of the available assets and their value;
- the anticipated future of the company;
- the source of information stated in the disclosure statement;
- the present condition of the debtor while in chapter 11;

- claims asserted against the debtor;
- the estimated return to creditors under a chapter 7 liquidation;
- financial information, valuations, and projections relevant to the creditors' decision to accept or reject the chapter 11 plan;
- information relevant to the risks posed to creditors under the plan; and
- the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers.

*See In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996).

23.     For the reasons discussed below, the Disclosure Statement fails to include adequate information regarding critical matters that a hypothetical investor would need to understand in order to make an informed decision about the Plan.  These matters include, but are not limited to: (i) information concerning the Debtors' negotiation of the RSA, the creation and empowerment of the Special Restructuring Committee, and the involvement of HPS and Insight Equity in the same; (ii) the Debtors' go-forward post-emergence business plans for certain of its facilities; (iii) the proposed recoveries for unsecured creditors (currently set forth in the Disclosure Statement as "[0.4-0.8]%"), the amount and the terms of Prepetition Note obligations that will convert into the New Second Lien Notes, the terms of the Debtors' post-emergence financing facility, the Valuation Analysis, the Liquidation Analysis, and Financial Projections[9]; and (iv) the justifications and the consideration paid or exchanged for the proposed releases embedded in the Plan, including the proposed third-party releases, and the potential claims being released.

**B.      Inadequate Disclosures Regarding the RSA, the Special Restructuring Committee, HPS and the Formulation of the Plan**

24.     The Disclosure Statement fails to provide virtually any detail surrounding the negotiation and execution of the RSA or the process by which the Special Restructuring

---

[9] Although the Debtors filed the Valuation Analysis, Liquidation Analysis and Financial Projections on August 29, 2019, as discussed *infra*, such short notice is insufficient.

Committee was formed and vested with its powers.  This is especially troubling since the Special Restructuring Committee was populated by two members that were hand-picked by HPS (allegedly from a "slate" it proposed) and granted exclusive control over the Debtors' restructuring efforts.  Against that context, the Disclosure Statement ***must*** provide information regarding (i) the creation of the Special Restructuring Committee; (ii) the appointment of the two directors that serve on the Special Restructuring Committee and their relationship to HPS and other RSA parties; (iii) the Board's reasoning to justify the abdication of its power and fiduciary duties to the Special Restructuring Committee; (iv) the evaluation and interview process conducted by the Board before electing the two new board members to populate the Special Restructuring Committee; and (v) the Debtors', Insight Equity's, and HPS's decision-making process and justifications behind the RSA, including the proposed distributions to and releases of old equity holders.  These are among the informational deficiencies that exist today, and the Committee has not even had an opportunity to start to conduct formal discovery to determine whether separate substantive deficiencies exist.  For these reasons, the Committee is proactively seeking to obtain discovery to identify and understand all components of the decision making process that were predicates to formulating the RSA and the Plan.  This information is critical to allow the Committee to prepare its position on valuation, the business plan, and the stakeholders' prepetition conduct to evaluate the propriety of those aspects of the Plan.  Without such disclosures, creditors are lacking a full and complete picture of the critical events, empirical analysis and business rationale that were the drivers of the current structure of the Plan on which unsecured creditors are asked to vote.

25.    Additionally, the Debtors fail to disclose why the RSA and Plan provide for distributions to and releases of old equity holders, including Insight Equity.  Such lack of

disclosure raises significant questions as to: (i) why old equity holders were accorded any consideration in the RSA and Plan; (ii) what role Insight Equity played in the negotiation of the RSA; (iii) why the Board approved the RSA with proposed distributions to old equity holders, despite providing for only *de minimis* distributions to General Unsecured Creditors; and (iv) why the Debtors believe granting Insight Equity a Debtor Release and Third Party Release (each as defined below) is appropriate.

26.     All of these facts must be disclosed in greater detail, along with the disclosure of HPS's control over the Debtors through the forbearance agreements, the direction to retain Ankura and the CRO and the subsequent negotiation of the RSA calling for the abdication of the Board's power and duties to the hand-picked Special Restructuring Committee.

