**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

|  |  |
|---|---|
| | : Chapter 11 |
| | : |
| In re: | : Case No. 19-11563 (KBO) |
| | : (Jointly Administered) |
| EMERGE ENERGY SERVICES LP, *et al.*, | : |
| | : **Hearing Date:** October 24, 2019 at 1 p.m. |
| Debtors. | : **Objection Deadline**: October 11, 2019 |
| | : at 4 p.m., extended for U.S. Trustee until |
| | : October 16, 2019 at 11:59 p.m. |
| | : |
| | : **Re:  Docket No. 362** |

---------------------------------------------------------- x

**OBJECTION OF THE UNITED STATES TRUSTEE TO CONFIRMATION
OF DEBTORS'  FIRST AMENDED JOINT PLAN OF REORGANIZATION
FOR EMERGE ENERGY SERVICES LP AND ITS AFFILIATED DEBTORS
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Andrew R. Vara, the Acting United States Trustee for Region 3 ("U.S. Trustee"), by and through his undersigned attorney, hereby submits this Objection to the Confirmation of the Debtors' First Amended Joint Plan of Reorganization for Emerge Energy Services LP and its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code (Dkt. 362) (the "Plan"), and in support of that Objection states as follows:

**I. PRELIMINARY STATEMENT**

1.      The Debtors have proposed a plan whereby the shareholders of the lead Debtor, which is a public company, are to receive no distribution under the Plan, have no right to vote on the Plan, and are deemed to reject the same.  Despite such treatment, the Debtors seek approval to deem all such public shareholders to have consented to providing third party releases to non-debtor parties unless such shareholders return a form opting out of such releases by the voting

deadline.

2.      This Court, in *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del.

2011),  ruled that "any third party release is effective only with respect to those who

*affirmatively consent* to it by voting in favor of the Plan and not opting out of the third party

releases."  *Id.* at 355 (emphasis added).  The Court clarified that an "opt out mechanism is not

sufficient to support the third party releases . . . particularly with respect to parties who do not

return a ballot (*or are not entitled to vote in the first place*).  Failing to return a ballot is not a

sufficient manifestation of consent to a third party release." *Id.* (emphasis added), citing *In re

Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999).[1]

3.      Although some decisions issued by this Court have not required affirmative

consent to third party releases to be provided by certain constituencies, there is no written

decision from this Court that has allowed members of a class *deemed to reject* a plan to be

treated as consenting to third party releases unless they return an opt-out form.

4.      Requiring affirmative consent for the public shareholders in these cases is

important for two reasons.  First, the shareholders are not receiving any distribution under the

Plan, and therefore no consideration for giving any releases.  Second, requiring an affirmative

expression of consent helps to ensure there is true consent, rather than consent assumed by

silence, which could be caused by factors such as the opt-out notice being wrongly addressed or

---

[1]      On October 16, 2019, in *Orchid Paper Products Co.,* Case No. 19-10792 (MFW), Judge Warlath
reiterated her ruling in *Washington Mutual* that for third party releases to be consensual there
must be some affirmative action required by the party giving consent, such as an opt-*in*
procedure, rather than an opt-out.  The Judge applied this standard to both the public
shareholders, who were deemed to reject the plan, and to general unsecured creditors, who had
the right to vote on the plan.

misdelivered, or other mail failures or delays.

5. The risk of mail errors should be borne by the beneficiaries of the releases, not by the Debtors' public shareholders. That is especially true here, where much of the stock of the Debtors is likely held in street name, and therefore the Debtors will not have mailed opt-out forms directly to most of the beneficial stockholders. Rather, the Debtors will have served the opt-out forms on brokers, and expected the brokers to pass such forms along to the beneficial stockholders. The Debtors have no control over the brokers, and therefore there will be no way to know whether any particular beneficial stockholder actually received notice of their right to opt-out of the release.

6. The U.S. Trustee also objects to deeming consent from those holders of general unsecured claims who do not return a ballot. Like the shareholders, silence from a creditor could simply mean the solicitation package never reached them. Also like the public shareholders, the general unsecured creditors will receive *no distribution* under the Plan, and therefore no consideration for any release, if the class votes to reject the Plan. Even if the class votes to accept the Plan, the distribution they will receive is been estimated by the Debtors to be de minimis -- between less than one-half of one percent to a maximum of 1.3% of their Allowed Claims. *See* Disclosure Statement, Dkt. 363, p. viii.

7. The U.S. Trustee objects to the Exculpation Clause of the Plan because it exculpates many persons and entities that are not fiduciaries of the estate. The exculpation also is not limited to actions or inactions taking place during the bankruptcy cases, as required by applicable law.

8. The U.S. Trustee further objects to a number of other Plan provisions, which are specified below.

9.     For the reasons set forth herein, the Plan should not be confirmed.

## II. JURISDICTION

10.     Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine this objection.

11.     Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District.  Such oversight is part of the U. S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts.  *See United States Trustee v. Columbia Gas Systems, Inc.* (*In re Columbia Gas Systems, Inc.*)*,* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc.* (*In re Revco D.S., Inc.*), 898 F.2d 498, 500 (6th Cir. 1990) (describing the "U.S. Trustee as a "watchdog").

