**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| | ) | |
| EMERGE ENERGY SERVICES LP, *et al.* | ) | Case No. 19-11563 (KBO) |
| | ) | |
| | ) | Jointly Administered |
| Debtors.[1] | ) | |
| | ) | |
| | ) | |
| | ) | **Hearing Date: October 24, 2019 at 1:00 p.m. (ET)** |
| | ) | **Objection Deadline: October 15, 2019 at 4:00 p.m. (ET)** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO CONFIRMATION OF
THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
EMERGE ENERGY SERVICES LP AND ITS AFFILIATE DEBTORS
<u>UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Emerge Energy Services LP (2937), Emerge Energy Services GP LLC (4683), Emerge Energy Services Operating LLC (2511), Superior Silica Sands LLC (9889), and Emerge Energy Services Finance Corporation (9875). The Debtors' address is 5600 Clearfork Main Street, Suite 400, Fort Worth, Texas 76109.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

      Valuation in Dispute ..............................................................3

      The Committee Has Identified Valuable Unencumbered Assets ................5

      The Plan Was Not Proposed in Good Faith ................................8

FACTUAL BACKGROUND ..................................................................................9

I.     General Case Background..................................................................9

II.    Debt Structure ................................................................................11

III.   The Plan ..........................................................................................12

IV.   Valuations .......................................................................................12

      Houlihan Valuation. ................................................................12

      Miller Buckfire Valuation. ......................................................14

ARGUMENT ..........................................................................................................14

I.     The Plan Does Not Satisfy Bankruptcy Code Section 1129(a)(7) Because a Liquidation of the Debtors' Unencumbered Assets Would Provide More Value to General Unsecured Creditors Than the Proposed Recovery Under the Plan..................................................................................................16

    A.    The Oklahoma Facility ..........................................................17

    B.    Business Interruption Insurance Payments ................................19

II.    The Plan Is Not "Fair And Equitable" Under Section 1129(b)(1)........................20

    A.    The Plan is Not "Fair and Equitable" Because it Provides Value to the Prepetition Noteholders in Excess of the Value of Their Claims ........21

III.   The Plan Should Not Be Confirmed Because It Is Not Proposed In Good Faith Under Section 1129(a)(3) Of The Bankruptcy Code..................................28

    A.    The Failure to Conduct a Market Test for Value ......................28

    B.    The Negotiation of the Plan and the RSA.................................30

    C.    The Combined Death Trap/Equity Recovery Provision ...........31

i

D.     The RSA Provides for an Impermissible Post-Emergence Release in Potential Contravention of this Court's Order ......................................31

IV.     The Plan is Not Confirmable Because the Releases are Inappropriate and Contravene Applicable Law ...............................................................32

A.     The Debtor Releases are Inappropriate ......................................................33

B.     The Non-Consensual Third-Party Releases are Impermissible ................38

V.     The Exculpation Provision in the Plan Exceeds the Scope of Section 1125(e) of the Bankruptcy Code ...........................................................42

VI.     Additional Confirmation Objections....................................................43

CONTESTED MATTER ................................................................................44

RESERVATION OF RIGHTS ........................................................................44

CONCLUSION ...............................................................................................45

## TABLE OF AUTHORITIES

CASES

Page(s)

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ...........................................................................................16, 28

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*,
229 F.3d 245 (3d Cir. 2000) ....................................................................................44

*In re Abeinsa Holding, Inc.*,
562 B.R. 265 (Bankr. D. Del. 2016) ........................................................................33

*In re Aegean Marine Petroleum Network, Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019) ...............................................................37, 39

*In re Armstrong World Indus.*,
348 B.R. 111 (Bankr. D. Del. 2006) ........................................................................21

*In re Boomerang Tube, Inc.*,
548 B.R. 69 (Bankr D. Del. 2016) ...........................................................................38

*In re Cantu*,
784 F.3d 253 (5th Cir. 2015) ...................................................................................16

*In re Chemtura, Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...............................................................28, 30

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000)............................................................................... 38-39

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ................................................... 14-15, 21, 39

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014) ....................................................................15

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ................................................... 15, 21, 38-39

*In re Glob. Indus. Techs., Inc.*,
645 F.3d 201 (3d Cir. 2011)......................................................................................39

*In re Glob. Ocean Carriers Ltd.*,
251 B.R. 31 (Bankr. D. Del. 2000) ..........................................................................34

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ................................................................. 41-42

*In re Jorgensen*,
  66 B.R. 104 (B.A.P. 9th Cir. 1986) ................................................................................28

*In re Leslie Fay Cos., Inc.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997) ...........................................................................28

*In re Master Mortg. Inv. Fund, Inc.*,
  168 B.R. 930 (Bankr. W.D. Mo. 1994) ...........................................................................33

*In re MCorp Fin., Inc.*,
  137 B.R. 219 (Bankr. S.D. Tex. 1992) ...........................................................................16

*In re Penn Cent. Transp. Co.*,
  596 F.2d 1102 (3d Cir. 1979) ........................................................................................21

*In re Prussia Assoc.*,
  322 B.R. 572 (Bankr. E.D. Pa. 2005) ............................................................................39

*In re PTL Holdings LLC*,
  No. 11-12676 (BLS), 2011 WL 5509031 (Bankr. D. Del. Nov. 10, 2011) ....................43

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) ..............................................................................40

*In re Tribune*,
  464 B.R. 126 (Bankr. D. Del. 2011) ..............................................................................43

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012) ...........................................................................................39

*In re Wash. Mut. Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ..............................................................34, 37, 41, 43

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ................................................................................34

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) ..........................................................................................28

*Koelbl v. Glessing (In re Koelbl)*,
  751 F.2d 137 (2d Cir. 1984) ..........................................................................................28

*United Artists Theatre Co. v. Walton*,
  315 F.3d 217 (3d Cir. 2003) ..........................................................................................35

## STATUTES

**Page(s)**

11 U.S.C. § 1129(a)(3) ...................................................................................... 9, 28, 31-32

11 U.S.C. § 1129(a)(5) ..................................................................................................44

11 U.S.C. § 1129(a)(7) ............................................................................................ passim

11 U.S.C. § 1129(a)(8) ..................................................................................................15

11 U.S.C. § 1129(b) ................................................................................................. passim

11 U.S.C. § 1129(b)(1) ............................................................................................20, 28

11 U.S.C. § 1129(b)(2) ............................................................................................ 20-21

**OTHER AUTHORITIES**

**Page(s)**

7 COLLIER ON BANKRUPTCY ¶ 1129 (16TH REV. ED. 2019) ................................................ 15-16, 21

The Official Committee of Unsecured Creditors (the "Committee") of the debtors and debtors-in-possession in the above-captioned cases (referenced alternatively herein as "Emerge" the "Debtors" or the "Company"), by and through its undersigned counsel, respectfully submits this objection (the "Objection") to confirmation of the Debtors' *First Amended Joint Plan of Reorganization for Emerge Energy Services LP and its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* [D.I. 362], dated September 11, 2019 (the "Plan"). In support of its Objection, the Committee contemporaneously files herewith the *Declaration of Matthew Rodrigue in Support of the Objection of the Official Committee of Unsecured Creditors to Confirmation of the First Amended Joint Plan of Reorganization for Emerge Energy Services LP and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code* (the "Rodrigue Decl.")[2]; and the *Declaration of David M. Posner in Support of the Objection of the Official Committee of Unsecured Creditors to Confirmation of the First Amended Joint Plan of Reorganization of Emerge Energy Services LP and Its Affiliate Debtors Under Chapter 11 of the Bankruptcy Code*, (the "Posner Decl.")[3]; and respectfully states as follows:

## PRELIMINARY STATEMENT[4]

1.      The Debtors are pursuing a Plan that is premised on a deeply flawed, outcome driven valuation analysis that was prepared *after* entry into the RSA and, remarkably, *after* publishing a Disclosure Statement fixing the Debtors' position to such value.  The Plan is a blatant attempt by a lender-in-possession, through its hand-picked "Special Restructuring Committee" of the Debtors' board, to effect an inequitable transfer to itself of all of the value of the Debtors'

---

[2] The Exhibits attached to the Rodrigue Decl. are referenced herein as Exhibits A and B.

[3] The Exhibits attached to the Posner Decl. are referenced herein as Exhibits C – BB.

[4] Undefined terms used in this Objection shall have the meanings ascribed to them below, in the Plan, or in the Disclosure Statement, as applicable.

material encumbered assets through what is effectively a private sale (one falling far short of arms'

length no less).[5]  Just as bad[6], the Plan also affects a transfer to the lender-in-possession of all

unencumbered assets.[7]   The Committee's principal objections to the Plan are driven by (i) the

Debtors' total enterprise value ("TEV")[8], which pursuant to the valuation prepared by the

Committee's expert, Miller Buckfire & Co., LLC and Stifel, Nicolaus & Co. ("Miller Buckfire"),

mandates that unsecured creditors receive substantially larger recoveries; (ii) valuable

unencumbered assets that should inure to the benefit of unsecured creditors irrespective of TEV;

and (iii) the complete elimination of the "at best" *de minimus* recovery for unsecured creditors

unless they are willing (by voting to accept the Plan) to permit the distribution of consideration

to the out of the money equity sponsor.

2.      As discussed herein, unless the Plan is substantially revised to appropriately

account for the true value of the Debtors' assets and the unencumbered nature of certain of them,

the sole beneficiaries of the Plan will be the parties that negotiated it: HPS, Insight Equity, and the

Debtors' management team.  Meanwhile, general unsecured creditors, whose claims are, according

---

[5] Notably, the Debtors' valuation is belied by HPS's own valuation work done just prior to the Petition Date, which reflects a midpoint value ($370 million) almost twice as high as the Debtors' midpoint value ($200 million) and within striking distance of the Committee's midpoint value ($390 million).

[6] The Debtors inexplicably refused to market test their assets pre- or postpetition.  Thus, the sole source of evidence in support of permitting the HPS-selected Debtor decision-makers, and "fiduciary out holders", to wipe out, according to the Debtors, approximately $574 million in unsecured debt for HPS's benefit is the outcome driven and deeply flawed valuation analysis performed by the Debtors' investment banker.