### C.     Inadequate Disclosures Regarding the Debtors' Mines and Facilities

27.     Although the Disclosure Statement describes the market decline in northern white sand ("NWS") mined and processed by the Debtors in Wisconsin and the levee breach at the Debtors' San Antonio mines, it is unclear from the Disclosure Statement how the Debtors intend to proceed on a go-forward basis with the facilities owned in Wisconsin, Texas, and Oklahoma,[10] particularly in light of the unique circumstances that appear to be attendant to each property. The Disclosure Statement must be amended to include disclosures regarding the following matters involving the Debtors' mining facilities:

- **Wisconsin**:  The Disclosure Statement must explain: (i) the Debtors' plans for the five Wisconsin sites that are currently idle; (ii) the value of each Wisconsin sites; (iii) the details of the Debtors' new railcar leases and the necessity of the same for the Debtors' operations of the Wisconsin sites; (iv) any efforts undertaken by the Debtors to market the Wisconsin sites; and (v) how the Wisconsin sites fit into the Debtors' go-forward business plan, particularly in light of the continuing depression in the NWS market.

---

[10] The Debtors do not even reference in the Disclosure Statement that they own an incomplete mine in Oklahoma that was purchased just over a year prior to the Petition Date and on which construction has ceased despite the Debtors having already incurred $15.2 million of expenses related to the construction of a 1.5 million-ton sand facility.  *See* First Day Declaration ¶ 29, fn. 8.

- **San Antonio, Texas**: The Disclosure Statement must explain: (i) the Debtors' go-forward plans for the facility; (ii) the estimated reopening date of mines A-C; (iii) an analysis of the potential recovery on any insurance claims filed related to the levee breach and the damages incurred (both property and business interruption) by the Debtors as a consequence of the levee breach; (iv) what were the "certain complications" at the San Antonio facility that resulted in the facility producing below its nameplate capacity; (v) whether such complications are capable of being rectified and if so, at what cost; (vi) what the long-term impact of the complications will be on the San Antonio facility; (vii) what the long-term impact of the levee breach will be on the San Antonino facility; (viii) whether any potential causes of action exist against, among others, any contractors or other third parties that worked at the site; and (ix) what the competitive pricing and profit forecast is for the facility when fully operational.

- **Kingfisher, Oklahoma**:  Although the Disclosure Statement references that the Debtors pursued in-basin facilities in Texas and Oklahoma, the Disclosure Statement fails to reveal that the Debtors did purchase a mine site in Kingfisher, Oklahoma in May 2018, began construction of a 1.5 million-ton sand facility thereon, and discontinued work at the site in January 2019 after incurring approximately $15.2 million in expenses, $7.3 million of which remains unpaid.  First Day Declaration ¶ 29, fn. 8.  In light of the foregoing, the Disclosure Statement must (i) describe the Debtors' go-forward plans for the Oklahoma site; (ii) explain whether the Debtors have attempted to market the site; (iii) include the value of the Debtors' interest in the site; (iv) contain an estimate of the costs that would be associated with completing construction on the facility; (v) describe the reasoning behind the purchase of the property and subsequent cessation of construction less than a year after the purchase; and (vi) provide an independent valuation of the property.

28.     Without these additional disclosures, creditors cannot properly assess the Debtors' ability to continue profitable operations at its mining facilities, including how the Debtors will overcome the setbacks and recover damages suffered due to flooding at the San Antonio facility. Nor can creditors properly assess the proposed business plan or the value of the equity interests and warrants that they are being offered under to the Plan without disclosure of this fundamental information.

**D.      Inadequate Disclosures to Appropriately Assess Valuation and Feasibility**

29.      The Disclosure Statement, as originally filed, did not include the Financial Projections, Liquidation Analysis, Historical Financial Statements, or Valuation Analysis, each of which were to be attached to the Disclosure Statement as Exhibits C – F, respectively.[11]   The Disclosure Statement also fails to include adequate disclosure of, among other things, (i) the New Warrants; (ii) the Exit Facility Loan Documents or the loan terms; (iii) the New Second Lien Notes Agreement; and (iv) the New Management Incentive Program.   Without this information, an unsecured creditor cannot make an educated, informed decision as to whether it should vote for or against the Plan.   The Debtors may attempt to downplay their failure to timely include these material documents and information by indicating that such information will be provided to creditors in a late-filed Plan Supplement.   However, this type of critical information must be disclosed to creditors now, and if creditors cannot meaningfully review it prior to voting, then for purposes of section 1125 of the Bankruptcy Code, it should be deemed as if it were never provided.