12.     Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment such plans and disclosure statements.

13.     Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this objection.

## III. FACTS

14.     The Debtor Emerge Energy Services LP ("Emerge LP") is a publicly traded entity.

15.     On July 15, 2019, (the "Petition Date"), the Debtors commenced these chapter 11 cases.

16.     On July 30, 2019, the U.S. Trustee appointed an Official Committee of Unsecured Creditors.  *See* Dkt. No. 111.

17.     On September 5, 2019, the Debtors filed a revised Plan and Disclosure Statement. *See* Dkt. Nos. 324 and 325.  On September 10, 2019, the Debtors filed a further amended Disclosure Statement. *See* Dkt. No. 350.

18.     On September 11, 2019, the Court entered the Order (I) Approving The Disclosure Statement, (II) Establishing The Voting Record Date, Voting Deadline And Other Dates, (III) Approving Procedures For Soliciting, Receiving And Tabulating Votes On The Plan And For Filing Objections To The Plan, (IV) Approving The Manner And Forms Of Notice And Other Related Documents, (V) Approving Procedures For Assumption Of Contracts And Leases And Form And Manner Of Assumption Notice, And (VII) Granting Related Relief.  *See* Dkt. No. 361.

19.     Also on September 11, 2019, the Debtors filed what appear to be the solicitation version of the Plan and Disclosure Statement, at Dkt. Nos. 362 and 363.

20.     The Debtors' Plan provides for two voting class, Class 5, consisting of holders of prepetition note claims, and Class 6, consisting of holders of general unsecured claims.   The Plan also includes certain classes that are unimpaired, and are therefore presumed to accept the Plan.

21.     Two classes under the Plan are deemed to reject, Class 8, consisting of the holders of equity interests in the Debtor Emerge Energy Services GP LLC, and Class 9, consisting of the holders of equity interests in the public Debtor, Emerge LP.

22.     Although the public shareholders of Emerge LP had no right to vote on the Plan, the Debtors' solicitation procedures proposed serving them with a form whereby they could opt-

out of giving third party release to non-debtors.  With respect to the voting classes, the ballot

permitted any creditor (other than one who was a signatory to the Restructuring Support

Agreement) to opt-out of giving third party releases, whether the creditor voted to accept or

reject the plan.  The ballot further provided that any creditor in a voting class who does not vote

on the Plan must return the ballot with the op-out box checked to avoid being deemed to give

third party releases.  *See* Disclosure Statement Order, Dkt. No 361, Ex. 3-B (form of ballot for

Class 6).

23.    At the hearing held before this Court on September 9, 2019, concerning approval

of the Disclosure Statement and solicitation procedures, the Securities and Exchange

Commission argued against the use of an opt-out form for the public shareholders.  The U.S.

Trustee reserved the right to object to the same in connection with confirmation of the Plan.  The

Court ruled that objections to the scope of third party releases would be addressed at

confirmation.

24.    Set forth below are certain of the provisions of the Plan that are relevant to the

third party releases and to the exculpation provision included in the Plan.  Other provisions of the

Plan to which the U.S. Trustee objects are included in Point IV of this Objection (Law and

Analysis).

25.    The **Third Party Release** provision is set forth in Art. X.B (2) of the Plan (the

"Third Party Releases"), and provides in pertinent part as follows:

> *Release By Third Parties*.  Except as otherwise expressly provided in this Plan,
> effective as of the Effective Date, to the fullest extent permitted by applicable
> law, ***for good and valuable consideration provided by each of the Released
> Parties,*** the adequacy and sufficiency of which is hereby confirmed, and without
> limiting or otherwise modifying the scope of the Debtor Release provided by the
> Debtor Releasing Parties above, each Non-Debtor Releasing Party (together with
> the Debtor Releasing Parties, the "Releasing Parties") will be deemed to have

conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "Third Party Release") from any and all claims, Causes of Action, Released and Settled Claims, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date *arising from or related in any way in whole or in part to any of the Debtors,* including, without limitation, (i) the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; provided, however, that the foregoing provisions of this Third Party Release shall not operate to waive or release (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (ii) any Causes of Action relating to the MSHA Action (other than against a member of the Special Restructuring Committee); and/or (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan . . . .

Plan, Art. X.B (2) (emphasis added).

26.     The Third Party Releases are being provided under the Plan by the **"Non-Debtor**

**Releasing Parties," ** [2] which are defined as follows:

> "*Non-Debtor Releasing Parties*" means, collectively: (a) the Committee and the members thereof in their capacity as such; (b) the Prepetition Credit Agreement Agent and the Releasing Prepetition Credit Agreement Lenders; (c) the DIP Credit Agreement Agent and the DIP Credit Agreement Lenders (d) the Prepetition Notes Agent and the Releasing Prepetition Noteholders; (e) the Releasing Old Emerge LP Equity Holders; (f) *those Holders of General Unsecured Claims or Old Emerge LP Equity Interests that do not affirmatively opt out of the Third Party Release as provided on their respective Ballots*; and (g) each Specified Railcar Lessor (to the extent it is a Released Party).

*Id.,* Art. I.C (emphasis added).