[7] On or before October 17, 2019, unless the deadline is further extended, the Committee will file a standing motion and proposed complaint that set forth claims with respect to valuable unencumbered assets.  The Committee believes that such unencumbered value is worth as much as approximately ███████████ ███████████████████████████████████████████████████.

[8] The Committee's expert report from Miller Buckfire (as defined below) uses the term "Total Distributable Value" for their overall value conclusion, consisting of TEV plus certain miscellaneous or presently non-operational assets. The Debtors' valuation analysis from Houlihan (as defined below) uses the term TEV to include all such assets.  For consistency, the Committee will use the term TEV when referring to Miller Buckfire's overall value conclusion.

to the Debtors, in excess of $570 million, will receive a recovery as small as 0.13% (using the Debtors' midpoint valuation), ***and that is only if such class of creditors votes to accept the Plan***.[9] In the event general unsecured creditors reject the Plan, the recovery is zero. Neither outcome is legally supportable given (i) the fatal flaws contained in the Debtors' valuation analysis, which analysis serves as the underpinning to the Debtors' unconfirmable Plan; and (ii) the existence of valuable unencumbered assets that are not only artificially devalued, but also improperly allocated under the Plan to HPS rather than unsecured creditors.

### Valuation in Dispute

3.      The Debtors' midpoint range valuation from Houlihan Lokey Capital, Inc. ("Houlihan")[10] of $200 million is $190 million less than the Committee's expert's midpoint valuation. Conveniently, Houlihan's valuation supports the Debtors' massive value transfer in favor of the party who not only hand selected the "Special Restructuring Committee" of the Debtors' board that solely controls the contents of the Plan and the exercise of the fiduciary out, but also who believed in a midpoint valuation of approximately $370 million just prior to the Petition Date: HPS.[11]  The Committee will vigorously dispute the Debtors' valuation analysis at the Confirmation Hearing.

4.      As discussed more fully below, Houlihan's valuation analysis is premised upon certain inherent flaws that make its conclusions of value unreliable. The Committee's testifying

---

[9] As the Voting Deadline is October 17, 2019, the voting results with respect to the Plan were not known to the Committee at the time this Objection was filed.

[10] Notably, the very same outfit that served as placement agent for the sale to HPS of the Prepetition Notes.

[11] *See* Discussion Materials [-] Project Sandman – Mezz Watchlist, dated May 7, 2019, attached to the Posner Decl. as Exhibit C [HPS0014584].

expert from Miller Buckfire prepared a valuation analysis that demonstrates that the Reorganized Debtors' TEV is between $335 million and $445 million, with a midpoint of $390 million.[12]

5.      Aside from its numerous methodology flaws (described below), the credibility of Houlihan's valuation is seriously undermined in that (i) inexplicably, the Debtors' assets were not subject to any market test (where HPS could easily have attempted to credit bid its secured claims to obtain control of the Debtors' assets subject to its liens if the value was as the Debtors assert); (ii) it curiously concludes with the same valuation range set forth in the Disclosure Statement despite the valuation analysis being prepared **after** the filing of the Disclosure Statement[13]; (iii) internal HPS documents reveal that as of May 7, 2019, HPS valued the Company at approximately $290 million to $450 million[14], which range hews to the conclusions in Miller Buckfire's valuation analysis; and (iv) internal HPS communications ████████████████████████████ ████████████████████████████████████████[15] Put simply, by utilizing Houlihan's flawed and unreliable valuation analysis, HPS is pilfering tens of millions of dollars of value that should otherwise be distributed to unsecured creditors irrespective of the existence of unencumbered assets.

6.      The relevance of the Debtors' flawed valuation to confirmability of its Plan is straightforward: because the Plan transfers to HPS (i) either 95% or 100% of the Reorganized Debtors' equity value worth up to approximately $205 million (based on Miller Buckfire's $390

---

[12] *See* Miller Buckfire Valuation (as defined below), attached to the Rodrigue Decl. as Exhibit A at pg. 9.

[13] *See* relevant portions of deposition of Mr. Adam Dunayer attached to the Posner Decl. as Exhibit D (the "Dunayer Depo. Tr.") at 30:7-16.

[14] *See* Discussion Materials [-] Project Sandman – Mezz Watchlist, dated May 7, 2019, attached to the Posner Decl. as Exhibit C [HPS0014584].

[15] *See* E-Mail from B. Pertuz, HPS, to P. Russo, HPS, copying D. Dimitrievich, HPS; R. Manideep, HPS, dated May 6, 2019, attached to the Posner Decl. as Exhibit E [HPS0032173].

million midpoint valuation, less $185 million in debt and preferred equity to be issued) or up to $260 million (based on Miller Buckfire's $445 million high end valuation, less $185 million in debt and preferred equity to be issued); *plus* (ii) $85 million in preferred equity (worth at least $85 million), and because the Prepetition Notes Claims are only approximately $217 million, the Plan provides HPS with value well in excess of a 100% recovery at the expense of unsecured creditors. As a result, and assuming *arguendo* that Class 6 votes to reject the Plan, the Plan is not "fair and equitable" to unsecured creditors and in violation of section 1129(b)(1) the Bankruptcy Code.

### The Committee Has Identified Valuable Unencumbered Assets

7.        As will be set forth in the *Motion of the Official Committee of Unsecured Creditors for Order Granting Leave, Standing and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtors' Estates and Related Relief* (the "Standing Motion"), the Committee seeks standing, to the extent necessary, *inter alia*, (i) to obtain a declaratory judgment that the Debtors' facility in Kingfisher County, Oklahoma (the "Oklahoma Facility") is unencumbered; (ii) to obtain a declaratory judgement that any payments under the Debtors' business interruption insurance related to the June 21, 2019 berm breach that occurred at the Debtors' San Antonio, Texas facility (the "BII Payments," and together with the Oklahoma Facility, the "Unencumbered Assets") are not encumbered by the Prepetition Liens; and (iii) to avoid liens (to the extent there are any) on the BII Payments.

8.        Unsurprisingly, the Debtors also ascribe artificially low values to the Unencumbered Assets so as to impede unsecured creditors from realizing any meaningful recoveries therefrom (even assuming the value of such unencumbered assets were allocated to unsecured creditors, which they are not).  The Committee disputes the Debtors' conveniently HPS-favorable valuations and asserts that the Unencumbered Assets are worth as much as

approximately ████████████████████████████████████████████

████████.[16]  Such value is driven, in part, by the Committee's view, ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

████████████████████████.[18]  In fact, internal HPS documents reflect that ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████.[19]

    9.     The evidence and clear intention of ████████████████████████████

████████████████████████████  suggests that the value of the Oklahoma Facility is

approximately ████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████  In fact, if the Debtors truly believe the Oklahoma Facility is worth ████████

██████████████████████████████████████████████████████████

████████████████████████.  Instead, the Debtors are preserving the asset for the benefit for

HPS, thereby exposing their true beliefs in the value of the allegedly worthless Oklahoma Facility.

---

[16] Both amounts are net of alleged mechanics' liens totaling approximately $8 million.  If such liens are invalid, the value of the Unencumbered Assets commensurately increases.

[17] *See* Miller Buckfire Valuation (as defined below), attached to the Rodrigue Decl. as Exhibit A at pg. 24.

[18] *See* EMES UCC Presentation, dated Aug. 19, 2019, attached to the Posner Decl. as Exhibit F provided by the Debtors to the Committee.

[19] *See* Discussion Materials [-] Emerge Energy Services – Situation Update, dated Aug. 2019, attached to the Posner Decl. as Exhibit G [HPS0041517].

10.     The balance of the value in the Unencumbered Assets resides in the BII Payments related to the June 2019 berm breach.  Miller Buckfire estimates that the BII Payments have a mid-point value of ██████████████████ ███████████████████████████ ███████████████████  Yet, the Plan, as currently proposed, fails to provide unsecured creditors with even a fraction of that value.  In an effort to rob unsecured creditors of the recoveries that may otherwise be derived from the value of the BII Payments, ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████

11.     The Debtors' artificially low valuation of the Unencumbered Assets not only has the effect described above of aiding the Debtors' overall lowball TEV (to the detriment of unsecured creditors irrespective of the existence of the Unencumbered Assets), but also of severely limiting the Plan value that should be allocable to unsecured creditors if such assets are in fact unencumbered.  Utilizing the Committee's midpoint valuation of the Unencumbered Assets of approximately ██████████ (which assumes $8 million of valid mechanics' liens), and assuming the Debtors' estimate for the total amount of general unsecured claims is accurate, the Unencumbered Assets alone (i.e., irrespective of value that would need to be allocated to unsecured creditors if Miller Buckfire's overall midpoint valuation, or anything close to it, is accepted) would generate an approximate ████████████████████████ as compared to an approximate 0.13% recovery under the Plan utilizing the Debtors' midpoint valuation or an approximate ████████████████ utilizing the Committee's midpoint valuation (and

---

[20] This amount alone results in an approximately 4.4% recovery on general unsecured claims assuming the Debtors' $574 million unsecured claims pool number is correct.

zero in either case if Class 6 votes to reject the Plan).  Remarkably, under the Plan, even at the Debtors' valuations of the Unencumbered Assets ████████████████████████████ ████████, unsecured creditors are still getting less than that to which they are entitled.  Under these facts, the Plan could only be confirmable under section 1129(a)(7) if the Debtors are not only correct about overall TEV, but also (i) correct about the value of the Oklahoma Facility, (ii) correct about the validity of the alleged mechanics' liens; and (iii) able to convince the Court at the Confirmation Hearing that the BII Payments are validly and unavoidably encumbered.  Because this showing cannot be made, the Plan fails to satisfy the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code and should not be confirmed.