30.      Moreover, the Debtors are scheduled to deplete the new-money component of the DIP Financing within eighteen (18) weeks of the Petition Date.   Continued liquidity for these Debtors is critical, and the present lack of disclosure surrounding the Exit Facility and its timing certainly raise post-emergence liquidity and feasibility concerns.   In addition, the Plan provides that the Prepetition Noteholders will receive New Second Lien Notes to be issued in an amount of "$150 million less the Aggregate Outstanding Revolving Loan Amount, ***or such other amount that is acceptable to the [Special Restructuring] Committee and Majority Noteholders***."   RSA, Term Sheet, Exhibit 1 (emphasis added).   The final amount of the New

---

[11] Although the Debtors filed the Financial Projections, Liquidation Analysis and Valuation Analysis on the same day as the original Disclosure Statement Motion objection deadline, the Disclosure Statement still fails to include the Historical Financial Statements.

Second Lien Notes has yet to be disclosed.  In fact, the Financial Projections imply that there may be no New Second Lien Notes post-Effective Date; yet, in various other places in the Disclosure Statement, the New Second Lien Notes are referenced, including in the description of the treatment of Class 5.  *See* Disclosure Statement § V.B.2(e) and Exhibit C.  As such, creditors are only left to guess as to the total secured debt that will saddle the Reorganized Debtors post-emergence, how much liquidity is needed to service that debt and run a profitable Company, and how that debt impacts the value of the equity currently proposed to be distributed to General Unsecured Creditors (if that Class votes in favor of the Plan).

31.    The Valuation Analysis attached to the Disclosure Statement provides a woefully insufficient amount of detail with respect to the actual analyses performed by Houlihan Lokey Capital, Inc., the Debtors' financial advisor and investment banker.  The deficiencies include, among others, the following: (i) the total enterprise value ("TEV") was allegedly estimated by "primarily relying on two generally accepted valuation techniques."  The Valuation Analysis provides no disclosure as to the level of reliance on these two methodologies (individually or in the aggregate), nor any disclosure as to the other analyses utilized in arriving at  TEV; (ii) with respect the Discounted Cash Flow Analysis ("DCF") and Comparable Company Analysis employed, there is a lack of detail as to the assumptions used by Houlihan Lokey or any detail as to how the TEV was arrived at by Houlihan Lokey including the weighting ascribed to either methodology employed.  Specifically, the Disclosure Statement does not detail key assumptions in the DCF including cost of debt, cost of equity or the weighted average cost of capital, among others nor does it detail the comparable companies that were utilized, the multiples that were selected or the Company's EBITDA over the projection period to which the multiples were applied in connection with the comparable companies analysis; and (iii) with respect to the

Concluded Range outlined, the Disclosure Statement does not detail the adjustments made to TEV to arrive at its total equity value estimate. The deficiencies in the disclosures regarding valuation must be rectified by the Debtors.

32.     Additionally, the Disclosure Statement does not make clear how much secured debt and preferred stock will be ahead of the equity interests potentially distributed to unsecured creditors post-emergence.  The Disclosure Statement also fails to include or explain the terms of the Perpetual Preferred Interests.  Such information must be provided in a clear and concise fashion for unsecured creditors.  This lack of disclosure, among other things, prevents creditors from assessing the substance and feasibility of the Plan.  Indeed, it is well settled that the Debtors must provide sufficient information in the Disclosure Statement to allow creditors to assess for themselves whether the proposed plan is feasible.  *See, e.g., In re Ferretti*, 128 B.R. at 21 (where debtor's disclosure statement stated that based on experience the debtor believed the plan was feasible, the court held, "[t]his is totally inadequate for any unsecured creditor to vote on this plan").  *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (affirming bankruptcy court's decision to decline to approve disclosure statement due to the highly speculative, contingent funding of the plan).  Therefore, without adequate information concerning the Valuation Analysis, Liquidation Analysis, the Exit Facility, and the other items enumerated above, nor sufficient time to analyze those documents filed yesterday, the feasibility of the Plan is called into significant question.

**E.      Inadequate Disclosures Regarding Proposed Releases**

33.     The Debtors intend to release the Revolving Loan Lenders and the Prepetition Noteholders (collectively, the "Prepetition Secured Parties"), the Debtors' current and former directors and officers, Insight Equity and a litany of other third parties from any and all claims by

way of the pre-negotiated Plan.  Unsurprisingly, the Disclosure Statement fails to include any substantive discussion regarding the consideration that the Released Parties are providing in exchange for their broad sweeping releases.  Rather, the Plan states that entry of the Confirmation Order shall constitute the Bankruptcy Court's finding that the releases are "in exchange for the good and valuable consideration provided by the Released Parties."  Plan § X.B.1 - 2.[12]

34.     Courts have held that contributions are a core component of the determination of whether to approve releases of non-debtor parties. *See, e.g.*, *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 215 (3d Cir. 2000).  As such, the Committee requests that the Disclosure Statement include a detailed analysis as to why the Released Parties should be entitled to the generous releases that are currently proposed in the Plan and whether any independent director of the Debtors conducted any investigation as to the propriety of the releases in connection with both the RSA and the Plan.