27.     The beneficiaries of the Third Party Releases are the "**Released Parties,"** who are

defined as follows:

> "*Released Party*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Credit Agreement Agent and the Releasing Prepetition Credit Agreement Lenders; (e) the DIP Credit Agreement Agent and the DIP Credit Agreement Lenders; (f) the Prepetition Notes Agent and the Releasing Prepetition Noteholders; (g) the Releasing Old Emerge LP Equity Holders, and (h) each Specified Railcar Lessor, so long as the applicable New Railcar Lease Agreement(s) between the Debtors and the applicable Specified Railcar Lessor is in full force and effect as of the Effective Date; and in each case the respective *Related Persons* of each of the foregoing Entities.

*Id.* (emphasis added).

28.     "**Related Persons**" is defined in the Plan as follows:

> "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers,

---

[2]   The Plan also provides that the "Debtor Releasing Parties" are giving releases under the Third Party Release Provision of Art. X.B (2) of the Plan, in addition to proving releases under the Debtor Release provision of Art. X.B (1) of the Plan.

directors, principals, employees, shareholders, members (including *ex officio* members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the date of the Restructuring Support Agreement, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor shall constitute a Related Person.

*Id.*

29.    The Plan's **Exculpation Clause** is as follows, in pertinent part:

Effective as of the Effective Date, the ***Exculpated Parties*** shall neither have nor incur any liability to any Person or Entity for any claims, Causes of Action or Released and Settled Claim arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other ***prepetition or postpetition act taken or omitted to be taken*** in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce this Plan. . . .

*Id.,* Art. X.E (emphasis added).

30.    The definition of "**Exculpated Parties**," is as follows:

"Exculpated Parties" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) any Committee and the members thereof in their capacity as such; (d) *the DIP Credit Agreement Agent; (e) DIP Credit Agreement Lenders; (f) the Prepetition Credit Agreement Agent; (g) the Prepetition Credit Agreement Lenders; (h) the Prepetition Notes Agent; (i) the Prepetition Noteholders; and (j) in each case, the respective Related Persons of each of the foregoing Entities.*

*Id.,* Art. I.C (emphasis added).

# IV. LAW AND ANALYSIS

31.     In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), this
Court held that the plan proponent bears the burden of proof with respect to confirmability of a
plan: "The Code imposes an independent duty upon the court to determine whether a plan
satisfies each element of § 1129, regardless of the absence of valid objections to confirmation."
*Id.* at 599.  Here, the Debtors fail to meet these standards, for the reasons set forth below.

### A.  Consent to Third Party Releases Requires an Affirmative Act, <u>Especially When Such Releases Lacks Consideration</u>

32.     As set forth in the Fact section above, the Third Party Releases in the Plan will be
given by the Debtors' public shareholders, who are to receive no distribution under the Plan,
have no right to vote on the Plan, and are deemed to reject the same.  The only way that a
shareholder can avoid being deemed to give the Third Party Releases is to return a form opting
out of such releases by the voting deadline.  Third Party Releases will also be deemed to be
given by any general unsecured creditor that does not return a ballot by the voting deadline,
despite the fact that general unsecured creditors may receive no distribution at all under the Plan,
and at best will receive only 1.3% of the value of their Allowed Claims.

33.     Some Courts in this District have determined that third-party releases of non-
debtors should be allowed only to the extent the releasing parties have given affirmative consent.
*See In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011).  In *Washington Mutual*
the Court held that "any third party release is effective only with respect to those who
*affirmatively consent* to it by voting in favor of the Plan and not opting out of the third party

releases." *Id.* at 355 (emphasis added). The Court clarified that merely having an opt out mechanism is not enough, holding that an "opt out mechanism is not sufficient to support the third party releases . . . particularly with respect to parties who do not return a ballot (*or are not entitled to vote in the first place*)." *Id.* (emphasis added). *Failing to return a ballot is not a sufficient manifestation of consent to a third party release.*" *Id.* (emphasis added), citing *In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999).

34. Other decisions from Court in this District are in accord with *Washington Mutual*. *See In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004)(holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003)(approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan); In *re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999)(release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

35. While the Court in *In re Indianapolis Downs, LLC*, 486 B. R. 286 (Bankr. D. Del. 2013) reached a different conclusion concerning the need for affirmative consent to third party releases, the Court pointed out that, in that case, unlike the present, "the third party release provision does not apply to any party that is deemed to reject the Plan." *Id.* at 305.

36. The Court in *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del 2010), also reached a different conclusion that *Washington Mutual* and the other cases cited above with respect to affirmative consent, but only with respect to releases given by unimpaired classes, who were "being paid in full." *Id.* at 144. In fact, in *Spansion,* the Court held that non-consensual

releases being deemed to be given by parties *who were not receiving any distribution under the plan* did not pass muster under applicable law, and therefore, "the proposed nonconsensual Third Party Release does not pass muster under *Continental.*" *See id.* at 145, referencing In *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000).

37.     Under the holding of *Washington Mutual*, and the other cases cited above, the Debtor' proposed opt-out procedure for Emerge LP's public shareholders must be rejected.  The shareholders "are not entitled to vote in the first place" (*Washington Mutual, Inc.*, 442 B.R. at 355), because they are deemed to reject the plan.   And if "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third party release" (*id.*), then failing to return an opt-out form cannot be a manifestation of such consent.  Thus, the Third Party Releases the Debtors seek to impose on the public shareholders are not consensual.