### The Plan Was Not Proposed in Good Faith

12.     The totality of the circumstances concerning the negotiation of the Plan and certain of its most inequitable provisions (from the perspective of unsecured creditors) including, among other things, the Class 6 "death trap" coupled with a distribution to the Debtors' "out of the money" equity sponsor, reflect that the Plan was not negotiated in good faith, or anything close to it.  The lack of "good faith" is further supported by the Debtors' inexplicable decision not to market test its assets pre- or postpetition and the fact that the HPS-favorable Plan is being pushed through by any means necessary at the behest of two "independent" Special Restructuring Committee members that were handpicked by HPS itself.   Put simply, if there was a case clearly demonstrating that a debtor's plan was not proposed in good faith, this it.

13.     For these reasons, the Debtors cannot satisfy their burden under the applicable legal standards for plan confirmation.  Specifically, the Debtors cannot demonstrate that the Plan (i)

---

[21] Net of alleged mechanics' liens totaling approximately $8 million. If such liens are invalid, the value of the Unencumbered Assets increases.

satisfies the "best interests of creditors" test of section 1129(a)(7); (ii) is "fair and equitable" as required by section 1129(b)(1); and (iii) was proposed in "good faith" under section 1129(a)(3). In addition, the Plan is unconfirmable for numerous other reasons including that it includes impermissible Debtor and third party releases and an unduly broad exculpation provision. Accordingly, the Committee respectfully requests that the Court deny confirmation of the Plan so as to permit the Committee, the Debtors, and HPS to go back to the drawing board and negotiate a confirmable plan of reorganization that treats unsecured creditors *owed potentially over a half a billion dollars* in a legally permissible manner.

## FACTUAL BACKGROUND

### I.    General Case Background

14.    On July 15, 2019 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.    Also on the Petition Date, the Debtors filed the *Declaration of Bryan M. Gaston, Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 14] (the "First Day Declaration"). Attached to the First Day Declaration as Exhibit B is a restructuring support agreement (the "RSA") dated as of April 18, 2019 by and among the Debtors, their Prepetition Secured Lenders, and certain equity owners of the Debtors.

16.    On July 30, 2019, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for the District of Delaware appointed the Committee [D.I. 111]. The Committee consists of the following five members: (i) Trinity Industries Leasing Company; (i) The Andersons, Inc. an Ohio Corporation; (iii) Iron Mountain Trap Rock Co.; (iv) Greenbrier Leasing Company, LLC; and (v) BMT Consulting Group, LLC.

17.    On August 29, 2019, the Debtors filed a revised version of the Plan [D.I. 268] and a revised version of the Disclosure Statement.  The August 29th revised Disclosure Statement attached, for the first time, a Liquidation Analysis and Valuation Analysis at Exhibits D and F, respectively.

18.    On September 5, 2019, the Debtors filed a further revised version of the Plan [D.I. 324] and a further revised version of the Disclosure Statement [D.I. 325].  On September 10, 2019, the Disclosure Statement was further amended [D.I. 350].

19.    On September 11, 2019, the Court entered its *Order (I) Approving the Disclosure Statement, (II) Establishing the Voting Record Date, Voting Deadline and Other Dates, (III) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan, (IV) Approving the Manner and Forms of Notice and Other Related Documents, and (V) Granting Related Relief* [D.I. 361]. As part of the Debtors' solicitation package, the Committee included a letter to unsecured creditors urging them to vote to reject the Plan.

20.    On September 16, 2019, the Court entered an order authorizing the employment and retention of Houlihan as financial advisor and investment banker to the Debtors *nunc pro tunc* to the Petition Date.  [D.I. 374].

21.    On September 25, 2019, the Court entered an order authorizing the employment and retention of Miller Buckfire as investment banker to the Committee *nunc pro tunc* to August 2, 2019.  [D.I. 406].

22.    The deadline to file the Committee's Objection was extended from October 14, 2019 to October 15, 2019.

23.     The deadline to file the Committee's Standing Motion was extended from October 15, 2019 to October 17, 2019.

24.     A hearing to consider confirmation of the Plan is scheduled for October 24, 2019 (the "Confirmation Hearing").

## II.    Debt Structure

25.     As of the Petition Date, the Debtors had funded debt obligations of approximately $283 million, comprised primarily of indebtedness of approximately $67 million under the Prepetition Credit Agreement and $216 million under the Prepetition Notes Agreement.  *See* First Day Declaration ¶¶ 23-24.

26.     Pursuant to the Final DIP Order, on August 14, 2019, the Court approved a $35 million senior secured priming and superpriority debtor-in-possession credit agreement (the "DIP Facility").  The DIP Facility lenders are the Prepetition Lenders and Prepetition Noteholders, and the DIP Facility includes an incremental roll up of the Prepetition Credit Agreement Claims.[22]  On the Effective Date, the Reorganized Debtors will enter into a $100 million exit facility asset-based loan, the proceeds of which will be used to, *inter alia*, repay in part the DIP Facility loans and Allowed Prepetition Credit Agreement Claims.

27.     Accordingly, as of an assumed effective date for the Plan of October 31, 2019, the Debtors' valuation hurdle to achieve recovery to unsecured creditors, aside from unencumbered assets, totals approximately $317 million.

---

[22] As of the anticipated Effective Date, the DIP Facility and the Prepetition Credit Agreement Claims are estimated to total approximately $100 million.

### III.    The Plan

28.    The Plan, as currently proposed, is consistent in all material respects with, and indeed seeks to implement, the RSA.  The Plan contemplates that the New General Partner will issue the New Emerge GP Equity Interests to holders of Allowed Prepetition Notes Claims, subject only to (i) dilution on account of the New Warrants and New Management Incentive Plan; (ii) a distribution to Holders of Allowed Class 6 General Unsecured Claims comprised of 5.0% of the New Limited Partnership Interests and New Warrants representing 10.0% of the New Limited Partnership Interests, but only if Class 6 votes to accept the Plan; and (iii) a distribution to Holders of Allowed Class 9 Old Emerge LP Equity Interests comprised of New Warrants representing 5.0% of the new Limited Partnership Interests, but only if Class 6 votes to accept the Plan.

29.    The Plan proposes to satisfy (i) the approximately $100 million of DIP Facility Loans and Prepetition Credit Agreement Claims with $50 million of new debt and $50 million of preferred equity; and (ii) the Prepetition Notes Claims with $85 million of preferred equity and 95% to 100% of the Reorganized Debtors' equity value.

30.    Utilizing Houlihan's midpoint TEV of $200 million, the total estimated value of the New Limited Partnership Interests at emergence is approximately $15 million ($200 million TEV less $185 million of debt and preferred equity).  Thus, if Class 6 votes to accept the Plan, such creditors will share in 5% of that purported value, or $750,000, pro rata among a pool of claims estimated at approximately $574 million, representing a recovery of approximately 0.13%. If Class 6 votes to reject the Plan, creditors holding such claims will get nothing.

### IV.    Valuations

#### <u>Houlihan Valuation</u>

31.    On September 25, 2019, the Debtors provided the Committee's advisors with Houlihan's valuation report (the "<u>Houlihan Valuation</u>"), which is attached to the Posner Decl. as

Exhibit F.  Houlihan considered two generally accepted valuation methodologies to arrive at its TEV estimate: (i) discounted cash flow analysis ("<u>DCF</u>"); and (ii) comparable companies approach.

32.     Based on the Debtors' August 9, 2019 business plan, Houlihan first projected operating cash flows through December 31, 2021, which were discounted back to the Valuation Date (October 31, 2019) using a calculated Weighted Average Cost of Capital ("<u>WACC</u>") for the Reorganized Debtors, to arrive at a present value for the expected operating cash flows during the projection period.  The Debtors' projected 2021 EBITDA was then multiplied against an exit multiple and discounted back to the Valuation Date using the same WACC to arrive at a discounted terminal value.  The TEV estimate is the result of adding together the discounted cash flows and discounted terminal value.

33.     In its comparable company analysis, Houlihan identified two peer companies with characteristics that it deemed relevant to valuing the Reorganized Debtors: Hi-Crush and Smart Sand.  Houlihan considered, but excluded, (i) Covia, (ii) U.S. Silica, and (iii) Source Energy Services.  Houlihan utilized observed TEV to EBITDA multiples to inform a range of multiples applicable to the Reorganized Debtors.  Houlihan limited its potential comparable companies to publicly-traded silica sand extraction companies whose operations focused primarily on serving the oil and gas industry.

34.     According to the Houlihan Valuation, Houlihan estimates that the TEV for the Reorganized Debtors as of October 31, 2019 is between $180 million and $220 million.  *See* Houlihan Valuation, attached to the Posner Decl. as Exhibit H at pg. 13.  As discussed more fully below, the Houlihan Valuation contains fundamental flaws that lead to an unsupportable  TEV conclusion for the Reorganized Debtors.

**Miller Buckfire Valuation**

35.     On October 3, 2019, Miller Buckfire finalized its valuation (the "Miller Buckfire Valuation").  *See* Miller Buckfire Valuation, attached to the Rodrigue Decl. as Exhibit A.  Miller Buckfire used the same two generally accepted valuation methodologies as Houlihan: DCF and comparable companies.  *Id.* at pg. 8.  As set forth in the Miller Buckfire Valuation, Miller Buckfire calculated a TEV for the Reorganized Debtors ranging between $335 million and $445 million. *Id.* at pg. 9.

36.     On October 11, 2019, Miller Buckfire issued a rebuttal report (the "Rebuttal Report").  *See* Rebuttal Report, attached to the Rodrigue Decl. as Exhibit B.  The Rebuttal Report analyzes the flaws contained in the Houlihan Valuation and made corrections to such flaws to arrive at an adjusted Houlihan Valuation between $354.2 million and $456.0 million, with a midpoint of $405.1 million, without the errors and other valuation infirmities embedded in the Houlihan Valuation.