35.     In addition to exceeding the scope of applicable law, the Committee has significant concerns regarding certain release terms set forth in the RSA, none of which are disclosed or explained to unsecured creditors.  The Disclosure Statement provides that the Debtors will request that the Court approve the release and exculpation provisions in the Plan. However, the RSA provides that if the Court does not approve the release and exculpation provisions set forth in the Term Sheet attached to the RSA, then HPS, as the controlling owner post-Effective Date, will cause the Reorganized Debtors to agree to provide such releases and exculpation "as promptly as reasonably possible after the occurrence of the Effective Date."  *See*

---

[12] Even if these informational deficiencies regarding the proposed releases were cured, the Committee believes that the Disclosure Statement Motion should be denied because the releases are legally flawed and render the Plan patently unconfirmable, as discussed in Section II.A below.

RSA ¶ 5(b).  Unsurprisingly, this inappropriate, attempted post-Effective Date release by the Reorganized Debtors is not mentioned in the Disclosure Statement.

### F.    Additional Disclosures are Required Prior to Solicitation

36.    In addition to the infirmities identified above, the Committee believes the following additional disclosures are required:

- **Global Settlement**: The Disclosure Statement briefly describes the "Global Settlement," which allegedly "compromise[s] and settle[s] various potential Claims and Causes of Action of the parties to the [RSA]."  *See* Disclosure Statement § IV.D.1.  The Debtors characterize the Global Settlement as the "cornerstone of the Plan and necessary to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest."  *Id.*  The Global Settlement appears to simply be the Majority Noteholders' agreement to "carve-out" the proposed Class 6 distribution of 5% of the New Limited Partnership Interests and New Warrants for 15% of the equity of the Reorganized Debtors from their "collateral."  *Id.*  The Disclosure Statement fails to disclose (i) what Claims and Causes of Action are allegedly being settled, the bases and value of the same, and the identities of the entities that hold such Claims and Causes of Action; (ii) why the Global Settlement is necessary to the Plan; (iii) whether the Global Settlement is an attempt to circumvent any opt-out provisions to the Third Party Releases; (iv) the value of the Global Settlement Fund; (v) what consideration and value are being provided by HPS and each of the other parties to the RSA to creditors to support the Global Settlement; (vi) whether creditors can opt-out of the Global Settlement; and (vii) whether the Plan cannot be confirmed or will be withdrawn if the Global Settlement is not approved and Class 6 votes against the Plan.  The overt failure of disclosure surrounding the Global Settlement, *the "cornerstone" of the Plan*, and its precise terms and the necessity for the same disqualifies the Disclosure Statement from approval.

- **Strategic Alternatives**: The Disclosure Statement explains that the Debtors entered into forbearance agreements with the Prepetition Credit Agreement Lenders and the Prepetition Noteholders beginning on December 31, 2018 in order to allow time for the Debtors to explore various strategic alternatives.  Disclosure Statement § II.D.2.  Shortly thereafter, the Debtors hired Ankura and the CRO and assert that the CRO "worked with senior management to develop and evaluate business plans and/or strategic restructuring alternatives."  Disclosure Statement § II.D.2.  Yet, such strategic alternatives are not set forth in the Disclosure Statement, nor is there an explanation of why the proposed restructuring is the best path forward for the Debtors.  The Debtors should be required to amend the Disclosure Statement to describe the strategic alternatives and explain why such alternatives were rejected in favor of the RSA and the Plan.

- **Fiduciary Out**:  The RSA provides that the Debtors have a "fiduciary out" from the transactions contemplated by the RSA.  *However*, such fiduciary out can be exercised "solely at the discretion of, and with the consent of, the Special Restructuring

Committee." RSA at § 5(c). The delegation of the right to control the Debtors' exercise of the fiduciary out to the Special Restructuring Committee renders the fiduciary out purely illusory. The Committee is hard pressed to imagine a scenario under which the Special Restructuring Committee, which was created pursuant to the RSA and whose members were hand-picked by HPS, would permit the Debtors to exercise the fiduciary out and proceed with a reorganization that was against the wishes of HPS. The fiduciary out itself and the apparent conflict of interest of the Special Restructuring Committee empowered to permit its exercise or not should be explained and disclosed.