38.     Requiring affirmative consent for the public shareholders in these cases is especially important because the shareholders are not receiving any distribution under the Plan, and therefore no consideration for any releases. [3]  In addition, requiring an affirmative expression of consent helps to ensure there is true consent, rather than consent assumed by silence, which could be caused by factors such as a package being wrongly addressed or misdelivered, or other mail failures or delays.  The risk of mail errors should be borne by the beneficiaries of the releases, not by the Debtors' public shareholders.  That is especially true here, where much of the

---

[3]    The Plan provides that the public shareholders in Class 9 *could* receive a pro rata share of New Warrants representing 5% of the New Limited Partnership Interest.  However, such a distribution would occur only if Class 6 (general unsecured creditors) votes to accept the Plan, which is something over which Class 9 shareholders have no control.  Moreover, it is unclear what value, if any, such warrants would have, and the Disclosure Statement estimates Class 9 recovery under any circumstances to be zero.  *See* Dkt. No. 363, at page ix.

stock of the Debtors is likely held in street name, and therefore the Debtors will not have mailed opt-out forms directly to most of the beneficial stockholders.  Rather, the Debtors will have served the opt-out forms on brokers, and expected the brokers to pass such forms along to the beneficial stockholders.  The Debtors' lack of control over the brokers means that neither the Debtors nor the Court will have any way of knowing whether any particular beneficial stockholder actually received notice of their right to opt-out of the release.

39.     Although perhaps not quite as egregious as requiring public shareholders who are deemed to reject a plan to return opt-out forms, the release provisions concerning the general unsecured creditors also fail to meet the requirements of affirmative consent.  The Plan provides that holders of general unsecured claims who do not return a ballot with the opt-out box checked with be deemed to give release.  This is true whether the creditor voted to accept the plan, reject the plan, or did not return a ballot at all.  The fact that a particular creditor who had the right to vote on the plan did not return a ballot does not mean they have consented to give Third Party Releases.  Rather, their silence could mean that the solicitation package never reached them.

40.     As with the public shareholders, the general unsecured creditors should not bear the risk of mail errors, especially because they will receive no distribution under the plan -- and therefore no consideration for any release -- if their class votes to reject the Plan.   Even if the class votes to accept the Plan, the distribution they will receive, which consists of new limited partnership interests and warrants, has been estimated by the Debtors to provide between less than one-half of one percent to 1.3% of the Allowed Claims of such creditors.  *See* Disclosure Statement, Dkt. 363, p. viii.   As such, the distribution to unsecured creditors under the Plan is zero or de minimis, and does not justify deeming consent to give third party release based solely on a creditor's silence.

13

**B.  The Debtors Have Not Met the Standards for Non-Consensual Third Party Releases**

41.     The Court should not permit the Debtors to force non-consensual releases on either the general unsecured creditors or the public shareholders, as the Debtors have not met the standards for approval of such non-consensual releases.

42.     In *Continental*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third party release is permissible.  The Court acknowledged that a number of Circuits do not allow such non-consensual releases under any circumstances.  *See id.* at 212.  Other Circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases," such as mass tort cases.  *See id.* at 212, *citing Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 843 F.2d 636, 640, 649 (2d Cir. 1988).   *See also, In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 141 (2d Cir. 2005)(third party release may be granted "only in rare cases").

43.     The Third Circuit in *Continental Airlines* ultimately determined that the proposed releases in that case, which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster under even the most flexible test for the validity of non-debtor releases." *Continental*, 203 F.3d at 214.  Therefore, the Court determined that it "need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration."  *Id.* at 214, n. 11 (emphasis added).  However, the Court did describe the "hallmarks of permissible non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions."  *Id.* at 214.

14

44.    In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that a clause in the plan which released claims of any creditors or equity holders against  the senior lenders for any act or omission in connection with the bankruptcy cases and reorganization process required factual showings under *Continental* – that the releases were necessary for the reorganization and were given in exchange for fair consideration.  *Id.* at 607.  The Court elaborated that "necessity" under Continental requires a showing: (a) that the success of the debtors' reorganization bears a relationship to the release of the non-consensual non-debtor parties and (b) that the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release.  *Id.* at 607.  A financial contribution is considered "critical" if without the contribution, the debtors' plan would be infeasible.  *Id.*  Fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release.  *Id.* at 608.  In most instances of a release provision in a plan, this will entail examining the proposed dividend that non-consenting creditors will receive under a plan with the releases compared to what they would receive under a plan without the releases. *See id.*; *see also In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del 2010)(applying same factors).

45.    The *Genesis* Court found that the senior lenders had made a financial contribution to the plan, which allowed the debtors to make the 7.34% distribution to the unsecured creditors, who otherwise would be "out of the money." *Id.* at 608. Ultimately, though, the Court found that such contribution was not enough, because "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by these facts . . . . [the] financial restructuring plan under consideration here would not present the extraordinary circumstances required to meet even the most flexible test for third party releases."