37.     As discussed more fully below, the Court should rely on the Miller Buckfire Valuation as it remedies the various material flaws in the Houlihan Valuation and, as a result, asserts (i) a TEV midpoint of $390 million; (ii) as a component thereof, a midpoint valuation of the unencumbered  Oklahoma Facility of ███████ (net of an estimated $8 million in alleged mechanics' liens); and (iii) also as a component  thereof, a midpoint valuation of the unencumbered BII Payments of ██████

**ARGUMENT**

38.     The requirements for confirmation are set forth in section 1129 of the Bankruptcy Code.  A plan proponent bears the burden of proving to the Court that a proposed plan satisfies every applicable confirmation requirement under Bankruptcy Code section 1129(a). *See In re*

*Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 241 (Bankr. S.D.N.Y. 2014); 7 *Collier on Bankruptcy* ¶ 1129.05[1][d] (16th rev. ed. 2019) [hereinafter "7 Collier"] ("At [the confirmation] hearing, the proponent bears the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied . . . . If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met.  In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence.").  For the reasons discussed herein, the Plan cannot be confirmed because the Debtors have not and cannot carry their burden to satisfy each and every statutory requirement under section 1129(a) of the Bankruptcy Code in particular, sections 1129(a)(7) (best interests test) and 1129(a)(3) (good faith).

39.    In addition, where an impaired class rejects a plan of reorganization, the plan proponent must also demonstrate that the plan meets the additional requirements of Bankruptcy Code section 1129(b), including the requirements that the plan does not unfairly discriminate against  dissenting classes and the treatment of the dissenting classes is fair and equitable.[23]  11 U.S.C. § 1129(b); *see also In re Exide Techs.*, 303 B.R. at 58; *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001) ("A nonconsensual plan requires the proponent to prove all but one of the thirteen  elements [of Bankruptcy Code Section 1129(a)], that all classes consent or are unimpaired, 11 U.S.C. § 1129(a)(8), plus the additional requirements of section 1129(b), that the plan does not  unfairly discriminate against dissenting classes and that treatment of such dissenting classes is  fair and equitable.").

---

[23] Although the Voting Deadline has not passed, the Solicitation Package included a letter from the Committee urging general unsecured creditors to vote to reject the Plan.  The arguments below regarding the "fair and equitable" requirement are premised upon Class 6 voting to reject the Plan.

40.     As discussed below, assuming Class 6 votes to reject the Plan, the Debtors also cannot satisfy their burden under section 1129(b) of the Bankruptcy Code.  Accordingly, the Plan should not be confirmed for this reason as well.

**I.     The Plan Does Not Satisfy Bankruptcy Code Section 1129(a)(7) Because a Liquidation of the Debtors' Unencumbered Assets Would Provide More Value to General Unsecured Creditors Than the Proposed Recovery Under the Plan**

41.     The Plan fails because, among other things, unsecured creditors would receive materially larger recoveries in a liquidation than they would under the Plan.  Section 1129(a)(7) of the Bankruptcy Code requires that a debtor's plan of reorganization provide each creditor in an impaired class with at least as much as that creditor would receive in a chapter 7 liquidation.  11 U.S.C. § 1129(a)(7)(A)(ii).  A plan of reorganization "may not be confirmed where the evidence is not sufficient on which to base an independent factual determination that the proposed plan is in the best interests of the creditors pursuant to § 1129(a)(7)."  *In re MCorp Fin., Inc.*, 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992); *see also In re Cantu*, 784 F.3d 253, 262 (5th Cir. 2015) ("A reorganization plan must either be accepted by each creditor or satisfy the Code's 'best interests of the creditor' rule, which requires that the holder of a claim receive under the reorganization plan at least as much as the holder would receive in the event of a chapter 7 liquidation"); 7 Collier, *supra*, ¶ 1129.02[7] (Section 1129(a)(7) provides "an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation").  The best interests test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

42.     Here, the proposed Plan does not provide recoveries to Class 6 unsecured creditors that meet, much less exceed, the recoveries that could be obtained in a chapter 7 liquidation.  In particular, as will be set forth in the Committee's soon-to-be-filed Standing Motion, the Committee

has concluded that certain of the Debtors' assets are not encumbered by valid, perfected and unavoidable liens of the Prepetition Secured Parties (or in certain cases, any liens at all) and, as a result, should be available for distribution to unsecured creditors.  Among these assets are the Oklahoma Facility[24] and the BII Payments related to the June 21, 2019 berm breach at the Debtors' San Antonio, Texas facility.

### A.    The Oklahoma Facility

43.    The Debtors own forty (40) acres of real property located in Kingfisher, Oklahoma consisting, in part, of a partially developed plant site.  According to the Disclosure Statement, "[t]he Debtors are not aware of the existence of any mortgage on the Debtors' property at Kingfisher, Oklahoma, securing the obligations under the Prepetition Credit Agreement" and "the Prepetition Notes Agreement."  Disclosure Statement § II.C.1 -2.[25]  In fact, in a blatant disregard for the treatment of unsecured creditors, the Special Restructuring Committee ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████.  As more fully set forth in the Standing Motion, the Committee has determined that the Oklahoma Facility is indeed unencumbered (except as noted above regarding equipment and fixtures, the value of which is not believed to be substantial in comparison to the overall value of the Oklahoma Facility) and as a result, is seeking a declaratory judgement providing same.

---

[24] Except to the extent of any equipment and fixtures, the value of which is not believed to be substantial in comparison to the overall value of the Oklahoma Facility.

[25] The Committee is aware of the Debtors' contention that some portion of the Oklahoma Facility consists of equipment and fixtures that are subject to perfected security interests in favor of the Prepetition Secured Parties, which may be true.  The Committee does not believe, however, that a substantial portion of the value of the Oklahoma Facility is attributable to any such equipment and fixtures.

44.     Miller Buckfire values the Oklahoma Facility ██████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████   *See* Miller Buckfire Valuation, attached to the Rodrigue Decl. as Exhibit A at pgs.

23-25.  Only for purposes of a liquidation, the Committee believes that the low range of $15 million

is appropriate.[26]   The Committee understands that there are approximately $8 million in alleged

mechanics' liens asserted against the Oklahoma Facility, leaving a net liquidation value of

approximately $7 million.[27]

45.     The Houlihan Valuation, on the other hand, ascribes a value range of ███████████

████████████████████████████████████████████████████   *See* Houlihan

Valuation, attached to the Posner Decl. as Exhibit F at pg. 13.  However, as set forth in the Rebuttal

Report, Houlihan's valuation of the Oklahoma Facility is flawed and unreliable.  *See* Rebuttal

Report, attached to the Rodrigue Decl. as Exhibit B at pg. 23.  In fact, on October 9, 2019, despite

the absence of *any* marketing process, the Debtors received an unsolicited offer to purchase the

Oklahoma Facility (inclusive of a credit bid of the alleged mechanics' liens) for approximately

$11.2 million (the "Oklahoma Bid"), which is ████████████████████████████

████████████   *See Pownall Service, LLC's Objection to Debtors' First Amended Joint Plan of*

*Reorganization* [D.I. 466].  ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[26] The Committee does not concede, however, that such liens are valid (to the extent they exist) or not subject to setoff.

[27] Even if the equipment and fixtures are subject to valid perfected liens of the Prepetition Secured Parties, and even if they are worth at liquidation as much as $2 million, the net liquidation value would still be approximately $5 million.

further evidencing the Debtors' desire to scare away all potentially interested parties so as to preserve this valuable unencumbered asset for HPS's sole benefit. And make no mistake, HPS clearly sees value in this asset. In fact, HPS has stated ███████████████████████████████ ███████████████████████████████████████████████████████████████ ████████[28]

### B. Business Interruption Insurance Payments

46.     The Committee has also concluded that the BII Payments relating to the berm breach are unencumbered and should be available for unsecured creditors. As set forth in the Standing Motion, the Committee is seeking, *inter alia*, (i) a declaratory judgement that the BII Payments are unencumbered by the Prepetition Liens; and (ii) avoidance of any Prepetition Liens that allegedly encumber such BII Payments as a preferential transfer.

47.     Miller Buckfire estimates that the BII Payments have ███████████████ ███████████████ *See* Miller Buckfire Valuation, attached to the Rodrigue Decl. as Exhibit A at pg. 9. For purposes of a liquidation, the Committee believes that ███████████ ███████████████ According to the Houlihan Valuation, the BII Payments are ███████ ███████████████ *See* Houlihan Valuation, attached to the Posner Decl. as Exhibit H at pg. 27. However, Houlihan's valuation of the BII Payments is based on an unsupported and ███████████████, is otherwise flawed, and ███████████ ███████. *See* Rebuttal Report, attached to the Rodrigue Decl. as Exhibit B at pg. 25.

---

[28] 

48.    Based on the foregoing, the Committee believes that the liquidation value of the Unencumbered Assets, which conservatively totals approximately ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ would be distributable to unsecured creditors in a liquidation scenario and result in recoveries of approximately ████████ Such a recovery is a far cry from the proposed Plan recoveries of 0.4% – 1.3%, if any at all.[29]  In fact, even using the Debtors' artificially low values for the Unencumbered Assets, unsecured creditors would still receive in a liquidation an approximate ██████████████████, which is far greater than what unsecured creditors would receive under the current Plan.  As a result, the Plan fails to satisfy the best interests of creditors test under section 1129(a)(7) of the Bankruptcy Code and should not be confirmed.

## II.    The Plan Is Not "Fair And Equitable" Under Section 1129(b)(1)

49.    Although the voting results with respect to the Plan were not known to the Committee at the time this Objection was filed,[30] the Committee assumes for purposes of this Objection that Class 6 will not vote to accept the Plan by the margins required under section 1126(c) of the Bankruptcy Code.  Accordingly, the Debtors will be required to satisfy the requirements of section 1129(b)—the "cramdown requirements"—as to each class that does not vote to accept the Plan.  A plan may only be confirmed as to a dissenting creditor class if it does not discriminate unfairly and is fair and equitable.  11 U.S.C. § 1129(b)(1).