- **Private vs. Public Company Post-Emergence**: The RSA contemplates a "Reorganized Public Company" emerging from the Chapter 11 Cases and contains undertakings to register the Plan Securities and list such equity interests on a nationally recognized exchange. *See* Appendix 1 to the RSA Term Sheet [D.I. 14]. However, the Plan and Disclosure Statement provide for a non-SEC reporting company emerging from the Chapter 11 Cases with no undertakings to register the Plan Securities or to list such Equity Interests on a nationally recognized exchanges. *See* Disclosure Statement § IV.D.7 and VI.B.3. One of the risk factors listed in the Disclosure Statement warns that there may not be an active trading market for the Plan Securities and that it is expected that the Reorganized Debtors will not be required to file reports with the SEC or otherwise provide financial or other information to the public, which would further impair liquidity of the Plan Securities. The Debtors should provide disclosure confirming this change of direction and whether such change was made as a result of a decision made by the Special Restructuring Committee, whose members, on a post-petition basis, are fiduciaries of the Debtors' estates.

37.    In light of the significant issues raised above that remain undisclosed in the Disclosure Statement, the Committee respectfully submits that the Disclosure Statement Motion cannot be granted at this juncture absent significant revision to the Disclosure Statement.

## II.    THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PLAN IT DESCRIBES IS PATENTLY UNCONFIRMABLE

38.    Courts routinely hold that, if a plan is not confirmable as a matter of law, the related disclosure statement should not be approved. *See, e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d at 154 (3d Cir. 2012) ("Courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."); *In re Quigley Co., Inc.*, 377 B.R. 110, 115–16

(Bankr. S.D.N.Y. 2007) (stating that if a plan is "patently unconfirmable on its face" then solicitation of votes on the plan would be futile); *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000) ("It is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed."). The debtor must show that "a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed." *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.,* 987 F.2d 154, 157 (3d Cir. 1993).

39.    A plan is considered "patently unconfirmable" if (i) confirmation defects cannot be overcome by creditor voting results and (ii) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing. *In re Am. Capital Equip.*, 688 F.3d at 154–55 (citing *In re Monroe Well Serv. Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)). In such circumstances, the related disclosure statement may not be approved. To do otherwise would be to impose upon a debtor's estate the costs and expenses associated with an unnecessary solicitation and allow the debtor to waste further the time and resources of its creditors and this Court. *See In re Valrico Square Ltd. P'ship,* 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").

### A.    The Releases Contained in the Plan are Impermissible

40.    It is troubling to say the least that the Board abdicated its fiduciary duties to the Special Restructuring Committee and kowtowed to HPS to propose a deeply flawed Plan that enriches HPS and Insight Equity with, among other things, valuable releases. Article X of the Plan provides for broad releases of various non-Debtor parties (each, a "Released Party" and,

collectively, the "Released Parties")[13] in these Chapter 11 Cases, including HPS and Insight Equity. Section X.B.1 of the Plan (the "Debtor Releases") provides that the Debtors and their Estates will release  the Released Parties from "any and all Claims, Causes of Action . . . whether directly or derivatively held . . . ," while Section X.B.2 (the "Third Party Releases" and, together with the Debtor Releases, the "Releases") provides that an extensive list of third parties (the "Releasing Parties")[14] will release the Released Parties from the same. *See* Plan §§ X.B.1 - 2. Just a few months ago, in a case involving the owner of several nuclear and coal plants and billions of dollars in debt, the Bankruptcy Court for the Northern District of Ohio denied approval of a disclosure statement because the plan releases associated therewith rendered the plan unconfirmable.  *See In re First Energy Solutions Corp.,* No 18-50757, Docket No. 2500 (Bankr. N.D. Ohio Apr. 11, 2019).  The Court should do the same here.

---

[13] "Released Party" is defined in the Plan as, collectively,(a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Credit Agreement Agent and the Releasing Prepetition Credit Agreement Lenders; (e) the DIP Credit Agreement Agent and the DIP Credit Agreement Lenders; (f) the Prepetition Notes Agent and the Releasing Prepetition Noteholders; (g) the Releasing Old Emerge LP Equity Holders, and in each case the respective Related Persons of each of the foregoing Entities." *See* Plan § I.C.

"Related Persons" is defined in the Plan as, "with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the date of the Restructuring Support Agreement, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor shall constitute a Related Person." *Id.*

[14] "Releasing Parties" is defined in the Plan to include (a) the Debtors; (b) the Reorganized Debtors, (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Credit Agreement Agent and the Releasing Prepetition Credit Agreement Lenders; (e) the DIP Credit Agreement Agent and the DIP Credit Agreement Lenders; (f) the Prepetition Notes Agent and the Releasing Prepetition Noteholders; (g) the Releasing Old Emerge LP Equity Holders; (h) those Holders of General Unsecured Claims or Old Emerge LP Equity Interests that do not affirmatively opt out of the Third Party Release as provided on their respective ballots.  Plan. § I.C.