*Id.* (emphasis added).

46.     In the present cases, there is nothing in the record to indicate the presence of "extraordinary circumstances," or that that the high threshold necessary for approval of non-consensual third party releases has been met with respect to each of the non-debtor parties that would be the recipients of these non-consensual releases.  It is also unclear what "critical financial contribution" to the Plan was given by each of the Released Parties, which include the Debtors' officers, directors, and professionals, the Debtors' non-debtor affiliates and their officers and directors, and the Creditors' Committee at its members.[4]

47.     The Debtors have the burden of establishing whether the *Continental/Genesis* factors have been met for each of the non-debtor Released Parties who are the beneficiaries of the non-consensual Third Party Releases, including whether the Third Party Releases are "both necessary and given in exchange for *fair consideration*."  203 F.3d at 214, n. 11 (emphasis added).

48.     It is difficult to see what fair consideration is being provided for the non-

---

[4]    The Third Circuit in *Continental,* and this Court in *Genesis* and *Washington Mutual,* found that the directors and the officers of the debtors in those cases did not satisfy the requirements necessary to entitle them to receive releases.  *See Continental*, 203 F.3d at 215 ("[W]e have found no evidence that the non-debtor D & Os provided a critical financial contribution to the Continental Debtors' plan that was necessary to make the plan feasible in exchange for receiving a release of liability"); *Washington Mutual*, 442 B.R. at 354 (holding that, "there is no basis for granting third party releases of the Debtors' officers and directors, . . . .[as] [t]he only 'contribution' made by them was in the negotiation of the Global Settlement and the Plan, [which] activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated); they are insufficient to warrant such broad releases of any claims third parties may have against them. . . . ."); *Genesis*, 266 B.R. at 606–07 ("[T]he officers, directors and employees have been otherwise compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' to the reorganization.").

consensual Third Party Releases in these cases.   The public shareholders of Emerge LP are deemed to reject the Plan, meaning they are treated as receiving no consideration.   As to the general unsecured creditors, they may receive a pro rata share of new limited partnership interests and warrants, which the Debtors value at the equivalent of between less than one-half of one percent and 1.3% of the Allowed Claims of the general unsecured creditors.   However, even this de minimis payment would not be made if the class of general unsecured creditors votes to reject the Plan.   *See Disclosure Statement,* at page viii.   If, under *Genesis*, a distribution of 7.34% of the claims of unsecured creditors was not sufficient to meet the *Continental* criteria, then a recovery of zero to 1.3% is not sufficient.

49.     The Debtors here should not be allowed the unfettered discretion to force public shareholders and the general unsecured creditors to discharge non-debtors from liability, because a permanent injunction limiting the liability of non-debtor parties is a rare thing that should not be considered absent a showing of "extraordinary circumstances."   *See Continental*, 203 F.3d at 212; *Tribune*, 464 B.R. at 178 (interpreting *Continental* to allow non-consensual releases only in "extraordinary cases."); *Genesis*, 266 B.R. at 608.

### C. The Debtors Must Establish that the Releases They Are to Give Under the Plan Are Permissible Under Applicable Law

50.     The Plan provides for the Debtors and their estates to grant broad releases in favor of all the same Released Parties who will receive Third Party Releases.   The Debtors' release covers not just actions and omissions in these Bankruptcy Cases, but rather "any act or omission, . . . existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of the Debtors . . . ."   Plan, Art. X.B (1).

51.     Pursuant to this Court's decision in *In re Tribune Company,* 464 B.R. 126 (Bankr. D. Del. 2011)(Carey, J.), and *In re Washington Mutual, Inc.,* 442 B.R. 314 (Bankr. D. Del. 2011)(Walrath, J.), among others, the five factors set forth in In re *Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del 1999) and *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994) should be considered to determine whether, notwithstanding § 524(e) of the Code, a plan may provide for releases by debtors of non-debtor entities.  *See Tribune* 464 B.R. at 186; *Washington Mutual*, 442 B.R. at 346; *In re Spansion, Inc.*, 426 B.R. 114, 142-43, n. 47 (Bankr. D. Del 2010)(Carey, J.); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004)(Walrath, J). Those factors are as follows:

    i.     identity of interests between debtor and non-debtor releasee, so that a suit against the non-debtor will deplete the estate's resources (e.g., due to a debtor's indemnification of a non-debtor);

    ii.    substantial contribution to the plan by non-debtor;

    iii.   necessity of release to the reorganization;

    iv.    overwhelming acceptance of plan and release by creditors; and

    v.     payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*Tribune* 464 B.R. at 186 (citing *Washington Mutual*, 442 B.R. at 346 (citing *Zenith*, 241 B.R. at 110)).  "The factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."  *Tribune* 464 B.R. at 186 (citing *Washington Mutual*, 442 B.R. at 346).

52.     The Debtors have the burden to establish whether the *Zenith/Master Mortgage* factors have been met as to each of the non-debtors who are the beneficiaries of the Debtor Releases.  Because an evidentiary predicate is necessary to approve the Debtor Releases, the U.S.

Trustee reserves argument on this issue until the record at the confirmation hearing is closed.