50.    Section 1129(b)(2)(B) describes how a plan may be "fair and equitable" to a class of impaired, non-accepting general unsecured claims.  11 U.S.C. § 1129(b)(2)(B).  The "fair

---

[29] As noted, in the event Class 6 votes to reject the Plan, recoveries for unsecured creditors would be zero.

[30] The Voting Deadline is October 17, 2019.

and equitable" standard "can be seen to have at least two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed." 7 Collier, *supra*, ¶ 1129.03[4][a].

### A.    The Plan is Not "Fair and Equitable" Because it Provides Value to the Prepetition Noteholders in Excess of the Value of Their Claims

51.    The second foundational component of the "fair and equitable" requirement—that no creditor may be paid more than it is owed—may be briefly summarized: "[o]nce the participant receives or retains property equal to its claim, it may receive no more." *Id.* at ¶ 1129.03[4][a][ii]. No claim or interest holder may be paid a "premium" in excess of the allowed amount of its claim. *Id.* For this reason, a plan that proposes to pay senior creditors value in excess of their allowed claim amounts is not "fair and equitable" under section 1129(b)(2)(B) of the Bankruptcy Code, and may not be confirmed. *See In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1110 (3d Cir. 1979) ("[A] plan is not 'fair and equitable' unless it provides participation for claims and interests in complete recognition of their strict priorities, and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan."); *In re Exide Techs.*, 303 B.R. 48 at 61 (denying confirmation of plan that afforded secured lenders value in excess of the amount of their claims); *In re Genesis Health Ventures, Inc.*, 266 B.R. at 612 ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

52.    Here, the Reorganized Debtors' TEV impacts whether the treatment of unsecured creditors under the Plan is fair and equitable. *See In re Exide Techs.*, 303 B.R. at 60-61 ("A determination of [a] Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b)."). As Plan proponent, it is the Debtors' burden to prove to this Court that the Plan does not afford any Class value in excess of the amount of its claim. *See, e.g.*, *In re Armstrong World Indus.*, 348 B.R. 111, 119 n.14, 120 (Bankr. D. Del.

2006) (plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code section 1129(a) and 1129(b)). The Debtors cannot carry their burden of proof.

53. The proposed Plan fails to satisfy the "fair and equitable" requirement under section 1129(b) because, based upon the analysis set forth in the Miller Buckfire Valuation, and assuming unsecured creditors vote to reject the Plan, the Plan transfers (i) 100% of the Reorganized Debtors' equity value worth $205 million (using a TEV of $390 million, the midpoint in the Miller Buckfire Valuation, less $185 million in debt and preferred equity to be issued); and (ii) approximately $85 million in preferred equity to Holders of Class 5 Prepetition Note Claims (worth at least $85 million), despite the fact that the Prepetition Notes Claims have an estimated value of only approximately $217 million. This results in a distribution to HPS of $73 million or more than they are owed. Such  treatment is antithetical to the Bankruptcy Code's "fair and equitable" requirement, especially where, as here, unsecured creditors are slated to recover as little as 0.4%, if anything at all.   As a result, the Plan cannot be confirmed.

54. Miller Buckfire prepared a valuation that conservatively concludes that the Debtors' TEV falls within a range of approximately $335 million to approximately $445 million, with a midpoint of approximately $390 million. Miller Buckfire's valuation is consistent with HPS's own prepetition value assessment on the Company, which valued the Company at approximately $289 million to $451 million.

55. In support of its valuation, Miller Buckfire also prepared a Rebuttal Report providing a specific factual analysis demonstrating the inherent and material flaws contained in the Houlihan Valuation and the credibility of the Miller Buckfire Valuation. In brief, the Houlihan Valuation contains numerous material errors that cause its conclusions regarding value to be

artificially depressed and, as a result, unreliable.  These errors are, among others: (i) the selection of an artificially low exit multiple and overstated discount rate in calculating TEV under the DCF analysis; (ii) the exclusion of logical peers in its selection of comparable companies, which results in a meaningfully lower multiple range under the Comparable Company Analysis; (iii) the fatal flaw of applying an EBITDA multiple against an unadjusted 2020E EBITDA, which is significantly impaired by the San Antonio, Texas berm breach and not representative of the Company's normalized operations; and (iv) the understatement of value of the Unencumbered Assets.

56.     The conclusions in the Houlihan Valuation are also discredited by HPS's own internal documents, which just prior to the Petition Date, calculated a TEV midpoint of approximately $370 million (and a high range of $451 million), which is $6 million *higher* than Miller Buckfire's high range of TEV.[31] ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████[32]

57.     The Miller Buckfire Valuation, however, corrects many of the errors and flawed assumptions utilized in the Houlihan Valuation.  Indeed, the Rebuttal Report prepared by Miller Buckfire highlights the flaws in the Houlihan Valuation and the corrections contained in the Miller Buckfire Valuation so as to address such flaws.  *See* Rebuttal Report, attached to the Rodrigue Decl. at Exhibit B.  Among those corrections are the following:

---

[31] *See* Mezzanine Watchlist, dated Sept. 17, 2019 attached to the Posner Decl. as Exhibit K [HPS0005959].

[32] *See* E-Mail from B. Pertuz, HPS, to P. Russo, HPS, copying D. Dimitrievich, HPS; R. Manideep, HPS, dated May 6, 2019, attached to the Posner Decl. as Exhibit E [HPS0032173].

| Categories | | Issues in Houlihan's Report<br>TEV: $180 million - $220 million | Correction |
|---|---|---|---|
| **Comparable Company Analysis** | **Unadjusted 2020E EBITDA** | • Houlihan applies an EBITDA multiple against the Company's 2020E EBITDA that is significantly impaired by the San Antonio berm breach. Houlihan applies equal weighting to an understated 2020E valuation and the 2021E valuation. | • The berm breach was a one-time event. Multiples should be applied to normalized 2020E EBITDA. |
| | **Selected Range of Comparable Company** | • Houlihan's multiple range is based on only two comparable companies: Hi-Crush and Smart Sand.  Houlihan excludes logical peers of the Debtors, including U.S. Silica Holdings, Inc. ("U.S. Silica") and Covia Holdings Corporation ("Covia"), in its selection of comparable companies, which results in a meaningfully lower multiple range.  This omission is inexplicable as both U.S. Silica and Covia are cited as competitors of the Debtors in the Debtors' 2018 Form 10-K filed with the Securities and Exchange Commission, the relevant portions of which are attached to the Posner Decl. as Exhibit L, and both Covia and U.S. Silica cite Emerge as a competitor in their respective filings the relevant portions of which are attached to the Posner Decl. as Exhibits M and N.  Moreover, recent equity research by Barclay's cites Hi-Crush Inc., Smart Sand, Inc. ("Smart Sand"), Covia and U.S. Silica as public comparable companies of the Debtors.  *See* Stifel Update, Barclays Update, and Jefferies Update attached to the Posner Decl. as Exhibits O, P, and Q, respectively. | • Covia and U.S. Silica should be included as comparable companies.. |
| | **Market Value of Debt** | • Houlihan calculates enterprise value using market value of debt, which significantly understates the value and multiples of the comparable companies. | • Total enterprise value should be calculated using face value of debt. The equity of the comparable companies is generally liquid and trades on the assumption that debt will be repaid at face value. |
| | **Selection of Comparable Companies** | • Since Houlihan only utilizes two comparable companies, a substantial portion of the comparable company analysis value is derived from Smart Sand, a company that trades at a noticeable discount to peers due | • The inclusion of additional comparable companies would reduce the reliance on Smart Sand and reduce the |

| Categories | | Issues in Houlihan's Report<br>TEV: $180 million - $220 million | Correction |
|---|---|---|---|
| | | to high exposure on take-or-pay contracts and recent customer litigation, set forth in Exhibits R attached to the Posner Decl. Additionally, Smart Sand only produces Northern White Sand, whereas the majority of the Debtors' value, as presented in management's business plan, is derived from in-basin operations in San Antonio. | idiosyncrasies of a limited sample size. Of all comparable companies, Smart Sand is perhaps the least relevant to Emerge due to its exclusive NWS business model, ongoing customer litigation and expiring take-or-pay contracts. As of June 30, 2019, Smart Sand reported $34.6 million of litigation related A/R balance, representing approximately 37%[33] of its market capitalization. |
| Discounted Cash Flow Analysis | WACC Based on Pro Forma Capital Structure | • 81% of Houlihan's weighted average cost of capital is based on the Company's pro forma capital structure, which was not negotiated at arms-length.<br><br>• It is generally appropriate to utilize a hypothetical industry capital structure when calculating the weighted average cost of capital. | • Valuation should utilize a WACC based on the median debt to equity ratios of the adjusted comparable companies universe and market debt metrics. |
| | Terminal Year & Terminal Multiple | • Terminal year EBITDA does not fully reflect a normalized level.<br><br>• Houlihan selected its terminal multiple based on two publicly traded comparables, which resulted in an artificially low range of multiples.<br><br>• Houlihan's exit multiple has a negative implied perpetuity growth rate, implying Emerge is liquidating over time. | • Valuation should use a long-term run rate EBITDA beyond the projection period (annualized 2H 2021). |
| | Size Premium | • Houlihan utilizes a size / distress premium of 11.14% resulting in a 40.0% cost of equity. | • A 6.85% size premium is the appropriate size premium for companies with equity capitalizations of $109.5 million to $184.8 million, |

---

[33] Per Bloomberg as of August 27, 2019.

| Categories | | Issues in Houlihan's Report<br>TEV: $180 million - $220 million | Correction |
|---|---|---|---|
| | | • Size premium reflects companies with a market capitalization of $2.5 million to $109.5 million. | per the Duff and Phelps 2018 Valuation Handbook – U/S. Cost of Capital. |



[35] *See* deposition of Mr. Richard Shearer attached to the Posner Decl. as Exhibit T at 151:8-13.

| Categories | | Issues in Houlihan's Report<br>TEV: $180 million - $220 million | Correction |
|---|---|---|---|
| | | | |
| | ██ | ██████████████ | ██████ |
| | | | ██████ |
| | | | |
| | ██ | ██████████████ | ██████ |
| | | | |

---

[36] On September 6, 2019, Sunoco filed a protective proof of claim of $10.127 million, comprising a $3.1 million Hydrotreater Completion Defect Claim and a $7.0 million Indemnification Notice Claim. ████████████████████████████████████████████████████████████████████

58.     For these reasons, the Court should rely on the Miller Buckfire Valuation, which demonstrates, among other things, that the Plan provides value to HPS that substantially exceeds the estimated $217 million in Prepetition Notes Claims.  Such a recovery violates the corollary of the absolute priority rule and as a result, the Plan cannot be found to be "fair and equitable" under section 1129(b)(1) of the Bankruptcy Code.