### i.      The Debtor Releases are Impermissible

41.      The Debtor Releases are impermissible.    Accordingly, the Plan cannot be confirmed until the Debtor Releases are removed or substantially modified.   In determining whether to approve a debtor's release of non-debtors in a chapter 11 plan, courts have applied the following factors:

1) whether there is an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;

2) whether there is a substantial contribution to the plan by the non-debtor;

3) the necessity of the release to the reorganization;

4) whether there is an overwhelming acceptance of the plan and release by creditors and interest holders; and

5) whether the plan provides for payment of all or substantially all of the claims of creditors and interest holders.

*In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (applying the same five-factor test).

42.      The Debtor Releases contained in the Plan do not meet any of these factors.  For example, there is no evidence that there is an identity of interest between the Debtors and the Released Parties such that a suit against any of the Released Parties will deplete the estates' resources.  The Released Parties consist primarily of the Debtors' current and former officers and directors, the Prepetition Secured Parties, and Insight Equity.  It is dubious that a suit against the Debtors' officers and directors or general partner in connection with the abdication of their fiduciary duties to the HPS-selected Special Restructuring Committee or their lenders would deplete estate resources in any way, particularly given that the Debtors have in excess of $70 million in directors and officers insurance coverage.

43.    The Disclosure Statement also does not contain any analysis as to why the releases are essential to the reorganization and/or how the Released Parties (except the Committee) have made a substantial contribution to support the Debtor Releases (the lack of such disclosure leads to the inescapable conclusion that such a showing cannot be made).  *See United Artists Theater Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (holding that releases must be given in exchange for fair consideration).[15]  With respect to the proposed releases for current and former directors and officers, not only did such parties fail to provide any discernable contribution to warrant the broad releases contained in the Plan, but certain of those directors and officers may be rewarded by the New Management Incentive Plan.  *See In re Aegean Marine Petroleum Network, Inc.,* 2019 WL 1527968, at *9 (Bankr. S.D.N.Y. Apr. 8, 2019) (Wiles, J.) ("I am sure that [the officers and directors of non-bankrupt companies] would also like to dispose of potential litigation claims against them as a reward for the work that they have done.  But that is not recognized as a ground on which to terminate litigation claims outside of bankruptcy.  There is no reason why it should constitute an excuse to terminate litigation claims just because a company is emerging from bankruptcy. . . the directors did what they were paid to do, and that does not mean they are entitled to releases of third-party claims, particularly when those releases really are not necessary or important to the accomplishment of the restructuring transactions.");  *See In re Boomerang Tube, LLC*, No. 15-11247-MFW (Bankr D. Del. Nov. 9, 2015), H'rg Tr. at

---

[15] The Debtors propose to release the current *and former* directors and officers of each of the Released Parties.  The Committee is hard pressed to think of *any* contribution that former directors and officers of the Released Parties made to the reorganization efforts in these Chapter 11 Cases.  That is because there are no such contributions.  Moreover, the Debtors' current directors and officers delegated to the Special Restructuring Committee all of the Board's power to, among other things, (i) implement the RSA, (ii) approve and authorize any actions contemplated to be taken by the Debtors in connection with the RSA, (iii) oversee discussions with the Debtors' key stakeholders regarding the transactions set forth in the RSA, (iv) manage the Debtors' day-to-day cash management in furtherance of the RSA, (v) manage and direct the CRO, who in turn may, among other things, (a) direct the Debtors' day-to-day book keeping, collections, disbursements, liquidity and reporting obligations, (b) coordinate and manage any asset divestitures, (c) develop a business plan, (d) direct and manage the Debtors' professionals, and (e) perform any other services and activities as directed by the Special Restructuring Committee.  *See* RSA Term Sheet [D.I. 14].  It is unclear, based upon the substantial power delegated to the Special Restructuring Committee, what, if any, contribution current directors and officers are making to the Debtors.

9:16–9:19 ("The Court concludes that simply negotiating a plan is not a sufficient substantial contribution by a director and officer, such as to warrant a release.").