### D.  **The Plan's Exculpation Clause is Impermissibly Broad**

53.     As stated by the Court in *Washington Mutual,* an "exculpation clause must be limited to the *fiduciaries* who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers."  442 B.R. at 350-51 (emphasis added).  The Court in *In re Tribune Company,* 464 B.R. 126 (Bankr. D. Del. 2011)(Carey, J.), stated agreement with the holding in *Washington Mutual* relating to exculpated parties, and held that the exculpation clause in *Tribune,* "must exclude non-fiduciaries."  *Id.* at 189, quoting *Washington Mutual,* 422 B.R. at 350 -51. *Accord, Indianapolis Downs, 486 B.R. 286 (Bankr. D. Del. 2013).*

54.     In *In re PTC Holdings LLC,* 55 Bankr. Ct. Dec 206, 2011 Bankr. LEXIS 4436, *38 (Bankr. D. Del. Nov. 10, 2011)(Shannon, J.), this Court sustained the U.S. Trustee's objection to the exculpation clause, stating that such clause "must be reeled into include only those parties who have acted as estate fiduciaries and their professionals." *Id.* at * 38.  In reaching this conclusion, the *PTC* Court reviewed the *Washington Mutual* decision*,* as well as the decision of the Third Circuit Court of Appeals in  *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000), on which *Washington Mutual* relied*.*  The issue in *PWS* was whether an official committee of unsecured creditors could receive exculpation.  As described by this Court in *PTC Holdings:*

> In reaching its conclusion, the *PWS* court examined § 1103(c) and noted that the section "has been interpreted to imply both a fiduciary duty to committee constituents and a limited grant of immunity to committee members."  "This immunity," the court found, "covers committee members for actions within the scope of their duties."  The *PWS* court's reasoning thus implies that a party's exculpation is based upon its role or status as a fiduciary.  That is why,

> as the *Washington Mutual* court pointed out, courts have permitted
> exculpation clauses insofar as they "merely state[] the standard to which ...
> estate fiduciaries [a]re held in a chapter 11 case."   That fiduciary standard,
> however, applies only to estate fiduciaries, "no one else."

*PTC Holdings* at * 37-38 (citations omitted).

55.     Contrary to the limits of exculpation set forth in the above-reference case law, the

Debtors' Plan includes, as "Exculpated Parties," numerous entities that are not fiduciaries of the

estate, including the DIP Credit Agreement Agent, DIP Credit Agreement Lenders, the

Prepetition Credit Agreement Agent, the Prepetition Credit Agreement Lenders, the Prepetition

Notes Agent, the Prepetition Noteholders, and all of their Related Parties.  *See* Plan, Art. I.C

(definition of "Exculpated Parties").  In addition, through the "Related Parties" provision, many

non-fiduciaries that are affiliated with the Debtors, the Committee and their members (as well as

with the various lenders and noteholders proposed to be exculpated), are provided exculpations.

Such parties include all of the current and former affiliates, employees, director, officers, and

professionals of the Debtors, the Committee, and each individual member of the Committee,

even though many such Related Partier are not themselves estate fiduciaries.

56.     In accordance with applicable case law cited above, the Exculpated Parties should

be limited to the following:  the Debtors, the directors and officers of the Debtors who served

during any portion of the cases, the Debtors' professionals retained in these cases, the

Committee, the members of the Committee, in their capacity as such, the individuals who sat on

the Committee, in their capacity as such, and the Committee's professionals retained in these

cases.  See *Washington Mutual,* 442 B.R. at 350-51 (an "exculpation clause must be limited to

the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the

Committees and their members, and the Debtors' directors and officers.")

20

57.     Even with respect to the estate fiduciaries that can be covered, the Exculpation Clause is impermissibly broad, because it is not limited to actions taking place during the bankruptcy case, but also expressly includes pre-petition activity.  Exculpations are to cover only "actions in the bankruptcy case."  *Washington Mutual*, 442 B.R. at 350, *citing PWS*, 228 F.3d at 246.

58.     Unless the Exculpation provision in the Plan is amended so that it benefits only fiduciaries of the Debtors' estates, and is limited to acts and omissions during the course of the bankruptcy cases, the Plan should not be confirmed.

### E.  The Plan is Not a Settlement Subject to Approval Under Bankruptcy Rule 9019

59.     There are a number of provisions in the Plan that treat the Plan as a settlement agreement that may be approved under Bankruptcy Rule 9019.  One such provision is found in Article X.A of the Plan, which provides:

> Pursuant to *section 1123 of the Bankruptcy Code*, and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, *the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan*.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the *compromise or settlement of all such Claims, Equity Interests and controversies*, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and any Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Plan, Art. X.A (emphasis added).

60.     Section 1123(b)(3)(A) of the Bankruptcy Code, which is cited in the Plan provision above, allows a plan proponent to propose "the settlement or adjustment of any claim or interest *belonging to the debtor* or to the estate."  11 U.S.C. § 1123(b)(3)(A)(emphasis added). However, Article X.A of the Plan does not appear limited to the settlement of claims belonging to the Debtors or the estates, and is therefore not permissible under section 1123(b)(3)(A).