### III.    The Plan Should Not Be Confirmed Because It Is Not Proposed In Good Faith Under Section 1129(a)(3) Of The Bankruptcy Code

59.     To be confirmable, a plan of reorganization must be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  In determining whether a chapter 11 plan has been proposed in good faith, courts look to whether the plan is proposed "with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'"  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)).  "Whether a reorganization plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of section 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'"  *In re Chemtura, Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (citations omitted).  Good faith also requires a showing that the plan reflects "fundamental fairness in dealing with the creditors."  *See In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Jorgensen*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986)).  The Plan does none of this.

#### A.    The Failure to Conduct a Market Test for Value

60.     The Supreme Court has identified two purposes of Chapter 11: (1) preserving going concerns; and (2) maximizing property available to satisfy creditors.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n*, 526 U.S. at 453.  Here, the failure to conduct a market test for the Debtors assets

demonstrates that the Plan's purpose is contrary to one of the Bankruptcy Code's key objectives—maximizing value.

61.     Evidence adduced at the Confirmation Hearing will show that, notwithstanding the clear need for a market test, the Debtors made the conscious decision not to conduct one.  Indeed, Mr. Adam Dunayer of Houlihan acknowledged that Houlihan did not undertake a market test, "didn't need to [take the asset to market]" and failed to explore or analyze other options to sell the assets including through a 363 sale.  *See* Dunayer Depo. Tr. 99:13-21, 198:21.

62.     The Debtors' deliberate decision not to conduct a market test and instead negotiate with only one creditor demonstrates that the Debtors (and HPS) were not proposing the Plan in a manner that was consistent with maximizing value.  Indeed, the Plan is premised on what is effectively a private sale that has only three beneficiaries: (i) HPS, who will acquire substantially all of the Reorganized Debtors' equity; (ii) the Debtors' management team, who stand to gain from the upside of the New Management Incentive Plan; and (iii) Insight Equity, who despite being in a class junior to Class 6 unsecured creditors, is slated to receive a recovery in the form of New Warrants (if Class 6 votes to accept the Plan) notwithstanding that more senior classes will not be paid in full and, inexplicably, is receiving a broad sweeping release.  Clearly, the Debtors' decision not to conduct a market test runs counter to the Debtors' well-established obligation to maximize the value of their estates.[37]

---

[37] As noted above, despite the Debtors' failure to conduct any market test and their position that the Oklahoma Facility is essentially worthless to the estates, the Debtors received an unsolicited offer to purchase the Oklahoma Facility at an amount in excess of the estimated mechanics' liens. ▌ demonstrates that the Debtors are not discharging their duties to maximize value for all creditors but rather, are attempting to maximize value for one creditor: HPS.

**B.      The Negotiation of the Plan and the RSA**

63.      Approximately three months prior to the Petition Date, the Debtors entered into the RSA with Insight Equity and HPS.  *See* First Day Declaration, Exhibit B.  The RSA created the Special Restructuring Committee that was empowered with some control and decision-making authority regarding, among other things, the implementation of the RSA, the Plan and the exercise of the Debtors' fiduciary out.  ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████[38]  ████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████[39]

64.      With those highly troubling revelations, bolstered by incontrovertible written admissions of their veracity, the process through which the RSA and the Plan were negotiated and proposed reflects anything but fundamental fairness in dealing with creditors.  *See In re Chemtura Corp.*, 439 B.R. at 608.  To the contrary, it reflects a highly conflicted and tainted process that continues unimpeded and is being defended at all costs.

---

[38] *See* E-Mails between E. Davis, Pirinate Consulting, A. Dunayer, Houlihan Lokey, K. Simon, Latham & Watkins, B. Gaston, Ankura, and J. Zammit, Houlihan, dated May 3-4, 2019, attached to the Posner Decl. as Exhibit V [EMES00726228] (emphasis added).

[39] 

### C. The Combined Death Trap/Equity Recovery Provision

65.     But there is more.  The Plan itself includes provisions that easily demonstrate bad faith.  As the Court is aware, the Plan contains a so called "death trap" provision where the unsecured creditors' recovery is conditioned upon acceptance by that class.  While such a provision alone may be perfectly appropriate (assuming, of course, all other confirmation requirements, including the best interests test, are met), the death trap provision in this Plan is uniquely combined with a proposed distribution to the Debtors' "way out of the money" equity (i.e., Insight Equity, an insider that negotiated the RSA).  Undersigned counsel is not aware of other cases in which this combination has been employed, and it reeks.  The Debtors have actually proposed a plan that tells unsecured creditors (owed over half a billion dollars no less) that not only are they getting at most a minimal recovery, ***and*** that they only get it if they accept the plan, but "oh by the way", if they accept the Plan to get these crumbs, they thereby allow a party below them in the waterfall (the equity sponsor behind this mess no less) to also get a recovery.  What could be more repugnant to unsecured creditors?  It is hard to imagine what violates section 1129(a)(3) if this does not.

### D. The RSA Provides for an Impermissible Post-Emergence Release in Potential Contravention of this Court's Order

66.     The Committee has significant concerns regarding certain release terms set forth in the RSA.  While the Debtors are requesting that the Court approve the Debtor Releases, Third Party Releases, and exculpation provisions set forth in the Plan (discussed in further detail below), the RSA provides, in renegade fashion, that if the Court *does not approve* the release and exculpation provisions set forth in the Term Sheet attached to the RSA (substantially similar to those contained in the Plan), then HPS, as the controlling owner post-Effective Date, will cause the Reorganized Debtors to agree to provide such releases and exculpation "as promptly as

reasonably possible after the occurrence of the Effective Date." *See* RSA ¶ 5(b).  Indeed, the

Debtors have stated that they intend to assume the RSA.[40]  The Court should not countenance the

HPS's attempted end-run around this Court's orders and applicable bankruptcy law.

67.      As a result, this Court should deny confirmation of the Plan because it does not

comply with Bankruptcy Code section 1129(a)(3).

## IV.    The Plan is Not Confirmable Because the Releases are Inappropriate and Contravene Applicable Law

68.      The Debtor Releases and Third Party Releases contained in the Plan Article X

provide for broad releases of various non-Debtor parties (each, a "Released Party" and,

collectively, the "Released Parties")[41] in these Chapter 11 Cases, including HPS, Insight Equity,

---

[40] Deposition of Bryan Gaston, dated Oct. 23, 2019, attached to the Posner Decl. as Exhibit AA, 156:21-157:11.

[41] "Released Party" is defined in the Plan as, "collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Credit Agreement Agent and the Releasing Prepetition Credit Agreement Lenders; (e) the DIP Credit Agreement Agent and the DIP Credit Agreement Lenders; (f) the Prepetition Notes Agent and the Releasing Prepetition Noteholders; (g) the Releasing Old Emerge LP Equity Holders, and (h) each Specified Railcar Lessor, so long as the applicable New Railcar Lease Agreement(s) between the Debtors and the applicable Specified Railcar Lessor is in full force and effect as of the Effective Date; and in each case the respective Related Persons of each of the foregoing Entities. *See* Plan § I.C.

"Related Persons" is defined in the Plan as, "with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members and managing members), managers, managed accounts or funds, management companies, fund advisors, advisory or subcommittee board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the date of the Restructuring Support Agreement, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor shall constitute a Related Person." *Id.*

"Releasing Parties" is defined in the Plan to include: (a) the Debtors; (b) the Reorganized Debtors, (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Credit Agreement Agent and the Releasing Prepetition Credit Agreement Lenders; (e) the DIP Credit Agreement Agent and the DIP Credit Agreement Lenders; (f) the Prepetition Notes Agent and the Releasing Prepetition Noteholders; (g) the Releasing Old Emerge LP Equity Holders; (h) each Specified Railcar Lessor (to the extent it is Released

and current and former directors and officers. Section X.B.1 of the Plan (the "Debtor Releases")
provides that the Debtors and their Estates will release the Released Parties from "any and all
Claims, Causes of Action . . . whether directly or derivatively held . . . ," while Section X.B.2 (the
"Third Party Releases" and, together with the Debtor Releases, the "Releases") provides that an
extensive list of third parties (the "Releasing Parties") will release the Released Parties from the
same. *See* Plan §§ X.B.1 - 2.

### A.     The Debtor Releases are Inappropriate

69.     The Debtor Releases are impermissible.  Accordingly, the Plan cannot be confirmed
until the Debtor Releases are removed or substantially modified.  With respect to a debtor's release
of non-debtors as part of a chapter 11 plan, Courts in this District have routinely applied a non-
exclusive five-factor test set forth in *Master Mortgage* to determine whether such releases are
appropriate:

> (1) the "identity of interest between the debtor and the third party, . . . such that
> a suit against the non-debtor is, in essence, a suit against the debtor or will deplete
> assets of the estate";
>
> (2) substantial contribution by the non-debtor of assets to the reorganization;
>
> (3) the essential nature of the injunction to the reorganization to the extent that,
> without the injunction, there is little likelihood of success;
>
> (4) an agreement by a substantial majority of creditors to support the injunction,
> specifically if the impacted class or classes "overwhelmingly" votes to accept the
> plan; and
>
> (5) a provision in the plan for payment of all or substantially all of the claims of the
> class or classes affected by the injunction.