44.    Perhaps the most troubling of all of the Debtor Releases is the proposed release of Insight Equity.  The Debtors fail to explain why Insight Equity, which wholly owns the general partner, Emerge Energy Services GP LLC, should receive a Debtor Release or Third Party Release (let alone a distribution under the Plan).  With respect to the Debtor Release, Insight Equity cannot be said to have made a substantial contribution to the Debtors and these Chapter 11 Cases.  Insight Equity has agreed to the abdication of the Board's powers to the Special Restructuring Committee in order to complete the transactions contemplated under the RSA, including the distribution of the Debtors' equity to HPS.  What benefit has Insight Equity provided to any stakeholder in these Chapter 11 Cases, besides to HPS and itself?  The provision of a potential distribution to Insight Equity (through Class 9) and sweeping releases raises significant concerns regarding the Board's and/or Special Restructuring Committee's agreement to such terms.  Such benefits for Insight Equity may reflect an inappropriate deal reached between Insight Equity and HPS that allowed HPS to improperly control these Debtors and own the Reorganized Debtors while throwing Insight Equity a bone in the form of the release and proposed distribution.

45.    With respect to the releases for HPS, any "contribution" to these Chapter 11 cases cannot be said to be a contribution at all.  Rather, any "contribution" by HPS to the Debtors is more akin to a calculated investment.  Although HPS is funding these Chapter 11 Cases through the DIP financing, it is doing so to achieve its ultimate goal of ownership of the Debtors, while receiving millions of dollars in fees related to the DIP Facility, payment of all of its legal fees, a creeping roll-up of the Revolving Loan, and interest on the Revolving Loan.  Against this

backdrop, HPS cannot be said to be making a "substantial contribution" in exchange for the broad Debtor Releases.

46.     Put simply, there are no facts present here to warrant the proposed Debtor Releases in favor of the Released Parties and the Disclosure Statement fails to articulate any justifications in support of same.

### ii.    The Third Party Releases are Impermissible

47.     Although the Third Circuit has not adopted a *per se* rule that nonconsensual third-party releases are impermissible, it has made clear that such releases are proper only in extraordinary cases.  *In re Cont'l Airlines*, 203 F.3d at 212 (concluding that third-party releases are valid only in "extraordinary" circumstances);  *see also In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 608 (Bankr. D. Del. 2001) (interpreting *Continental's* holding on non-debtor releases to mean that, "limiting the liability of non-debtor parties is a *rare thing that should not be considered absent a showing of exception circumstances* in which several key factors are present") (emphasis added).  Recently, the Bankruptcy Court for the Southern District of New York reiterated "just how extraordinary a thing it is" to impose involuntary releases, noting that bankruptcy courts "should do so only in those extraordinary cases where a particular release is essential and integral to the reorganization itself."  *In re Aegean Marine Petroleum Network, Inc.*, 2019 WL 1527968, at *7-8 ("Getting a release may be a comfort the parties would like to have, but releases are not supposed to be imposed involuntarily just to make people feel better."). These Chapter 11 Cases are not reflective of such rare or extraordinary cases.

48.     Section X.B.1 of the Plan provides third party releases of the Debtors, the Prepetition Secured Parties, Insight Equity and other third parties.  The effect of the third-party releases is to improperly insulate not only the Debtors, but the Prepetition Secured Parties and Insight Equity from any and all prepetition causes of action, which is the subject of ongoing

discovery and investigation by the Committee. *See* fn. 3, *supra*.  The Disclosure Statement should contain information explaining why the third-party releases in the Plan are in compliance with the law and present rare and unique circumstances under the facts of this case such that the releases are likely to be approved by the Court.  *See In re Motors Liquidation Co.*, 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Although (since the Code is silent on the matter) third-party releases aren't 'inconsistent with the applicable provisions of this title,' the Second Circuit has ruled that they're permissible only in rare cases, with appropriate consent or under circumstances that can be regarded as unique . . . . But when those circumstances haven't been shown, third-party releases can't be found to be 'appropriate.'") (citations omitted).  The Debtors' and the Prepetition Secured Parties' demand for Third Party Releases here turn important provisions of the Bankruptcy Code and well settled case law on their head all to further the agenda of HPS and a small set of insiders.  Such efforts are offensive from the standpoint of unsecured creditors and warrant denial of the Disclosure Statement as they render the Plan patently unconfirmable.

### B.    The Exculpation Provision in the Plan Exceeds the Scope of Section 1125(e) of the Bankruptcy Code and Renders the Plan Unconfirmable

49.    Section X.E of the Plan provides that the Released Parties will be exculpated from liability for, in relevant part:

> any claims, Causes of Action or Released and Settled Claim arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan

Plan § X.E.