21

61.     Black's Law Dictionary defines "settlement" as "an agreement ending a dispute or lawsuit."  Black's Law Dictionary (10th ed. 2014) (emphasis added).  Black's Law Dictionary defines "agreement" as "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."  *Id.*

62.     Bankruptcy Rule 9019(a) confers discretion on the bankruptcy court to approve a compromise or settlement on motion after notice and a hearing. Fed. R. Bankr. P. 9019(a).  "In making its evaluation, the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Washington Mutual*, 442 B.R. at 328 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

63.     While a plan may incorporate a settlement, a plan and a settlement are not one and the same.  What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" is different than what may be permissible under a plan, which is subject to the requirements of sections 1123 and 1129 of the Bankruptcy Code.  *See, e.g., Tribune*, 464 B.R. at 176 (concluding at confirmation stage that a negotiated settlement could be approved because it was fair, reasonable and in the best interest of the Debtors' estates and making an express finding that the settlement was properly part of the plan pursuant to section 1123(b)(3)(A)).

64.     The Debtors' Plan *does* include a settlement between the Debtors and the Prepetition Revolver Agent, the Prepetition Revolving Lenders, the Prepetition Note Agent, or the Prepetition Noteholders, whereby the Debtors are releasing all claims against such entities and the related parties of such entitles.  The claims being released are termed the "Released and Settled Claims."   *See* Plan I.C (definition of "Released and Settled Claims").  There is a separate

22

provision in the Plan that expressly approves the settlement of the Released and Settled Claims. *See id.* at X.I.

65.     The language of Art. X.A of the Plan, however, is not limited to the settlement of the Released and Settled Claims.  Rather, Art. X.A treats the Plan itself is a settlement agreement, and therefore presumably subject to approval under Bankruptcy Rule 9019.  Sending a plan to impaired creditors for a vote is not the same thing as parties negotiating a settlement among themselves.

66.     Similarly, the second paragraph of the Third Party Release provision in Article X.B (2) impermissibly seeks to treat the release of third party claims as a settlement.  The language of that paragraph is as follows:

> Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) *a good faith settlement and compromise of the claims released by the Third Party Release*; (iii) in the best interest of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

Plan, Art. X.B (2) (emphasis added).

67.     The Third Party Releases set forth in Article X.B (2) of the Plan are not part of any agreement between the Debtors and the parties affected by the Plan, or between the parties being deemed to give Third Party Releases and the beneficiaries of the same, except perhaps those parties who are signatories to the Restructuring Support Agreement.  Moreover, the wording of this portion of Art. X.B (2) is phrased as findings of fact.  As such, they are not appropriately included in a plan.  In addition, the factors listed do not correctly set forth the

standard for approval of third party releases, which is that such releases are consensual, or meet

the *Continental* standards, which include being "necessary" to the reorganization, as well as

being given in exchange for fair consideration.

68.     The second paragraph of the provision relating to Debtor Releases, in Art. X.B(1),

is similar to that of the second paragraph of the Third Party Releases:

> Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval,
> *pursuant to Bankruptcy Rule 9019*, of the Debtor Release, which includes by
> reference each of the related provisions and definitions contained herein, and further,
> shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in
> exchange for the good and valuable consideration provided by the Released Parties;
> (ii) a good faith settlement and compromise of the claims released by the Debtor
> Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable
> and reasonable; and (v) given and made after due notice and opportunity for hearing .

Plan, Art. X.B (1)(emphasis added).

69.     Like the language of the Third Party Release, the above quoted language is

phrased as findings of fact, and therefore is not an appropriate provision in a plan.  In addition,

Bankruptcy Rule 9019 is not the standard for approval of Debtor Releases.  Rather, the

*Zenith/Master Mortgage* standards are what Courts in this District apply to evaluate debtor

releases.  Although items (i) through (v) above include some of those factors, they do not include

all.

70.     There is also settlement language included in the discharge provision, discussed

below.

## F.  **The Discharge Provision is Overbroad and Includes Extraneous Provisions**

71.     The discharge provision of the Plan, which is found in Art. X.D,[5] consists of three

paragraphs that go beyond what section 1141(d)(1) of the Code provides regarding the nature of

the discharge received by a reorganizing debtor under Chapter 11.   In addition to including what

is provided by section 1141(d)(1), the first and third paragraphs of the Plan's discharge provision

again frames the Plan as a settlement, and the third paragraph includes an injunction that is in

---

[5]     The Discharge provision of the Plan is as follows:

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the
Bankruptcy Code, except as otherwise expressly provided by this Plan (including, without limitation,
Article V.E and V.F of this Plan) or the Confirmation Order, effective as of the Effective Date, all
consideration distributed under this Plan shall be in exchange for, and in complete satisfaction,
*settlement*, discharge, and release *of, all Claims, Equity Interests and Causes of Action of any kind* or
nature whatsoever against the Debtors or any of their respective assets or properties, including any
interest accrued on such Claims or Equity Interests from and after the Petition Date, and regardless of
whether any property shall have been abandoned by order of the Bankruptcy Court, distributed or
retained pursuant to this Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by this Plan (including, without limitation, Article V.E and V.F
of this Plan) or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be
deemed discharged and released under and to the fullest extent provided under sections 524 and
1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any
kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the
Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the
Bankruptcy Code.   Such discharge shall void any judgment obtained against the Debtors or the
Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by this Plan (including, without limitation, Article V.E and
V.F of this Plan) or the Confirmation Order, upon the Effective Date: (i) the rights afforded herein
and the treatment of all Claims and Equity Interests shall be in exchange for and in complete
satisfaction, *settlement*, discharge, and release *of all Claims and Equity Interests of any nature*
whatsoever, including any interest accrued on such Claims from and after the Petition Date, against
the Debtors or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests
shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect
thereto shall be extinguished completely without further notice or action; and (iii) *all Entities shall be
precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, each of their
respective successors and assigns, and each of their respective assets and properties, any such
Claims or Equity Interests, whether based upon any documents, instruments or any act or omission,
transaction, or other activity of any kind or nature that occurred prior to the Effective Date or
otherwise*.  Plan, Art. X.D (emphasis added).

addition to the main injunction set forth in Art. X.G of the Plan.

### G.  <u>Other Provisions to Which the U.S. Trustee Objects</u>

72.     There are a number of other Plan provisions to which the U.S. Trustee objects, as detailed below.  The U.S. Trustee is hopeful that, prior to the confirmation hearing, some, if not all, of these objections will be able to be resolved.  However, the U.S. Trustee sets forth such objections now, in case such efforts are not successful.

<u>Definition of Allowed Claim and Disputed Claim</u>

73.     The definitions of "Allowed Claim" and "Disputed Claim" both incorporate the concept that a claim supported by a proof of claim that was filed after the applicable bar date is not an allowed claim, regardless of whether an objection to such claim has been filed.  *See* Plan, Art. I.C.  Such a concept is contrary to section 502(a) of the Code, which provides that, "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, . . .  objects."  11 U.S.C. § 502(a).   There is no exception for late-filed claims.

74.     The definition of "Disputed Claim" is further inconsistent with section 502(a) in that subsection (b)(2) of the definition appears to limit the filing of claim objections to the Debtors, whereas section 502(a) of the Code explicitly provides that "a party in interest" may object to a claim or interest.  *Id.*   Art. VIII.A (2) of the Plan also appears, at least implicitly, to allow only the Debtors to file claims objections.

75.     The definition of "Disputed Claim" also is objectionable because it references, in subparagraphs (b) and (d), the Debtors' ability to dispute a claim in some fashion other than filing an objection.  However, section 502(a) of the Code provides that, at least as to claims

supported by proofs of claims, objections must be filed to prevent the claim from being an allowed claim.  There is no alternative method to dispute proofs of claims.

<u>The Debtors Should Not Be Able to Object to Claims Filed in These Cases in Other Courts</u>

76.     Article VIII.A.1 of the Plan includes the following language: "The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or Disputed Equity Interest in the ordinary course of business in the manner and venue in which such Claim or Equity Interest would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced."  Such language might make sense if the Plan was one in which claims were to pass through unaffected by the bankruptcy cases, as occurs in some pre-packaged plans.  However, that is not the situation in these cases.  If the Debtors wish to contest claims or interests that have been filed in these Bankruptcy Cases, they need to do so in this Court, not elsewhere.

<u>Setoffs Exercised Prior to the Petition Date Should Not Be Enjoined</u>

77.     The Injunction Provision of the Plan, found in Art. X.G, enjoins the assertion of any form of setoff in response to any claim that the Debtors or other parties benefiting from the plan injunction (such as the Released Parties) might pursue.   In *Folger Adams*, 209 F.3d 252 (3rd Cir. 2000), the Court of Appeals for the Third Circuit ruled that defenses such as recoupment and setoffs exercised pre-petition by a non-debtor party are not wiped out by way of a section 363 sale.  The same should hold true in chapter 11 plans.

<u>Section 1146(a) Provision Relating to Stamp Tax or Similar Tax</u>

78.      Section XII.K of the Plan addresses exemption from certain taxes set forth in section 1146(a) of the Code.  However, that section of the Code is limited in scope, providing in its entirety that, "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar taxes." 11 U.S.C. § 1146(a).  Section XII.K of the Plan expands that Code provision beyond its terms, in part by using a defined term, "Stamp or Similar Tax," which, as set forth in the definitional section of the Plan, includes a wide range of taxes and fees that are not mentioned in section 1146(a) of the Code.

## V. RESERVATION OF RIGHTS

79.      The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee respectfully requests that the Court issue an order denying confirmation of the Plan, and/or grant such other relief as this Court deems appropriate, fair and just.

Dated: October 16, 2019                      Respectfully submitted,
   Wilmington, Delaware

               **ANDREW R. VARA**
               **ACTING UNITED STATES TRUSTEE**
               **Region 3**

               By: _/s/ Juliet Sarkessian_
               Juliet Sarkessian, Esquire
               Trial Attorney
               United States Department of Justice
               Office of the United States Trustee
               J. Caleb Boggs Federal Building
               844 King Street, Suite 2207, Lockbox 35
               Wilmington, DE 19801
               (302) 573-6491
               (302) 573-6497 (Fax)
               Juliet.M.Sarkessian@usdoj.gov