*In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935, 97 (Bankr. W.D. Mo. 1994); *see also In
re Abeinsa Holding, Inc.*, 562 B.R. 265, 282 (Bankr. D. Del. 2016) (applying the 5-factor Master

---

Party); and (i) those Holders of General Unsecured Claims or Old Emerge LP Equity Interests that do not
affirmatively opt out of the Third Party Release as provided on their respective ballots. *Id.*

Mortgage test to debtors' proposed release of third parties); *In re Wash. Mut. Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (the "factors articulated in Master Mortgage form the foundation" for the analysis of whether a debtor's release of third parties is appropriate); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (applying the five-factor Master Mortgage test to debtors' release of third parties).

70.     Although no single factor is dispositive, courts in this district have focused the analysis on whether the parties to be released have provided a substantial contribution to the plan. *See Wash. Mut.*, 442 B.R. at 349-50 (approving releases of parties that had waived significant claims against the debtors' assets and the estates but concluding that "there is no basis whatsoever for the Debtors to grant a release to directors and officers or any professionals . . . current or former . . . [because] there has been no evidence presented of any 'substantial contribution' made to the case by the directors, officers or professionals, justifying releases for those parties."). Courts do not grant third-party plan releases lightly, and the plan proponent bears the burden of establishing the appropriateness of the non-debtor releases. *See Zenith Elecs. Corp.*, 241 B.R. at 110 (releases by the debtor against third parties may be provided under certain limited circumstances); *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 43 (Bankr. D. Del. 2000) (noting that it is the debtors' burden to establish that releases are appropriate). Importantly, in order for a party to make a "substantial contribution" worthy of a plan release, the party must contribute something tangible to the Plan, whether in the form of cash or providing an "extraordinary service" to the case. *In re Wash. Mut., Inc.*, 442 B.R. at 348.

71.     Section X.B.1 of the Plan sets forth the exceedingly broad releases by the Debtors. Yet, the Plan fails to provide *any* analysis as to why the releases are essential to the reorganization and/or how the Released Parties have made a "substantial contribution" to support the proposed

34

releases.  *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (holding that releases must be given in exchange for fair consideration).  In fact, both members of the Special Restructuring Committee testified that they had not performed an analysis of the alleged substantial contributions the Released Parties made in order to obtain a release.  Transier Depo. Tr. 108:9-20, 109:25-111:9, 111:16-112:18-113:14; Davis Depo. Tr. 267:24-268:9.  Furthermore, both members of the Special Restructuring Committee, which members are empowered with the authority to implement the restructuring transactions set forth under the RSA through these Chapter 11 Cases and the Plan, admitted that the ***Special Restructuring Committee had not made any inquiry or investigation into any potential claims or causes of action against Insight Equity, HPS or any members of the Board*** (as defined below).[42]  Despite this lack of inquiry ***and*** investigation, the Debtors now propose to release a wide swath of claims and causes of action in exchange for no value whatsoever.  Highlighting the uncertainty of whether valuable causes of action are being released under the Plan is the fact that Mr. Davis curiously testified that the Plan is not releasing Insight Equity, directors and officers, or any other parties related to the June 2019 berm breach until the Special Restructuring Committee completes its investigation into the berm breach.[43]  Yet, that is contrary to the release provisions of the Plan, which contain no such exception.

72.    To justify the Debtor Releases of HPS, the Committee anticipates that the Debtors will argue that HPS provided a "substantial contribution" to these Chapter 11 Cases by way of the DIP Facility.  This argument misses the mark because this supposed "contribution" is not a contribution at all.  Indeed, in exchange for this "contribution," and *in addition* to the proposed

---

[42] *See* Transier Depo. Tr. 113:20-114:11, 119:10-125:25; Davis Depo. Tr. 258:19-265:7, 275:14-24.

[43] Davis Depo. Tr. 262:11-266:13; 281:14-283:7.

releases by the Debtors (and many other lender-favorable protections), HPS is slated to receive, among other things, repayment of all indebtedness incurred under the DIP Facility, including substantial fees, interest, and approximately $39 million in amounts rolled-up from the Prepetition Credit Agreement, by way of the proceeds derived from the Exit Facility.  Such a result cannot be described as a "substantial contribution," or any contribution, that warrants a broad sweeping release.  Instead, it is more appropriately characterized as a calculated investment to achieve HPS's ultimate endgame of owning the Reorganized Debtors while also receiving millions of dollars in fees related to the DIP Facility, payment of all of its legal fees, a creeping roll up of the Revolving Loan and interest on the Revolving Loan.

73.     The Debtors also fail to explain why Insight Equity, which wholly owns the general partner, Emerge Energy Services GP LLC (the "General Partner"), should receive a Debtor Release (let alone a distribution under the Plan).  With respect to the Debtor Release, Insight Equity cannot be said to have made a substantial contribution to the Debtors and these Chapter 11 Cases.  Pursuant to the RSA, the General Partner delegated the power and authority related to the management and control of the Debtors to the Board of Directors of the General Partner (the "Board").  Subsequently, the Board executed a Voting and Standstill Agreement and Voting Proxy abdicating the Board's powers, including all control and decision-making authority for the Debtors in its restructuring and these Chapter 11 Cases, to the Special Restructuring Committee in accordance with the Amended and Restated Charter for the Special Restructuring Committee.[44] Insight Equity agreed to the abdication of the Board's powers to the Special Restructuring Committee in order to complete the transactions contemplated under the RSA, including the

---

[44] The RSA with the Voting and Standstill Agreement, Voting Proxy, and Amended and Restated Charter for the Special Restructuring Committee dated April 18, 2019, attached to the Posner Decl. as Exhibit BB.

distribution of the Debtors' equity to HPS (and potentially warrants to itself).  Indeed, a member

of the Special Restructuring Committee ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████[45]  Against this context, it is clear that Insight Equity's

contribution to these cases was for the benefit of HPS and itself.  Such a contribution is not

sufficient for a third party release in favor of Insight Equity and sets a dangerous precedent that

"out of the money" equity sponsors can receive plan releases for what is essentially just agreeing

to  get out of the secured lender's way.

       74.    With respect to the proposed releases for current and former directors and officers,

not only did such parties fail to provide any discernable contribution to warrant the broad releases

contained in the Plan, but certain of those directors and officers may be rewarded by the New

Management Incentive Plan.  *Wash. Mut.*, 442 B.R. at 354 ("[T]here is no basis for granting third

party releases of the Debtors' officers and directors , . . . . [as] [t]he only 'contribution' made by

them was in the negotiation of the Global Settlement and the Plan, [which] activities are nothing

more than what is required of directors and officers of debtors in possession (for which they have

received compensation and will be exculpated) . . . ."); *see also In re Aegean Marine Petroleum

Network, Inc.,* 599 B.R. 717, 728-29 (Bankr. S.D.N.Y. 2019) (Wiles, J.) ("I am sure that [the

officers and directors of non-bankrupt companies] would also like to dispose of potential litigation

claims against them as a reward for the work that they have done.  But that is not recognized as a

ground on which to terminate litigation claims outside of bankruptcy.  There is no reason why it

should constitute an excuse to terminate litigation claims just because a company is emerging from

bankruptcy . . . the directors did what they were paid to do, and that does not mean they are entitled

---

[45] Davis Depo. Tr. 256:13-15.

to releases of third-party claims, particularly when those releases really are not necessary or important to the accomplishment of the restructuring transactions."); *see In re Boomerang Tube, Inc.*, 548 B.R. 69 (Bankr D. Del. 2016), H'rg Tr. at 9:16–9:19 ("The Court concludes that simply negotiating a plan is not a sufficient substantial contribution by a director and officer, such as to warrant a release.").

75.     Put simply, there are no facts present here to support that Released Parties provided a substantial contribution that warrants a proposed Debtor Release.  Furthermore, the Debtor Releases also fall short of the five-factor test in that the Plan does not pay substantially all of the claims of Class 6 creditors, or anything remotely close to it.  In fact, if Class 6 votes to reject the Plan, the Plan proposes to pay unsecured creditors nothing and the Debtor Releases will still remain intact.  Furthermore, it remains to be seen if a substantial majority of creditors voted to accept the Plan and the Debtor Releases contained therein.  For these reasons, the proposed Debtor Releases are impermissible and cause the Plan to be unconfirmable as a matter of law.

**B.     The Non-Consensual Third-Party Releases are Impermissible**

76.     Although the Third Circuit has not adopted a *per se* rule that nonconsensual third-party releases are impermissible, it has made clear that such releases are proper only in extraordinary cases.  *In re Cont'l Airlines*, 203 F.3d 203, 212 (3d Cir. 2000) (concluding that third-party releases are valid only in "extraordinary" circumstances; *see also In re Genesis Health Ventures, Inc.*, 266 B.R. at 608 (interpreting *Continental*'s holding on non-debtor releases to mean that, "limiting the liability of non-debtor parties is a *rare thing that should not be considered absent a showing of exceptional circumstances* in which several key factors are present") (emphasis added) (citation omitted).  Recently, the Bankruptcy Court for the Southern District of New York reiterated "just how extraordinary a thing it is" to impose involuntary releases, noting that bankruptcy courts "should do so only in those extraordinary cases where a particular release is

38

essential and integral to the reorganization itself." *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. at 727 ("Getting a release may be a comfort the parties would like to have, but releases are not supposed to be imposed involuntarily just to make people feel better."). These Chapter 11 Cases are not reflective of such rare or extraordinary cases.