50.     The Plan's exculpation provision is inconsistent with applicable law in this District because it includes parties other than the estate fiduciaries.  *See In re Indianapolis Downs, LLC*, 486 B.R. at 306 ("The Exculpations under the Plan as modified and filed with the Court are limited so as to apply only to estate fiduciaries. The Third Circuit has held that 'a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence.'") (citations omitted); *see also In re Wash. Mut., Inc.*, 442 B.R. at 350-51 (limiting exculpation clause to estate fiduciaries who have served during the chapter 11 proceeding: estate professionals, the committee and their members, and the debtors' directors and officers); *In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (same); *In re PTL Holdings LLC*, 2011 WL 5509031 at *11-12 (Bankr. D. Del. 2011) (BLS) (holding exculpation "must be reeled in to include only those parties who have acted as estate fiduciaries and their professionals.").  Thus, unless all entities or persons that are not estate fiduciaries are removed from the exculpation provision, the exculpation provision in the Plan violates the Bankruptcy Code, and the Plan cannot be confirmed.

51.     For these reasons, the Plan is patently unconfirmable unless the exculpation provision is revised consistent with applicable law. Accordingly, the Court should deny the Disclosure Statement Motion unless the exculpation provision is appropriately modified. [16]

---

[16] The Committee reserves all of its rights to raise any and all objections to confirmation, including the impropriety of the "death trap" treatment of General Unsecured Creditors, violations of the absolute priority rule in connection with the proposed distributions to old equity holders, failure of the best interests test, and the inability to meet the feasibility standards due to the deficient Valuation Analysis and Financial Projections.

### III.   THE DEBTORS SHOULD INCLUDE A LETTER FROM THE COMMITTEE IN THE SOLICITATION PACKAGES

52.    Should the Disclosure Statement be approved, the Debtors should be required to include a solicitation letter from the Committee in the solicitation package.   A copy of the Committee's letter (subject to revisions that may be made prior to or at the hearing on the Disclosure Statement Motion) is attached to this Objection as **Exhibit A.**   The Committee submits that including the attached letter is necessary and appropriate. *See*, *e.g.*, *In re VER Technologies Holdco LLC*, No. 18-10834 (KG) (Bankr. D. Del. 2018) [D.I. 415] (allowing inclusion of Committee letter by agreement among parties); *In re Boomerang Tube, LLC*, No. 15-11247, Hr'g Tr. at 5:17-20 (same); *In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Nov. 25, 2013), D.I. 778 (approving inclusion of letter from the official committee of unsecured creditors urging creditors to vote against plan in solicitation package); *In re Capitol Bancorp Ltd.*, No. 12-59409 (Bankr E.D. Mich. June 27, 2013), D.I. 489 (same); Tr. Of Proceedings held Dec. 17, 2008 at 44:7–46:21, *In re Motor Coach Indus., Inc*., No. 08-12136 (Bankr. D. Del. 2008) (allowing creditors' committee to include in solicitation package a letter outlining the committee's issues with the proposed plan).[17]

### CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court enter an order: (i) denying the Disclosure Statement Motion or, in the alternative, requiring the Debtors to amend the Disclosure Statement, and provide sufficient time for creditors to review the newly revised disclosure statement prior to the hearing to approve the same, so as to address the issues and concerns raised in this Objection; and (ii) granting such other and further relief as the Court deems just and proper.

---

[17] The Debtors have agreed to include a statement of position from the Committee in the Solicitation Package, but only "if reasonably acceptable to the Debtors in form and content."  *See* Motion ¶ 36(vi).

Dated: August 30, 2019
Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

 _/s/ Aaron H. Stulman_
Jeremy W. Ryan (DE Bar No. 4057)
Christopher M. Samis (DE Bar No. 4909)
L. Katherine Good (DE Bar No. 5101)
Aaron H. Stulman (DE Bar No. 5807)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: jryan@potteranderson.com
        csamis@potteranderson.com
        kgood@potteranderson.com
        astulman@potteranderson.com

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd C. Meyers (admitted _pro hac vice_)
David M. Posner (admitted _pro hac vice_)
Kelly Moynihan (admitted _pro hac vice_)
The Grace Building
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: tmeyers@kilpatricktownsend.com
        dposner@kilpatricktownsend.com
        kmoynihan@kilpatricktownsend.com

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Lenard M. Parkins (admitted _pro hac vice_)
700 Louisiana Street, Suite 4300
Houston, TX 77002
Telephone: (281) 809-4100
Facsimile: (281) 929-0797
Email: lparkins@kilpatricktownsend.com

_Proposed Counsel to the Official Committee of Unsecured_
_Creditors of Emerge Energy Services LP, et al._