77.     In the Third Circuit, the Debtors must satisfy the *Continental* standard for the Court to approve the nonconsensual Third Party Releases sought by the Debtors through the Plan.   In general, to determine whether nonconsensual third party releases are appropriate, the Court in *Continental* and its progeny have looked to certain "hallmarks": "fairness, necessity to the reorganization, and specific factual findings to support these conclusions."   203 F.3d at 214-15 (noting that the debtors had failed to show the necessity of the injunction where they had not demonstrated that the success of the reorganization hinged in any way on the issuance of the injunction).   Factors courts have considered when determining to approve nonconsensual third party releases are: (i) whether the releases "were given in exchange for reasonable consideration"; (ii) whether the success of a debtor's reorganization bears a relationship to the release and permanent injunctions; and (iii) whether the non-debtors "provided a critical financial contribution to the" debtor's plan "that was necessary to make the plan feasible in exchange for receiving a release of liability."   *Id.*; *see also In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012) ("in order for a reorganization plan that includes an injunction barring third-party claims against non-debtors to be approved, the injunction must be "both necessary to the reorganization and fair" under 11 U.S.C. § 105(a)); *accord In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (quoting *Cont'l Airlines*) (nonconsensual releases permitted in exceptional circumstances when adequate record in support was developed); *In re Prussia Assoc.*, 322 B.R. 572, 596 (Bankr. E.D. Pa. 2005) (citing *Cont'l Airlines*); *In re Exide Tech.*, 303 B.R. at 72 (same); *see also In re Genesis Health*

*Ventures, Inc.*, 266. B.R. at 608 (finding that nonconsensual third party release was a "rare thing" that should only be considered in exceptional circumstances); *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010) (finding that third party releases of claims held by parties who are receiving no contribution under the plan is not appropriate).

78.     Section X.B.2 of the Plan provides third party releases of the Debtors, HPS, Insight Equity, the Debtors' current and former directors and officers, and a litany of other third parties. The effect of the third-party releases is to improperly insulate not only the Debtors, but HPS and Insight Equity from any and all prepetition causes of action. Yet, as discussed above, the Debtors provide little analysis as to why these chapter 11 cases are extraordinary such that they require broad sweeping third party releases. The absence of any real disclosure leads to the inescapable conclusion that such a showing cannot be made. Indeed, the Committee is hard pressed to think of how the Debtors' current *or former* directors, officers, and managers were essential to the Debtors' reorganization so as to receive a third party release. As recognized in *Spansion*, efforts by a debtors' directors and officers in planning and negotiating the plan do not "rise to the level of the 'critical financial contribution' contemplated in *Continental* and *Genesis* that is needed to obtain approval of non-consensual releases." *Spansion*, 426 B.R. at 145. The same also rings true for Insight Equity and HPS, as these parties have not demonstrated an identity of interest between them and the Debtors or made any "substantial contribution" to these cases. *Cf. Millennium Lab Holdings II, LLC*, Case No. 15-12284 (LSS), Hr'g Tr. 16:12-26:8 (Bankr. D. Del. Dec. 11, 2015) (demonstrating an identity of interest through indemnification and advancement obligations and providing substantial contributions in the form of, among other things, a $325 million payment).

79.     Put simply, the facts of these cases do not warrant approval of the nonconsensual Third Party Releases requested in the Plan, and the Debtors cannot carry *their* burden to

demonstrate that these releases satisfy the standards set forth in *Continental*. Accordingly, the Third Party Releases contravene applicable law and should be excised entirely from the Plan.

80.     The Debtors will likely argue that the Third Party Releases are "consensual" due to the opt-out election on the ballot and urge this Court to follow Judge Shannon's ruling in *Indianapolis Downs*. *See In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013). However, *Indianapolis Downs* is distinguishable to these cases because the Debtors here have proposed a death trap for creditors who will relinquish any recovery if they vote against the Plan. Moreover, in *Wash. Mut.*, Judge Walrath held, and cited several cases that stood for the proposition, that the Court "does not have the power to grant a third party release of a non-debtor." *In re Wash. Mut., Inc.*, 442 B.R at 352. As is discussed at length above, and as will be demonstrated at the Confirmation Hearing, unsecured creditors are, in fact, "in the money" despite the Disclosure Statement and Plan stating otherwise. However, because the Plan is premised on unsecured creditors receiving a *de minimis* recovery or no recovery, creditors have no incentive to pay postage to vote on the Plan, let alone opt-out of the Third Party Releases. For these same reasons, it is also unfair for unsecured creditors who abstain from voting to be deemed to consent to the third party releases. The woeful facts laid out in the Disclosure Statement and Plan combined with the lack of incentive to participate is exactly what the Debtors (and all of the Released Parties) are counting on. Under these facts, it is unfair to force creditors to affirmatively opt-out of the Third Party Releases.

81.     Based on the foregoing, the Committee submits that the proposed nonconsensual third party releases contravene applicable law and render the Plan unconfirmable.

**V.      The Exculpation Provision in the Plan Exceeds the Scope of Section 1125(e) of the Bankruptcy Code**

82.      Section X.E of the Plan provides that the Released Parties will be exculpated from

liability for, in relevant part:

> any claims, Causes of Action or Released and Settled Claim arising prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan

Plan § X.E.

83.      The Plan's exculpation provision is inconsistent with applicable law in this District

because it includes parties other than the estate fiduciaries.  *See In re Indianapolis Downs, LLC*,

486 B.R. at 306 ("The Exculpations under the Plan as modified and filed with the Court are limited

so as to apply only to estate fiduciaries. The Third Circuit has held that 'a creditors' committee, its

members, and estate professionals may be exculpated under a plan for their actions in the

bankruptcy case except for willful misconduct or gross negligence.'" (citations omitted)); *see also*

*In re Wash. Mut., Inc.*, 442 B.R. at 350-51 (limiting exculpation clause to estate fiduciaries who

have served during the chapter 11 proceeding: estate professionals, the committee and their

members, and the debtors' directors and officers); *In re Tribune*, 464 B.R. 126, 189 (Bankr. D.

Del. 2011) (same); *In re PTL Holdings LLC*, No. 11-12676 (BLS), 2011 WL 5509031, at *11-12

(Bankr. D. Del. Nov. 10, 2011) (holding exculpation "must be reeled in to include only those

parties who have acted as estate fiduciaries and their professionals").

84.      Even worse, the Plan's exculpation provision is in direct contravention of this

Court's specific instructions regarding same.  *See* Disclosure Statement Hr'g Tr. 91:5–15, Sept. 9,

2019 [D.I. 248] ("With respect to the exculpation, I will preview my thoughts on that. I think it's very clear what the district requires. Non-estate fiduciaries in this district are not entitled to get exculpation, so you can either proceed soliciting with what you have in the plan or you can just scale it back -- essentially scale it back now or scale it back later, but it's going to be scaled back."). The Debtors' refusal to entertain this Court's specific instructions regarding certain Plan provisions highlights the "by any means necessary" approach the Debtors and HPS are taking in confirming the Plan.

85.     Thus, unless all entities or persons that are not estate fiduciaries are removed from the exculpation provision, it violates the Bankruptcy Code, and the Plan cannot be confirmed.

## VI.    Additional Confirmation Objections

86.     In addition to the concerns raised above, the following additional provisions are objectionable and should not be approved as part of the proposed Plan:

- **Avoidance Actions:** The Plan provides that the Reorganized Debtors will retain all Causes of Action, including Avoidance Actions, and shall have the exclusive right to enforce, sue on, settle, compromise, transfer or assign such actions. Plan § X.F. Avoidance powers are intended to allow a debtor-in possession or a trustee to recover certain payments for the benefit of unsecured creditors. Avoidance Actions should not be pursued for the exclusive benefit of a secured creditor. Accordingly, such actions should be transferred to a trust and preserved for the benefit of unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("when recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors").

- **Dissolution of Creditors' Committee:** Section XII.R of the Plan provides that on the Effective Date, the Committee shall automatically dissolve and the Reorganized Debtors "shall not be responsible for paying any fees, costs or expenses incurred by the members, professionals, or advisors to any Committee after the Effective Date." The Plan should provide that, notwithstanding the Committee's dissolution, the Committee shall continue to exist and be compensated for: (i) fees and expenses incurred in connection with requests for payment of Professional Fee Claims and reimbursement of expenses of members of the Committee, including preparing, defending, objecting and attending any hearings related to such requests; and (ii) any appeals of the Confirmation Order or other appeal to which the Committee is a part.

- **Disclosure of New Board Members:** The Plan fails to satisfy the requirements of section 1129(a)(5) of the Bankruptcy Code, requiring, among other things, the disclosure of the identities and affiliations of any individual proposed to serve as a director, officer or voting trustee of the debtor. *See* 11 U.S.C. § 1129(a)(5). The Committee submits that the Debtors should disclose the identity and affiliations (and compensation, if appropriate) of all new Board Members at or prior to the Confirmation Hearing.

## CONTESTED MATTER

87.     Pursuant to Bankruptcy Rule 9014, confirmation of the Plan is a contested matter and the Committee reserves all rights to seek discovery and present evidence at the Confirmation Hearing.

## RESERVATION OF RIGHTS

88.     The Committee reserves its rights to raise such other or further objections to the Plan as may be necessary or appropriate at or prior to the Confirmation Hearing.

## CONCLUSION

89.     Based on the foregoing, the Committee respectfully requests that the Court enter an order (i) denying confirmation of the Plan; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: October 15, 2019
      Wilmington, Delaware

Respectfully submitted,

**POTTER ANDERSON & CORROON LLP**
*/s/ Jeremy W. Ryan*
Jeremy W. Ryan (DE Bar No. 4057)
Christopher M. Samis (DE Bar No. 4909)
L. Katherine Good (DE Bar No. 5101)
Aaron H. Stulman (DE Bar No. 5807)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: jryan@potteranderson.com
      csamis@potteranderson.com
      kgood@potteranderson.com
      astulman@potteranderson.com

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd C. Meyers (admitted *pro hac vice*)
David M. Posner (admitted *pro hac vice*)
Kelly Moynihan (admitted *pro hac vice*)
The Grace Building
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: tmeyers@kilpatricktownsend.com
      dposner@kilpatricktownsend.com
      kmoynihan@kilpatricktownsend.com

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Lenard M. Parkins (admitted *pro hac vice*)
700 Louisiana Street, Suite 4300
Houston, TX 77002
Telephone: (281) 809-4100
Facsimile: (281) 929-0797
Email: lparkins@kilpatricktownsend.com

*Counsel to the Official Committee of Unsecured
Creditors of Emerge Energy Services LP, et al.*